**GOTTLIEB & GORDON LLP**
Derrelle M. Janey
The Trinity Building
111 Broadway, Suite 701
New York, New York 10006
(212) 566-7766
(212) 374-1506 (fax)
*Attorneys for Plaintiff John Cottam*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------- x

|  |  |
|---|---|
| **JOHN COTTAM,** | : Case No. |
| Plaintiff, | : |
| -against- | : |
| **GLOBAL EMERGING CAPITAL GROUP, LLC, ALEXANDER KIBRIK, WILLIAM UCHIMOTO, 6D GLOBAL TECHNOLOGIES, INC., 6D ACQUISITIONS, INC., and TEJUNE KANG,** | : **COMPLAINT AND** <u>**DEMAND FOR JURY TRIAL**</u> |
| Defendants. | : |

--------------------------------------------------------- x

JOHN COTTAM ("Dr. Cottam" or "Plaintiff"), for his complaint against GLOBAL

EMERGING CAPITAL GROUP, LLC, ALEXANDER KIBRIK, WILLIAM UCHIMOTO, 6D

GLOBAL TECHNOLOGIES, INC., 6D ACQUISITIONS, INC., and TEJUNE KANG

(collectively, "Defendants"), alleges as follows:

<u>**JURSIDICTION AND VENUE**</u>

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 (federal question) and 1332 (diversity), and 15 U.S.C. § 78aa.  Additionally, this Court

has supplemental jurisdiction of the state law claims asserted herein pursuant to 28 U.S.C.

§ 1367(a).

2.      The amount of damages at issue exceeds $75,000.00, exclusive of interest and costs.

3.      This Court has personal jurisdiction over each of the Defendants because they reside in New York State, they regularly transact or have transacted business in New York State, their conduct giving rise to this complaint was directed towards and/or had an effect in New York State, or they agreed to be subjected to the jurisdiction of New York.

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 78aa.  A substantial part of the events or omissions giving rise to the claim occurred in this District; one or more Defendants resides or maintains offices within New York State, generally, and this District, in particular; and one or more Defendants agreed that one or more of the claims asserted herein should be adjudicated in New York State.[1]

## PARTIES AND RELEVANT NON-PARTIES

5.      Plaintiff, Dr. Cottam, is a natural person who, at all relevant times, was over the age of 18.  Dr. Cottam is a dermatologist and maintains his residence in Florida.

6.      Defendant Global Emerging Capital Group, LLC ("GECG") is a Pennsylvania limited liability company with a principal office address of 44 Wall Street, 12th Floor, New York, New York 10005.  GECG is broker/dealer registered with the SEC under SEC No. 8-66308 and CRD No. 130120.  GECG is a resident of Pennsylvania and New York.  At all times relevant to this complaint, GECG operated under its former name, Radnor Research & Trading Company, LLC ("Radnor").[2]

---

[1]      The Subscription Agreement, as defined herein, provides that any claims arising from the Subscription Agreement are to be commenced in a federal or state court within New York State.

[2]      On or about February 25, 2016, Radnor officially changed its name to Global Emerging Capital Group, LLC by causing a certificate of amendment to be filed with Pennsylvania's Department of State.

7.      Defendant Alexander Kibrik ("Kibrik") is a registered representative with CRD No. 5557827.  Kibrik was employed by Radnor from May 2011 through July 2015, when, upon information and belief, he was terminated for cause.  Upon information and belief, Kibrik is a resident of New York.  At all relevant times, in his communications and dealings with Dr. Cottam as his investment advisor, Kibrik acted as Radnor's employee and agent.

8.      Defendant 6D Global Technologies, Inc. ("6D Global") is a Delaware corporation headquartered in New York at 17 State Street, Suite 2550, New York, New York 10004. Accordingly, 6D Global is a citizen of New York and Delaware.  6D Global traded on the NASDAQ exchange under the ticker symbol "SIXD."  NASDAQ has suspended trading of 6D Global's shares.

9.      CleanTech Innovations, Inc. ("CleanTech") was a NASDAQ-listed company (ticker symbol "CTEK") domiciled in Nevada with operations in China.  CleanTech designed and manufactured structural towers for megawatt-class wind turbines.  As described more fully herein, CleanTech changed its name to 6D Global.

10.     Initial Koncepts, Inc., d/b/a Six Dimensions ("Six Dimensions"), was a California corporation with offices in California, Ohio and New York.  It operated as a technology services provider.

11.     Defendant 6D Acquisitions, Inc. ("6D Acquisitions"), a Nevada corporation, was a special purpose vehicle formed for the purpose of investing in the reorganized company that followed a share exchange between CleanTech and Six Dimensions.  The reorganized company was 6D Global.  6D Acquisitions dissolved on or around October 22, 2014.

12.     Defendant Tejune Kang ("Kang") has been 6D Global's Chairman and CEO since September 2014.  Kang resides in New York.  According to filings with the SEC, Kang owns

3

29.7% of 6D Global's outstanding shares of common stock.  Kang was also the CEO and President of 6D Acquisitions.

13.     Non-Party Benjamin Tianbing Wei a/k/a Benjamin Wey ("Wey") resides in New York.  He is the subject of numerous lawsuits related to his orchestration and manipulation of the stock prices of various companies through his undisclosed and controlling ownership therein. Among other matters, he is a defendant in a civil action in this District commenced by the United States Securities and Exchange Commission (the "SEC") alleging violations of the federal securities laws in connection with some of the entities named in this Complaint.  *See SEC v. Wey, et al.*, 15-CV-7116 (S.D.N.Y.) (PKC) (the "SEC Action").  A copy of the Amended Complaint in the SEC Action, filed on November 9, 2015, is annexed hereto as Exhibit A and is incorporated herein by reference.  Wey is also currently under Indictment in this District for, *inter alia*, conspiring to violate federal securities laws and commit money laundering (the "Criminal Action") as a result of his conduct underlying the allegations set forth in the SEC Action.  A copy of the Indictment is attached hereto as Exhibit B and is incorporated herein by reference.

14.     Defendant William Uchimoto ("Uchimoto") is an attorney licensed to practice in Pennsylvania.  Uchimoto is a citizen of Pennsylvania, where he resides.  Uchimoto transacts business within New York State.  During the relevant time period, he was Radnor's (now GECG) regulatory legal counsel, and, *inter alia*, advised Radnor regarding Radnor's conduct in New York in connection with the facts underlying this Complaint.  Upon information and belief, during the relevant time period, Uchimoto also acted as Wey's personal legal counsel and as legal counsel for Wey's entities, including CleanTech, and was involved with the share exchange between CleanTech and Six Dimensions.  Uchimoto is also a defendant in the SEC Action.

## FACTS

15.     In early September 2014, Dr. Cottam was approached by Kibrik, his investment representative at Radnor, who presented Dr. Cottam with a Private Confidential Offering (the "Offering") as a possible lucrative investment.  The Offering was an investment in 6D Acquisitions, a "special purpose vehicle" created for the purpose of investing in the reorganized company (6D Global) following a share exchange between CleanTech and Six Dimensions (the "Share Exchange").  As disclosed in the materials Kibrik presented to Dr. Cottam and filings with the SEC, the purpose of the Offering was to infuse capital of between a minimum of $3,000,000.00 and a maximum of $5,100,000.00 into 6D Global.  The materials and SEC filings further stated that the successful completion of the Offering was a mandatory prerequisite to the consummation of the Share Exchange.

16.     As set forth herein, to induce Dr. Cottam to invest money in the Offering, Defendants at various times made oral and written representations to Dr. Cottam knowing they were false when made and omitted material information in their communications with Dr. Cottam.

17.     In connection with the Offering, in early September 2014, Kibrik provided Dr. Cottam with a document, dated June 17, 2014, entitled "Confidential Subscription Documents" (the "Subscription Documents").[3]

18.     Included within the Subscription Documents was a subscription agreement (the "Subscription Agreement"), which set forth the terms of the Offering.  The Subscription Agreement explicitly represented that "[t]here are no material misstatements or omissions in this Subscription Agreement or any information provided in the Offering materials."

---

[3]     A copy of the Subscription Documents is attached hereto as Exhibit C and incorporated herein by reference.

19.     As described in the Subscription Agreement, the contemplated Share Exchange was for CleanTech to issue approximately 50% of its outstanding shares of common stock to the shareholders of Six Dimensions in exchange for all of Six Dimensions' outstanding shares, the net result of which was to render Six Dimensions a wholly-owned subsidiary of CleanTech as depicted in Diagram 1 below.

20.     As one of the conditions for the Share Exchange to occur, prior to or simultaneous with the Share Exchange, CleanTech was required to change its name to "6D Global Technologies, Inc." and obtain approval for its stock to be listed on the NASDAQ Capital Market.

**Diagram 1: Net Result of Share Exchange as Represented in Subscription Agreement**



21.     The Subscription Agreement identified Radnor as the exclusive placement agent (the "Placement Agent") for the Offering.  As Placement Agent, Radnor was set to earn a substantial economic windfall with a successful Offering.  The Subscription Agreement disclosed that Radnor's Placement Agent fee was 15% of the Offering, which represented up to

2,550,000 shares in 6D Global.  Although not disclosed to Dr. Cottam in the Subscription

Agreement or elsewhere, Radnor's fee also included a 10% cash commission based upon the

total proceeds invested through the Offering.

22.     With the intent to induce Dr. Cottam to invest in the Offering, in September 2014,

**prior** to Dr. Cottam's investment, Kibrik represented to Dr. Cottam that a return of 15 – 30 times

his investment through this Offering would not be unrealistic.

23.     Pursuant to the Offering, investors could purchase "Units" for $15,000.00 per

Unit.  Each Unit consisted of fifty-thousand (50,000) shares of 6D Acquisitions common stock.

24.     The terms of the Subscription Agreement were unequivocal: for every one share

of 6D Acquisitions stock purchased through the Offering, the investor would receive one share

of 6D Global stock.  In particular, the Subscription Agreement provided:

> **Immediately upon the closing and effectiveness of the Share Exchange, each
> share of Common Stock underlying the Units purchased herein shall be
> automatically converted on a 1:1 basis into shares of [6D Global's] Nasdaq
> listed common stock (the "Financing Security Exchange"), such shares shall
> be distributed to the Subscribers herein and [6D Acquisitions] shall
> subsequently be dissolved.**

25.     The Subscription Agreement also similarly stated:

> **WHEREAS, upon completion of the Offering and immediately upon the
> closing of the Share Exchange, all of the Company's common stock
> underlying the Units (as defined herein) offered hereby will be automatically
> exchanged into shares of [6D Global] on a 1:1 basis.**

26.     On or about September 18, 2014, relying on, *inter alia*, the clear terms of the

Subscription Agreement and Kibrik's promise of receiving a considerable return on his

investment, Dr. Cottam purchased a total of 58 Units through the Offering for $870,000.00,

representing 2,900,000 shares of common stock in 6D Acquisitions.  On or about September 25,

2016, Dr. Cottam caused $870,000.00 to be wired to the escrow agent identified in the Subscription Documents.

27.     Upon information and belief, Dr. Cottam was one of the largest investors, if not the largest investor, in the Offering.

28.     On September 29, 2014, CleanTech and Six Dimensions merged pursuant to a reverse merger.  As described more fully below, prior to Dr. Cottam's investment in the Offering, the undisclosed plan to engage in a reverse merger was not communicated to Dr. Cottam by any Defendant.

29.     Pursuant to the clear and explicit terms of the Subscription Agreement providing for a 1:1 share purchase, and the representations of Kibrik acting on behalf of Radnor, Dr. Cottam expected and should have obtained 2,900,000 shares of 6D Global following the September 29 Share Exchange, as depicted in Diagram 2 below.

**Diagram 2: Dr. Cottam's Investment as Represented in the Subscription Agreement**



30.    Dr. Cottam did not receive the correct number of shares.  Dr. Cottam instead received a total of 420,290 shares in 6D Global, 2,479,710 fewer shares than he should have received pursuant to the clear and unambiguous language of the Subscription Agreement.

31.    Defendants did not inform Dr. Cottam that he would be receiving 420,290 shares of 6D Global rather than 2,900,000 shares prior to his investment in the Offering.

32.    Relying on the clear language of the Subscription Agreement, following the Share Exchange, Dr. Cottam believed he owned 2,900,000 shares of 6D Global.  It was not until around April 2015, when he attempted to sell his shares, as set forth below, that he learned of the share deficiency.

33.    After learning of the share deficiency, in or around April 2015, Dr. Cottam demanded an explanation from Kibrik and Radnor as to why he did not receive the correct number of shares.  They failed to provide him with an explanation.  Over the next couple of months, Dr. Cottam made repeated demands to Kibrik and Radnor for an explanation as to why he had received over 2.47 million fewer shares in 6D Global than what he should have.

34.    On or about May 21, 2015, Dr. Cottam was eventually contacted by Uchimoto, who identified himself as Radnor's counsel and asked that Dr. Cottam call to discuss Dr. Cottam's questions.

35.    In text and email communications between Dr. Cottam and Uchimoto in the late spring/early summer 2015, Uchimoto provided Dr. Cottam with nothing more than a manufactured explanation designed to cover up the fraud and deceit that had occurred with respect to Dr. Cottam's investment.  According to Uchimoto, Dr. Cottam received fewer shares in 6D Global than what was set forth in the Subscription Agreement because of two reverse stock splits in CleanTech that had occurred prior to the Share Exchange.  According to Uchimoto, the

shares of 6D Global issued to Dr. Cottam were reduced proportionally with these two reverse stock splits.

36.     The first reverse stock split (on a 1:3 basis) of CleanTech stock occurred on July 14, 2014.  The Subscription Agreement, which Kibrik and Radnor provided to Dr. Cottam in September 2014, did not disclose that this reverse stock split had occurred two months earlier.

37.     The second reverse stock split (on a 1:2.3 basis) occurred on September 25, 2014, after Dr. Cottam had signed the Subscription Agreement and only four days prior to the consummation of the Share Exchange.  Even if Uchimoto's explanation was valid as to the effect on the shares allocated to Dr. Cottam, this fact was not communicated to Dr. Cottam at the time, and, in reality, is simply a red-herring.

38.     Dr. Cottam repeatedly asked Uchimoto to communicate with him in writing and, in particular, to provide documentation to support this contrived explanation; however, Uchimoto provided no such documentation.

39.     Contrary to Uchimoto's purported explanation, the status of CleanTech's stock, including whether it underwent any reverse stock split, was irrelevant to the number of shares Dr. Cottam was to receive in 6D Global, the reorganized entity (as defined in the Subscription Agreement).  The Subscription Agreement was unambiguous; it contained no language predicating the number of shares of 6D Global that Dr. Cottam was to receive on the number of CleanTech shares.

40.     In fact, the Subscription Agreement clearly stated that the offering price of the Units was completely unrelated to the "value, assets or other objective criteria of value" of CleanTech.  Thus, the number of 6D Acquisition shares to be purchased through the Offering

(which was based upon the Unit offering price of $15,000.00/Unit with each Unit representing 50,000 shares) in 6D Acquisitions was completely unrelated to the value of CleanTech.

41.     Neither Kibrik nor Radnor disclosed the reverse share splits in any of their communications with Dr. Cottam prior to his investment in the Offering.

42.     None of the Defendants bothered to amend the Subscription Agreement to correct its material misstatements and omissions or otherwise notify Dr. Cottam of its material misstatements and omissions.

43.     Dr. Cottam invested in 6D Acquisitions, which by the clear terms of the Subscription Agreement, was intended to purchase shares on a 1:1 basis from the newly reorganized entity: 6D Global.  Dr. Cottam purchased 2,900,000 shares of 6D Acquisitions, and, therefore, he should have received 2,900,000 shares of 6D Global.

**Additional Material Misrepresentations and
Omissions Regarding the Offering**

44.     In addition, Defendants individually and collectively made other material misrepresentations and omissions in connection with the Offering, as set forth below.

**Defendants misrepresented that the Share Exchange was not a reverse merger**

45.     Dr. Cottam did not want to invest in a reverse merger; nor did he want to invest in any transaction involving a shell corporation.  Before investing in the Offering, Dr. Cottam sought certain assurances from Kibrik and Radnor, as the Placement Agent and his financial advisors, that the Offering did not involve either of those situations.  On several occasions, Dr. Cottam asked Kibrik whether the Offering was a reverse merger or involved a shell corporation. Kibrik denied that it was.

46.     The terms of the Subscription Agreement confirmed that the transaction between CleanTech and Six Dimensions was to be a "Share Exchange," through which Six Dimensions

would become "a wholly-owned subsidiary of CleanTech." The Share Exchange, as defined in the Subscription Agreement, did not describe a reverse merger or the use of a shell corporation. Indeed, the Subscription Agreement described CleanTech as a

> **A NASDAQ-listed public company domiciled in the State of Nevada with its main operations in China. The Company designs and manufactures structural towers for megawatt-class wind turbines serving China's clean technology industry as well as highly engineered metal components used in China's steel and energy industries. This Offering contemplates, that CleanTech will acquire 6D and will conduct all its operations through 6D.**

47. Under the section entitled "Risks Related to Investing in the Units, the Subscription Agreement states, in relevant part, that "[u]pon consummation of the Share Exchange, 6D will become the operational subsidiary of CleanTech." Elsewhere in the Subscription Agreement, it similarly states "upon completion of the Offering and Share Exchange, CleanTech's operations shall be conducted through its new subsidiary 6D (such post-Share Exchange Nasdaq listed parent entity to be referred to herein as '6DT')."

48. Based upon the representations contained in the Subscription Agreement and the assurances from Kibrik, Dr. Cottam was led to believe that following the Share Exchange, CleanTech, operating under a new name, would continue its operations through its subsidiary, Six Dimensions.

49. Relevant SEC filings prior to the Share Exchange provided further assurances to Dr. Cottam that he was not investing in a reverse merger or a shell company. For instance, in CleanTech's 10-Q for the period ending June 30, 2014, filed with the SEC, CleanTech reported that **it was not a shell company**.

50. Similarly, in an Information Statement CleanTech filed with the SEC on September 4, 2014, pursuant to Section 14(c) of the Exchange Act, CleanTech unambiguously represented that the transaction between CleanTech and Six Dimensions "will not be a 'reverse

merger.'" Following the Share Exchange, the newly formed 6D Global filed an 8-K with the SEC on October 1, 2014, in which it continued to represent that the Share Exchange was not a "reverse merger."

51.     These characterizations presented in the Subscription Agreement and the SEC filings, however, were false, fraudulent and misleading.  In fact, prior to Dr. Cottam's investment in the Offering and the Share Exchange, the Defendants Kang, 6D Acquisitions, 6D Global (formerly CleanTech) knew and planned that the Share Exchange between CleanTech and Six Dimensions would be a reverse merger utilizing CleanTech as a shell corporation, a transaction and scheme that was orchestrated by Wey.  The Defendants hid this fact from Dr. Cottam in order to induce Dr. Cottam to invest in the Offering.

52.     Indeed, as of June 14, 2014, prior to Dr. Cottam's investment in the Offering, CleanTech had already divested itself of **all** its operations and assets and functioned solely as a shell corporation.  This was not disclosed to Dr. Cottam by any of the Defendants, nor was it disclosed in any SEC filing.  CleanTech reported in its 10Q for the period ending June 30, 2014, that it had disposed of its China subsidiaries as of June 12, 2014; however, in the same filing, CleanTech also represented that it was not a shell company.  The clear implication was that CleanTech had operations and business concerns other than its China subsidiaries that would continue following the Share Exchange.  This was false.

53.     The true characterization of the Share Exchange between CleanTech and Six Dimensions was not revealed until two months after the Defendants received Dr. Cottam's investment funds.  In 6D Global's 10-Q for the period ending September 30, 2014, filed with the SEC on November 12, 2014, and incorporated herein by reference, 6D Global described the Share Exchange:

13

The Exchange is being treated as a reverse recapitalization effected by a share exchange for financial accounting and reporting purposes since substantially all of CleanTech's operations were disposed of prior to the consummation of the transaction. Six Dimensions is treated as the accounting acquirer as its stockholders control the Company after the Exchange Agreement, even though CleanTech was the legal acquirer. As a result, the assets and liabilities and the historical operations that are reflected in these financial statements are those of Six Dimensions as if Six Dimensions had always been the reporting company and, on the date of the Exchange Agreement, changed its name and reorganized its capital stock. Since CleanTech had no operations upon the Exchange Agreement taking place, the transaction was treated as a reverse recapitalization for accounting purposes and no goodwill or other intangible assets were recorded by the Company as a result of the Exchange Agreement. Historical common stock amounts and additional paid-in capital have been retroactively adjusted using the exchange ratio of approximately 1.3 shares of CleanTech Common Stock for each one common share of Six Dimensions.[4]

**The Defendants made material misrepresentations and omissions regarding share restrictions and created unnecessary and artificial obstacles to selling the shares**

54.     Upon finally learning of the number of shares in 6D Global he owned (albeit 2,479,710 fewer shares than what he should have owned, as set forth above), Dr. Cottam sought to liquidate his investment. As of September 29, 2014 (the day Dr. Cottam obtained his shares), 6D Global shares were trading at approximately $8.30/share. However, when he attempted to sell his 6D Global shares, he was informed for the first time that he could not sell because the stock was restricted.

55.     Prior to investing in the Offering, Dr. Cottam was never told by Kibrik or Radnor that his investment would be restricted in any fashion. The Subscription Agreement similarly did not disclose that there would be restrictions placed upon his investment. In fact, the Subscription Agreement explicitly stated that upon the consummation of the Share Exchange, the 6D Acquisition shares would be converted on a 1:1 basis into shares of 6D Global's NASDAQ

---

[4]     6D Global's 10-K, for the period ending December 31, 2014, contains very similar language except it changes all instances of "Six Dimensions" to "6D Global."

listed common stock, conveying the clear message that Dr. Cottam would be able to sell his 6D Global stock immediately upon receiving it.

56.     Upon learning of the restriction, Dr. Cottam was told by Kibrik that the shares would be restricted for six months, after which the restriction would be **automatically** lifted, and Dr. Cottam would be able to sell the shares.  As set forth below, this did not happen.

57.     Near the end of March 2015 – the end of the six-month period – Dr. Cottam sought to sell his shares of 6D Global common stock, which at that time, was trading at between $8 and $9/share.  However, when he tried to sell them, he was told by Kibrik that the shares continued to be restricted, and Dr. Cottam was told for the first time that the restriction would not be automatically removed.  In fact, Kibrik informed Dr. Cottam that 6D Global had "recently" changed the requirements for removing the restrictions and that certain hurdles needed to be overcome in order to effectuate the removal of the restriction.  This was a lie.

58.     Kibrik and Radnor did not "recently" learn of this change in requirements to have the restriction removed.  In fact, they knew no later than February 9, 2015, almost two months earlier.  Indeed, knowing full-well that Dr. Cottam wanted to sell his 6D Global stock as quickly as possible, neither Kibrik nor Radnor informed Dr. Cottam of these changes when they had first learned of them.

59.     Because of Kibrik's and Radnor's failure to timely inform Dr. Cottam that he would be required to undertake certain steps to remove the restrictions, Dr. Cottam was unnecessarily delayed in having the trading restrictions eventually removed.

60.     6D Global eventually provided Dr. Cottam with a written list of requirements necessary to have the restriction removed.  In fact, Dr. Cottam was informed by a 6D Global representative that one of the reasons for the imposition of the hurdles to remove the restriction

was because 6D Global had previously been a shell corporation, a fact which had been misrepresented in numerous SEC filings.

61.    Upon information and belief, 6D Global, operating under the thumb of Wey, sought to prevent investors such as Dr. Cottam from selling their shares in 6D Global in order to unlawfully control the market.  In so doing, 6D Global created arbitrary, fraudulent and unlawful hurdles that investors such as Dr. Cottam were required to overcome in order to have the restriction removed.

62.    From April 2015 through August 2015, Dr. Cottam sought to have the restriction removed so that he could finally sell his 6D Global stock.  However, each time he tried to obtain information from Radnor, Kibrik or 6D Global regarding the necessary process, he was confronted with confusing, misleading and ever-changing requirements.  On numerous occasions, although he had collected and presented to 6D Global the materials that 6D Global had indicated it needed in order to have the restriction removed, Dr. Cottam was told by 6D Global that he had to complete additional, previously undisclosed tasks.  For instance, Dr. Cottam was advised that in order to remove the restriction, he was required to obtain a sell order, a requirement that was not contained on the written list initially provided to Dr. Cottam.  Upon information and belief, 6D Global's goal was to make it as difficult as possible for Dr. Cottam to remove the restrictions to prevent him from selling his shares.

63.    In August 2015, the restrictions on Dr. Cottam's shares of 6D Global common stock were finally removed, and he was able to sell his shares.  However, by that time, 6D Global's share price was in the midst of a death spiral, plummeting from approximately $8/share to approximately $2/share.

64.      In August 2015, Dr. Cottam sold his shares in 6D Global for approximately
$940,000, at approximately $2.24/share.

**Defendants Misrepresented that Wey was not involved**

65.      Prior to investing in the Offering, in September 2014, Dr. Cottam sought and
received assurances from Kibrik that the Offering did not involve Benjamin Wey.

66.      Having been victimized by a previous scam orchestrated by Wey, Dr. Cottam
wanted to avoid investing in any transaction involving Wey, a fact of which Kibrik was well-
aware.

67.      As Kibrik and Radnor knew, Dr. Cottam had lost a substantial amount of money
in an earlier investment through another broker in Deer Consumer Products, Inc. ("Deer"), which
had become a publicly-traded entity through a reverse merger with a shell company, a
transaction that had been orchestrated by Wey.  Dr. Cottam had learned prior to his investment in
the Offering for 6D Acquisitions and 6D Global that the Deer transaction had involved Wey and,
accordingly, Dr. Cottam did not want to invest in any transaction that was associated with Wey.

68.      Prior to Dr. Cottam's investment, Kibrik denied that Wey was involved in any
way with the Share Exchange; the Subscription Agreement did not identify Wey as being
involved; none of the relevant SEC filings disclosed that Wey was involved or had any
ownership in any of the relevant entities.

69.      However, Wey was in fact very involved with the Offering, which Defendants
should have disclosed and were required under the law to disclose.  It has recently been
disclosed that Wey was the owner of NYGG (Asia) Ltd., the largest creditor of CleanTech.  As
set forth in the Subscription Agreement, NYGG (Asia) Ltd. was to receive almost 50% of the
shares of 6D Global following the Share Exchange, making it the largest shareholder of 6D

Global stock.  Following the Share Exchange, Wey, through NYGG (Asia) Ltd., controlled 6D

Global.  Had the Defendants properly advised Dr. Cottam of this fact, which they knew or

should have known, he never would have invested in the Offering.

70.     Indeed, Dr. Cottam's concerns regarding Wey's involvement were prophetic.  On

September 10, 2015, the SEC commenced the SEC Action against Wey, Uchimoto, and others,

and the United States Attorney's Office filed the Indictment against Wey, as described above.

The same day, NASDAQ suspended the trading of 6D Global stock.

### AS AND FOR THE FIRST CAUSE OF ACTION
### VIOLATION OF SECTION 10(b) OF
### THE EXCHANGE ACT (15 U.S.C. § 78j(b)) AND RULE 10b-5
### (Against All Defendants)

71.     Dr. Cottam repeats and re-alleges paragraphs 1 - 70 as if set forth in full herein.

72.     Defendants, acting individually and in concert, directly and indirectly, engaged in

a common scheme, plan, and unlawful course of conduct, pursuant to which they knowingly or

recklessly engaged in acts, practices, and courses of business which operated a fraud and deceit

upon Dr. Cottam and made various deceptive and untrue statements of material facts necessary

in order to make the statements made, in light of the circumstances under which they were made,

not misleading to Dr. Cottam.

73.     The purpose and effect of said scheme, plan, and unlawful course of conduct was,

among other things, to induce Dr. Cottam to invest in the Offering and to purchase shares of 6D

Global.

74.     Defendants Radnor and Kibrik were motivated to commit the fraud described

herein, at least in part, by the substantial financial incentives Radnor was set to receive as the

Offering's Placement Agent.

75.     Defendants 6D Acquisitions, 6D Global and Kang were motivated to commit the fraud described herein in order to induce Dr. Cottam to invest in the Offering to supply 6D Global with funds to operate and to supply 6D Global with the minimum amount of funds required in order to consummate the Share Exchange.

76.     Defendant Uchimoto, acting in his capacity as legal counsel to Radnor, Wey or Wey's entities (including CleanTech/6D Global), was motivated to commit the fraud described herein to assist his clients obtain financial benefits and for him to share in those financial benefits.

77.     Defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, and participated in the issuance of deceptive and materially false and misleading statements to Dr. Cottam and the public, as described above.

78.     To his detriment, Dr. Cottam relied on the Defendants' misleading statements and omissions in investing in the Offering, not knowing the false and misleading nature of the statements and omissions.

79.     As a result of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed a device, scheme, or artifice to defraud; (b) made an untrue statement of material fact or omitted a material fact necessary to make the statement not misleading; or (c) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit in connection with the purchase or sale of any security, to wit: the Offering.

80.     Dr. Cottam was damaged as a result of the Defendants' conduct in an amount to be determined at trial.

## AND AS FOR A SECOND CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY
### (Against GECG and Kibrik)

81.     Dr. Cottam repeats and re-alleges paragraphs 1 - 80 as if set forth in full herein.

82.     GECG (acting then as Radnor) and Kibrik were under a duty to act for and give advice for the benefit of Dr. Cottam in accordance with their fiduciary duty as Dr. Cottam's financial investment advisor.  In particular, GECG and Kibrik had a duty to make truthful and complete disclosures and representations in connection with the Offering.

83.     GECG and Kibrik breached that duty by, *inter alia*,

   a.   placing their own financial interests above Dr. Cottam's interests in recommending and encouraging Dr. Cottam's investment in the Offering;

   b.   misrepresenting and omitting material information to Dr. Cottam in connection with the Offering;

   c.   recklessly or negligently communicating misinformation and omitting material information to Dr. Cottam in connection with the Offering; and

   d.   intentionally, recklessly or negligently engaging in conduct that prevented or otherwise delayed Dr. Cottam from obtaining the removal of the restriction necessary to sell the shares of 6D Global.

84.     As a result of GECG's and Kibrik's breaches of fiduciary duty, Dr. Cottam was damaged in an amount to be determined at trial.

## AS AND FOR A THIRD CAUSE OF ACTION
## BREACH OF CONTRACT
### (Against 6D Global, 6D Acquisitions, and Kang)

85.     Dr. Cottam repeats and re-alleges paragraphs 1 - 84 as if set forth in full herein.

86.     Dr. Cottam and 6D Acquisitions entered into a legally binding and valid contract, signed by Kang on behalf of 6D Acquisitions and for the ultimate benefit of 6D Global, for Dr. Cottam to purchase 2,900,000 shares of 6D Acquisitions common stock (represented by 58 Units of 50,000 shares per Unit) for the explicitly stated purpose of receiving 2,900,000 shares of 6D Global common stock when they became available.

87.     Dr. Cottam fully complied with his obligations pursuant to the contract by causing $870,000.00 to be transmitted to the escrow agent identified in the Subscription Agreement.

88.     6D Acquisitions, Kang and 6D Global breached the contract with Dr. Cottam by failing to issue Dr. Cottam 2,900,000 shares of 6D Acquisitions and/or failing to issue Dr. Cottam 2,900,000 shares of 6D Global common stock.

89.     As a result of the foregoing, Dr. Cottam is entitled to an award of damages in an amount to be determined at trial.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(Against Uchimoto)**

90.     Dr. Cottam repeats and re-alleges paragraphs 1-88 as if set forth in full herein.

91.     As set forth above, GECG and Kibrik owed Dr. Cottam a fiduciary duty and breached that fiduciary duty.

92.     Uchimoto substantially assisted GECG's and Kibrik's breaches of fiduciary duty to Dr. Cottam by affirmatively assisting, helping conceal or failing to act when he was required to do so, which enabled the breaches of fiduciary duty to occur.  Uchimoto, *inter alia*, schemed with Radnor and Kibrik to cover up and conceal their misconduct related to the Offering.  In communications with Dr. Cottam, Uchimoto provided unsubstantiated explanations for why Dr. Cottam received more than 2.47 million fewer shares in 6D Global than what he was supposed to

receive in an effort to dissuade Dr. Cottam from pursuing his rights and assist GECG and Kibrik continue and hide their breaches of fiduciary duty.

93.     As a result of the foregoing, Dr. Cottam was injured and is entitled to an award of damages in an amount to be determined at trial.

## JURY DEMAND

94.     Dr. Cottam hereby demands a trial by jury on all issues so triable.


WHEREFORE, Dr. Cottam's prayer for judgment and relief are as follows:

(a) An award of actual, compensatory and punitive damages from all Defendants, jointly and individually, for all damages Dr. Cottam sustained as a result Defendants' conduct, in an amount to be determined at trial, including interest thereon;

(b) An award of reasonable attorney's fees and the costs of this action; and

(c) Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       June 16, 2016


Respectfully submitted,


GOTTLIEB & GORDON LLP

By: _____
    Derrelle M. Janey

111 Broadway, Suite 701
New York, New York 10006
(212) 566-7766 (phone)
(212) 374-1506 (fax)
djaney@gottliebgordon.com

*Attorneys for Plaintiff John Cottam*

22