# EXHIBIT C

# PRIVATE CONFIDENTIAL OFFERING

## 6D ACQUISITIONS, INC.
### (a Nevada corporation)

## CONFIDENTIAL SUBSCRIPTION DOCUMENTS

**June 17, 2014**

**Please complete all subscription documents contained herein in accordance with the instructions and deliver them to:**

**Radnor Research & Trading Company, LLC**
**44 Wall Street, #34**
**New York, New York 10005**
**Attn: Jon-Jorge Aras, Esq., Legal Counsel to Placement Agent**
**Tel: (215) 525-1165**

**<u>Please deliver the completed documents, and the full amount of your proposed investment, no later than June 30, 2014.  The minimum offering is $3,000,000 and the maximum offering is $5,100,000.  The offering period may be extended by the Company and the Placement Agent (as hereinafter defined) in their joint discretion, without further notice, to a date not later than September 30, 2014.</u>**

383736.1A

# CONFIDENTIAL OFFERING

# 6D ACQUISITIONS, INC.

## Instructions for the Completion of Subscription Documents

*Before subscribing, please review carefully the Company's Subscription Agreement and any other materials provided by the Company, (collectively, the "Offering Materials").* **PLEASE TYPE OR PRINT IN INK ALL INFORMATION.**

To all Subscribers:

1. In connection with your subscription for shares of common stock of 6D Acquisitions, Inc., a Nevada corporation (the "**Company**"), please provide all of the requested information and sign each of the following documents, which are included in this packet:

    (a) Confidential Investor Questionnaire: One copy of the Confidential Investor Questionnaire is included as Exhibit A. Please complete and execute this document.

    (b) Subscription Agreement. One copy of the Subscription Agreement is included as Exhibit B and contains a signature page. Please complete and execute the signature page.

    (c) Form W-9 Request for Taxpayer Identification Number. Please complete and execute the form attached as Exhibit C.

    Please return all of the completed and signed documents described above to the following or to its agents and representatives:

**Radnor Research & Trading Company, LLC**
**44 Wall Street, #34**
**New York, New York 10005**
**Attn: Jon-Jorge Aras, Esq.**
**Tel: (215) 525-1165**

2. You must tender funds with your subscription documents equal to the entire amount of your subscription. Please wire funds to Continental Stock Transfer & Trust Company(the "**Escrow Agent**") at:

    Bank Name: JP Morgan Chase
    Bank Address: 4 Metro Tech Center, 4th Floor, Brooklyn NY 11234
    ABA# : 021000021
    Acct # █████████
    Acct Name : "CST&T AAF 6D Acquisitions, Inc."

3. All subscribers must complete and sign the documents if the subscribers are joint tenants with rights of survivorship, tenants in common, or persons residing in a community property state.

4. A copy of the Subscription Agreement countersigned by the Company will be sent to the subscribers whose subscriptions have been accepted, in whole or in part, as soon as practicable after the closing date.

5. All of the foregoing must be signed and completed documents and funds by June 30, 2014, or such later date as may be determined by the Company and Radnor Research & Trading Company, LLC (the "**Placement Agent**") in their joint discretion.

1

**Exhibit A**

**6D ACQUISITIONS, INC.**
**CONFIDENTIAL INVESTOR QUESTIONNAIRE**

**I.      For Subscribers who are individuals:**

Name: _John Cottam_

Age: ▮▮▮▮▮▮

Residence Address: ▮▮▮▮▮▮▮▮▮▮▮ _West Orange NJ 07052_

How long has this been your legal address? _15+_

Telephone number: ▮▮▮▮▮▮▮▮▮

E-mail ▮▮▮▮▮▮▮▮▮▮

Name of current employer: _Self Employed_

Address of current employer: ▮▮▮▮▮▮▮▮▮▮ _Tampa FL 33618_

Business Telephone Number: _____   Facsimile: _____

E-mail: _____

Describe nature of current employment and positions(s) held (e.g., officer, partner, owner) and

for how long: _Skin Doc, 15+, owner_

_____

_____

If you have been employed by your current employer for less than three years, please list your

employment and position(s) for the past three years:

_____N/A_____

_____

Other business affiliations (service on Boards of Directors, etc.):

_____N/A_____

_____

Educational background (schools and degrees):

_____College_____

_____

A-1

**Note:  In answering questions 1 - 3 below, do not include information with respect to your spouse if you are not presently living with your spouse, regardless of whether there is a formal separation agreement, unless she or he is making the investment with you.**



**II.    For Subscribers who are not individuals:**

Name of entity:_____

Is the entity a: Corporation _____ LLC_____ Proprietorship _____ Trust _____

Other _____

Describe nature of entity's business or activity: _____

_____

Business Address: _____

_____

Name and title of person to be contacted concerning this investment: _____

_____

Business Telephone Number: _____

Facsimile: _____   E-mail: _____

1. Please indicate here and/or on the <u>Appendix 1</u> the tests for an accredited investor that you meet: _____

2. The person executing this Questionnaire represents that such individual is authorized to execute this Questionnaire and the Subscription Agreement on behalf of such entity, and that no additional permission or authorization is or will be required from any person in order to effect the purchase of securities of the Company.

3. For a prospective investor that is not an individual but qualifies as an accredited investor because it meets the <u>tenth test</u> on the attached <u>Appendix 1</u> (i.e., an entity in which all of the equity owners are accredited investors), this Questionnaire must be completed and executed by each equity owner. Please make copies of this Questionnaire, have each equity owner fill it out and attach them to this Questionnaire.

### III.   <u>For Non-U.S. Subscribers:</u>

1. The Subscriber is neither a U.S. person nor acquiring the Shares for the account or benefit of any U.S. person. The Subscriber, if other than a natural person, was not formed for the purpose of acquiring the Shares.

2. The Subscriber understands that a "U.S. person", as defined by Regulation S, includes any natural person resident in the United States; any partnership or corporation organized or incorporated under the laws of the United States; any estate of which any executor or administrator is a "U.S. person"; any trust of which any trustee is a "U.S. person"; any agency or branch of a foreign entity located in the United States; any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a "U.S. person"; any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if any individual) resident in the United States; and any partnership or corporation organized or incorporated under the laws

A-3

of a jurisdiction other than the United States which was formed by a "U.S. person" principally for the purpose of investing in securities not registered under the Act, unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a) of Regulation D promulgated under the Act) who are not natural persons, estates or trusts.

3. The Subscriber is making this subscription from his residence or offices at the address set forth below. The Subscriber understands that the exemption afforded by Regulation S requires that the purchasers of the securities not be in the United States when the offer is made. The purchase of the Shares hereunder by the Subscriber is in accordance with all securities and other laws of the jurisdiction in which it is incorporated or legally resident. This Agreement has not been executed or delivered by the Subscriber in the United States

**IV.**    **For all Subscribers:**

1. I have carefully reviewed the Offering Materials for this offering of 6D Acquisitions, Inc. (the "Company"): ___✓___ Yes _____ No

2. Do you have the knowledge and experience in financial and business matters sufficient to be capable of evaluating the merits and risks of various investments both public and private?

___✓___ Yes _____ No

If so, please describe the basis of your knowledge and experience. I have done Several Private Placements

3. Are you aware that an investment in the securities of the Company is a high-risk investment and could result in a loss of your entire investment? ___✓___ Yes _____ No

4. Please identify the source of funds used for this investment: Income

5. Are you relying upon this investment for the purpose of satisfying any liquidity needs? _____ Yes ___✓___ No    If so, please describe: _____

A-4

6.  The undersigned represents the foregoing information to be true and correct and agrees that such information may be relied upon by the Company, its shareholders, officers, directors and counsel in connection with any investment by the undersigned in the Company's securities. The undersigned will notify the Company promptly if there is any change in the answers given in the subscription documents prior to the acceptance of the undersigned's subscription.

Dated: Sept 18 , 2014

_____
Signature

JOHN COTTAM
(Please Print Name)

_____
(Title, if you are signing on behalf of an entity)

A-5

**Exhibit B**

**CONFIDENTIAL SUBSCRIPTION AGREEMENT**

THERE IS NO MARKET FOR THE SECURITIES OFFERED HEREIN AND NO ASSURANCE CAN BE GIVEN THAT AN ACTIVE TRADING MARKET WILL DEVELOP FOR THE SECURITIES OR, IF ONE DOES DEVELOP, THAT IT WILL BE MAINTAINED.  IN THE ABSENCE OF A PUBLIC TRADING MARKET, AN INVESTOR MAY BE UNABLE TO LIQUIDATE HIS INVESTMENT IN OUR COMPANY.

THE SECURITIES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK AND SHOULD NOT BE PURCHASED BY ANYONE WHO CANNOT AFFORD THE LOSS OF THEIR ENTIRE INVESTMENT.  THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, OR THE SECURITIES LAWS OF ANY STATE, OR OTHER JURISDICTION AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS.  THESE SECURITIES MAY NOT BE TRANSFERRED, SOLD, PLEDGED, HYPOTHECATED OR ASSIGNED EXCEPT AS PERMITTED UNDER SUCH ACT OR SUCH LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.

## CONFIDENTIAL SUBSCRIPTION AGREEMENT

This CONFIDENTIAL SUBSCRIPTION AGREEMENT (this "Subscription Agreement") is made as of the date set forth on the signature page of this Agreement, between 6D Acquisitions, Inc., a Nevada corporation, with principal offices at 17 State Street, Suite 450, New York, New York 10004 (the "Company") and the person or persons listed and signing on the signature page hereto (the "Subscriber"). All documents mentioned herein are incorporated by reference.

### W I T N E S S E T H:

**WHEREAS**, the Company is a special purpose vehicle formed for the purpose of investing in the reorganized entity following a proposed share exchange (the "Share Exchange") between CleanTech Innovations, Inc., a publicly traded Nevada corporation ("CleanTech"), and Initial Koncepts, Inc., a California corporation d/b/a Six Dimensions ("6D") (www.sixdimensions.com) whereby CleanTech will issue 266,787,609 shares of its common stock, equal to approximately fifty percent (50%) of its outstanding shares of common stock, to the shareholders of 6D in exchange for all of the outstanding shares of 6D (the "Exchange"), thereby rendering 6D a wholly-owned subsidiary of CleanTech prior to the Exchange, Initial Koncepts, Inc. will convert into a Nevada corporation "Six Dimensions, Inc.";

**WHEREAS**, prior to or simultaneous with the closing of the Share Exchange, and as a condition thereto, CleanTech shall have (i) obtained shareholder approval to amend its Articles of Incorporation to: (A) increase its authorized common stock to 1,200,000,000 shares, par value $0.0000001 per share, (B) change the name of the company to "6D Global Technologies, Inc." and (C) authorize the conversion of the company into a corporation organized under the laws of the State of Delaware; (ii) obtained approval by NASDAQ of the listing of the company's common stock on the NASDAQ Capital Market; (iii) obtained the resignation of all of the company's China-based officers and directors and the appointment of new officers and directors; (iv) completed the spin-off of all of the company's China-based operations and assets in exchange for the satisfaction and/or assumption of all liabilities of the company in excess of $500.00 and the return of 17,729,403 shares of common stock by the shareholders of the company to be retired and returned to CleanTech's treasury; and (v) completed the conversion by NYGG (Asia) Ltd., the largest creditor of the company, of all of its outstanding debt and liabilities held in CleanTech into 242,534,190 shares of CleanTech's common stock immediately following the closing. (The form of the proposed Agreement and Plan of Share Exchange is attached as Appendix "D");

**WHEREAS**, there are currently an aggregate of 24,982,822 shares of CleanTech Common Stock issued and outstanding and pursuant to the provisions of the proposed Share Exchange, 17,729,403 shares will be cancelled in the Spin-Out, NYGG (Asia) Ltd. will be issued 242,534,190 shares of the Company's Common Stock pursuant to the Conversion of all of its notes, loans, debts, advances and liabilities made to, in, by or on behalf of the Company, and 266,787,609 Exchange Shares will be issued to the shareholders of 6D.  Upon raising the Maximum Offering of $5.1 million, CleanTech will be capitalized as follows:

| | |
|---|---|
| 266,787,609 shares | Exchange Shares issued to 6D |
| 242,534,190 shares | Exchange Shares issued to NYGG Asia post-conversion |
| 7,253,419 shares | Public Shares post-cancellation of 17,729,403 shares |
| 17,000,000 shares | Investors in Offering (assuming $5,100,000 maximum) |
| 2,550,000 shares | Placement Agent's 15% equity fee (5-year Warrants, assuming $5,100,000 maximum offering is completed) |
| 536,125,218 shares | Total Issued and Outstanding (including Warrants) |

**WHEREAS**, it shall be a condition to the closing of the Share Exchange that the Company complete the Offering (as defined herein);

**WHEREAS**, upon completion of the Offering and Share Exchange, CleanTech's operations shall be conducted through its new subsidiary 6D (such post-Share Exchange Nasdaq listed parent entity to be referred to herein as "6DT");

**WHEREAS**, upon the completion of the Offering and immediately upon the closing of the Share Exchange, all of the Company's common stock underlying the Units (as defined herein) offered hereby will be automatically exchanged into shares of 6DT on a 1:1 basis;

**WHEREAS**, the Company has engaged Radnor Research & Trading Company, LLC, as the Company's exclusive placement agent (the "Placement Agent") to assist the Company selling the Units;

**WHEREAS**, in the event the Share Exchange is not consummated, all subscriptions shall be returned to the subscribers herein without interest, deduction or offset; and

**WHEREAS**, upon completion of the Offering, the Share Exchange and the Financing Exchange, 6DT may undergo a reverse-split of its then-outstanding common stock at the Company's sole discretion (the "Reverse Split").

**NOW, THEREFORE**, in consideration of the premises and respective mutual covenants, representations and warranties herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.      The Offering.

(a)     This Subscription Agreement is for the purchase of subscription units (the "Units"), each Unit to consist of fifty thousand (50,000) shares of the Company's common stock, par value $0.001 per share (the "Common Stock"). The purchase price for each Unit shall be fifteen thousand dollars ($15,000), and the minimum subscription per Subscriber shall be $10,000, or two-thirds (2/3) of one (1) Unit (the "Offering"). The Company reserves the right, in its sole discretion, to accept fractional subscriptions.

(b)     Immediately upon the closing and effectiveness of the Share Exchange, each share of Common Stock underlying the Units purchased herein shall be automatically converted on a 1:1 basis into shares of 6DT's Nasdaq listed common stock (the "Financing Security Exchange"), such shares shall be distributed to the Subscribers herein and the Company shall subsequently be dissolved. The shares comprising the Units will subject to the Split

(c)     The minimum offering (the "Minimum Offering") shall be three million dollars ($3,000,000) and the maximum offering (the "Maximum Offering") shall be five million one hundred thousand dollars ($5,100,000).

(d)     The Use of Proceeds, assuming the Maximum Offering of $5,100,000, and deducting estimated closing expenses of $1,000,000, is:

3

| | | |
|---|---|---:|
| Net cash raised | | 4,100,000 |
| New hires - sales | | 500,000 |
| New hires - support/infrastructure | | 250,000 |
| New hires - technical engineers | | 1,000,000 |
| M&A | | 1,500,000 |
| Working Capital | $ | 850,000 |

(e)    This Offering is being made only to accredited investors who qualify as accredited investors pursuant to the suitability standards for investors described under Regulation D of the Securities Act of 1933, as amended (the "Securities Act"), and those investors whom have no need for liquidity in their investments.

2.    The Parties.

(a)    Initial Koncepts, Inc., doing business as Six Dimensions ("6D") (www.sixdimensions.com) is a California corporation originally formed in California as Initial Koncepts, Inc. in 2004 by Silicon Valley entrepreneurs with extensive technology and management consulting services industry backgrounds, previously having held positions at PeopleSoft (now Oracle Corporation) and other global technology firms. With offices in Ohio, New York and California, 6D has evolved quickly into a reputable and award-winning technology services provider that counts many of the largest U.S.-based technology players, Fortune 500 companies and universities, among other institutions, as its clients.   From enterprise software upgrades to complete implementation, 6D offers multi-faceted and deep domain technology expertise across the widest range of markets and programming languages, earning the Company and its senior management numerous accolades by industry observers and its peers.  The unaudited financial statements of 6D for the period ended March 31, 2014 are attached hereto as Annex "A".  Initial Koncepts, Inc., intends to convert into a Nevada corporation named Six Dimensions, Inc. prior to the closing of the Exchange.

(b)    Cleantech Innovations, Inc. is a NASDAQ-listed public company domiciled in the State of Nevada with its main operations in China. The Company designs and manufacturers structural towers for megawatt-class wind turbines serving China's clean technology industry as well as highly engineered metal components used in China's steel and energy industries.  This Offering contemplates, that CleanTech will acquire 6D and will conduct all its operations through 6D.

(c)    6D Acquisitions, Inc. is a special purpose vehicle formed for the purpose of investing in the reorganized entity following a proposed share exchange (the "Share Exchange") between CleanTech and Six Dimensions.  Following the closing of the Share Exchange and the issuance of the shares purchased in the Offering to the Subscribers, the Company will be dissolved.

3.    Conditional Closing.  The closing of the Offering and the transactions contemplated hereby are conditioned upon the closing of the Share Exchange and the transactions and conditions

4

contemplated thereby. It is a condition to close the Share Exchange that the Company shall have received the Minimum Offering amount in the Company's designated escrow account at Continental Stock Transfer & Trust Company. In the event the Minimum Offering amount is not received by the Escrow Agent into the Company's designated escrow account by June 30, 2014 (unless otherwise extended by the Company and the Placement Agent in their sole discretion to September 30, 2014), all subscriptions shall be returned to the Subscribers without interest, deduction or offset.

    4.   <u>Risks Related to Investing in the Units</u>. Investing in the Units involves a high degree of risk. Upon consummation of the Share Exchange, 6D will become the operational subsidiary of CleanTech. The Financing Security Exchange will cause each share of Common Stock underlying the Units to be exchanged for shares of CleanTech's common stock. **<u>Therefore, an investment in the Units is subject to the general and operational risks of both 6D and CleanTech. The Subscriber acknowledges that there are significant risks associated with the purchase of the Units and that such securities are highly speculative and should not be purchased by anyone who cannot afford a total loss of his and her investment</u>**. 6D is subject to a number of risk factors, including but not limited to:

***Risks Specific to 6D***

***6D's business, financial condition and results of operations may be materially impacted by economic conditions and related fluctuations in client demand for marketing, business, technology and other consulting services.*** The market for our consulting services and the technologies used in our solutions historically has tended to fluctuate with economic cycles, particularly those cycles in the U.S., where we earn the majority of our revenues. During economic cycles in which many companies are experiencing financial difficulties or uncertainty, clients and potential clients may cancel or delay spending on marketing, technology and other business initiatives. Our efforts to down-size, when necessary, in a manner intended to mirror downturned economic conditions could be delayed and costly and could also result in us having inadequate people resources as economic conditions improve. A downturn could result in reduced demand for our services, assignment cancellations or delays, lower revenues and operating margins resulting from price reduction pressures for our services, and payment and collection issues with our clients. Any of these events could materially and adversely impact our business, financial condition and results of operations.

***Our markets are highly competitive and we may not be able to continue to compete effectively.*** The markets for the services we provide are highly competitive. We compete principally with large systems consulting and implementation firms, traditional and digital advertising and marketing agencies, offshore consulting and outsourcing companies, and clients' internal information systems departments. To a lesser extent, other competitors include boutique consulting firms that maintain specialized skills and/or are geographically focused. Some of our competitors have significantly greater financial, technical and marketing resources, and generate greater revenues and have greater name recognition, than we do. Often, these competitors offer a larger and more diversified suite of products and services than we offer. If we cannot keep pace with the intense competition in our marketplace, our business, financial condition and results of operations will suffer.

***6D operates in a highly competitive environment, which could adversely affect its sales and pricing.*** 6D operates in a highly competitive environment, and its outlook depends on a forecast of 6D's

share of sales based on its ability to compete with others in the marketplace. 6D competes on the basis of price, quality, product performance and customer service. There can be no assurance that 6D's products and services will be able to compete successfully with other companies' products. Thus, 6D's share of industry sales could be reduced due to aggressive pricing or product strategies pursued by competitors, unanticipated raw material shortages, refurbishing or remanufacturing difficulties, 6D's failure to price its products competitively, its failure to produce products at a competitive cost or an unexpected buildup in inventories, leading to severe downward pressure product prices. Changes in market acceptance of prices, changes in market requirements for price discounts or changes in competitors' behavior could have an adverse impact on 6D's business, results of operations and financial condition.

***6D anticipates it may require additional financing in the future.*** While 6D believes the proceeds from this Offering will be sufficient to expand and grow its business in the near future, it may require additional financing to expand and grow its business. There can be no assurance that financing sufficient to enable 6D to expand and grow its business will be available in the future. The inability to obtain future financing or to produce levels of revenue to meet financial needs could result in 6D's inability to operate, grow and expand the business.

***6D's business, financial condition and results of operations may be materially impacted by military actions, global terrorism, natural disasters and political unrest.*** Military actions in Iraq, Afghanistan and elsewhere, global terrorism, natural disasters and political unrest in the Middle East and other countries are among the factors that may adversely impact regional and global economic conditions and, concomitantly, 6D's clients' ability, capacity and need to invest in 6D's services. Additionally, hurricanes or other unanticipated catastrophes, both in the U.S. and globally, could disrupt 6D's operations and negatively impact 6D's business as well as disrupt 6D's clients' businesses, which may result in a further adverse impact on 6D's business. As a result, significant disruptions caused by such events could materially and adversely affect 6D's business, financial condition and results of operations.

***If 6D does not attract and retain qualified professional staff, 6D may be unable to perform adequately 6D's client engagements and could be limited in accepting new client engagements.*** 6D's performance is largely dependent on the talents and efforts of highly skilled individuals. 6D's future success depends on its continuing ability to identify, hire, develop, motivate and retain highly skilled personnel for all areas of its organization. 6D's continued ability to compete effectively depends on its ability to retain and motivate its existing employees. Failure to attract, integrate, motivate, and retain current and/or additional key employees could have a material adverse effect on 6D's business, operating results and financial condition.

***The success of 6D's business depends in large part on 6D's ability to develop solutions and service offerings that keep pace with the changes in the markets in which 6D provides its services.*** The professional services markets in which 6D operates are characterized by rapid technological change, evolving industry standards, changing customer preferences and new product and service introductions. 6D's future success will depend on 6D's ability to develop solutions and service offerings that keep pace with changes in the markets in which 6D provides services. No assurances can be made that 6D will be successful in developing new services addressing evolving technologies in a timely or cost-effective

6

manner or, if these services are developed, that 6D will be successful in offering and deploying them in the marketplace. In addition, 6D cannot be sure that products, services or technologies developed by others will not render 6D's services non-competitive or obsolete. 6D's failure to address the demands of the rapidly evolving technological environment could have a material adverse effect on 6D's business, results of operations and financial condition. 6D's ability to remain competitive will also depend on our ability to design and implement, in a timely and cost-effective manner, solutions for clients that both leverage their legacy systems and appropriately utilize newer technologies.

*Changes in 6D's effective tax rate or tax liability may have an adverse effect on 6D's results of operations.* 6D's effective tax rate could be adversely impacted by several factors, some of which are outside 6D's control, including: (a) changes in relative amounts of income before taxes in the various jurisdictions in which 6D operates that have differing statutory tax rates; (b) 6D's ability to accurately value certain assets, including intellectual property; (c) changes in tax laws and the interpretation of those tax laws; (d) changes to 6D's assessments about the realizability of 6D's deferred tax assets which are based on estimates of 6D's future results, the prudence and feasibility of possible tax planning strategies and 6D's internal structure, and the economic environment in which we do business; (e) the outcome of future tax audits and examinations; and (f) changes in generally accepted accounting principles that affect the accounting for taxes.

*6D may not be able to recognize revenue in the period in which 6D's services are performed, which may contribute to fluctuations in 6D's revenue and margins.* 6D provides its services under time-and-materials, fixed-price and retainer contracts. All revenue is recognized pursuant to generally accepted accounting principles. These principles require 6D to recognize revenue once evidence of an arrangement has been obtained, services are delivered, fees are fixed or determinable and collectability is reasonably assured. If 6D performs its services prior to the period in which 6D is able to recognize the associated revenue, 6D's revenue and margins may fluctuate from quarter to quarter.

*6D's profitability will be adversely impacted if 6D is unable to maintain 6D's pricing and utilization rates as well as control 6D's costs.* 6D's profitability derives from and is impacted by three primary factors: (a) the prices for 6D's services; (b) 6D's professionals' utilization or billable time; and (c) 6D's costs. To achieve 6D's desired level of profitability, 6D's utilization must remain at an appropriate rate, and 6D must contain its costs. Should 6D reduce its prices in the future as a result of pricing pressures, or should 6D be unable to achieve 6D's target utilization rates and costs, 6D's profitability could be adversely impacted.

*6D's clients could unexpectedly terminate their contracts for 6D's services.* Most of 6D's contracts can be canceled by the client with limited advance notice and without significant penalty. A client's termination of a contract for 6D's services could result in a loss of expected revenues and additional expenses for staff that were allocated to that client's assignment. 6D could be required to maintain underutilized employees who were assigned to the terminated contract. The unexpected cancellation or significant reduction in the scope of any of 6D's large assignments, or client termination of one or more recurring revenue contracts could have a material adverse effect on 6D's business, financial condition and results of operations.

***6D may be unable to achieve anticipated benefits from acquisitions.*** The anticipated benefits from any acquisitions that 6D has undertaken in the past or may undertake might not be achieved. For example, if 6D acquires a company, 6D cannot be certain that clients of the acquired business will continue to conduct business with 6D, or that employees of the acquired business will continue their employment or integrate successfully into 6D's operations and culture. The identification, consummation and integration of acquisitions require substantial attention from management. The diversion of management's attention, as well as any difficulties encountered in the integration process, could have an adverse impact on 6D's business, financial condition and results of operations. Further, we may incur significant expenses in completing any such acquisitions, and 6D may assume significant liabilities, some of which may be unknown at the time of the acquisition.

***Risks Related to the Securities Markets and Investments in the Units***

***6D's management team does not have extensive experience in public company matters.*** 6D's management team has had limited public company management experience or responsibilities, which could impair our ability to comply with legal and regulatory requirements such as the Sarbanes-Oxley Act of 2002 and applicable federal securities laws including filing required reports and other information required on a timely basis. There can be no assurance that our management will be able to implement and affect programs and policies in an effective and timely manner that adequately respond to increased legal, regulatory compliance and reporting requirements imposed by such laws and regulations. Our failure to comply with such laws and regulations could lead to the imposition of fines and penalties and further result in the deterioration of 6D's business.

***There may be limitations on the effectiveness of 6D's internal controls, and a failure of our control systems to prevent error or fraud may materially harm our company.*** Proper systems of internal controls over financial accounting and disclosure are critical to the operation of a public company. 6D is at the very early stages of establishing, and 6D may not be unable to effectively establish such systems, especially in light of the fact that 6D expects to operate as a subsidiary of a publicly reporting company. This would leave 6D without the ability to reliably assimilate and compile financial information about 6D and significantly impair 6D's ability to prevent error and detect fraud, all of which would have a negative impact on 6D's company from many perspectives. Moreover, 6D does not expect that disclosure controls or internal control over financial reporting, even if established, will prevent all error and all fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives will be met. Further, the design of a control system must reflect the fact that there are resource constraints and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected. Failure of its control systems to prevent error or fraud could materially adversely impact 6D.

***6D does not intend to pay any cash dividends in the foreseeable future and, therefore, any return on your investment in our capital stock must come from increases in the fair market value and trading price of the capital stock.*** 6D has not paid any cash dividends on our common stock and do not intend to pay cash dividends on our common stock in the foreseeable future. 6D intends to retain future

earnings, if any, for reinvestment in the development and expansion of 6D' business. Any credit agreements, which 6D may enter into with institutional lenders, may restrict 6D's ability to pay dividends. Whether we pay cash dividends in the future will be at the discretion of 6D's board of directors and will be dependent upon 6D's financial condition, results of operations, capital requirements and any other factors that the board of directors decides is relevant. Therefore, any return on your investment in 6D's capital stock must come from increases in the fair market value and trading price of the capital stock.

*6D may issue additional equity shares to fund 6D's operational requirements which would dilute your share ownership.* 6D's continued viability depends on its ability to raise capital. Changes in economic, regulatory or competitive conditions may lead to cost increases. Management may also determine that it is in the best interest of 6D to develop new services or products. In any such case additional financing is required for 6D to meet its operational requirements. In such event, 6D may be required to materially alter its business plan or curtail all or a part of its operational plans. While 6D currently has no offers to sell it securities to obtain financing, sale or the proposed sale of substantial amounts of its common stock in the public markets may adversely affect the market price of 6D's common stock and 6D's stock price may decline substantially. In the event that 6D is unable to raise or borrow additional funds, 6D may be required to curtail significantly its operational plans.

*The offering price of the Units was determined arbitrarily.* The offering price of the Units does not bear any relation to book value, assets, earnings or other objective criteria of value and has been arbitrarily determined by the Company, 6D, CleanTech or 6DT; nor does it necessarily reflect the market price of CleanTech's common stock. There can be no assurance that the shares will trade at a value commensurate with the offering price.

*Because a small number of shareholders will own a large percentage of the Company's stock, you will have minimal influence over shareholder decisions.* Certain individuals will have significant ownership in 6DT and will retain significant control of 6DT in the future. As a result of such ownership concentration, this group of individuals will have significant influence over the management and affairs of 6D, 6DT and its business. They will also exert considerable, ongoing influence over matters subject to stockholder approval, including the election of directors and significant corporate transactions, such as a merger, sale of assets or other business combination or sale. This concentration of ownership may have the effect of delaying, deferring, or preventing a change in control, impeding a merger, consolidation, takeover or other business combination involving us, or discouraging a potential acquirer from making a tender offer or otherwise attempting to obtain control of 6DT, even if such a transaction would benefit other stockholders.

**IN ADDITION TO THE ABOVE RISKS, AN INVESTMENT IN THE UNITS IS SUBJECT TO THE RISKS OF CLEANTECH.** *The Subscriber should carefully consider the Risk Factors contained in CleanTech's most recent annual report on Form 10-K, as updated or supplemented by subsequent quarterly reports on Form 10-Q and current reports on Form 8-K to the extent filed, each of which are incorporated herein by reference, as the same may be updated from time to time by future filings under the Securities Exchange Act of 1934, as amended, before making an investment decision. If any of such Risk Factors actually occur, the CleanTech's business, results of operations,*

*financial condition and cash flows could be materially adversely affected, the trading price of its common stock could decline significantly, and the Subscriber might lose all or part of its investment. Additional risks and uncertainties that CleanTech's is unaware of or that CleanTech's believes are not material at this time could also materially adversely affect CleanTech's business, financial condition or results of operations. In any case, the value of the CleanTech's common stock or other securities could decline, and the Subscriber could lose all or part of its investment. The Subscriber represents and warrants that he or she has carefully considered and reviewed all the information contained within the reports CleanTech's files with the Commission.*

5.      <u>Representations and Warranties of the Subscriber</u>.  The Subscriber hereby represents and warrants to the Company as follows:

(a)      The Subscriber hereby irrevocably agrees to purchase the Units for the amount set forth by Subscriber on the signature page to this Subscription Agreement if and when such subscription is accepted by the Company in its sole discretion.  The Subscriber shall tender to the Company, at the time of his or her subscription, the entire amount of Subscriber's subscription.  Payment of such amount shall be made by wire transfer to the Escrow Agent in accordance with the instructions on the second page of this offering booklet at the time Subscriber tenders Subscriber's subscription documents.

(b)      The Subscriber understands and agrees that, after the Company's receipt of this Agreement, the Company will review Subscriber's eligibility and will determine whether to accept or reject this subscription in whole or in part, in its sole and absolute discretion, for any reason whatsoever.  The purchase and sale of Units pursuant to this Agreement will be effective only if, when and to the extent the Company, in its sole discretion, accepts Subscriber's subscription by countersignature on the signature page hereof indicating the Units being sold and, if Subscriber's payment for the Units is made.  If the subscription has been rejected for any reason, payment relating to any Units will be promptly returned, without interest, deduction or offset.

(c)      The Subscriber acknowledges that the Company has not made nor is making any representations or warranties, express or implied, concerning, among other things, the present or likely value of the Units, or the prospects of the Company.  The Subscriber is aware that the purchase of Units involves a high degree of risk and can result in a complete loss of the Subscriber's investment.  In subscribing for Units, Subscriber acknowledges that, notwithstanding any financial projections or sources and uses of proceeds provided to the Subscriber for illustrative purposes, the Subscriber is not relying upon the Company or 6DT attaining any projected results of operations, cash flow or financial condition in making an investment in Units.

(d)      The Subscriber (i) is an accredited investor within the meaning of Rule 501 of the Securities and Exchange Commission (the "Commission") under the Securities Act; (ii) understands the meaning of the term "accredited investor" and that, in order to be treated as an accredited investor, Subscriber must meet one of the tests for an accredited investor set forth on <u>Appendix A</u> to this Agreement; and (iii) has read <u>Appendix A</u> and is an accredited investor based on satisfying the test for accredited investors as set forth on the signature page of this Agreement;

(e)     The Subscriber is a sophisticated investor in securities of companies and acknowledges that Subscriber can bear the economic risk of the Subscriber's investment, and that the Subscriber has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in Units.  The Subscriber acknowledges that the information set forth in the Offering materials is not intended to be exhaustive and is provided only as a guide to assist the Subscriber in making an independent investigation of the Company.  The Subscriber understands that the Offering materials does not contain all of the information that would normally be contained in a prospectus used in a public offering, or in an offering memorandum typically used in a private offering.  The Subscriber acknowledges having had the opportunity to ask questions of the Company concerning the Company's business and activities and prospects, the Units and the terms and conditions of this Offering, 6DT's planned operations and prospects, and obtained such additional information and reviewed such documents as the Subscriber deemed necessary.

(f)     The Company has fully answered all inquiries of the Subscriber, if any, concerning such matters and has afforded the Subscriber the opportunity to obtain any additional information (to the extent that the Company possesses such information or could acquire it without unreasonable effort or expense) necessary to verify the accuracy of any information given to the Subscriber.  The Subscriber has discussed the Offering materials and all related matters, to the extent the Subscriber deems necessary, with the Subscriber's legal, tax, accounting, financial and other advisors, including, without limitation, to the extent relevant, the matters referred to in subsections (d) and (e) of this Section .  The Subscriber is aware of the tax consequences of owning Units, is aware of the ability of the Company, and upon conclusion of the Merger, 6DT, to issue additional shares of common stock, and that the Subscriber may suffer significant dilution in the event that the Company or 6DT raises additional funds through the issuance of its securities.  The Subscriber has independently determined that the Units are a suitable investment of Subscriber.

(g)     The Subscriber recognizes, understands and acknowledges that there are substantial restrictions on the transferability of Units, and that Subscriber may have to hold Units indefinitely and may not be able to liquidate Subscriber's investment in Units when Subscriber wishes to do so, if at all, because among other things: (i) Units cannot be offered or sold unless an exemption from registration is available under the Securities Act or the Units are registered under the Securities Act, and (ii) the Company is under no obligation to register the Units or assist the Subscriber in complying with any exemption from registration.  Accordingly, the Subscriber will not transfer any Units except in compliance with all applicable federal and state securities laws and regulations, and, in such connection, the Company may request an opinion of counsel reasonably acceptable to the Company as to the availability of any exemption.  Notwithstanding the foregoing, the shares of Common Stock underlying the Units shall be automatically exchanged into shares of 6DT upon the effectiveness of the Merger.

(h)     The Subscriber's overall commitment to investments is not disproportionate to the Subscriber's net worth; the purchase of Units will not cause the Subscriber's overall commitments to such investments to become disproportionate or excessive; and the Subscriber has adequate means of providing for the Subscriber's current needs and personal contingencies and has no need for liquidity in this investment.

(i)     The Subscriber agrees, acknowledges and understands that if it is a Registered Representative of a FINRA member firm, he or she must give such firm the notice required by FINRA's Rules of Fair Practice, receipt of which must be acknowledged by such firm in the investor questionnaire attached hereto as Exhibit A.

(j)     The Subscriber is acquiring Units pursuant to this Agreement for investment and not with a view to the sale or distribution thereof, for Subscriber's own account and not on behalf of others and has not granted any other person any interest or participation in or right or option to purchase all or any portion of the Units.  No other person has, or will upon acquisition or immediately thereafter, have a direct or indirect beneficial interest in the Units.  Subscriber is aware that the Units are restricted securities within the meaning of Rule 144 of the Securities Act, and may not be sold or otherwise transferred other than pursuant to an effective registration statement or an exemption from registration. The Subscriber understands the meaning of these restrictions.  The Subscriber is not participating, directly or indirectly, in an underwriting or any such distribution or other transfer of the Units.  The Subscriber does not now have reason to anticipate any change in the Subscriber's circumstances or any other particular event which would cause the Subscriber to have a need to sell the Units.

(k)     The Subscriber is not subscribing for the Units as a result of or subsequent to any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over television or radio, or presented at any seminar or meeting.

(l)     The Subscriber has relied on the advice of, or has consulted with, only the Subscriber's own legal, tax, financial, investment and other advisors to the extent that Subscriber deems advisable.

(m)     The Subscriber is a resident of the jurisdiction set forth on the signature page hereto.

(n)     If the Subscriber is a corporation, partnership, trust, limited liability company or other entity, it represents that: (i) it is duly organized, validly existing and in good standing in its jurisdiction of incorporation or organization and has all requisite power and authority to enter into and perform this Agreement and to invest in the Units provided herein; (ii) an investment in the Company will not result in any violation of, or conflict with, any term or provision of the charter, bylaws or other organizational documents of the Subscriber or any other instrument or agreement to which the Subscriber is a party or is subject; (iii) an investment in the Company has been duly authorized by all necessary action on behalf of the undersigned; and (iv) this Subscription Agreement has been duly executed and delivered on behalf of the Subscriber and constitutes a legal, valid and binding agreement of the undersigned.

(o)     If the Subscriber is a corporation, partnership, trust, limited liability company or other entity, the person signing this Agreement on its behalf hereby represents and warrants that the information being provided by signing this Agreement is true and correct with respect to such corporation, partnership, trust, limited liability company or other entity, as the case may be.

(p)     If the Subscriber is purchasing the Units subscribed for hereby in a representative or fiduciary capacity, the representations and warranties contained herein (and in any other written

statement or document delivered to the Company in connection herewith) shall be deemed to have been made on behalf of the person or persons for whom such Units are being purchased.

(q)     There is no requirement applicable to the Subscriber to make any filing with, or to obtain any permit, authorization, consent, waiver or approval of, any person or any governmental or regulatory authority as a condition to the lawful consummation by the Subscriber of the purchase of Units pursuant to this Agreement, which has not already been obtained.

(r)     Neither the execution and delivery of this Agreement by the Subscriber nor the consummation of the transactions contemplated herein will (i) result in a default or constitute an event of default or a breach (or gives rise to any right of termination, cancellation or acceleration, or result in any lien, charge or encumbrance upon any property or assets of the Subscriber) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, agreement, lease or other instrument or obligation to which the Subscriber is a party or by which the Subscriber or any of its properties or assets is bound, or (ii) violate any order, writ, injunction, decree, statute or regulation or any other restriction of any kind or character in the United States applicable to the Subscriber or any of its properties or assets, which violation would have a material adverse effect on its business or operations.

(s)     The Subscriber represents and warrants that no broker or finder was involved directly or indirectly in connection with the Subscriber's purchase of Units pursuant to this Agreement.  The Subscriber shall indemnify the Company and hold it harmless from and against any manner of loss, liability, damage or expense, including fees and expenses of counsel, resulting from a breach of the Subscriber's warranty contained in this Section unless the Company has agreed in advance to payment to such finder or broker.

(t)     The Subscriber acknowledges that none of the Offering materials have been approved or disapproved by the Commission or any other Federal or state governmental agency or any national securities exchange.  Neither the Commission nor any such agency or exchange of any jurisdiction has passed upon the accuracy or adequacy of any of the Offering materials or the merits of an investment in the Units.  Any representation to the contrary is a criminal offense.

(u)     All of the information provided by the Subscriber to the Company in this Agreement and related documentation is true and correct.  The Subscriber has been informed by the Company that the issuance of the Units pursuant to this Agreement is intended to be exempt under Section 4(2) of the Securities Act and: (A) Regulation D, and in particular, Rule 506, of the Commission promulgated under the Securities Act or (B) the safe-harbor set forth in Regulation S adopted under the Securities Act that provides certain offerings conducted outside the United States are not subject to the registration requirements of the Securities Act, and similar exemptions under state law and applicable exemption under state securities laws, and the Subscriber understands that such exemption is dependent upon the accuracy of the information contained in the Subscriber's representations set forth in this Agreement. The Subscriber represents and warrants that the address set forth on the signature page is the Subscriber's true and correct address, and understands that the Company will rely on the Subscriber's representations contained in this Agreement and the information furnished to the Company in connection with this subscription including in making filings under state securities or blue sky laws.

(v)     The Subscriber agrees to indemnify and hold harmless the Company and its directors, officers, shareholders, affiliates, advisers, placement agent and its representatives, counsel and employees and anyone acting on behalf of the Company from and against all damages, losses, costs and expenses (including reasonable attorneys' fees) which they may incur by reason of any breach of the representations and warranties made by Subscriber in this Agreement, or in any document provided by the Subscriber to the Company.

(w)     This Agreement contains the entire agreement between the parties with respect to the subject matter hereof and supersede all prior agreements, understandings, offers and negotiations, oral or written, with respect thereto and no extrinsic evidence whatsoever may be introduced in any judicial or arbitration proceeding, if any, involving this Agreement.

(x)     The Subscriber agrees, acknowledges and understands that the Company and its counsel, are entitled to rely on the representations, warranties and covenants made by the Subscriber herein.

6.     Representations and Warranties of the Company.   The Company hereby represents and warrants to the Subscriber as follows:

(a)     There are no material misstatements or omissions in this Subscription Agreement or any information provided in the Offering materials.

(b)     The Company is a corporation duly formed and in good standing under the laws of the State of Nevada with full power and authority to conduct its business as presently contemplated.

(c)     The Company has the power to execute, deliver and perform this Subscription Agreement and any other agreement contemplated herein.

(d)     If and when the Company accepts the Subscriber's subscription and the applicable funds clear, the Subscriber will become a holder of the Units.

7.     Confidentiality.

(a)     The Subscriber acknowledges that in connection with the Units the Subscriber may have access to books and records of the Company and its affiliates (individually or collectively, for purposes of this Section 4, the "Company") or other information of the Company or its business that is proprietary or otherwise confidential, the unauthorized disclosure or use of which could cause material harm to the Company's business.  Accordingly, Subscriber hereby agrees that the Subscriber shall hold the Company's Confidential Information (as hereafter defined) strictly confidential and will not make any use of or disclose, nor authorize or permit any third party to use or disclose, in whole or in part, any Confidential Information nor disclose any Confidential Information, in whole or in part, to any third party, except in connection with the enforcement of the Subscriber's rights under this Agreement and the transactions contemplated hereby.  However, the Subscriber may furnish or otherwise disclose the Confidential Information to any professional adviser who needs to know such information for the

14

purpose of assisting the Subscriber in the evaluation of any such rights or claims (the "Subscriber's Agent") provided that (i) each Subscriber's Agent shall be informed by of the confidential nature of the Confidential Information, and (ii) the Subscriber shall be responsible for any breach of this Agreement by each Subscriber's Agent.

(b)    "Confidential Information" means any and all confidential and proprietary information or trade secrets of the Company, of any nature, whether written or oral and in any medium, relating directly or indirectly to the Company, its personnel, customers, suppliers and other third parties, which is not generally known or which the Company deems confidential, including, without limitation, supplier lists, distributor lists, customer lists, price lists, financial statements and other financial matters, business plans, market research and strategies, contracts, inventions, patents, patent applications, software, hardware, manufacturing and sale processes and any other proprietary processes, methods, research activities and/or know-how and similar items. However, "Confidential Information" shall not include any information which the Subscriber can demonstrate (i) is generally known outside the industry in which the Company operates at the time of disclosure, or that subsequently becomes generally known through no fault of the Subscriber; (ii) was already known to the Subscriber at the time of disclosure by the Company and which knowledge is supported by documentary evidence; or (iii) was independently developed by a Subscriber, without reliance on or reference to any Confidential Information disclosed by the Company and which independent development is supported by documentary evidence.

(c)    The Subscriber acknowledges that the Subscriber's covenants in this Section 6 are a material inducement to the Company to the acceptance by the Company of the Subscriber's subscription to purchase Units. The Subscriber hereby agrees that the Subscriber's breach or threatened breach of any of the provisions of this Section 6 shall cause immediate and irreparable harm to the Company, and, in such event, that the Company may obtain, without the posting of any bond, preliminary and permanent injunctions prohibiting the Subscriber from use or disclosure of the Confidential Information from any court of competent jurisdiction, in addition to and without limiting any other remedies available to the Company at law or in equity.

(d)    The covenants and obligations of the Subscriber contained in this Section 4 shall survive any termination of this Agreement and the payment of the Units or the termination of Subscriber's ownership interest in the Company. Upon the Company's request, the Subscriber shall return or destroy any copies of Confidential Information that Subscriber has in Subscriber's possession or control, as well as any documents incorporating or describing such Confidential Information, and deliver to the Company a certification that such destruction or return has occurred.

8.    Miscellaneous.

(a)    Except as otherwise specifically stated herein, all notices provided for in this Agreement shall be in writing signed by the party giving such notice, and sent by a nationally recognized overnight courier or sent by registered or certified mail (air mail if overseas), return receipt requested. Notices shall be deemed to have been given three days after mailing or one day after delivery to overnight courier. Notices shall be sent to the Company, at 17 State Street, Suite 450, New York,

New York 10004, and to Subscriber at Subscriber's address and facsimile number set forth on the signature page, or to such other address as any party shall designate in the manner provided in this Section 8(a).

(b)     This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof, superseding any and all prior or contemporaneous oral and prior written agreements, understandings and letters of intent.  This Agreement may not be modified or amended nor may any right be waived except by a writing which expressly refers to this Agreement, states that it is a modification, amendment or waiver and is signed by all parties with respect to a modification or amendment or the party granting the waiver with respect to a waiver.  No course of conduct or dealing and no trade custom or usage shall modify any provisions of this Agreement.  The failure of either party at any time to require performance by the other party of any provision of this Agreement shall in no way affect the right to require such performance at any time thereafter, nor shall the waiver by either party of a breach of any provision of this Agreement be taken or held to be a waiver of any succeeding breach of such provision or as a waiver of the provision itself.

(c)     This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State without giving effect to New York's choice of laws rules.  Each of the parties hereby (i) irrevocably consents and agrees that any legal or equitable action or proceeding arising under or in connection with this Agreement, other than those seeking injunctive relief, shall be brought exclusively in any Federal or state court in the State of New York (but may be appealed to any court with appropriate jurisdiction); (ii) irrevocably submits to and accepts, with respect to his or its properties and assets, generally and unconditionally, the jurisdiction of the aforesaid courts; and (iii) agrees that any action against such party may be commenced by service of process by any method of notice set forth in this Agreement other than facsimile.

(d)     This Agreement shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and permitted assigns.

(e)     Neither this Agreement nor any of Subscriber's rights hereunder may be transferred or otherwise assigned hereunder except with the prior written consent of the Company, which may be granted or withheld in its sole discretion.

(f)     This Agreement may be executed and delivered in two or more counterparts and by facsimile or electronic copy (pdf), each of which shall be deemed an original but all of which together shall constitute one and the same document.

(g)     The various representations, warranties, and covenants set forth in this Agreement or in any other writing delivered in connection therewith shall survive the issuance of the Units.

*[-signature page follows-]*

## SIGNATURE PAGE

The Subscriber hereby offers to purchase and subscribe to _____ (5 ) Unit(s) and does payment of $15,000 per unit for an aggregate investment of $ 70,000

JOHN COTTAM
Name of Subscriber

Signature of Subscriber

Name of Joint Subscriber
(If Applicable)

Signature of Joint Subscriber
(If Applicable)

Name and Title of Authorized Signatory
(If Applicable)

███████████████████████

West Orange NJ 07052
(Print) City, State and Zip Code

███████████████████████

AGREED TO AND ACCEPTED:

As of _____, 2014

6D ACQUISITIONS, INC.

By: _____
    Name: Telang Kang
    Title: Chief Executive Officer

17

## Appendix A - Accredited Investors

A Subscriber who meets any one of the following tests is an accredited investor:

(a)       Subscriber is an individual who has a net worth, or joint net worth with Subscriber's spouse, of at least $1,000,000.  For these purposes, the term "net worth" means the excess of total assets over total liabilities; however, it **excludes** the fair market value of your primary residence <u>unless</u> the indebtedness exceeds the fair market value.

(b)       Subscriber is an individual who had individual income of more than $200,000 (or $300,000 jointly with Subscriber's spouse) for the past two years, and Subscriber has a reasonable expectation of having income of at least $200,000 (or $300,000 jointly with Subscriber's spouse) for the current year.

(c)       Subscriber is an executive officer of the Company.

(d)       Subscriber is a bank as defined in section 3(a)(2) of the Securities Act or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity.

(e)       Subscriber is a broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934.

(f)       Subscriber is an insurance company as defined in section 2(13) of the Securities Act.

(g)       Subscriber is an investment company registered under the Investment Company Act of 1940 or a business development company as defined in section 2(a)(48) of that Act.

(h)       Subscriber is a small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investment Act of 1958.

(i)       Subscriber is an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors.

(j)       Subscriber is a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

(k)       Subscriber is an organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or Company, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000.

(l)       Subscriber is a trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of the Commission under the Securities Act.

(m)       Subscriber is an entity in which all of the equity owners are accredited investors (i.e., all of the equity owners meet one of the tests for an accredited investor).

If an individual investor qualifies as an accredited investor, such individual may purchase the Shares in the name of Subscriber's individual retirement account ("IRA").

18

**Exhibit C**


**IRS Form W-9**
for submission of SSN/Taxpayer Identification Number

[ Attached.  Instructions for the form may be found at:
http://www.irs.gov/pub/irs-pdf/fw9.pdf  ]

ANNEX A

**Unaudited Financial Statements for Six Dimensions**
**For the Period Ending March 31, 2014**

Initial Koncepts, Inc. (dba Six Dimensions)
Condensed Balance Sheets

| | As of | |
|---|---|---|
| | March 31, 2014 (unaudited) | December 31, 2013 |
| **Assets** | | |
| **Current Assets** | | |
| Cash | $ 42,302 | $ 5,611 |
| Accounts receivable | 1,206,874 | 1,117,624 |
| Unbilled revenues | 181,076 | 131,844 |
| Prepaid expenses and other current assets | 80,822 | 47,457 |
| Deferred costs | - | - |
| Total Current Assets | 1,511,074 | 1,302,536 |
| **Property and Equipment, net** | 23,116 | 29,033 |
| **Other Assets** | | |
| Restricted cash | 110,534 | 110,499 |
| Capitalized software, net | 140,735 | 154,808 |
| Security deposits | 23,707 | 48,707 |
| Due from related party | - | 410,130 |
| Total Other Assets | 274,976 | 724,144 |
| **Total Assets** | $ 1,809,166 | $ 2,055,713 |
| **Liabilities and Stockholder's Deficit** | | |
| **Current Liabilities** | | |
| Accounts payable and accrued liabilities | $ 827,065 | $ 818,316 |
| Due to factor | 782,831 | 870,295 |
| Current maturities of capital lease liability | 48,182 | 52,892 |
| Current maturities of notes payable | 586,600 | 586,600 |
| Security deposit payable | 30,000 | |
| Total Current Liabilities | 2,274,678 | 2,328,103 |
| **Long-Term Liabilities** | | |
| Capital lease liability, net of current maturities | 121,875 | 131,348 |
| Notes payable, net of current maturities | 58,370 | 60,020 |
| Other liabilities | 68,518 | 73,192 |
| Total Long-Term Liabilities | 248,763 | 264,560 |
| **Total Liabilities** | 2,523,441 | 2,592,663 |
| **Commitment and Contingencies** | | |
| **Stockholder's Deficit** | | |
| Common stock, par value $0.01: 500,000 shares authorized; | | |
| 300,000 shares issued and outstanding | 3,000 | 3,000 |
| Accumulated Deficit | (717,275) | (539,950) |
| Total Stockholder's Deficit | (714,275) | (536,950) |
| **Total Liabilities and Stockholder's Deficit** | $ 1,809,166 | $ 2,055,713 |

See accompanying notes to the condensed financial statements

F-2

**Initial Koncepts, Inc. (dba Six Dimensions)**
**Condensed Statements of Operations**
**(Unaudited)**

| | For the Three Months Ended | |
| --- | --- | --- |
| | March 31, 2014 | March 31, 2013 |
| Revenues | $ 2,654,575 | $ 2,248,595 |
| Cost of revenues | 1,565,966 | 1,498,395 |
| Gross margin | 1,088,609 | 750,200 |
| **Operating expenses** | | |
| Compensation | 474,878 | 579,431 |
| Professional fees | 56,174 | 2,388 |
| Selling, general and administrative | 266,887 | 188,228 |
| Total operating expenses | 797,939 | 770,047 |
| Income (loss) from operations | 290,670 | (19,847) |
| **Other income (expense)** | | |
| Interest and dividend income | 46,526 | 30 |
| Interest expense | (56,700) | (21,776) |
| Realized gain on sale of marketable securities | - | 4,817 |
| Other income | 10,000 | - |
| Other expense, net | (174) | (16,929) |
| Net income (loss) | $ 290,496 | $ (36,776) |
| Net income (loss) per common share - basic and diluted | $ 0.97 | $ (0.12) |
| **Weighted average common shares outstanding** | | |
| Basic and diluted | 300,000 | 300,000 |

See accompanying notes to the condensed financial statements
F-3

22

Initial Koncepts, Inc. (dba Six Dimensions)
Condensed Statements of Comprehesive Income (Loss)
(Unaudited)

| | For the Three Months Ended | |
| --- | --- | --- |
| | March 31, 2014 | March 31, 2013 |
| Net income (loss) | $ 290,496 | $ (36,776) |
| Other comprehensive income (loss): | | |
| Net unrealized gain on marketable securities | - | 3,100 |
| Reclassification to realized gain on sale of marketable securities | | (4,817) |
| Other comprehensive income (loss) | - | (1,717) |
| Comprehensive income (loss) | $ 290,496 | $ (38,493) |

See accompanying notes to the condensed financial statements

F-4

**Initial Koncepts, Inc. (dba Six Dimensions)**
**Condensed Statement of Stockholder's Deficit**
**For the Three Months Ended March 31, 2014**
**(Unaudited)**

| | Common stock, par value $0.01 | | Accumulated Deficit | Total Stockholder's Deficit |
|---|---|---|---|---|
| | Shares | Amount | | |
| Balance, January 1, 2014 | 300,000 | $ 3,000 | $ (539,950) | $ (536,950) |
| Distribution to stockholder | | | (467,821) | (467,821) |
| Net Income | | | 290,496 | 290,496 |
| Balance, March 31, 2014 | 300,000 | $ 3,000 | $ (717,275) | $ (714,275) |

See accompanying notes to the condensed financial statements

F-5

24

Initial Koncepts, Inc. (dba Six Dimensions)
Condensed Statements of Cash Flows
(Unaudited)

| | For the Three Months Ended | |
|---|---|---|
| | March 31, 2014 | March 31, 2013 |
| **Cash Flows From Operating Activities:** | | |
| Net income (loss) | $ 290,496 | $ (36,776) |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | |
| Depreciation and amortization | 19,990 | 5,945 |
| Amortization of debt issuance costs | - | 2,629 |
| Realized gain on sale of marketable securities | - | (4,817) |
| Deferred Rent | (4,674) | - |
| Restricted Cash | (35) | - |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (89,250) | (14,896) |
| Unbilled revenues | (49,232) | (321,048) |
| Prepaid expenses and other current assets | (33,365) | (5,852) |
| Security deposits | 55,000 | (5,160) |
| Accounts payable and accrued liabilities | 8,749 | 222,380 |
| Deferred Revenue | - | 97,440 |
| Net Cash Provided by (Used in) Operating Activities | 197,679 | (60,155) |
| | | |
| **Cash Flows From Investing Activities:** | | |
| Proceeds from sale of marketable securities | - | 27,748 |
| Loans to related parties | (46,433) | (28,135) |
| Net Cash Used in Investing Activities | (46,433) | (387) |
| | | |
| **Cash Flows From Financing Activities:** | | |
| Gross proceeds on line of credit | - | 2,171,763 |
| Repayments on line of credit | - | (2,141,500) |
| Gross proceeds on factor borrowing | 2,983,542 | - |
| Repayments on factor borrowing | (3,071,006) | - |
| Distribution to shareholder | (11,258) | - |
| Repayment of capital lease obligations | (14,183) | (5,894) |
| Repayment of notes payable | (1,650) | (1,650) |
| Debt issuance costs | - | (6,250) |
| Net Cash (Used in) Provided by Financing Activities | (114,555) | 16,469 |
| | | |
| Net change in cash | 36,691 | (44,073) |
| | | |
| Cash, beginning of period | 5,611 | 78,180 |
| | | |
| Cash, end of period | $ 42,302 | $ 34,107 |
| | | |
| **Supplemental disclosures of cash flow information:** | | |
| Interest paid | $ 56,700 | $ 21,776 |
| | | |
| **Supplemental disclosure of non-cash investing and financing activities:** | | |
| Capital lease of computer equipment | $ - | $ 13,421 |
| Reclassification of due from related party as profit distribution | $ 456,563 | $ - |
| Net unrealized gain on marketable securities | $ - | $ 3,100 |

See accompanying notes to the condensed financial statements

F-6

25

Initial Koncepts, Inc. (dba Six Dimensions)
Notes to the Condensed Financial Statements
(Unaudited)

## Note 1 – Organization and Operations

### *Initial Koncepts, Inc. (dba Six Dimensions)*

Initial Koncepts, Inc. (the "Company") was incorporated under the laws of the State of California on February 9, 2004. The Company provides enterprise implementation and integration consulting and staffing services to customers throughout the United States.

### Note 2 – Liquidity

At December 31, 2013, the Company had a cash balance of approximately $6,000 and a working capital deficiency of approximately $1,026,000. At March 31, 2014, the Company had a cash balance of approximately $42,000 and a working capital deficiency of approximately $764,000. In 2013, the Company principally financed its operations from using proceeds from issuance of notes and factoring its sales invoices. Although the Company had a net loss for the year ended December 31, 2013, the Company had net income and net cash flows from operations of approximately $290,000 and $198,000, respectively, for the three months ended March 31, 2014. Furthermore, prior to 2013, the Company had a history of profitability. Although management believes that the Company's liquidity as of March 31, 2014, might not be sufficient to achieve its business plans, the Company signed a binding letter of intent on May 14, 2014 that will result in the Company raising approximately $5.1 million in an equity financing. The proceeds of the financing will be used for potential mergers and acquisitions as well as funding new lines of business.

## Note 3 – Significant and Critical Accounting Policies and Practices

The Management of the Company is responsible for the selection and use of appropriate accounting policies and the appropriateness of accounting policies and their application. Critical accounting policies and practices are those that are both most important to the portrayal of the Company's financial condition and results and require management's most difficult, subjective, or complex judgments, often as a result of the need to make estimates about the effects of matters that are inherently uncertain. The Company's significant and critical accounting policies and practices are disclosed below as required by generally accepted accounting principles.

### *Basis of Presentation*

The accompanying unaudited condensed financial statements of the Company should be read in conjunction with the audited financial statements and notes thereto for the year ended December 31, 2013 included elsewhere in the Company's Proxy Statement. The accompanying condensed financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("U.S. GAAP") for interim financial information and the rules and regulations of the SEC. Accordingly, since they are interim statements, the accompanying condensed financial statements do not include all of the information and notes required by U.S. GAAP for annual financial statements, but reflect all adjustments consisting of normal, recurring adjustments, that are necessary for a fair presentation of the financial position as of March 31, 2014 and results of operations and cash flows for the interim periods presented. The results of operations for the three months ended March 31, 2014 are not necessarily indicative of the operating results for the full fiscal year or any future period. The December 31, 2013 balance sheet information was derived from the audited financial statements as of that date.

### *Use of Estimates and Assumptions and Critical Accounting Estimates and Assumptions*

The preparation of condensed financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date(s) of the financial statements and the reported amounts of revenues and expenses during the reporting period(s).

26

Critical accounting estimates are estimates for which (a) the nature of the estimate is material due to the levels of subjectivity and judgment necessary to account for highly uncertain matters or the susceptibility of such matters to change and (b) the impact of the estimate on financial condition or operating performance is material. The Company's critical accounting estimates and assumptions affecting the condensed financial statements were:

(i) *Assumption as a going concern*: Management assumes that the Company will continue as a going concern, which contemplates continuity of operations, realization of assets, and liquidation of liabilities in the normal course of business;

(ii) *Allowance for doubtful accounts*: Management's estimate of the allowance for doubtful accounts is based on historical sales, historical loss levels, and an analysis of the collectability of individual accounts; and general economic conditions that may affect a client's ability to pay. The Company evaluated the key factors and assumptions used to develop the allowance in determining that it is reasonable in relation to the financial statements taken as a whole;

(iii) *Fair value of long-lived assets*: Fair value is generally determined using the asset's expected future discounted cash flows or market value, if readily determinable. If long-lived assets are determined to be recoverable, but the newly determined remaining estimated useful lives are shorter than originally estimated, the net book values of the long-lived assets are depreciated over the newly determined remaining estimated useful lives. The Company considers the following to be some examples of important indicators that may trigger an impairment review: (i) significant under-performance or losses of assets relative to expected historical or projected future operating results; (ii) significant changes in the manner or use of assets or in the Company's overall strategy with respect to the manner or use of the acquired assets or changes in the Company's overall business strategy; (iii) significant negative industry or economic trends; (iv) increased competitive pressures; (v) a significant decline in the Company's stock price for a sustained period of time; and (vi) regulatory changes.

These significant accounting estimates or assumptions bear the risk of change due to the fact that there are uncertainties attached to these estimates or assumptions, and certain estimates or assumptions are difficult to measure or value.

Management bases its estimates on historical experience and on various assumptions that are believed to be reasonable in relation to the financial statements taken as a whole under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources.

Management regularly evaluates the key factors and assumptions used to develop the estimates utilizing currently available information, changes in facts and circumstances, historical experience and reasonable assumptions. After such evaluations, if deemed appropriate, those estimates are adjusted accordingly.

Due to inherent uncertainty involved in making estimates, actual results reported in future periods may be affected by changes in these estimates.

### Fair Value of Financial Instruments

The Company has categorized its financial assets and liabilities measured at fair value into a three level hierarchy in accordance with the FASB's guidance. Fair value is defined as an exit price, the amount that would be received upon the sale of an asset or paid upon the transfer of a liability in an orderly transaction between market participants at the measurement date. The degree of judgment utilized in measuring the fair value of assets and liabilities generally correlates to the level of pricing observability. Financial assets and liabilities with readily available, actively quoted prices or for which fair value can be measured from actively quoted prices in active markets generally have more pricing observability and require less judgment in measuring fair value. Conversely, financial assets and liabilities that are rarely traded or not quoted have less price observability and are generally measured at fair value using valuation models that require more judgment. These valuation techniques involve some level of management estimation and judgment, the degree of which is dependent on the price transparency of the asset, liability or market and the nature of the asset or liability.

The carrying amounts of the Company's financial assets and liabilities, such as cash, accounts receivable, unbilled revenues, prepaid expense and other current assets, accounts payable and accrued liabilities, and due to factor, approximate their fair

values because of the short maturity of these instruments.

The Company's capital lease liability and notes payable approximate the fair value of such instruments based upon management's best estimate of interest rates that would be available to the Company for similar financial arrangements at March 31, 2014 and December 31, 2013.

Transactions involving related parties cannot be presumed to be carried out on an arm's-length basis, as the requisite conditions of competitive, free-market dealings may not exist. Representations about transactions with related parties, if made, shall not imply that the related party transactions were consummated on terms equivalent to those that prevail in arm's-length transactions unless such representations can be substantiated.

*Accounts Receivable and Allowance for Doubtful Accounts*

Accounts receivable are recorded at the invoiced amount, net of an allowance for doubtful accounts. The Company estimates the allowance for doubtful accounts. The Company performs on-going credit evaluations of its customers and adjusts credit limits based upon payment history and the customer's current credit worthiness, as determined by the review of their current credit information; and determines the allowance for doubtful accounts based on historical write-off experience, customer specific facts and economic conditions.

Management charges balances off against the allowance after all means of collection have been exhausted and the potential for recovery is considered remote. The Company determines when receivables are past due or delinquent based on how recently payments have been received.

Outstanding account balances are reviewed individually for collectability. The allowance for doubtful accounts is the Company's best estimate of the amount of probable credit losses in the Company's existing accounts receivable. As of March 31, 2014 and December 31, 2013, the allowance for doubtful accounts was not material. Bad debt expense is included in general and administrative expenses.

The Company does not have any off-balance-sheet credit exposure to its customers.

*Revenue Recognition*

The Company recognizes revenue from the provision of professional services when it is realized or realizable and earned. The Company considers revenue realized or realizable and earned when all of the following criteria are met: (i) persuasive evidence of an arrangement exists, (ii) the services have been rendered to the customer, (iii) the sales price is fixed or determinable, and (iv) collectability is reasonably assured. Appropriate allowances for returns and discounts are recorded concurrent with revenue recognition.

Revenues recognized in excess of the amounts invoiced to clients are classified as unbilled revenues.

*Income Tax Provision*

The Company is taxed as an S Corporation under the Internal Revenue Code and applicable state statutes. Under an S Corporation election, the income of the Company flows through to the stockholders to be taxed at the individual level rather than the corporate level. Accordingly, the Company will have no tax liability at the federal level (with limited exceptions) as long as the S Corporation election is in effect.

In addition, the Company has elected to be treated as a Subchapter S corporation for Arizona, California, Colorado, Kentucky, Massachusetts, Ohio and Virginia corporate income tax purposes. This treatment imposes individual income taxes on the shareholder's respective shares of corporate profits and results in a significantly reduced corporate level state tax.

The income allocable to each shareholder is subject to examination by federal and state taxing authorities. In the event of an examination of the income tax returns, the tax liability of the stockholders could be changed if an adjustment in the income is ultimately determined by the taxing authorities. As of December 31, 2013, the tax returns of the Company for the years 2010 through 2013 remain open for the Internal Revenue Service and various state authorities.

Accordingly, these financial statements do not reflect a provision for income taxes. Minimum and franchise taxes assessed by states and local agencies are reported in selling, general and administrative expenses in the condensed statement of operations.

The Company's records interest and penalties as a component of selling, general and administrative expenses. There were no amounts accrued for penalties or interest as of March 31, 2014 and December 31, 2013 or during the three months ended March 31, 2014 and 2013. Management is currently unaware of any issues under review that could result in significant payments, accruals or material deviations from its position.

Certain transactions of the Company may be subject to accounting methods for federal income tax purposes that differ significantly from the accounting methods used in preparing the statements in accordance with U.S. GAAP. Accordingly, the taxable income of the Company reported for federal income tax purposes may differ from net income in these condensed financial statements.

The Company did not take any uncertain tax positions and had no adjustments to its income tax liabilities or benefits as of March 31, 2014 and December 31, 2013.

*Net Income (Loss) per Common Share*

Basic net income (loss) per common share is computed by dividing net income (loss) by the weighted average number of shares of common stock outstanding during the period. Diluted net income (loss) per common share is computed by dividing net income (loss) by the weighted average number of shares of common stock and potentially outstanding shares of common stock during the period to reflect the potential dilution that could occur from common shares issuable through contingent share arrangements, stock options and warrants. During the three months ended March 31, 2014 and 2013, the Company has no common stock equivalents outstanding.

*Reclassification*

Certain accounts in the comparative financial statements have been reclassified to conform to the current year's presentation. These reclassifications have no effect on the prior period's net loss.

*Subsequent Events*

The Company evaluated subsequent events through the date when the financial statements are issued.

*Recently Issued Accounting Pronouncements*

In April 2014, the FASB issued Accounting Standard Update ("ASU") 2014-08, *"Financial Statements (Topic 205) and Property, Plant, and Equipment (Topic 360)."* This new standard raises the threshold for disposals to qualify as discontinued operations, allows companies to have significant continuing involvement and continuing cash flows with the discontinued operation, and provides for new and additional disclosures of discontinued operations and individually material disposal transactions. The Company anticipates adopting the new standard when it becomes effective in the first quarter of 2015.

Management does not believe that any other recently issued, but not yet effective accounting pronouncements, if adopted, would have a material effect on the accompanying condensed financial statements.

**Note 4 – Related Party Transactions:**

*Due from Related Party*

The Company has a loan outstanding to its sole stockholder. During the three months ended March 31, 2014 and 2013, the Company advanced monies totaling $46,433 and $28,135 to this individual. The receivable bears interest at 2.64% with no definite repayment terms. The balance as of December 31, 2013 was $410,130. On March 31, 2014, the loan balance of $456,563 was eliminated as the Company treated the loan balance as a stockholder distribution.

*Storage Lease*

The Company presently leases a storage facility on a month to month basis from a related company. Monthly rental payments are $600. Rent expense totaled $1,800 and $1,800 for the three months ended March 31, 2014 and 2013, respectively.

**Note 5 – Letter of Credit and Restricted Cash:**

The Company has secured a standby letter of credit for the benefit of RFR/SF17 State Street L.P. for the required security deposit on their office facility in New York.

The Bank letter of credit is in the amount of $110,422. The letter of credit expires on July 01, 2014 and contains automatic renewal periods of one year.

The fair value of these letters of credit approximates their contract values. The letter of credit was collateralized by $110,534 and $110,499 of cash at March 31, 2014 and December 31, 2013, respectively, which was reported as restricted on the condensed balance sheets.

**Note 6 –Due to Factor:**

On August 6, 2013, the Company signed a one year agreement with a financial services company for the purchase and sale of accounts receivables with a recourse basis. The financial services company commenced funding during August 2013. The financial services company advances up to 90% of qualified customer invoices, less applicable discount fees, and holds the remaining 10% as a reserve until the customer pays the financial services company. The released reserves are returned to the Company. The Company is charged .7% for the first 30 days outstanding plus prime plus 1.75% daily for funds outstanding over 30 days. Uncollectable customer invoices are charged back to the Company after 90 days. At March 31, 2014, the advances from the factor, inclusive of fees, amounted to $882,794 which was offset against due from factor of $99,963. At December 31, 2013, the advances from the factor, inclusive of fees, amounted to $977,160 which was offset against due from factor of $106,865. Advances from the factor are collateralized by substantially all assets of the Company.

**Note 7 – Stockholder's Deficit**

*Distribution to Stockholder*

During the three months ended March 31, 204 and the year ended December 31, 2013, the Company made distributions of $467,821 and $49,972, respectively to its sole stockholder.

**Note 8 – Commitments and Contingencies**

*Operating Leases*

The Company is obligated under various operating lease agreements for office facilities in California, Florida, New York and Ohio. In addition, the Company leases office facilities on a month-to month basis in Minnesota and Colorado.

Rent expense under all office leases aggregated $88,972 and $33,659 for the three months ended March 31, 2014 and 2013, respectively and recorded in selling, general and administrative expenses in the accompanying condensed statement of operations.

The Company is also obligated under various operating lease agreements for equipment. Rent expenses under all equipment leases aggregated $13,671 and $3,701 for the three months ended March 31, 2014 and 2013,

respectively and recorded in selling, general and administrative expenses in the accompanying condensed statement of operations.

*New York Office Sub-lease*

In February 2014, the Company signed a twenty-four (24) month agreement to sub-lease a portion of it office facilities in New York City expiring in February 2016. The lease requires base annual rental payments to the Company of $120,000 for the term of the lease. Rental income will be recognized on a straight-line basis over the term of the lease. As part of the lease agreement, the Company received a $30,000 security deposit, which is shown as a liability on the accompanying condensed balance sheet.

*Deferred Rent*

To induce the Company to enter into certain operating leases, landlords have granted free rent for various months over the term of occupancy. Rent expenses recorded on the straight-line basis in excess of rents paid is recognized as deferred rent. As of March 31, 2013 and December 31, 2012, deferred rent was $68,518 and $73,192, respectively.

*Consulting Agreement*

On January 20, 2014, the Company entered into a one year consulting agreement with the following terms and conditions:

- Compensation –
  - Initial services agreement $18,000,
  - $5,000 per month thereafter starting March 15, 2014,
  - 1% of the fully diluted capital structure of the Company on the filing of the initial Registration Statement on Form S-1 or upon the closing of a reverse merger transaction into a public entity

**Note 9 - Concentrations and Credit Risks**

*Revenues*

For the three months ended March 31, 2014 and 2013, the Company had the following concentrations of revenues with customers:

| Customer | Three months ended March 31, 2014 | Three months ended March 31, 2013 |
|---|---|---|
| A | 14% | -% |
| B | 14% | -% |
| C | 10% | -% |
| D | 10% | -% |
| E | -% | 11% |
| F | -% | 13% |

*Accounts Receivable*

As of March 31, 2014 and December 31, 2013, the Company had the following concentrations of accounts receivable with customers:

| Customer | As of March 31, 2014 | As of December 31, 2013 |
|---|---|---|
| A | 15% | -% |
| B | 12% | -% |
| C | 19% | 17% |
| D | -% | 12% |

A reduction in sales from or loss of such customers would have a material adverse effect on the Company's results of operations and financial condition.

**Note 12 – Subsequent Events**

In April 2014 the Company signed a lease amendment for its office facilities in San Ramon, California. The amendment extends the lease past the May 31, 2014 expiration date on a month to month basis with monthly rental payments of $2,836.

In April 2014, the Company amended the repayment schedules of the following debt:
- The maturity date for debt offering (F), issued on July 23, 2013 for $25,000, was amended from April 2014 to due on demand.
- The maturity date for debt offering (G), issued on October 3, 2013 for $50,000, was amended from April 2014 to July 2014.
- The maturity date for debt offering (J), issued on October 26, 2013 for $50,000, was changed from April 2014 to due on demand.

In April 2014, the Company signed a thirty-nine (39) month leases agreement for its office facilities in Pleasanton, California expiring in September 2017. The lease requires base annual rent of approximately $34,000 for the first year, with 3% increments each year thereafter. The lease contains a two (2) month rent abatement period starting on July 1, 2014. Rent expense will be recognized on a straight line basis over the term of the lease. The lease contains one option to renew for a term of sixty (36) months.

On May 14, 2014, the Company signed a binding letter of intent for a proposed merger of equals between a publicly traded company ("pubco") and the Company. The potential merger would result in the Company receiving newly issued common shares equal to 50% of the pubco's outstanding capitalization and the creation of a new company listed on the NASDAQ capital market. The merger is subject to the following pre-closing events:
- 100% of the pubco's operations, assets and liabilities would be spun out to the pubco's current management and the controlling shareholders in exchange for the cancellation of all of the pubco's shares;
- the elimination off all of the outstanding notes and interest payments due to the pubco's largest creditor in exchange for a certain number of the Vehicle's newly issued common stock, which shall be subject to a lock-up for at least one year;
- an equity investment of approximately $5.1 million through the pubco's largest creditor or others in a private placement offering of shares of a special purpose Nevada corporation in which subscriptions shall be exchanged for shares of the pubco's common stock in conjunction with the closing of the merger; and
- the offering proceeds from the financing shall be used for all merger-related expenses and for general corporate purposes of the newly formed company