K&L GATES LLP

Peter N. Flocos
K&L Gates LLP
599 Lexington Avenue
New York, NY 10022-6030
Phone: 212.536.4025
Fax: 212.536.3901
Email: peter.flocos@klgates.com

B. John Casey (admitted *pro hac vice*)
K&L Gates LLP
One SW Columbia St., #1900
Portland, OR 97258
Phone: 503-226-5716
Email: john.casey@klgates.com

*Counsel for Defendants 6D Global Technologies,*
*Inc., 6D Acquisitions, Inc., and Tejune Kang*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN COTTAM,<br><br>                                      Plaintiff,<br><br>          v.<br><br>GLOBAL EMERGING CAPITAL GROUP, LLC; ALEXANDER KIBRIK; WILLIAM UCHIMOTO; 6D GLOBAL TECHNOLOGIES, INC.; 6D ACQUISITIONS, INC., and TEJUNE KANG,<br><br>                                      Defendants. | Case No. 1:16-cv-04584 (RJS)<br><br>**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT BY DEFENDANTS 6D GLOBAL TECHNOLOGIES, INC., 6D ACQUISITIONS, INC., AND TEJUNE KANG** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

FACTUAL ALLEGATIONS ................................................................................ 6

I.    Plaintiff's Investment in the September 2014 Private Offering............................ 6

II.    The Alleged Misrepresentations and Omissions.................................................. 8

III.    Plaintiff Receives What He Bargained for Under the Subscription Agreement and Makes Eight Percent on His Investment in Less Than a Year............................................................................................................... 8

LEGAL STANDARDS ...................................................................................... 10

ARGUMENT ..................................................................................................... 12

I.    Plaintiff Has Failed to State a Claim Against the 6D Defendants Under Section 10(b) or Rule 10b-5................................................................ 12

    A.    Plaintiff has not alleged any actionable material misstatements or omissions by any of the 6D Defendants ................................. 13

        1.    Plaintiff does not and cannot allege that the 6D Defendants made any actionable misrepresentations or omissions during pre-contractual negotiations ........................... 13

        2.    The Subscription Agreement itself contradicts Plaintiff's fraud allegations concerning the quantity of shares he received and the restrictions on their sale .................................. 15

            a.    Plaintiff cannot base a Rule 10b-5 claim on the fact that he received the economic benefit for which he bargained ........................................................ 15

            b.    The Subscription Agreement plainly disclosed that Plaintiff's securities were restricted................................ 16

    B.    Plaintiff's Rule 10b-5 claim fails for a host of additional, independent pleading deficiencies ......................................... 17

        1.    Plaintiff has failed to allege scienter ........................................... 18

        2.    Plaintiff has failed to allege an actionable economic loss .......... 19

        3.    Plaintiff has failed to allege that any conduct by the 6D Defendants caused his loss......................................................... 20

4.      Plaintiff has not alleged scheme liability under Rule 10b-5(a) or (c) ................................................................................. 22

II.     Plaintiff Has Failed to State a Breach of Contract Claim Against the 6D Defendants .............................................................................................. 23

CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abuhamdan v. Blyth, Inc.*,
  9 F. Supp. 3d 175 (D. Conn. 2014) ....................................................................23

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
  692 F.3d 34 (2d Cir. 2012) ................................................................................20

*In re Alstom SA Sec. Litig.*,
  406 F.Supp.2d 433 (S.D.N.Y. 2005) ..................................................................12

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004) ................................................................18

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .......................................................................10, 11, 16, 24

*Atlas Partners, LLC v. STMicroelectronics, Int'l N.V.*,
  No. 14-CV-7134 VM, 2015 WL 4940126 (S.D.N.Y. Aug. 10, 2015) .............12, 24

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ...........................................................................14, 15

*Barrows v. Forest Laboratories, Inc.*,
  742 F.2d 54 (2d Cir. 1984) .................................................................................20

*In re BioScrip, Inc. Sec. Litig.*,
  95 F.Supp.3d 711 (S.D.N.Y. 2015) ....................................................................11

*CAMOFI Master LDC v. Riptide Worldwide, Inc.*,
  No. 10 CIV. 4020 CM JLC, 2012 WL 6766767 (S.D.N.Y. Dec. 17, 2012) .........19

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ......................................................................14, 18, 19

*Elsky v. Hearst Corp.*,
  232 A.D.2d 310, 648 N.Y.S.2d 592 (App. Div. 1st Dep't 1996) .........................25

*Gurary v. Winehouse*,
  190 F.3d 37 (2d Cir. 1999) .................................................................................20

*Janus Capital Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011) .................................................................................3, 13, 14

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001)..........................................................................18, 19

*Katel Ltd. Liab. Co. v. AT & T Corp.*,
  607 F.3d 60 (2d Cir. 2010)...................................................................................25

*Kramer v. Time Warner Inc.*,
  937 F.2d 767 (2d Cir. 1991)...................................................................................8

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005).............................................................................21, 23

*In re Lipper Holdings, LLC*,
  1 A.D.3d 170, 766 N.Y.S.2d 561 (2003) ..............................................................3

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010)...................................................................................7

*In re Parmalat Sec. Litig.*,
  383 F.Supp.2d 616 (S.D.N.Y. 2005).....................................................................12

*Pivot Point Capital Master LP v. Deutsche Bank AG*,
  No. 08 CIV. 2788 AKH, 2010 WL 9452230 (S.D.N.Y. Dec. 9, 2010)....................16

*In re QLT Inc. Sec. Litig.*,
  312 F. Supp. 2d 526 (2004) ..................................................................................22

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)..................................................................................12

*S.E.C. v. KPMG LLP.*,
  412 F. Supp. 2d 349 (S.D.N.Y. 2006)...................................................................23

*Stoneridge Inv. Partners, LLC v. Scientific–Atlanta*,
  552 U.S. 148 (2008)..............................................................................................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..............................................................................................11

*Union Cent. Life Ins. Co. v. Credit Suisse Sec. (USA), LLC*,
  No. 11 CIV. 2327 GBD, 2014 WL 7179989 (S.D.N.Y. Dec. 10, 2014) ...........22, 23

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
  127 F. Supp. 3d 156, 168–69 (S.D.N.Y. 2015).................................................12, 24

*In re Yukos Oil Co. Sec. Litig.*,
  No. 04 CIV. 5243 (WHP), 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006).........18, 23

**Statutes**

Private Securities Litigation Reform Act, Pub. L. 104-67, § 109 Stat. 737 (1995)..............4, 11, 12

**Other Authorities**

17 C.F.R. 230.144 ................................................................................... *passim*

17 C.F.R. 240.10b-5 ............................................................................... *passim*

Fed. R. Civ. P. 8(a) ...........................................................................................11

Fed. R. Civ. P. 9(b) ......................................................................4, 11, 12, 23

Defendants 6D Global Technologies, Inc. ("6D Global"), 6D Acquisitions, Inc. ("6D Acquisitions"),[1] and Tejune Kang ("Kang" and, collectively, the "6D Defendants") respectfully submit the following Memorandum in Support of their Motion to Dismiss the Complaint.

## INTRODUCTION

Plaintiff John Cottam asks this Court to award him a windfall that is both legally and economically unjustifiable.  He argues, implausibly, that not receiving 6.9 times the percentage ownership in 6D Global that he bargained for under his Subscription Agreement and the capitalization table ("Cap Table") set forth therein not only breached that Agreement but also is securities fraud.   Although Plaintiff received what he bargained for, and ultimately *profited* by eight percent on his investment in less than a year, he contends that he is entitled to many times that amount under the Subscription Agreement.

The plain terms of the Subscription Agreement, however, including the Cap Table, demonstrate that he has failed to state a contract claim, much less a fraud claim.  In its third "Whereas" clause, the Subscription Agreement states that CleanTech Innovations, Inc. ("CleanTech") "will be capitalized" as set forth in the Cap Table appearing in that clause, after the private placement closed.  The Subscription Agreement also explained in its "Whereas" clauses that after the private placement, CleanTech shares would be exchanged for the shares of Initial Koncepts, Inc., doing business as "Six Dimensions" or "6D"; CleanTech would be renamed 6D Global; and the shares purchased in the private placement would be converted on a 1:1 basis into shares of CleanTech/6D Global.

The Cap Table also indicated that after the private placement, there would be a total of 536,125,218 CleanTech/6D Global shares outstanding, a number which included among other

---

[1]        6D Acquisitions no longer exists.  Compl. ¶ 11.

things (a) up to 17,000,000 shares issued in the private placement,[2] (b) 266,787,609 shares to be employed in the share exchange, and (c) 242,534,190 shares issued to a creditor named NYGG Asia in satisfaction of its debt.  Plaintiff alleges that under Section 1(a) of the Subscription Agreement, he was purchasing 58 "Units" under the Subscription Agreement, or 2,900,000 shares, for a total purchase price of $870,000 ($15,000 per unit).  Assuming that to be the case, Plaintiff would own *0.54 percent* of the company, *i.e.*, 2,900,000 divided by the 536,125,218 total shares shown in the Cap Table, in return for his $870,000 payment.

The Subscription Agreement also stated that the "shares comprising the Units" purchased by Plaintiff "will subject to" a "reverse-split" of CleanTech/6D described earlier in the document,[3] although the Subscription Agreement also stated that the reverse split was expected to occur "upon completion of" the private placement and the share exchange.  Subsequent to the June 17, 2014 date stated on the cover of Plaintiff's subscription documents, but before the September 29, 2014 closing of the transactions, CleanTech underwent two "reverse" stock splits that were announced to the public in SEC filings, such that 6.9 shares became one share (collectively, the "Reverse Split").  Because the Reverse Split affected all shareholders equally, no single shareholder's *percentage ownership* changed as a result of the Reverse Split (even though the number of shares owned by each shareholder, and the company's total number of shares, were divided by 6.9).  Thus, as discussed herein, the *percentage* ownership provided to Plaintiff, and all other investors in the private placement, was consistent with the Cap Table, and

---

[2]      The 17,000,000 share number expressly assumed that the $5.1 million maximum private placement amount was raised.  In fact, as discussed herein, the private placement raised about $4.6 million, and therefore certain of the numbers discussed in this Memorandum require a slight adjustment that does not impact the substance of the arguments.

[3]      *See* Compl. Ex. C at the sixth "Whereas" clause on p. 3, and Section 1(b) ("The shares comprising the Units will subject to the Split.").

Plaintiff received his bargained-for 0.54 percent ownership interest in the company in return for his $870,000 investment (in fact, Plaintiff received slightly *more*, because as noted the private placement closed after raising somewhat less than the $5.1 million maximum and therefore did not result in the issuance of the full ownership percentage stated in the Cap Table).

Plaintiff, however, contends that he is entitled to an ownership percentage that is *6.9* times the amount that he bargained for and that is contemplated by the Cap Table – that is, 2,900,000 shares divided *not* by the 536,125,218 shares in the Cap Table, but rather by the dramatically *smaller* number of post-Reverse Split shares outstanding after the transactions contemplated in the Subscription Agreement closed.  No reasonable investor – particularly the kind of sophisticated and accredited investor that Plaintiff represented himself in writing to be[4] – could have interpreted the Subscription Agreement this way, and no two arms-length parties would have ever agreed to such terms.  The case law is clear that a "contract should not be interpreted to produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties."  *In re Lipper Holdings, LLC*, 1 A.D.3d 170, 171, 766 N.Y.S.2d 561 (2003).  The only interpretation here that is both literally correct and commercially reasonable is that Plaintiff got what he bargained for, and is entitled to nothing more.  There is nothing for the court to "fix," and no remedy to be afforded Plaintiff, because there was no wrong in the first instance, from either a contractual or a Rule 10b-5 standpoint.

**Plaintiff's Section 10(b) and Rule 10b-5 Securities-Fraud Claim (Count I)**

In Count I, Plaintiff asserts a securities-fraud claim.  As the Court suggested during the September 13, 2016 hearing, this claim has no merit.  *First*, Plaintiff contends that he was induced into the private placement (from which he made money) based on several alleged oral

---

[4]     See Compl. Ex. C, pg. A-4; Sections 5(d)-(e).

misrepresentations or omissions from parties *other than* the 6D Defendants.  Those parties included Radnor Research & Trading Company ("Radnor"), the alleged "placement agent" for the offering, and a Radnor employee, Alexander Kibrik.  Nowhere does Plaintiff allege, however, that any of the *6D Defendants* made the alleged oral misrepresentations or omissions, authorized Radnor or Kibrik to make the alleged oral statements, or even *knew about* what Radnor and Kibrik told (or did not tell) Plaintiff outside of the terms of the Subscription Agreement.  His failure to allege such facts, much less with the strict particularity required by Rule 9(b) and the PSLRA, is fatal to his securities-fraud claim.

<u>Second</u>, Plaintiff asserts that the 6D Defendants misled him, in the Subscription Agreement itself, about the amount of his investment, but the Agreement's plain terms defeat Plaintiff's claims.  Based on the Cap Table in the Subscription Agreement, Plaintiff bargained for and received a 0.54 percent interest in the company in return for his $870,000 investment.

Plaintiff also alleges that the 6D Defendants failed to disclose that there would be restrictions on the sale of his shares.  But Plaintiff expressly represented in the Subscription Agreement that he understood that, under the securities laws, "there are substantial restrictions on the transferability of Units, and that [Plaintiff] may have to hold Units indefinitely and may not be able to liquidate [his] investment in Units when [he] wishes to do so, if at all."  Compl. Ex. C, § 5(g).  Plaintiff also represented that he understood that "the Units are restricted securities within the meaning of Rule 144 of the Securities Act," and Plaintiff agreed that he "underst[ood] the meaning of these restrictions."  *Id*. at § 5(j).  Although Plaintiff alleges that 6D Global required him to take certain steps in order to effect transferability of his shares, this fails on its face to state a Rule 10b-5 claim.  Plaintiff also contends that, while the Units in 6D Acquisitions may have been restricted, the 6D Global shares into which those Units converted were not.  But the Subscription Agreement is clear on its face that in substance, Plaintiff was

purchasing shares in 6D Global, and correspondingly, Plaintiff's Complaint is predicated on the damages he supposedly suffered as a result of not getting a sufficient number of 6D Global shares.  Plaintiff's hyper-technical hairsplitting has no place under Rule 144 and the other federal laws restricting transferability of shares acquired in private placements.  *See, e.g.*, 17 C.F.R. 230.144(a)(3)(i) (defining "restricted securities" as those "acquired directly or indirectly from the issuer . . . in a transaction or chain of transactions not involving any public offering.").

Plaintiff also fails to adequately plead the critical element of scienter.  Aside from attempting to transform ordinary contract issues into scienter on the part of the 6D Defendants, Plaintiff relies entirely on a conclusory allegation that the 6D Defendants were motivated to complete the offering to keep 6D Global afloat, which courts have stated repeatedly is insufficient to plead scienter.  Nor does Plaintiff allege any actionable damages – to the contrary, the facts alleged show that he *profited* on an investment he would not have entered absent the supposed fraud.  Plaintiff also fails to allege that the purported fraud, as opposed to other intervening factors, *caused* any loss (assuming he suffered any, which he didn't).  Finally, Plaintiff's half-hearted attempt to allege "scheme liability" under Rule 10b-5(a) and (c) fails as a matter of law because, as he concedes in the Complaint, that claim is based on the same alleged misrepresentations and omissions underlying his traditional Rule 10b-5(b) claim.

**Plaintiff's Breach of Contract Claim (Count III)**

Plaintiff's breach of contract claim in Count III, which arises from the Subscription Agreement, also fails.  As noted previously, and as discussed further below, Plaintiff received what he bargained for under the Cap Table contained in, and other terms of, the Subscription Agreement:  a 0.54 percent interest in the company (*i.e.*, 2,900,000 shares divided by 536,125,218 total company shares) in return for an $870,000 investment.  In fact, because the private placement did not raise the $5.1 million maximum, plaintiff actually received a slightly

higher interest in the company than what he bargained for.  Plaintiff attempts to make much of

the fact that the Subscription Agreement states that the Reverse Split was to take place *after* the

private placement and share exchange, whereas the Reverse Split in fact took place *prior* to those

transactions.  But that is a red herring given that the Reverse Split had no negative impact on the

percentage interest in the company that Plaintiff bargained for and received.

 Accordingly, the Court should dismiss Plaintiff's securities-fraud (Count I) and breach of

contract claim (Count III) with prejudice as to the 6D Defendants.

**FACTUAL ALLEGATIONS**

**I.** **Plaintiff's Investment in the September 2014 Private Offering**

 Plaintiff alleges that he was misled in connection with a September 2014 private

placement offering (the "Offering").  The terms of the Offering, as set forth in the written

Subscription Agreement, provided that Plaintiff would purchase subscription units ("Units")

from 6D Acquisitions, Inc. ("6D Acquisitions").  Compl. Ex. C, Section 1(a).  Each Unit

consisted of 50,000 shares of 6D Acquisitions' common stock.  *Id*.  The Offering envisioned

that, in connection with Plaintiff's investment, two separate entities – CleanTech, a publicly

traded company, and Initial Koncepts, Inc., doing business as "Six Dimensions," or "6D" –

would engage in a share exchange.  *Id*. at first "Whereas" clause.  The net result of that share

exchange would make 6D a subsidiary of CleanTech.  Compl. ¶ 19.  CleanTech would also

change its name to 6D Global Technologies, Inc. ("6D Global").  *Id*. ¶ 20.  Upon closing of the

share exchange, all of 6D Acquisitions' common stock represented by the Units (including

Plaintiff's shares) would be automatically converted into shares of the newly named entity, 6D

Global, on a 1:1 basis.  *Id*. Ex. C, Section 1(b).

 The Cap Table in the Subscription Agreement stated that after completion of the

Offering, CleanTech would have 536,125,218 total shares outstanding, including 266,787,609

shares for issuance in the share exchange and 17,000,000 shares issued in the Offering (assuming the $5.1 million maximum Offering).  *Id*. Ex. C, third "Whereas" clause.  The Subscription Agreement disclosed that there may be reverse share splits, and that the shares underlying Plaintiff's Units would be subject to those splits.  *Id*. Ex. C, sixth "Whereas" clause ("[U]pon the completion of the Offering, the Share Exchange and the Financing Exchange, 6DT may undergo a reverse-split of its then-outstanding common stock at the Company's sole discretion."); Section 1(b) ("The shares comprising the Units will subject to the Split.").

The Subscription Agreement also disclosed that there would be restrictions on the sale and transferability of Plaintiff's shares.  It explained that "there are substantial restrictions on the transferability of Units, and that Subscriber may have to hold Units indefinitely and may not be able to liquidate Subscriber's investment in Units when Subscriber wishes to do so, if at all."  *Id*. Section 5(g).  It also disclosed that the Units were "restricted securities within the meaning of Rule 144 of the Securities Act, and may not be sold or otherwise transferred other than pursuant to an effective registration statement or an exemption from registration."  *Id*. Section 5(j). Plaintiff represented that he was a "sophisticated" and "accredited" investor, *id*. at Sections 5(d)-(e), and that he "underst[ood] the meaning of these restrictions" and was not acquiring the Units "with a view to the sale or distribution thereof," *id*. Section 5(j).

Subsequent to the June 17, 2014 date stated on the cover of Plaintiff's subscription documents, but before the September 29, 2014 closing of the various transactions,[5] CleanTech

---

[5]     Declaration of B. John Casey in Support of Motion to Dismiss Plaintiff's Complaint by Defendants 6D Global Technologies, Inc., 6D Acquisitions, Inc., and Tejune Kang ("Casey Decl."), Ex. C (October 1, 2014 Form 8-K, Item 1.01) (stating that the share exchange, the Offering and the issuance of shares to NYGG Asia in satisfaction of its debt all occurred on September 29, 2014).  The Court may take judicial notice of the content of SEC filings.  *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 355 n.5 (2d Cir. 2010); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).  The cover of the subscription documents

underwent two "reverse" stock splits that were announced to the public in SEC filings, such that 6.9 shares became one share (collectively, the "Reverse Split").[6]

## II.  The Alleged Misrepresentations and Omissions

Plaintiff alleges that a representative from the placement agent for the Offering made various misrepresentations and omissions in discussions leading up to Plaintiff's signing of the Subscription Agreement.  That representative, Kibrik, allegedly told Plaintiff that "a return of 15 - 30 times his investment . . . would not be unrealistic," Compl. ¶ 22; did not disclose that there had been or would be reverse share splits, *id*. ¶ 41; denied that the Offering was a "reverse merger," *id*. ¶ 45; and assured Plaintiff that a third-party, Benjamin Wey, was not involved with the Share Exchange, *id*. ¶ 65.  Plaintiff does not allege, however, that any of the 6D Defendants directed, authorized, or even knew about any of Kibrik's alleged misstatements or omissions.

Plaintiff also briefly alleges other purported misrepresentations or omissions leading up to the Offering, apparently for atmosphere.  He claims that CleanTech indicated in its 10-Q for the period ending June 30, 2014 that it was not a "shell company," *id*. ¶ 49, and that CleanTech stated in a September 4, 2014 Information Statement that the share exchange between it and Initial Koncepts would not be a "reverse merger," *id*. ¶ 50.  Plaintiff alleges that CleanTech had "divested itself of all of its operations and assets" prior to the Offering, and was thus a shell company, and that the share exchange really was a "reverse merger."  *Id*. ¶¶ 51–52.

## III.  Plaintiff Receives What He Bargained for Under the Subscription Agreement and Makes Eight Percent on His Investment in Less Than a Year

Plaintiff admits that although he was supposedly "induced" into investing in the Offering,

---

provided to Plaintiff not only stated a June 17, 2014 date, but also indicated that the private placement offering would be completed by June 30, 2014, although the completion date could be extended to September 30, 2014.  Compl. Ex. C.

[6]      Casey Decl., Ex. A (July 3, 2014 Form 8-K); Ex. B (September 16, 2014 Form 8-K).

he profited $70,000 (or eight percent) in less than a year.  *Id.* ¶ 26 (Plaintiff invested $870,000 in September 2014); ¶ 64 (Plaintiff sold his shares in August 2015 for $940,000).

Plaintiff claims that he invested $870,000 to receive 2,900,000 million shares in 6D Acquisitions that would then be converted on a 1:1 basis to 6D Global shares.  *Id.* ¶ 29.  As noted, the Cap Table appearing in the Subscription Agreement stated that after the Offering, CleanTech would have 536,125,218 total shares outstanding, including 17,000,000 shares issued to investors in the Offering (assuming the $5.1 million maximum Offering).  *Id.* Ex. C, third "Whereas" clause.  Thus, if Plaintiff was promised 2,900,000 shares, what he bargained for was a 0.54 percent ownership interest, *i.e.*, 2,900,000 divided by 536,125,218.  *Id.*

As a result of the publicly disclosed Reverse Split, however, *all* of CleanTech's (*i.e.*, 6D Global's) shares were reduced by a divisor of 6.9. Casey Decl. Exs. A and B (disclosing the share splits); Ex. C (October 1, 2014 Form 8-K, Item 5.01).  6D Global's SEC filings allowed investors such as Plaintiff to track the changes in the company's capitalization from the capitalization set forth in the Subscription Agreement Cap Table.  For example, as noted, on October 1, 2014, the Form 8-K filed with the SEC by 6D Global (as it had been renamed) announced that the Offering and the share exchange were completed on September 29, 2014. The Form 8-K also disclosed that all of the outstanding capital stock of Six Dimensions had been exchanged for 38,664,871 newly issued shares of the common stock of 6D Global (the renamed CleanTech). Casey Decl. Ex. C, Item 1.01.  That number – 38,664,871 – is equal to the number of exchange shares stated in the Cap Table (266,787,609) *divided by 6.9*.  Similarly, the Form 8-K disclosed that after the Offering and the share exchange, 6D Global's total shares outstanding were 77,066,989.  *Id.* at Item 5.01 (footnote 1 to table).  That number (77,066,989) is almost exactly the number obtained by taking the 536,125,218 total shares outstanding number

stated in the Cap Table and *dividing by 6.9*.[7]

Central to Plaintiff's Complaint, both as to the Rule 10b-5 claim and the contract claim, is the contention that Plaintiff received only 420,290 shares instead of the 2,900,000 shares supposedly promised in the Subscription Agreement. However, as of the time that the Offering closed, and Plaintiff received his 420,290 shares, those 420,290 shares represented the same 0.54 percent ownership interest that Plaintiff had bargained for under the Subscription Agreement. That is because the company's total shares had fallen to 77,066,989, from 536,125,218, as a result of the Reverse Split. In fact, 420,290 shares divided by 77,066,989 shares yields 0.55 percent, a figure that is slightly *higher* than what Plaintiff bargained for.[8]

Plaintiff also claims that he was not permitted to sell his shares when he would have liked because 6D Global imposed certain "restrictions" on the sale. But as noted, the Subscription Agreement stated specifically that the securities were "restricted" within the meaning of Rule 144 and thus subject to sale and transfer restrictions. Compl. Ex. C, Sections 5(g), (j).

## LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is *plausible* on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added; internal quotations omitted). And "[w]here a complaint pleads facts that are *merely consistent* with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (emphasis added; quotations

---

[7]   The slight discrepancy appears to be largely a function of the fact that the Cap Table assumed that the $5.1 million maximum Offering amount was raised, whereas, as noted in the October 1, 2014 Form 8-K, the private placement in fact raised about $4.6 million. *Id.* at Item 1.01.

[8]   Again, this discrepancy appears to be largely a function of the fact that the Cap Table assumed that the $5.1 million maximum Offering amount was raised, whereas the Offering in fact raised about $4.6 million.

PAGE 10

omitted).  "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id*. at 679.

### Plaintiff's Rule 10b-5(b) claim is subject to heightened pleading standards

Plaintiff's claim under Section 10(b) of the Exchange Act and Rule 10b-5(b) based on alleged misleading statements or omissions is subject to the heightened pleading standards of Federal Rule of Civil Procedure Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").  Fed. R. Civ. P. 8(a), 9(b); 15 U.S.C. § 78u–4; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318, 321 (2007).

To state a claim, Plaintiff must show "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta*, 552 U.S. 148, 157 (2008) (citation omitted).

Under the PSLRA, securities fraud plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc.*, 551 U.S. at 321 (citing 15 U.S.C. § 78u–4(b)(1)–(2)).  A complaint alleging securities fraud must also "specify each statement or omission alleged to have been misleading . . . [and] the reason or reasons why the statement or omission is misleading." *In re BioScrip, Inc. Sec. Litig.*, 95 F.Supp.3d 711, 725 (S.D.N.Y. 2015) (citing 15 U.S.C. § 78u–4(b)(1)) (alterations omitted).  Rule 9(b) "imposes a comparable requirement" on Rule 10b-5 plaintiffs.  *Id*. (citing Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.")); *see also Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (discussing requirements imposed by the PSLRA and Rule 9(b)).

**Rule 10b-5(a) and (c) - Scheme Liability**

Plaintiff also appears to allege liability under subsections (a) and (c) of Rule 10b-5, which prohibit schemes to defraud investors.  *See* 17 C.F.R. § 240.10b–5.  To state a claim for scheme liability, a plaintiff must present facts showing "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance."  *In re Alstom SA Sec. Litig.*, 406 F.Supp.2d 433, 474 (S.D.N.Y. 2005).  Scheme liability claims are subject to the PSLRA pleading standard with respect to scienter.  *Id*. at 475.  Plaintiff must also satisfy Rule 9(b) by alleging with particularity "what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue."  *In re Parmalat Sec. Litig.*, 383 F.Supp.2d 616, 622 (S.D.N.Y. 2005).

**Breach of Contract**

New York courts "look[] to all corners of the document rather than view sentences or clauses in isolation."  *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 168–69 (S.D.N.Y. 2015) (internal quotations omitted).  "[U]nder New York law, 'a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties.'"  *Atlas Partners, LLC v. STMicroelectronics, Int'l N.V.*, No. 14-CV-7134 VM, 2015 WL 4940126, at *5 (S.D.N.Y. Aug. 10, 2015) (quoting *Greenwich Capital Fin. Prods., Inc. v. Negrin*, 74 A.D.3d 413, 903 N.Y.S.2d 346, 346 (App. Div. 1st Dep't 2010)).

## ARGUMENT

**I.    Plaintiff Has Failed to State a Claim Against the 6D Defendants Under Section 10(b) or Rule 10b-5**

Plaintiff has crafted a narrative in his Complaint that, despite his sophistication and experience with these types of private offerings, the 6D Defendants and others pulled the wool

over his eyes.  That narrative, however, is both inadequately pled and squarely contradicted by common sense and the very Subscription Agreement through which he made the investment.

### A.   Plaintiff has not alleged any actionable material misstatements or omissions by any of the 6D Defendants

#### 1.   Plaintiff does not and cannot allege that the 6D Defendants made any actionable misrepresentations or omissions during pre-contractual negotiations

Plaintiff alleges that Kibrik made a series of oral, extra-contractual statements to him about his investment in the Offering, but nowhere alleges that those statements were made or authorized or directed by the 6D Defendants.  The Supreme Court has intentionally given the Rule 10b-5 implied private right of action a "narrow scope" by limiting liability to those who "'*made*' the material misstatements[.]"  *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141, 144 (2011) (emphasis added).  As the Court explained, "[o]ne 'makes' a statement by stating it."  *Id*. at 142.  Unless a person had "ultimate authority over the statement, including its content and whether and how to communicate it," there is no liability.  *Id*.

Plaintiff does not plead such "ultimately authority" with respect to the 6D Defendants. He alleges that *Kibrik* made numerous statements or omissions to him.  Compl. ¶ 22 ("Kibrik represented to [Plaintiff] that a return of 15-30 times his investment through this Offering would not be unrealistic"); ¶ 41 ("Neither Kibrik nor Radnor disclosed the reverse share splits in any of their communications with [Plaintiff] prior to his investment"); ¶ 45 (Kibrik denied that the offering was a reverse merger or involved a shell corporation); ¶ 65 (Plaintiff "sought and received assurances from Kibrik that the Offering did not involve Benjamin Wey").  Plaintiff nowhere alleges, however, that the 6D Defendants had "ultimate authority" over these statements, their content, or how to communicate them.  *Janus*, 564 U.S. at 142.  In fact, Plaintiff does not even allege that the 6D Defendants *knew* that Kibrik made these alleged statements.

Even if Plaintiff could somehow allege facts with particularity attributing these and other extra-contractual statements to the 6D Defendants,[9] he is prohibited from relying on them to support a Rule 10b-5 claim.  The Subscription Agreement plainly states, in two separate places, that it is the "*entire agreement*" between the parties and "supersed[es] all prior agreements [and] understandings" regarding the investment.[10]  The presence of a merger clause (in this case, *two* merger clauses) creates a fully integrated agreement, and bars Plaintiff from asserting securities fraud based on any prior statements concerning the investment.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007) ("Where the plaintiff is a sophisticated investor and an integrated agreement between the parties does not include the misrepresentation at issue, the plaintiff cannot establish reasonable reliance on that misrepresentation.").

In *ATSI Commc'ns*, for example, the Second Circuit held that a merger clause barred plaintiff's Rule 10b-5 claim "to the extent [plaintiff's] causes of action [were] based on alleged

---

[9]     Plaintiff briefly alleges that the 6D Defendants misstated the nature of the share exchange in a handful of SEC filings (and the Subscription Agreement) – specifically whether the share exchange would involve a reverse merger or a shell company. Compl. ¶¶ 46–50.  Plaintiff does not plead these alleged omissions/misrepresentations with particularity (*e.g.*, how does he define a "reverse merger" or "shell corporation," and how were the actual facts different than what was disclosed to him).  Nor does Plaintiff plead why these alleged omissions or misrepresentations were *material*, *i.e.*, facts demonstrating that "there [was] a substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the 'total mix' of information made available." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (affirming dismissal where shareholders failed to allege facts demonstrating materiality).  Finally, Plaintiff did not and cannot plead that these alleged omissions or misrepresentations *caused* any loss.  To the extent they induced him to make his investment, they actually caused him to profit – to the tune of eight percent in less than a year.

[10]     Compl. Ex. C, Section 5(w) ("This Agreement contains the entire agreement between the parties with respect to the subject matter hereof and supersede[s] all prior agreements, understandings, offers and negotiations, oral or written, with respect thereto and no extrinsic evidence whatsoever may be introduced . . . involving this Agreement."); *id*. Section 8(b) ("This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof, superseding any and all prior or contemporaneous oral and prior written agreements, understandings and letters of intent.").

misrepresentations made during negotiations preceding the [parties' investment transaction]."
*Id*. Here, Plaintiff is, by his own admission, "a sophisticated investor" and an "accredited investor." Compl. Ex. C, Section 5(e) ("The Subscriber is a sophisticated investor in securities of companies"); Section 5(d) ("The Subscriber [] is an accredited investor within the meaning of Rule 501"); *see also* Compl. Ex. C at A-4 (representing that he has "the knowledge and experience in financial and business matters sufficient to be capable of evaluating the merits and risks of various investments both public and private"); *id*. (confirming that he has "done several private placements."). He thus cannot rely on "alleged misrepresentations made during negotiations preceding" the Subscription Agreement. *See ATSI Commc'ns, Inc.*, 493 F.3d at 105 ("Of the misrepresentations that [plaintiff] claims, we can quickly dispose of all except the two alleged in the transaction agreements.").

      2.    <u>The Subscription Agreement itself contradicts Plaintiff's fraud allegations concerning the quantity of shares he received and the restrictions on their sale</u>

Plaintiff's Rule 10b-5 claim also relies on purported misrepresentations or omissions in the Subscription Agreement itself, but the Agreement belies his allegations, and no reasonable investor could have interpreted the Subscription Agreement as Plaintiff says he did.

      a.    *Plaintiff cannot base a Rule 10b-5 claim on the fact that he received the economic benefit for which he bargained*

Plaintiff claims that he "did not receive the correct number of shares" when his Units were converted into 6D Global shares because the shares "were reduced proportionately with [] two reverse stock splits." Compl. ¶¶ 30, 35–37. Specifically, as noted, Plaintiff alleges that he was entitled to 2,900,000 shares of 6D Global under the Subscription Agreement regardless of the publicly disclosed Reverse Split.

Plaintiff has not even alleged a material inaccuracy in the Subscription Agreement, much

less a misstatement or omission for Rule 10b-5 purposes.  As discussed previously in Factual

Allegations III, based on the Cap Table in the Subscription Agreement, Plaintiff (i) was *promised*

a 0.54 percent ownership interest in the company, *i.e.*, 2,900,000 shares divided by 536,125,218

shares, in return for an $870,000 investment, and (ii) *in fact received* that ownership interest, *i.e.*,

420,290 shares divided by 77,066,989 shares, in return for an $870,000 investment.  This must

be the case because, as also noted previously, the Reverse Split, like any stock split, does not

alter any shareholder's percentage ownership interest in the company.[11]

An admitted "sophisticated" and "accredited" investor such as Plaintiff, *id.* at Ex. C,

Sections 5(d)-(e), surely would be aware of these basic facts.  No reasonable investor could

believe that he was entitled to the kind of enormous windfall that Plaintiff demands in his

Complaint.  *See Pivot Point Capital Master LP v. Deutsche Bank AG*, No. 08 CIV. 2788 AKH,

2010 WL 9452230, at *5 (S.D.N.Y. Dec. 9, 2010) (dismissing Rule 10b-5 claim where a

sophisticated investor's purported misunderstanding about the nature of its investment was

"facially implausible and insufficient to support its claim.").  And, even if there had been a

misunderstanding, the notion that Plaintiff was *defrauded* on this basis is inherently implausible.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[A] complaint must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face.").

        b.    *The Subscription Agreement plainly disclosed that Plaintiff's securities were restricted*

Plaintiff also alleges that "[t]he Subscription Agreement [] did not disclose that there

would be restrictions placed upon his investment."  Compl. ¶ 55.  That is untrue.  Plaintiff was

---

[11]    For example, according to the Subscription Agreement, including the Cap Table, NYGG Asia, which had been a creditor of CleanTech, was to receive 242,534,190 shares in connection with the Offering and share exchange in satisfaction of the debt.  However, according to the

explicitly informed, in the Subscription Agreement, "that there are substantial restrictions on the transferability of Units, and that [Plaintiff] may have to hold Units indefinitely and may not be able to liquidate [his] investment in Units when [he] wishes to do so, if at all." *Id.* Ex. C, Section 5(g).  The Subscription Agreement also explained that Plaintiff's Units were "restricted securities within the meaning of Rule 144 of the Securities Act." *Id.*, Section 5(j).  In fact, Plaintiff even represented that he "underst[ood] the meaning of these restrictions." *Id.*

Plaintiff now contends that, because his Units in 6D Acquisitions were converted into shares of 6D Global, a publicly traded company, the Subscription Agreement "convey[ed] the clear message that [he] would be able to sell his 6D Global stock immediately upon receiving it." Compl. ¶ 55.  As discussed, the Subscription Agreement stated the opposite.  *Id.* Ex. C, Sections 5(g), 5(j).  And it did so precisely because Plaintiff acquired his shares in 6D Global through a *private offering* and therefore those shares were "restricted securities" within the meaning of Rule 144.  Compl. ¶ 15 (acknowledging that the Offering was a "Private Confidential Offering"); 17 C.F.R. 230.144(a)(3) (defining "[r]estricted securities" as "[s]ecurities acquired directly or indirectly from the issuer, or from an affiliate of the issuer, in a transaction or chain of transactions not involving any public offering.").  As a result, Plaintiff's 6D Global shares were subject to the sale and transfer restrictions under Rule 144, including, for example, the holding period of which he complains.  17 C.F.R. 230.144(d)(1)(i).

**B.     Plaintiff's Rule 10b-5 claim fails for a host of additional, independent pleading deficiencies**

Even if Plaintiff had alleged (or could allege) an actionable misstatement or omission by one of the 6D Defendants, his Rule 10b-5 claim must be still be dismissed.  He has not pled that

---

Form 8-K filed on October 1, 2014 (at Item 1.01), NYGG Asia in fact received only 35,149,883 shares, *i.e.*, 242,534,190 *divided by 6.9*, in satisfaction of its debt.

the 6D Defendants acted with scienter, that he suffered any out-of-pocket loss (he actually made

a healthy profit), that anything the 6D Defendants did *caused* a loss, or that any scheme or

manipulation by the 6D Defendants existed for purposes of Rule 10b-5(a) or (c).

               1.     <u>Plaintiff has failed to allege scienter</u>

       To plead scienter, Plaintiff needed to allege with particularity facts that show "(1) that

defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial

evidence of conscious misbehavior or recklessness."  *ECA v. JP Morgan Chase Co.*, 553 F.3d

187, 198 (2d Cir. 2009).  He has done neither.

       Plaintiff offers a single conclusory allegation concerning the 6D Defendants' motive,

specifically that they "were motivated to commit the fraud . . . to induce [Plaintiff] to invest in

the Offering to supply 6D Global with funds to operate and to supply 6D Global with the

minimum amount of funds required in order to consummate the Share Exchange."  Compl. ¶ 75.

The mere desire to complete a corporate transaction to keep the company afloat is a motive that

is "generally possessed by most corporate directors and officers," and is not sufficient for Rule

10b-5 liability.  *Kalnit v. Eichler*, 264 F.3d 131, 139, 141 (2d Cir. 2001) ("[T]he desire to

achieve the most lucrative acquisition proposal can be attributed to virtually every company

seeking to be acquired.  Such generalized desires do not establish scienter.").[12]  Plaintiff must

allege that *each* of the 6D Defendants "benefited in some *concrete and personal way* from the

purported fraud."  *JP Morgan Chase Co.*, 553 F.3d at 198 (emphasis added; internal quotations

omitted).  Plaintiff alleges nothing of the sort.

---

[12]    *See also In re Yukos Oil Co. Sec. Litig.*, No. 04 CIV. 5243 (WHP), 2006 WL 3026024, at
*18 (S.D.N.Y. Oct. 25, 2006) ("[T]he incentive to boost stock price to stimulate an impending
acquisition or optimize the terms for the corporation, without more, does not constitute an
adequate motive to defraud investors."); *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,

Nor does Plaintiff even attempt to allege the second avenue to pleading scienter – "strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* And given that Plaintiff has failed to plead motive, "the strength of the circumstantial allegations [of conscious misbehavior or recklessness] must be correspondingly greater." *Kalnit,* 264 F.3d at 142 (internal quotations omitted). Nor could Plaintiff allege conscious misbehavior or recklessness, given that the Reverse Split was timely announced in SEC filings, and that the Subscription Agreement itself stated that the Reverse Split was being contemplated. Even if the relative timing of the share exchange and Reverse Split could have been clearer in the Subscription Agreement, the undisputed facts and circumstances flatly negate any inference that the 6D Defendants acted recklessly or were consciously trying to defraud Plaintiff.

2. <u>Plaintiff has failed to allege an actionable economic loss</u>

One irony of Plaintiff's securities-fraud theory is that he actually *profited* on his investment. Plaintiff concedes that he made an *eight-percent* return on his investment ($70,000) in under a year. It is no wonder that Plaintiff avoids pleading any damages theory. *See id.* ¶ 80 (alleging generically that he "was damaged as a result of the Defendants' conduct in an amount to be determined at trial").

Even if he had tried, Plaintiff could not plead economic loss under Rule 10b-5. Securities fraud damages are "ordinarily . . . based on out-of-pocket losses," the purpose of which is "to restore the plaintiff to the position he was in before the fraud." *CAMOFI Master LDC v. Riptide Worldwide, Inc.*, No. 10 CIV. 4020 CM JLC, 2012 WL 6766767, at *13 (S.D.N.Y. Dec. 17, 2012) (internal quotations omitted). Here, restoring Plaintiff to his position prior to the alleged fraud would require *taking back* the eight percent ($70,000) he earned on an investment he

---

381 F. Supp. 2d 192, 218 (S.D.N.Y. 2004) (generalized allegations that company sought to

would not have otherwise made.  Plaintiff cannot plausibly allege with any reasonable degree of certainty (and has not even tried) that he would have achieved an eight-percent return on any alternative investment during the same period.[13]

Nor is Plaintiff entitled to any type of "benefit-of-the-bargain" damages – a theory he does not even plead.  These damages are not available if it is "speculative . . . whether the parties would have reached any agreement" absent the alleged omissions and misrepresentations. *Barrows v. Forest Laboratories, Inc.*, 742 F.2d 54, 60 (2d Cir. 1984).  Here, Plaintiff affirmatively alleges that he would *not* have struck a bargain with the 6D Defendants absent the alleged fraud.  Compl. ¶¶ 45, 70, 73.  Even if he had alleged otherwise, the terms of such an agreement would be entirely *hypothetical*.  *See Barrows*, 742 F.2d at 60 ("A claim for benefit-of-the-bargain damages must be based on the bargain that was actually struck, not on a bargain whose terms must be supplied by hypotheses about what the parties would have done if the circumstances surrounding their transaction had been different.").  Plaintiff's profit and consequent failure to allege any valid damages theory require dismissal of his Rule 10b-5 claim.

        3.      <u>Plaintiff has failed to allege that any conduct by the 6D Defendants caused his loss</u>

Even if Plaintiff could allege an actionable economic loss under Rule 10b-5 (he cannot),

---

inflate stock price to effectuate a merger were insufficient to state a Rule 10b-5 claim).

[13]     Furthermore, Plaintiff never alleges that he paid more than the true value of the shares he purchased.  *See Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 40 (2d Cir. 2012) ("[D]amages consist of the difference between the price paid and the 'value' of the stock when purchased.").  In fact, the Complaint alleges that Plaintiff paid significantly less for the shares than what they were worth.  On September 25, 2014, Plaintiff paid $870,000 and ultimately received 420,290 shares of 6D Global.  Compl. ¶¶ 26, 30.  As of September 29, 2014, 6D Global shares traded at $8.30, meaning that the value of his shares at the time was $3,488,407 – an impressive 4x more than what he paid.  Id. ¶ 54; *see Gurary v. Winehouse*, 190 F.3d 37, 46 (2d Cir. 1999) ("[A] defrauded buyer is entitled under Rule 10b–5 to recover only the excess of what he paid over the value of what he got.") (internal quotations omitted).

he has not pled that any of the alleged omissions or misrepresentations *caused* his loss.  So-called "loss causation" requires Plaintiff to allege "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.,* that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (emphasis in original; quotations omitted).

The Complaint offers nothing more than a single conclusory allegation that Plaintiff "was damaged as a result of the Defendants' conduct."  Compl. ¶ 80.  This lone allegation is insufficient on its own, and contradicted in the Complaint.  First, to the extent Plaintiff alleges that he was wrongfully prohibited from selling his shares more quickly, the Subscription Agreement that he signed plainly disclosed the restrictions on subsequent sales.  And Plaintiff, a self-described accredited and sophisticated investor, should have known that public shares issued in a private offering are subject to Rule 144's sale restrictions.

Second, while Plaintiff claims that the "true characterization of the Share Exchange between CleanTech and Six Dimensions" was "revealed" in 6D Global's 10-Q on November 12, 2014, Compl. ¶ 53, he does *not* allege that the November 12 disclosure caused 6D Global's share price to drop.  To the contrary, he alleges that 6D Global shares traded at $8.30 as of September 29, 2014, and remained at about $8 to $9 per share *six months later*.  Compl. ¶¶ 54, 57.  Plaintiff does not allege *any* share price decrease until August 2015 – nearly a year after he discovered that he received fewer shares than he allegedly expected (September 2014), nine months after the "true characterization of the Share Exchange" was allegedly publicly revealed (November 2014), and five months after he allegedly learned that the restriction on his shares would not be automatically lifted (March 2015).  Compl. ¶¶ 43, 54, 57.  Plaintiff does not allege how the "revelation" of any of the alleged omissions impacted 6D Global's share price *in any way*.

In fact, he alleges an *intervening cause* of his alleged loss that superseded any purported omission or misrepresentation.  He alleges that the restrictions on his shares were "finally removed in August 2015," but "by that time, 6D Global's share price was in the midst of a *death spiral*, plummeting from approximately $8/share to approximately $2/share."  Compl. ¶ 63 (emphasis added).  He never describes the so-called "death spiral," and certainly does not allege that it resulted from the materialization of any of the alleged omissions or misrepresentations.  *See In re QLT Inc. Sec. Litig.*, 312 F. Supp. 2d 526, 537 (2004) (dismissal required where "revised fourth quarter sales forecast . . . was clearly an intervening cause that superseded any direct effect of the alleged [misstatement]").

    4.    <u>Plaintiff has not alleged scheme liability under Rule 10b-5(a) or (c)</u>

Based on a single allegation in the Complaint, it appears that Plaintiff may be pursuing a "scheme liability" claim under Rule 10b-5(a) and (c).  Compl. ¶ 79 (merely concluding that all defendants violated Rule 10b-5(a) and (c)).  Those sections prohibit a person from "employ[ing] any device, scheme, or artifice to defraud," [Rule 10b-5(a)], or "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person. [Rule 10b-5(c)]." 17 C.F.R. 240.10b-5.  To state a claim under these "scheme liability" provisions, Plaintiff must allege that the 6D Defendants: "(1) committed a deceptive or manipulative act, (2) with the requisite scienter, (3) that the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendant's actions caused the plaintiff's injuries."  *Union Cent. Life Ins. Co. v. Credit Suisse Sec. (USA), LLC,* No. 11 CIV. 2327 GBD, 2014 WL 7179989, at *5 (S.D.N.Y. Dec. 10, 2014).  Plaintiff must plead this claim with Rule 9(b) particularity.  *Id*.

For the reasons stated above, Plaintiff has failed to plead the scienter, economic loss, or loss causation elements of his scheme-liability claim.  *See supra* Sections I.B.1–3.

PAGE 22

The claim should also be dismissed because it is improperly premised on the same alleged misrepresentations and omissions as his Rule 10b-5(b) claim.  And "where the sole basis for [Rule 10b-5(a) and (c)] claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b–5(a) and (c)."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005); *S.E.C. v. KPMG LLP.*, 412 F. Supp. 2d 349, 378 (S.D.N.Y. 2006) (holding that where "the core misconduct alleged is in fact a misstatement, it [is] improper to . . . designat[e] the alleged fraud a 'manipulative device.'").  Here, Plaintiff actually concedes that his Rule 10b-5(a) and (c) claim is duplicative of his Rule 10b-5(b) claim.  Compl. ¶ 77 (alleging that defendants' "scheme, plan, and unlawful course of conduct" was merely to "cause[] to be issued, and participate[] in the issuance of deceptive and materially false and misleading statements" to Plaintiff).  Plaintiff is not permitted to shoehorn standard allegations of misrepresentations and omissions into a "scheme liability" claim under Rule 10b-5(a) and (c).  *See Union Cent. Life Ins. Co.*, 2014 WL 7179989, at *5 (dismissing claims under 10b-5(a) and (c) claims where plaintiffs "impermissibly base[d] their allegations on the same misrepresentations and omissions . . . that supported their 10b-5 claim"); *In re Yukos Oil Co. Sec. Litig.*, No. 04 CIV. 5243 (WHP), 2006 WL 3026024, at *17 (S.D.N.Y. Oct. 25, 2006) (granting motion to dismiss Rule 10b-5(a) and (c) claims where the complaint "allege[d] only that [p]laintiffs were misled by [defendant's] misstatements and omissions.").

## II.    Plaintiff Has Failed to State a Breach of Contract Claim Against the 6D Defendants

This Court should dismiss Plaintiff's contract claim as a matter of law because, based simply on the Complaint and the attached documents, including the Subscription Agreement, Plaintiff received what he bargained and paid for in connection with the Offering.  As discussed previously in Factual Allegations III, based on the Cap Table in the Subscription Agreement, Plaintiff (i) was *promised* a 0.54 percent ownership interest in the company, *i.e.*, 2,900,000

shares divided by 536,125,218 shares, in return for $870,000, and (ii) *in fact received* that ownership interest, *i.e.*, 420,290 shares divided by 77,066,989 shares, in return for $870,000.

This Court can and should exercise its own judicial experience and common sense to reject out of hand Plaintiff's highly implausible contention that he was entitled to *6.9 times the ownership interest contemplated in the Subscription Agreement Cap Table in return for the same $870,000.*  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").  This is particularly the case because Plaintiff admittedly is a "sophisticated" and "accredited" investor who has "done several private placements."  Compl. Ex. C, pg. A-4, Sections 5(d)-(e).

Indeed, Plaintiff's interpretation is not merely implausible, it is also commercially unreasonable.  Sophisticated parties could not have reasonably expected or intended that Plaintiff be given the windfall that he demands in his Complaint, a windfall that no other shareholder received.  *See Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 173–74 (S.D.N.Y. 2015) (granting judgment on the pleadings where the proffered interpretation of a contract provision would lead to a "commercially unreasonable interpretation"); *Atlas Partners, LLC v. STMicroelectronics, Int'l N.V.*, No. 14-CV-7134 VM, 2015 WL 4940126, at *12 (S.D.N.Y. Aug. 10, 2015) (granting motion to dismiss complaint where plaintiff's interpretation of an agreement "would lead to a result that is absurd and/or commercially unreasonable" – "the Court cannot interpret a contract so as to reach such a result."); *Elsky v. Hearst Corp.*, 232 A.D.2d 310, 310–11, 648 N.Y.S.2d 592 (App. Div. 1st Dep't 1996) (reversing trial court's denial of defendant's motion to dismiss because plaintiff's contract interpretation was "commercially unreasonable.").  Plaintiff's reading of the Subscription Agreement "leads to an illogical result" and should be rejected.  *Katel Ltd. Liab. Co. v. AT & T Corp.*, 607 F.3d 60, 65 (2d Cir. 2010).

PAGE 24

**CONCLUSION**

For the foregoing reasons, Plaintiff's claims against the 6D Defendants should be

dismissed with prejudice.

September 21, 2016.

                               Respectfully submitted,

                               By: _s/ Peter N. Flocos_
                               Peter N. Flocos
                               K&L Gates LLP
                               599 Lexington Avenue
                               New York, NY 10022-6030
                               Phone: 212.536.4025
                               Fax: 212.536.3901
                               Email: peter.flocos@klgates.com

                               B. John Casey, admitted _pro hac vice_
                               K&L Gates LLP
                               One SW Columbia Street, Suite 1900
                               Portland, OR 97258
                               Tel.: (503)-228-3200
                               Email: john.casey@klgates.com

                               Attorneys for Defendants 6D Global Technologies, Inc., 6D Acquisitions, Inc., and Tejune Kang,

To: All Counsel of Record via CM/ECF

PAGE 25