G9EPCOTC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   JOHN COTTAM,

4                  Plaintiff,

5          v.                              16 CV 4584 (RJS)

6   GLOBAL EMERGING CAPITAL GROUP,
    LLC, ET AL.,
7
                   Defendants.
8
    ------------------------------x
9                                          New York, N.Y.
                                           September 14, 2016
10                                         2:37 p.m.

11  Before:

12                 HON. RICHARD J. SULLIVAN,

13                                         District Judge

14                         APPEARANCES

15  GOTTLIEB & JANEY, LLP
         Attorneys for Plaintiff
16  BY:  DERRELLE M. JANEY
         JUSTIN F. HEINRICH
17

18  K&L GATES, LLP (NYC)
         Attorneys for Defendants 6D Global Technologies, Inc., 6D
19  Acquisitions, Inc., Tejune Kang
    BY:  PETER N. FLOCOS
20       MAX E. KAPLAN

21

22

23

24

25

G9EPCOTC

1         (In open court)

2         (Case called)

3         THE COURT:  Okay.  Have a seat.  Thank you.  Let me

4  take appearances for the plaintiffs.

5         MR. JANEY:  For the plaintiff, John Cottam, Gottlieb

6  and Janey by Derrelle Janey.  Good afternoon, your Honor.

7         THE COURT:  All right.  Good afternoon to you.  And

8  with you?

9         MR. JANEY:  I'm joined at counsel table by my

10  colleague, Justin Heinrich.

11         THE COURT:  Okay.  Mr. Heinrich and Mr. Janey, good

12  afternoon.  And for the defendants?

13         MR. FLOCOS:  Good afternoon.  Peter Flocos from the

14  firm of K&L Gates, representing the two 6D entities, who are

15  defendants, as well as Tejune Kang, who's also a defendant.

16  And with me is my colleague, Max Kaplan.

17         THE COURT:  All right.  Good afternoon to each of you.

18         So the other folks are in arbitration, doing whatever

19  they're doing.  What's going on there?  Can you tell me,

20  Mr. Janey?

21         MR. JANEY:  Sure, your Honor.  First, I think it's

22  appropriate, by way of background, if I might.  Earlier this

23  year, with respect to the defendants who are going to be a part

24  of the FINRA arbitration, we had requested Dr. Cottam's

25  customer file from the broker dealer Radnor.  We did not

G9EPCOTC

1    receive the customer agreement that would arguably compel him

2    into arbitration until we commenced this proceeding.

3         It simply was not a part of the earlier packet of

4    documents we received prior to commencement; otherwise, we

5    would not have named them in this action.  We had been in

6    constant contact with their counsel.  They understand that that

7    arbitration filing is imminent.  We anticipate that filing will

8    occur next week.

9         THE COURT:  All right.  So you guys will keep me

10   posted but, obviously, what happens there might be relevant to

11   what happens here.

12        MR. JANEY:  We certainly agree with that, and we're

13   prepared -- I know your Honor has asked certain questions of us

14   that we're prepared to speak to whenever your Honor would like

15   us to.  But we certainly, for the plaintiff, take the position

16   that there, inevitably, will be material information and

17   evidence that will be relevant to the District Court

18   proceeding.

19        THE COURT:  So let me ask the defendants.  The

20   defendants want to make a motion to dismiss, and so is there

21   any advantage to just waiting to see how it goes in the

22   arbitration, and maybe that will make our job easier.  What do

23   you think of that?

24        MR. FLOCOS:  Respectfully, your Honor, I would say

25   that -- and I think both parties view it this way, because both

G9EPCOTC

1   parties, as stated in our joint letter to the Court, both

2   parties are of the view that it would be better to adjudicate

3   the motion to dismiss first and find out the answer to that.

4          I think that it's possible that this case may go away

5   in its entirety after the arbitration is concluded, but we

6   don't know that.  I think that's speculative, and in the

7   meantime, certainly from the vantage point of the 6D

8   defendants, we think we have clean grounds for dismissal here

9   and that the Court should just address that now, with a bird in

10  the hand, rather than two in the bush, if you will.

11         THE COURT:  All right.  Well, let's talk about the

12  contemplated motion.  So there are fraud claims and there's a

13  contract claim.

14         MR. FLOCOS:  Right.

15         THE COURT:  It's difficult for me to see -- well, let

16  me take a step back.  This is a pre-motion conference, as well

17  as an initial conference.  I never tell a party they can't make

18  a motion.  That's not the purpose.  The purpose is not to

19  discourage motions.  The purpose, frankly, is to kick the

20  tires, give me an opportunity to consider arguments and to

21  prepare for arguments, to ask some questions and, hopefully, to

22  streamline the process, to make it more efficient, to give

23  guidance to, certainly in this case, pretty sophisticated

24  practitioners about sort of what I think or at least what I

25  initially think.

G9EPCOTC

1         I'm not going to rule today, but I share at least some

2    of my thoughts or observations.  You're free to talk me out of

3    it, or to tell me why I'm wrong or what I've missed, but I'm

4    not going to rule today.  Sometimes I will tell you, I think

5    I'm going to rule this way and then, you know, that will inform

6    your decision going forward.  So that's the spirit of this

7    thing and that's why we do it.

8         So sometimes I think some lawyers think why do we have

9    these pre-motion conferences?  This judge is just throwing up

10   walls between us and our right to make motions.  At least in my

11   case, that's not the purpose at all.  It's really, I think, to

12   hopefully make the more process more efficient, and I find it

13   is helpful to me, believe it or not.  Sometimes I find the

14   pre-motion letters much more valuable than the briefs because

15   it just forces you to condense and to really burrow into the

16   key facts and the key authority as opposed to, you know, going

17   on for 25 pages or more, in some cases.

18        MR. FLOCOS:  Cutting to the chase.  We understand and

19   appreciate your Honor's comments.

20        THE COURT:  So let's then talk about it.  So we've got

21   a contract claim, which seems to me to sort of cover the whole

22   ballgame here.  It's hard for me to see how the fraud claim is

23   really a fraud claim at all.  If the plaintiff is right on the

24   contract, then they've won and will have gotten pretty much

25   everything they wanted out of the fraud claim; is that correct,

1    Mr. Janey, or am I missing something?

2              MR. JANEY:  Well, in the first -- yes.  However, in

3    the first instance, your Honor, our position is that these

4    claims can be credibly argued certainly at the pleading stage,

5    in the alternative.

6              THE COURT:  Okay.  But it's the same damages either

7    way, right?

8              MR. JANEY:  Yes, your Honor.

9              THE COURT:  All right.  So then let's focus on the

10   contract claim.  I have read this contract about 25 times now.

11   I think I understand it.  It's interesting.  It's not

12   beautifully written, candidly.  There's a lot of terms that are

13   defined, and then different terms are used later in the

14   agreement, reverse split and then there's a reference to the

15   stock split, which I assume is a reference to reverse split,

16   but who knows.  There's a reference the financing exchange, but

17   it's later then defined as the financing security exchange.  I

18   assume those are the same things, but it's a lot for me to see

19   a document involving sophisticated parties about pretty

20   sophisticated investment vehicles that sort of have those types

21   of mistakes or inconsistencies.

22             But at least as I see it, or at least as I think I

23   read this thing, we've got these whereas clauses that sort of

24   set the stage for the offering, and the third whereas clause is

25   the one that looked at least most interesting to me because

G9EPCOTC

1    what it seems to be saying is that, in that nanosecond, in that

2    metaphysical moments before or at the same time that the

3    offering is completed, the share exchange is executed, and the

4    financing exchange is -- financing security exchange is

5    completed.

6            At that, I guess the nanosecond before that moment,

7    CleanTech is going to be capitalized with 536 million shares.

8    Of those shares, 17 million are sort of designated for the

9    investors in the offering.  That's what they're going to go and

10   then, sort of at that moment, that metaphysical moment, there's

11   then a one-to-one exchange of the company, 6D Acquisitions'

12   shares for 6DT or Global shares, and there's also a

13   metaphysical moment, maybe the nanosecond right before that,

14   when CleanTech shares get converted into 6DT or 6D Global

15   shares.

16           And it seems to me that there are no splits or reverse

17   splits or anything that's taking place before then that is

18   going to affect the one-to-one exchange that is contemplated in

19   the agreement.  But it also seems to me that the one-to-one

20   exchange is premised on there being 536 million shares of

21   CleanTech stock; no more, no less.  So that's what it looks

22   like to me, and the facts here are that at the moment of the

23   exchange, how many CleanTech shares were there, or right before

24   the exchange?  Is it 536 million, or was it less than that?

25           MR. FLOCOS:  Your Honor, if I can address that --

G9EPCOTC

1          THE COURT:  Sure.

2          MR. FLOCOS:  -- for the 6D defendants.  I think your

3     Honor put your finger on it.

4          THE COURT:  I'm not as dumb as I look, but Janey may

5     disagree with that on a lot of levels.

6          MR. FLOCOS:  I think that the heartbeat of this claim

7     is what your Honor articulated at the beginning, and perhaps I

8     am at risk for conceding this at the motion-to-dismiss stage,

9     but I would concede upfront that I, too, upon reading the

10    subscription agreement, it is not necessarily a model of

11    clarity at times, but I think for purposes of the motion to

12    dismiss, coupled with what is a matter of public record in SEC

13    filings, I think your Honor has what he needs.

14          The complaint acknowledges that this share

15    capitalization table that your Honor pointed to, if your Honor

16    flips to the front of the documents, they are dated June 17th,

17    and the complaint acknowledges that, that although physically

18    Dr. Cottam is given the documents later, that the date of the

19    offering documents themselves are June 17th.

20          THE COURT:  Right.

21          MR. FLOCOS:  So this is the share capitalization as of

22    June 17th.

23          THE COURT:  Well, who cares, because it says:  Upon

24    raising the maximum offering of 5.1 million, at that point,

25    CleanTech will be capitalized as follows.  So what they do in

G9EPCOTC

1    June and July and August, they can go up, they can go down,

2    they can split three ways, and they can reverse split two ways,

3    and they can do whatever they want, it seems to me.  But when

4    the whistle is going to blow at the point of the offering being

5    completed, the share exchange and the financing exchange taking

6    place, it seems to me this is what the capitalization is going

7    to be.  Am I wrong about that?

8             MR. FLOCOS:  Your Honor, I think so because it was --

9             THE COURT:  Okay.

10            MR. FLOCOS:  -- thereafter, and I think this is the

11   nub of the dispute, it was thereafter --

12            THE COURT:  Thereafter what?  After the offering was

13   completed or after June 17th?

14            MR. FLOCOS:  Well, after June 17th but before the

15   share exchange but before this group of transactions was

16   completed.

17            THE COURT:  You concede -- let me interrupt you for a

18   second -- that these transactions all occur literally at the

19   same time, or maybe in an order, but they are almost

20   contemporaneously.  They have to be.

21            MR. FLOCOS:  My understanding is I think they are.  I

22   think the word that the corporate people use is substantially

23   contemporaneous.

24            THE COURT:  Okay.  That's what it reads like to me,

25   too.  Okay.  So keep going.  I interrupted you, sorry.

G9EPCOTC

1    MR. FLOCOS:  We further agree that the one-to-one

2    exchange ratio is predicated on 536 million shares.

3    THE COURT:  Well, it seems to me that the entire

4    transaction, or series of transactions is predicated on that.

5    Maybe I'm wrong, but you have the last whereas clause on Page 2

6    which says what CleanTech's capitalization will be upon raising

7    the maximum offering of 5.1 million.

8    It then says on the next page, it will be a condition

9    in the closing of the share exchange that the company complete

10   the offering.  And so it seems to me that the contemplation is

11   that the offering will be completed, and these shares -- or the

12   capitalization of CleanTech will be this.  It sounds like

13   that's not what happened, and I'm not sure what the remedy is

14   when that doesn't happen.  But I just want to make sure I'm not

15   missing something.

16   MR. FLOCOS:  Well, I'm not sure whether you're missing

17   something or I'm missing something.  I can tell you what, from

18   the defendant's vantage point, this comes down to is that the

19   exchange ratio, the one-to-one was based on an amount of shares

20   that was later subjected to a reverse split.

21   THE COURT:  Later subjected to a reverse split.

22   Later --

23   MR. FLOCOS:  Subsequently.

24   THE COURT:  What do you mean by later?  After the

25   transactions took place?  Because it seems to me that's fine,

G9EPCOTC

1    or before the transactions took place?

2              MR. FLOCOS:  It was --

3              THE COURT:  I think you're saying before, though,

4    right?  You're saying that there was, I think, a July and then

5    a September reverse or a split that --

6              MR. FLOCOS:  The document -- Let's talk about the

7    document.

8              THE COURT:  Let's do that.

9              MR. FLOCOS:  Then let's talk about the SEC filing.

10   The document says that there may be a split upon or after the

11   closing of a share exchange.

12             THE COURT:  Yes, upon or after.

13             MR. FLOCOS:  Right.

14             THE COURT:  So if the thing happens, they would get

15   one for one and sort of immediately, almost substantially

16   simultaneously, they announce a stock split or reverse.  Then

17   the investors here get -- they are subject to the same reverse

18   as every other shareholder, but that's already after they got

19   their one for one, right?

20             MR. FLOCOS:  That is according to the document, yes.

21             THE COURT:  Okay.

22             MR. FLOCOS:  Okay.  But after the date of this

23   document, June 17th --

24             THE COURT:  June 17th.

25             MR. FLOCOS:  -- and, indeed, with respect to one split

G9EPCOTC

1    after the time that Dr. Cottam says that he physically received

2    this document, which I think he says he physically received it

3    in September, there were two publicly announced reverse share

4    splits.  Okay?

5              THE COURT:  Reverse share splits in what stock?

6              MR. FLOCOS:  In CleanTech.

7              THE COURT:  In CleanTech stock.

8              MR. FLOCOS:  Yes, in CleanTech stock, but that is

9    ultimately -- When the share exchange took place --

10             THE COURT:  Okay, but what it seems to me that you're

11   really arguing is that even though that whereas clause at the

12   bottom of Page 1 of the subscription agreement was not complied

13   with --

14             MR. FLOCOS:  Yeah, what I'm arguing --

15             THE COURT:  -- it was lower or higher, in this case it

16   was actually lower, the investors, Dr. Cottam and others, are

17   locked into the ratio that exists in the numbers reflected in

18   Page 2.  So if there's twice as many shares in CleanTech, then

19   the shares of the investors in the offering should be twice as

20   many too.  That's what you're saying?  There should be 34

21   million, if there were actually a billion and change shares.

22             MR. FLOCOS:  What I'm arguing is that, as I understand

23   it, Dr. Cottam's theory is essentially that he was entitled to

24   X shares, okay, notwithstanding the fact that there was a

25   reverse stock split that changed the mathematics such that --

G9EPCOTC

1    he's essentially arguing that he was entitled to, by my count,

2    you know, 6.9 shares for the price of one, is essentially how

3    he is interpreting this; that the ratio is simply fixed in

4    stone.  The reverse stock split --

5              THE COURT:  Wait.  He's arguing that the ratio is

6    fixed in stone?  You're arguing that the ratio is fixed in

7    stone, it seems to me.  He's arguing that he gets one share of

8    the new CleanTech stock, which is the 6D Global or 6DT, for

9    each share that he has in 6D Acquisition, right?  That's what

10   he's arguing.

11             MR. FLOCOS:  Correct.

12             THE COURT:  Hard to argue with that.  That's exactly

13   what this thing says.

14             MR. FLOCOS:  But by the time he got his shares, and it

15   had been publicly announced, the company underwent -- and as

16   discussed in the document, the company underwent two reverse

17   stock splits so that it's our position, respectfully submitted,

18   that no reasonable investor could believe that, having

19   undergone these two reverse stock splits so that now instead of

20   there being seven shares outstanding, there was one share

21   outstanding, that the investor was nevertheless entitled to the

22   original amount of shares.  That would result in an enormous

23   windfall to the investor that I don't think parties could have

24   ever reasonably contemplated.

25             THE COURT:  Well, it seems to me that, just from where

G9EPCOTC

1     I'm sitting, that this contract doesn't say a thing about what

2     the remedies will be if CleanTech at the time of the offering,

3     at the time of these transactions, actually has a different

4     capitalization than what is set forth here.

5             So your argument, I think, is probably going to be

6     based on extrinsic evidence and logic and reason, that any

7     reasonable investor would assume that the ratio that -- the

8     percentage of the CleanTech stock that is designated for the

9     investors in the offering is what ought to be the same

10    percentage when the exchange takes place.  That's not crazy to

11    me, but it's not obvious to me.

12            MR. FLOCOS:  Your Honor, respectfully, I don't think

13    that is a -- I really don't think --

14            THE COURT:  You don't have to say "respectfully"

15    because I have no reason to think that you would talk to me

16    other than respectfully.

17            MR. FLOCOS:  I don't think that is a fact question.

18    If I am misinterpreting Dr. Cottam's theory, I'm sure Mr. Janey

19    will set us straight in a moment here, but I don't think there

20    is any dispute that he is arguing that he is entitled to seven

21    shares of the --

22            THE COURT:  No, he's not saying he is entitled to

23    seven shares.  He's saying he's entitled --

24            MR. FLOCOS:  And my math may be --

25            THE COURT:  -- to one share.

G9EPCOTC

1          MR. FLOCOS:  -- a little bit off.  Maybe it's five

2     shares for the price of one, but when you multiple out the

3     reverse share splits, that's what it comes down to.  So that

4     we're taking a document that admittedly is somewhat sloppy, but

5     who would have ever agreed to that, as an investment thesis?

6     Do we really need discovery?  We're going to spend resources on

7     discovery and summary judgement motions to discover that,

8     indeed, what parties would have ever entered into a windfall

9     agreement of that kind?  What the remedy is --

10          THE COURT:  Well, look, this is because you guys --

11     you guys, CleanTech, rather than comply with what's in the last

12     whereas clause on the first page, even though it's page No. 2,

13     it's the first real page of the agreement, you're saying that

14     because they were pretty careless, is what it seems to me and

15     they went into the transactions with fewer shares than what is

16     specified here in the capitalization breakdown, that they

17     should be sort of saved from the stupidity of that.

18          I guarantee you, if they had split the other way, so

19     that there were twice as many shares, Cottam and everybody else

20     would have just pulled out of the subscription agreement.

21     Right?  They would have said, this is not the agreement we

22     signed onto.  We don't want any part of this because you just

23     watered down our shares.  You really breached the agreement.

24          And so it's kind of puzzling to me that CleanTech

25     could have put themselves in this situation by their own

G9EPCOTC

1    choice.  I'm sort of stunned.  They may have a great

2    malpractice action against somebody, but I'm not sure why

3    Cottam has to say, well, we'll fix this for you.  I'm not sure.

4                MR. JANEY:  Your Honor --

5                THE COURT:  Yes, let's let Janey get a word in here.

6                MR. JANEY:  You know, your Honor, just a couple of

7    things.  No. 1, I think that the Court, from our perspective,

8    understands the controversy squarely.

9                THE COURT:  It took me all night to do it.

10               MR. JANEY:  I will tell you --

11               THE COURT:  We were talking about this after midnight.

12               MR. JANEY:  I'm not as bright as your Honor because,

13   in this case, I've been reading and rereading certainly more

14   than 25 times, and I had to have my colleagues read and reread

15   and try to explain it to me.

16               But the sum and substance of it is, from our

17   perspective, with all due respect to counsel, the date stamp on

18   the cover of the document is irrelevant.  It's not an operative

19   term of this contract.  The operative term, as your Honor is

20   describing, is what the shares were supposed to be, what the

21   one-to-one ratio was meant to be, how many shares would happen

22   after the offering.

23               The offering is clearly defined for the purposes of

24   the agreement.  This controversy is about the agreement.  Now,

25   the quick math that counsel was doing, I must admit, I couldn't

G9EPCOTC

quite keep up with, but very, very simply, Dr. Cottam was

looking for the one-to-one exchange.  He bought 58 units in the

SPV, which is -- and correct me if I'm wrong --

THE COURT:  It's 50,000 shares per unit.

MR. JANEY:  -- 50,000 shares of the public company.

This was to happen contemporaneously.  Contrary to counsel's

position, this notion of the reverse splits with respect to

understanding the contract is a red herring.

In other words, with respect to what Dr. Cottam was

supposed to receive, the notion of reverse splits, which are

not contemplated in the main of this agreement, cannot now

retroactively be applied to what Dr. Cottam was supposed to

receive and that he should now be satisfied with.  And a view

that, well, there were these reverse splits and he should be --

despite what the contract says, he should be satisfied with

what he got.

THE COURT:  No, I get what he's saying.  What he's

saying is that if CleanTech breaches this agreement or if they

monkey around with the share percentages at the bottom of

Page 2, they can maybe monkey around with some of these, but

they don't get to monkey around with the 17 million.

MR. JANEY:  Well, that's right.  So with respect to

the dates, because I understood your Honor to be asking about

some of the dates, just to talk about the reverse splits for a

moment, at least from our perspective so that we can put them

G9EPCOTC

squarely.  The subscription agreement did not disclose that

there were reverse splits, the first one taking place on

July 14th.

          THE COURT:  Reverse splits in CleanTech?

          MR. JANEY:  Reverse splits in CleanTech.  And that

there was a second one in September 25th of that year, four

days prior to the exchange.  Dr. Cottam had already paid his

money.

          THE COURT:  Look, I assume Dr. Cottam couldn't care

whether they split 19 times, 20 times, no times.  I think I

assume Dr. Cottam, like every other subscriber, assumed that

CleanTech would make sure that on the day of these

transactions, the total capitalization was going to be what's

at the bottom of the page.

          MR. JANEY:  That's correct.

          THE COURT:  That they had to do that.  I think that's

presumed, and I would argue a requirement of the transactions

going forward.

          MR. JANEY:  Correct.

          THE COURT:  I think the question that I would have for

you, though, is when that requirement wasn't satisfied -- in

other words, what's at the bottom of Page 2 didn't happen, it's

a smaller number -- you're saying, well, we still get 17

million shares even though there might only be 200 million

total shares.

G9EPCOTC

1          And you're saying, yeah, that's right because, tough

2     luck, you guys at CleanTech are a bunch of idiots.  And they're

3     saying, well, it's just not the spirit of this thing.  What we

4     really meant to say at the bottom of Page 2 was that this would

5     be the proportional breakdown.

6          If they had done that, then I think they'd win.  If

7     the bottom of the page said that CleanTech will be capitalized

8     as follows, 49.2 exchange shares issued to 6D, 14.1 issued

9     at -- if you did it that way, no problem.  Didn't do it that

10    way, and so the question I have is who bears the cost of the

11    screwup?

12          MR. JANEY:  Well --

13          THE COURT:  Is the remedy some sort of rescission or

14    is the remedy just give me the 17 million shares, and

15    CleanTech, you can either sue the lawyers who wrote this thing,

16    or you can just learn a valuable lesson for future business

17    transactions?  I don't know.  I'm not sure I'm going to be able

18    to resolve that on motion to dismiss.

19          MR. JANEY:  Right.  We won't resolve it on motion to

20    dismiss, but ultimately, your Honor, it's our position that

21    would get to it.  But the comment that I would make, at least

22    for today's purposes, is that the defendant cannot have it both

23    ways.  Defendant cannot say that they are a viable company

24    represented by sophisticated counsel circulating these

25    documents to the marketplace, accepting in monies from persons

G9EPCOTC

 1    like Dr. Cottam, an investment of almost a million dollars, and

 2    when they don't comply with the document that they put in his

 3    hand after accepting his money, say you were an accredited

 4    investor.  Sorry, you should have read it more closely or you

 5    should have gone and searched and looked, and you should have

 6    understood and maybe some thought outside of their head but

 7    that's not how it works.

 8         THE COURT:  Right, but I guess their response to you

 9    is, look, if these guys had thought this through, then all they

10    would have had to do was the reverse split a nanosecond after

11    the transactions took place.  Great, you get your 17 million

12    shares, and then they reduce it down.  But I think the point is

13    that this wouldn't have been hard to fix.

14         MR. JANEY:  The issue, your Honor, what I would

15    further submit, is that the issue of the miscalculation is only

16    the beginning of the problem in the case.  Right?

17         THE COURT:  Maybe.  I tell you, though, it doesn't

18    sound to me like fraud.  It sounds like incompetence or just an

19    honest mistake, but it doesn't sound like fraud.

20         MR. JANEY:  Well, this is where, going back to your

21    Honor's --

22         THE COURT:  Fraud would have been this, Mr. Janey.

23    Instead of having 500 million shares as capitalization, you had

24    2 billion, and still give you 17 million out of that.

25         MR. JANEY:  I'm not --

G9EPCOTC

1          THE COURT:  That would have been fraud it seems to me,

2     arguably.  It would have supported an inference of fraud.

3     Here, what you're saying is that they defrauded you into doing

4     this transaction, which got you no less than what you would

5     have gotten had the transaction been done correctly.

6          MR. JANEY:  There are other events, though, that are

7     surrounding this case.

8          THE COURT:  How are you worse off?  I don't

9     understand.  It seems to me you can only do better, and what I

10    would say is maybe he should do better because that's what the

11    language says.  I think in order to plead scienter, you have to

12    be able to articulate the theory whereby you're doing worse,

13    and I don't see how you're doing worse.

14         MR. JANEY:  For example, your Honor -- and not with

15    respect to the doing worse, but getting to the fraud issue.

16    Your Honor is certainly aware that the original complaint named

17    William Uchimoto in the case.  There is a large sort of ether

18    that's circulating some of the underlying facts.

19         I believe, as we lay out in the complaint and attach

20    as appendices to the complaint, it is certainly put forth from

21    the SEC complaints that Mr. Uchimoto was, one, the counsel to

22    CleanTech.  He was also the CleanTech to Benjamin Wey.  That

23    case is now, the SEC action, is now in its second amended

24    complaint.

25         We submit that more will come out of the FINRA case as

G9EPCOTC

1    to the connectivity on some of these things.  The issues,

2    discussions around restrictions, how the restrictions were

3    discussed and conveyed to Dr. Cottam both from the issuer and

4    from Radnor, and that's one of the reasons, quite frankly, that

5    we agree with counsel that we're willing to, after the motion

6    to dismiss is resolved, we certainly believe that the case will

7    continue.

8           And on that premise, to stay the District Court action

9    pending the FINRA arbitration because there, we believe that

10   will be more that we understand from discovery in that case on

11   the sorts of questions your Honor is now asking.

12          THE COURT:  All right.  Well, look, as I sit here now,

13   and I'm not ruling, it seems to me that the fraud claim is a

14   heavy lift.  It seems to me that the contract claim is likely

15   in denial on the motion to dismiss.  I don't know what the

16   parties contemplated in the event that what's at the bottom of

17   Page 2 was not complied with.

18          I don't know what remedies they contemplated.  I don't

19   know if there was any discussion about that.  I think that

20   would require some extrinsic evidence.  And it's not obvious to

21   me that it's the Court's job to fix this problem because if you

22   had gone the other way, if you had, at the time of the maximum

23   offering and the transactions taking place, you had more than

24   536 million shares, I think clearly the plaintiffs here would

25   have either been able to get out of this transaction all

G9EPCOTC

together, or they'd have a breach of contract claim.

          The problem here is not that they breached the
contract, it's that you breached your own contract.  Again, I
can't imagine why CleanTech would arrange their affairs so that
they've got less than 536 million shares since that can only
hurt them in the exchange.  But I'm not sure what the remedy is
when that's what they did because, certainly, the plaintiffs
didn't breach the agreement.  Right?

          MR. FLOCOS:  I think, your Honor --

          THE COURT:  Are you arguing that they breached the
agreement?  Are you bringing that --

          MR. FLOCOS:  No.

          THE COURT:  You're not bringing a Counterclaim for a
breach of contract by them, are you?

          MR. FLOCOS:  There's been no contemplation in my mind
about a Counterclaim --

          THE COURT:  Because they didn't do anything.

          MR. FLOCOS:  -- for breaching the agreement.  We
certainly agree with your Honor on the fraud count.  I don't
think there's anything that remotely rises to the level of
scienter, and I won't belabor that.  I won't argue that.

          THE COURT:  There's some other problems, as well, that
you raise.

          MR. FLOCOS:  There are some other problems.  That's
set forth in our premotion letter, and I won't belabor that

G9EPCOTC

1    here.  On the contract claim, I appreciate your Honor's point

2    about the agreement not specifying a remedy, but I think the

3    loss applies a remedy if there is a legal wrong.  And when you

4    have a public -- when you have a transaction that is

5    predicated, I mean, yes --

6             THE COURT:  But it's not.  I just can't read this

7    document and say it is predicated on them getting a percentage

8    as opposed to a raw number of shares.  That's what you're

9    saying.  You're saying that if you actually have a larger

10   number at the bottom of this list on Page 2, that their 17

11   million shares should go up or down, depending on what that

12   number is as a percentage, but it doesn't say that.

13            If you wanted to monkey around with the 266 million

14   shares issued to 6D, or you wanted to monkey around with the

15   seven million in shares that were for post-cancellation public

16   shares, I think the argument is you can do that, I suppose.

17   But you don't get to monkey with the 17 million number, the raw

18   number that is designated for investors in the offering because

19   that's what you told them they're going to get.  They're going

20   to get --

21            MR. FLOCOS:  I don't think anyone is -- when you have

22   a subsequent, publicly announced SEC-filed reverse stock split,

23   in my mind, that's not monkeying with the numbers.  That's an

24   adjustment that when Dr. Cottam was told that he was going to

25   get 50,000 shares and then subsequently there was a reverse

G9EPCOTC

stock split, it seems to me that any reasonable investor would
have to understand that you're not going to get your original
50,000 shares.  You're going to get that adjusted by the
subsequent reverse stock split.

THE COURT:  But that isn't what the agreement says.
That's not what the agreement says.

MR. JANEY:  It does not say that.

MR. FLOCOS:  It does not say that, but a reasonable
investor could only come to that conclusion.

THE COURT:  Look, I'd love to see the cases that say
that, but I don't think that's obvious from the way this is
written.  If you wrote this -- not you, but if this was written
in terms of percentages, that the CleanTech stock will be
capitalized in the following percentages, then, yes, you're
home free.  But I don't know that the listing of these raw
numbers to the penny, basically, 266,787,609 shares to 6D.

I mean, it is carefully calculated as to what these
stocks are, and it's not saying as of today, June 17th, and
they're subject to change.  It says as of, basically, the date
of the transactions, this is what the capitalization will be,
and so I think there's more than a good argument here that the
plaintiffs believe they were entitled to the 17 million shares,
which is a one-for-one ratio based on the offering.  Right?
The offering is going to be 17 million shares of 6D
Acquisition, right?

G9EPCOTC

1          MR. FLOCOS:  Your Honor, I'm just -- I'm just

2     restating my position at this point.

3          THE COURT:  I think it's 340 units, right?

4          MR. FLOCOS:  Apparently, he believed he was entitled

5     to what we view as a pretty obvious mathematical windfall.  We

6     disagree and don't think that we even need to have discovery

7     about that, but if your Honor disagrees, that's fine.  We can

8     bring our motion certainly on the 10B claim.

9          We will take your Honor's comments into consideration

10    regarding whether we bring a motion on the contract claim, but

11    our position is, as I have stated, indeed, to interpret this

12    agreement in the fashion advocated by the plaintiff, yes, I

13    agree.  Read literally, that's what it says, but it couldn't

14    have been -- he got what he paid for.  He could not have been

15    entitled to what was a very large windfall.

16         THE COURT:  No, but I think, again, we're going in

17    circles.

18         MR. FLOCOS:  Right.

19         THE COURT:  What he's saying is I bargained for a

20    one-to-one stock exchange on the units that I purchased being

21    for -- one-to-one for the 17 million shares that are designated

22    in this agreement.  I think I've got it.  Maybe I'm totally

23    wrong on the facts, and correct me if I'm wrong, Mr. Janey, but

24    I think it is 340 units, each unit worth 50,000 shares at

25    $15,000 per unit?

G9EPCOTC

1                    MR. JANEY:  That's correct.

2                    THE COURT:  So he was buying shares in a particular

3       number, and his understanding, based on this agreement, is that

4       he's going to get a one-for-one exchange on CleanTech shares,

5       or actually CleanTech shares that are morphed into 6D Global

6       shares, but it's a numerical exchange.  It's not a ratio

7       exchange.  So anyway, I think we all get it; so let's just talk

8       about this briefing schedule then.

9                    MR. JANEY:  We've conferred on the briefing schedule,

10      your Honor, from plaintiff's perspective.  If it's amenable to

11      the Court, we certainly have conferred.

12                   THE COURT:  What's the schedule that you've come up

13      with?

14                   MR. FLOCOS:  It would be our -- the motion to dismiss

15      would be served not later than September 21st.

16                   THE COURT:  Okay.

17                   MR. FLOCOS:  And the opposition would be due on

18      October 12th, and then the reply --

19                   MR. JANEY:  On the 26th of October.

20                   MR. FLOCOS:  -- that would be due on the 26th.

21                   THE COURT:  Okay.  That's fine with me.  You may, in

22      light of what I've said today, want to think about what you're

23      going forward on.  I'm not trying to talk you out of anything,

24      but I do think, as I sit here now, I think it's highly unlikely

25      I'm going to be granting the motion to dismiss across the

G9EPCOTC

1    board.

2            I think there's a very strong likelihood I'm going to

3    be dismissing the fraud claims, as this thing is currently

4    pled.  I think the issue for me is whether I should be staying

5    discovery in the interim, and I'm not inclined to, since I'm

6    pretty confident that the contract claim is going forward.  At

7    the very least, I think some discovery as to what the parties

8    contemplated would be the remedy for what ended up happening

9    here, which is a different capitalization in CleanTech at the

10   moment of the transactions.

11           MR. JANEY:  Plaintiff would agree with that, your

12   Honor.  We would submit --

13           THE COURT:  I think that's probably pretty discrete

14   discovery.  I think there must be only two or three people who

15   would even have an opinion on this.

16           MR. FLOCOS:  You took the words out of my mouth.  If

17   there is to be -- I mean, obviously, we'd like your Honor to

18   take a look at the motion before we reach the question of the

19   discovery stay, but if there is going to be discovery, I think

20   it would be pretty discrete.

21           THE COURT:  I think it will be discrete; so maybe,

22   Mr. Janey, if we stay it, what's the big deal because you've

23   still got the arbitration going and we can quickly catch up if

24   I rule as likely as I'm going to rule.

25           MR. JANEY:  Sure.

G9EPCOTC

1        MR. FLOCOS:  But that's our view of the world, your

2   Honor, in a nutshell.

3        THE COURT:  This is a pretty quick, as these things

4   go, schedule for the motion.  I've already telegraphed pretty

5   well, at least as far as pre-motion conferences go, what I

6   think is likely to happen.  I haven't ruled because maybe

7   you'll show me some case that say, no, no, courts should fix

8   all the problems that lawyers have gotten themselves into.

9        I think some judges might be more open to that than

10  others.  I'm generally not.  I don't believe I'm a fixer.  I

11  just think it's not really for courts to do that, especially

12  when it's sophisticated parties.  But if the Second Circuit

13  says, oh, no, you've got to fix these things and not resort to

14  extrinsic evidence; instead, just use your best guess as to

15  what you think would be fair, I guess I'll look at that

16  authority, but I don't think that really is the state of the

17  law.

18       So let's stay discovery.  Once I rule, I'll then say,

19  great, you tell me what discovery you need, and we'll know what

20  we're shooting at at that point.  And in the meantime, maybe

21  we'll have some feedback from the arbitration which might be

22  relevant.  Who knows?

23       MR. JANEY:  Okay.  Thank you, your Honor.

24       THE COURT:  All right.  So let's do this.  I will

25  issue a short order memorializing these dates that you just

G9EPCOTC

1    gave me, and then we'll take it from there.

2              Let me say that this was a pleasure.  It was an

3    interesting issue, well-lawyered with lawyers who are very

4    respectful and smart and responsive.  It's a shame that I'm

5    thanking you for this.  You would think that that should just

6    be always the way it is.  Not always.  So anyway, thanks.  I

7    enjoyed it.

8              MR. JANEY:  Thank you, your Honor.

9              MR. FLOCOS:  Thank you, your Honor.

10             THE COURT:  Okay.  If anybody needs a copy of this

11   transcript, you can take it up with the court reporter now, or

12   later through the website.  Okay.

13             (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25