**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ x
                                                        :
**JOHN COTTAM,**                                        :
                                                        :
                   Plaintiff,            :
                                                        :
       -against-                               :
                                                        :  Case No.  16-CV-04584 (RJS)
**GLOBAL EMERGING CAPITAL GROUP,**                      :
**LLC, ALEXANDER KIBRIK, WILLIAM**                      :
**UCHIMOTO, 6D GLOBAL**                                 :
**TECHNOLOGIES, INC., 6D**                              :
**ACQUISITIONS, INC., and TEJUNE**                      :
**KANG,**                                               :
                                                        :
      Defendants.                               :
                                                        :
                                                        :
                                                        :
------------------------------------------------------------ x


### MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS FILED BY DEFENDANTS 6D GLOBAL TECHNOLOGIES, INC., 6D ACQUISITIONS, INC., and TEJUNE KANG


GOTTLIEB & JANEY LLP
111 Broadway, Suite 701
New York, New York 10006
(212) 566-7766

*Attorneys for Plaintiff*
*John Cottam*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................... iii

PRELIMINARY STATEMENT ...............................................................1

FACTUAL BACKGROUND .....................................................................2

ARGUMENT ............................................................................................4

   I.     LEGAL STANDARD .................................................................4

   II.    THE CLAIM FOR BREACH OF CONTRACT
        SHOULD NOT BE DISMISSED..................................................5

   III.   THE COMPLAINT ALLEGES A CLAIM OF SECURITIES
        FRAUD WITH SUFFICIENT PARTICULARITY ...............................11

       A.  Defendants made numerous actionable
           material misstatements and omissions ............................................12

            1.  The Subscription Agreement misrepresented the number of shares Dr.
               Cottam was to receive and omitted the occurrence of the reverse stock
               splits and the effect that the reverse stock splits would have on his
               investment ....................................................................................13

            2.  The Subscription Agreement failed to disclose that Dr. Cottam's shares in
               6D Global would be restricted ......................................................15

            3.  Defendants Misrepresented the Process Regarding How to Remove the
               Restrictions in Order for Dr. Cottam to Sell the 6D Global Stock ............17

            4.  The Subscription Agreement failed to disclose the contemplated reverse
               merger and that CleanTech was a shell company......................................18

       B.  The Complaint Sufficiently Alleges Scienter ....................................19

       C.  Dr. Cottam's economic injuries were caused by the Defendants' conduct ....21

   IV.   LEAVE TO AMEND SHOULD BE GRANTED....................................23

CONCLUSION .......................................................................24

# TABLE OF AUTHORITIES

## Rules and Statutes

FRCP 12(b)(6) ...................................................................................................................1

FRCP 15(a)(2) .................................................................................................................24

15 U.S.C. § 78u-4(b)(2) ..................................................................................................19

17 C.F.R. § 240.10b-5......................................................................................................11

## Cases

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................................................4-5

*Atlas Partners, LLC v. STMicroelectronics, Intl. N.V.*,
    2015 WL 4940126 (S.D.N.Y. 2015)..........................................................................10

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)........................................................................................19

*In re Bioscrip, Inc. Sec. Litig.*,
    95 F.Supp.3d 711 (S.D.N.Y. 2015) ..........................................................................21

*Brass v. American Film Technologies, Inc.*,
    987 F.2d 142 (2d Cir. 1993).......................................................................................16

*Burns v. Delaware Charter Guarantee & Trust Co.*,
    805 F.Supp.2d 12 (S.D.N.Y. 2011) ..........................................................................10

*Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., N.A.*,
    773 F.3d 110 (2d Cir. 2014).......................................................................................5

*DiFolco v. MSNBC Cable LLC*,
    622 F.3d 104 (2d Cir. 2010).......................................................................................5

*Dynamic International Airways, LLC v. Air India Ltd.*,
    2016 WL 3748477 (S.D.N.Y. July 8, 2016) .............................................................10

*Elsky v. Hearst Corp.*,
    232 A.D.2d 310 (1st Dep't 1996) ..............................................................................10

*Employees' Retirement Sys. Of Gov't of the Virgin Islands v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)..................................................................................19

*Fiore v. Rivera*,
    2015 WL 5007938 (E.D.N.Y. Aug. 20, 2015).................................................23

*Ganino v. Citizens Util. Co.*,
    228 F.3d 154 (2d Cir. 2000)..................................................................................12

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S.Ct. 2398 (2014)............................................................................................11

*Hayden v. County of Nassau*,
    180 F.3d 42 (2d Cir. 1999)....................................................................................23

*Int'l Motor Sports Group, Inc. v. Gordon*,
    1999 WL 619633 (S.D.N.Y. 1999)......................................................................11

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)..................................................................................21

*Katel LLC v. AT&T Corp.*,
    607 F.3d 60 (2d Cir. 2010)....................................................................................10

*Mazuma Holding Corp. v. Bethke*,
    21 F.Supp.3d 221 (S.D.N.Y. 2014) ......................................................... 14, 21-22

*In re Musicland Holding Corp. v. Wachovia Bank, N.A.*,
    374 B.R. 113 (Bankr. S.D.N.Y. 2007)...................................................................7

*Nielsen v. Rabin*,
    746 F.3d 58 (2d Cir. 2014)......................................................................................4

*Pivot Point Capital Master LP v. Deutsche Bank AG*,
    No. 08-CV-2788 (AKH), 2010 WL 9452230 (S.D.N.Y. Dec. 9, 2010)............14

*Rahl v. Bande*,
    328 B.R. 387 (Bankr. S.D.N.Y. 2005)...................................................................7

*Reiss v. Fin. Performance Corp.*,
    97 N.Y.2d 195 (2001) ......................................................................................8, 10

*In re: Residential Capital, LLC v. Wells Fargo, N.A.*,
  531 B.R. 25 (Bankr. S.D.N.Y. 2015) ..............................................................5, 6

*In re Ridley*,
  453 B.R. 58 (Bankr. E.D.N.Y. 2011) .................................................................11, 12

*In re Sanofi-Aventis Securities Litigation*,
  774 F.Supp.2d 549 (S.D.N.Y. 2011)..................................................................11, 12

*Schmidt v. Magnetic Head Corp.*,
  97 A.D.2d 151 (2d Dep't 1983) .........................................................................6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)............................................................................................19

*Thesling v. Bioenvision, Inc.*,
  374 Fed.Appx. 141 (2d Cir. 2010) ......................................................................12

*In re Virtus Investment Partners, Inc. Sec. Litig.*,
  2016 WL 3647959 (S.D.N.Y. July 1, 2016) .......................................................20

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
  127 F.Supp.3d 156 (S.D.N.Y. 2015)...................................................................10

## PRELIMINARY STATEMENT

Plaintiff John Cottam ("Dr. Cottam") submits this memorandum of law in opposition to the motion to dismiss, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP"), submitted by the defendants 6D Global Technologies, Inc. ("6D Global"), 6D Acquisitions, Inc. ("6D Acquisitions"), and Tejune Kang ("Kang") (collectively, the "Defendants").  [ECF Nos. 43-45].

The Defendants, in seeking to dismiss the Complaint, ask the Court to ignore their clear and unequivocal contract with Dr. Cottam in connection with a highly risky investment opportunity, notwithstanding the fact that Dr. Cottam performed his obligations thereto by transmitting $870,000 to the Defendants.  The Defendants wish to avoid their obligations and responsibilities which are plainly set forth in the contract they drafted.  As a result of the Defendants breach of that contract, Dr. Cottam was denied approximately 2.4 million shares in 6D Global which he should have received pursuant to that contract.

Moreover, in connection with this investment, the Defendants also defrauded Dr. Cottam by misrepresenting and omitting material information in order to induce him to invest.  The contract, drafted by the Defendants, failed to disclose and misrepresented, *inter alia*, the number of shares they intended that Dr. Cottam would receive, that reverse stock splits had occurred which the Defendants intended to have an effect on the number of shares Dr. Cottam was to receive, that the shares Dr. Cottam received would be restricted, and that the transaction involved both a reverse merger and a shell corporation.  As a result of the Defendants fraudulent and misleading conduct, as set forth herein, Dr. Cottam has been injured because he did not receive the correct number of shares which the Defendants had promised him and he was delayed in

1

selling the reduced number of shares that he eventually obtained from the Defendants.

None of the arguments presented in the Defendants' motion are sufficient to warrant the extreme remedy of a dismissal for failure to state a claim.  Accordingly, we respectfully submit that the Court deny the Defendants' motion to dismiss Dr. Cottam's well-pled Complaint.

## FACTUAL BACKGROUND

In early September 2014, Dr. Cottam was approached by Alexander Kibrik ("Kibrik"), his investment representative at Radnor Research & Trading Company ("Radnor"),[1] who presented Dr. Cottam with a Private Confidential Offering (the "Offering") as a possible lucrative investment.  (Compl., ¶ 15).  In connection with the solicitation to invest in the Offering, Kibrik provided Dr. Cottam with a document, dated June 17, 2014, entitled "Confidential Subscription Documents" (the "Subscription Documents").[2]  (Compl. ¶ 17). Included within the Subscription Documents was a subscription agreement (the "Subscription Agreement"), which set forth the terms of the Offering.  (Compl. ¶ 18).

The Offering was an investment in Defendant 6D Acquisitions, a "special purpose vehicle" created for the purpose of investing in the reorganized company (Defendant 6D Global) following a share exchange between the companies CleanTech and Six Dimensions (the "Share Exchange").  (Compl. ¶ 15).  The stated purpose of the Offering was to infuse capital of between a minimum of $3,000,000.00 and a maximum of $5,100,000.00 into 6D Global.  (Compl. ¶ 15). The successful completion of the Offering was a mandatory prerequisite to the consummation of

---

[1]    Radnor has subsequently changed its name to Global Emerging Capital Group.

[2]    A copy of the Subscription Documents is attached as Exhibit C to the Complaint and will be cited as "Ex. C" herein.  The referenced pagination will be to the corresponding page of the filed exhibit.  [ECF. No. 1-3].

the Share Exchange.  (Compl. ¶ 15).

As described in the Subscription Agreement, the contemplated Share Exchange was for CleanTech to issue approximately 50% of its outstanding shares of common stock to the shareholders of Six Dimensions in exchange for all of Six Dimensions' outstanding shares, the net result of which was to render Six Dimensions a wholly-owned subsidiary of CleanTech.  (Ex. C, p.10).  Pursuant to the Offering, investors could purchase "Units" for $15,000.00 per Unit with each Unit consisting of fifty-thousand (50,000) shares of 6D Acquisitions common stock. (Ex. C, § 1(a)).

The terms of the Subscription Agreement were unequivocal: for every one share of 6D Acquisitions stock purchased through the Offering, the investor would receive one share of 6D Global stock.  In particular, the Subscription Agreement provided:

> **Immediately upon the closing and effectiveness of the Share Exchange, each share of Common Stock underlying the Units purchased herein shall be automatically converted on a 1:1 basis into shares of [6D Global's] Nasdaq listed common stock (the "Financing Security Exchange"), such shares shall be distributed to the Subscribers herein and [6D Acquisitions] shall subsequently be dissolved.**

(Ex. C, § 1(b)).  The Subscription Agreement also similarly stated:

> **WHEREAS, upon completion of the Offering and immediately upon the closing of the Share Exchange, all of the Company's common stock underlying the Units (as defined herein) offered hereby will be automatically exchanged into shares of [6D Global] on a 1:1 basis.**

(Ex. C, p.11).

On or about September 18, 2014, relying on, *inter alia*, the clear terms of the Subscription Agreement, Dr. Cottam signed the Subscription Agreement to purchase a total of 58 Units for $870,000.00, representing 2,900,000 shares of 6D Acquisitions common stock.

(Compl. ¶ 26).  On or about September 25, 2016, Dr. Cottam caused $870,000.00 to be wired to the escrow agent identified in the Subscription Documents.  (Compl. ¶ 26).

On September 29, 2014, CleanTech and Six Dimensions merged pursuant to a reverse merger.  (Compl. ¶ 28).  Although Dr. Cottam should have received 2,900,000 shares of 6D Global following the merger, Dr. Cottam instead received a total of only 420,290 shares of 6D Global.  (Compl. ¶ 30).

Dr. Cottam was informed by William Uchimoto, Radnor's legal counsel, that the discrepancy in shares was because of two reverse stock splits in CleanTech that had occurred prior to September 29, 2014.  The first reverse stock split (on a 1:3 basis) of CleanTech stock purportedly affecting his shares occurred on July 14, 2014; however, the Subscription Agreement provided to Dr. Cottam in September 2014 did not disclose that this reverse stock split had occurred two months earlier.  (Compl. ¶¶ 36).  The second reverse stock split (on a 1:2.3 basis) purportedly affecting Dr. Cottam's shares occurred on September 25, 2014, after Dr. Cottam had signed the Subscription Agreement and only four days prior to the consummation of the Share Exchange.  (Compl. ¶ 37).

## ARGUMENT

### I.   LEGAL STANDARD

It is well-established that in deciding a motion to dismiss for failure to state a cause of action pursuant to FRCP 12(b)(6), the reviewing court must accept all factual statements alleged in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).  The relevant inquiry is not whether the asserted claim is probable, but whether the claim is "plausible on its face."  *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

When considering whether to deny a motion to dismiss, a court may consider the facts alleged within the complaint and any documents attached to or incorporated by reference in the complaint. *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010). The court may also consider any documents that are relied upon in the complaint (although not incorporated by reference) such that they are "integral" to the allegations within the complaint. *Id.*

## II.     THE CLAIM FOR BREACH OF CONTRACT SHOULD NOT BE DISMISSED

When interpreting a contract, "[the Court's] primary objective is to give effect to the intent of the parties as revealed by the language of their agreement. The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2014). Thus, "[i]f the terms of the contract are complete, clear and unambiguous on their face, they must be enforced according to the plain meaning of their terms." *In re: Residential Capital, LLC v. Wells Fargo, N.A.*, 531 B.R. 25, 42 (Bankr. S.D.N.Y. 2015). "It is fundamental that courts enforce contracts and do not rewrite them. 'The courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the

writing.'" *Schmidt v. Magnetic Head Corp.*, 97 A.D.2d 151, 157 (2d Dep't 1983) (quoting *Morlee Sales Corp. v. Manufacturers Trust Co.*, 9 N.Y.2d 16, 19 (1961)).  A party to a contract may not compel the Court to, in effect, rewrite the contract *ex post* simply because the party now finds compliance with the agreed upon terms undesirable.  *See Residential Capital*, 531 B.R. at 45 ("[a party] cannot not renegotiate the terms of the contract for which it bargained simply because things did not turn out favorably for it").

Here, the Defendants' arguments in support of their motion to dismiss the breach of contract claim must be rejected as they are premised on the faulty supposition that there was no breach because Dr. Cottam received the 0.54 percent ownership interest in 6D Global purportedly promised in the Subscription Agreement.  This strained interpretation of the Subscription Agreement, however, would require the Court to substantially rewrite it to include language that conflicts with its otherwise clear and unambiguous terms, a result which is impermissible under the law.

The Subscription Agreement clearly and unequivocally provides that any shares in 6D Acquisitions that Dr. Cottam had purchased pursuant to the Offering (the 2,900,000 shares) would automatically convert into shares of 6D Global on a 1:1 basis, entitling him to precisely 2,900,000 shares of 6D Global.  (Ex. C, p.11).  If the Court adopted Defendants' interpretation regarding "ownership percentage", not only would it render much of the Subscription Agreement meaningless, but it would conflict with the core promise that Dr. Cottam would receive the 6D Global shares on a 1:1 basis.  The Subscription Agreement expressly, exclusively and consistently describes this series of transactions relevant to Dr. Cottam in terms of discrete numbers of shares of the relevant companies.  (*See, e.g.,* Ex. C, at § 1(a) ("This Subscription

Agreement is for the purchase of subscription units (the "Units"), each Unit to consist of fifty thousand (50,000) shares of [6D Acquisition's] common stock, par value $0.001 per share.  The purchase price for each Unit shall be fifteen thousand dollars ($15,000)[.]")).  The Defendants do not cite – nor can they – one instance in the Subscription Agreement in which it describes these transactions in terms of proportional interests in ownership, as Defendants now claim is – or should be – the case.  In fact, by the terms of the Subscription Agreement, Dr. Cottam's investment in 6D Acquisitions **had no relationship** with the value of 6D Global and/or CleanTech.  (*See* Ex. C, p.17 ("The offering price of the Units was determined arbitrarily.  The offering price of the Units does not . . . necessarily reflect the market price of CleanTech's common stock.")).  The Defendants' interpretation conditioning their performance based on a contrived ownership percentage simply turns the Subscription Agreement on its head and must be rejected by this Court.

Because the Subscription Agreement is unambiguous on its face, the Defendants' attempt to evade or modify its enforcement by claiming that its plain meaning does not represent the actual intent of the parties must fail.  *See In re Musicland Holding Corp. v. Wachovia Bank, N.A.*, 374 B.R. 113, 121 (Bankr. S.D.N.Y. 2007) (holding that if one party harbored an expectation that was secret at the time of contracting, and which contradicts the language agreed upon, "the court cannot rewrite the contract to fulfill their unspoken expectation").  This is especially true because the Defendants are sophisticated in business transactions and understand the complex nature of securities transactions.  *See Rahl v. Bande*, 328 B.R. 387, 401 (Bankr. S.D.N.Y. 2005) ("[I]t is well settled that where the meaning of an agreement among sophisticated parties is unambiguous on its face, the agreement does not become ambiguous

7

simply because one of the parties later asserts that it intended a different interpretation").

The Defendants' suggestion that the contract should not be interpreted as written because it would create a "windfall" for Dr. Cottam is troubling, especially in light of the nature of the Offering, which was, on its face, was "highly speculative" and "involve[d] a high degree of risk." (Ex. C, p.9). Indeed, the very reason why an investor such as Dr. Cottam would enter into such a risky investment as the Offering is to reap a potential windfall. Here, both parties entered into the Subscription Agreement understanding that it involved a great deal of risk, and now the Defendants wish to deny Dr. Cottam the "windfall" that he earned pursuant to that agreement because, as they allege, it is a "windfall."

However, New York's Court of Appeals has squarely rejected the Defendants' argument under extremely similar circumstances. *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195 (2001). In *Reiss*, the defendant, Financial Performance Corporation ("Financial"), had issued warrants to plaintiffs to purchase a specific quantity of shares of its common stock at a particular price. Subsequent to the issuance of the warrants, Financial underwent a reverse stock split. After the reverse stock split, the holders of the warrants (the plaintiffs) sought to execute them, but Financial refused to honor the warrants as written, claiming that the quantity of shares expressly provided for in the warrants had to be adjusted in proportion to the reverse stock split in order to avoid creating a windfall for the plaintiffs. 97 N.Y.2d at 197-201.

The Court found the warrants were enforceable as written as there was no ambiguity in their terms. In rejecting the defendant's claim that to enforce the warrants as written would create a windfall for the plaintiffs, the Court noted that the parties must have foreseen the possibility of a reverse stock split because the defendants had included reverse split adjustment

8

provisions in warrant agreements with other investors.  The Court concluded that the defendants

must have purposefully omitted these provisions in their agreements with the plaintiffs.  *Id.* at

199-200.

"[T]his Court will not imply a term where the circumstances surrounding the formation

of the contract indicate that the parties, when the contract was made, must have foreseen the

contingency at issue and the agreement can be enforced according to its terms." *Id.*

The Court went on to explain:

> It may be that [the warrant-holder] would be entitled to a remedy if
> Financial performed a forward stock split, on the theory that he did
> not intend to acquire nothing.  We should not assume that one
> party intended to be placed at the mercy of the other.  *It does not
> follow, however, that Financial should be given a comparable
> remedy to save it from the consequences of its own agreements and
> its own decision to perform a reverse stock split.*

*Id.* at 201 (internal citations omitted) (emphasis added).

Here, the Defendants, the drafters of the Subscription Agreement, certainly foresaw the

possibility of a reverse stock split because the Subscription Agreement specifically provides that

Dr. Cottam's shares of 6D Global would be subject to reverse splits *upon completion* of the

Share Exchange.  (Ex. C, p. 11).[3]  Certainly, had the Defendants wanted to subject the number of

shares in 6D Global obtained pursuant to the Offering to prior reverse splits, they had the

---

[3]     The Defendants' reliance on the phrase in the Subscription Agreement that "[t]he shares
comprising the Units will subject to the Split" is misplaced.  (Def. Memo. 2; Ex. C,
§ 1(b)).  This phrase does nothing to assist the Defendants (1) because it is incoherent and
meaningless; and (2) "Split" is not defined in the Subscription Agreement other than
possibly "Reverse Split" which relates only to Reverse Splits that occur after the
consummation of the Offering.

opportunity to do so when they drafted the Subscription Agreement.[4]

As in *Reiss*, the Court here should not "imply a term where the circumstances surrounding the formation of the contract indicate that the parties, when the contract was made, must have foreseen the contingency at issue and the agreement can be enforced according to its terms." *Id.* at 199.  Nor should the Court save the Defendants from "the consequences of [their] own agreements and [their] own decision to perform a reverse stock split." *Id.* at 201.[5]  The Court cannot allow the Defendants to avoid their obligations under the Subscription Agreement, especially after they received the benefit of Dr. Cottam's $870,000 investment.  Accordingly, the Defendant's motion to dismiss the breach of contract claim must be denied.

---

[4]  To the extent that the Court determines there is any ambiguity in the Subscription Agreement, which would require the presentation of extrinsic evidence, it would be error to grant the motion to dismiss.  *See Burns v. Delaware Charter Guarantee & Trust Co.*, 805 F.Supp.2d 12, 23-24 (S.D.N.Y. 2011) ("[T]he interpretation of ambiguous contract provisions[] are inappropriate for resolution on a motion to dismiss, where allegations are taken as true and read in a light most favorable to plaintiffs.").  Moreover, any ambiguity in a contract must be construed against the Defendants, as they were the parties who controlled the drafting of the Subscription Agreement.  *Dynamic International Airways, LLC v. Air India Ltd.*, 2016 WL 3748477, at *8 (S.D.N.Y. July 8, 2016).

[5]  None of the cases cited by the Defendants supports their position.  (Def. Memo. 24).  In two of the cases the Defendants cite, the Courts dismissed claims of breach of contract on the grounds of commercial unreasonableness where a plaintiff's proposed interpretation would render a contract internally inconsistent.  *See Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC,* 127 F.Supp.3d 156, 174 (S.D.N.Y. 2015); *Katel LLC v. AT&T Corp.*, 607 F.3d 60 (2d Cir. 2010); *Elsky v. Hearst Corp.*, 232 A.D.2d 310, 311 (1st Dep't 1996).  As discussed at length above, the Defendants' proposed interpretation of the Subscription Agreement would render it internally inconsistent with, *inter alia*, its promise of a 1:1 exchange of 6D Acquisitions stock and 6D Global stock.  In *Atlas Partners, LLC v. STMicroelectronics, Intl. N.V.*, 2015 WL 4940126 (S.D.N.Y. 2015), the Court found a proposed contract interpretation commercially unreasonable because it required the illogical assumption that a party had amended an agreement to pay a fee without receiving any services in return.  Moreover, the Court did not depart from the plain meaning of the written terms of the contracts at issue, which is what the Defendants are advocating here.

### III.    THE COMPLAINT ALLEGES A CLAIM OF SECURITIES FRAUD WITH SUFFICIENT PARTICULARITY

Pursuant to Rule 10b-5, "it is unlawful for any person, directly or indirectly, . . . (b) [t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]"  17 C.F.R. § 240.10b-5.  Under well-established law, a plaintiff must allege the following elements to sustain a claim under Section 10(b) of the Exchange Act and Rule 10b-5(b): (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.  *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2407 (2014).

Additionally, both FRCP 9(b) and the Private Securities Law Reform Act ("PSLRA") require that claims sounding in securities fraud be pled with particularity.  To satisfy these heightened pleading requirements, the complaint must (1) specify the statements the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent.  *In re Sanofi-Aventis Securities Litigation*, 774 F.Supp.2d 549, 559 (S.D.N.Y. 2011) (*quoting ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)).  The need to plead fraud claims with particularity, however, does not require absolute precision so long as the pleading provides the defendant with "fair and reasonable notice of the claims and the grounds upon which it is based."  *In re Ridley*, 453 B.R. 58, 66 (Bankr. E.D.N.Y. 2011); *Int'l Motor Sports Group, Inc. v. Gordon*, 1999 WL 619633, at *3 (S.D.N.Y. 1999).  Indeed, courts have acknowledged that Rule 9(b)'s pleading requirements may be relaxed for information particularly within the defendant's

knowledge.  Thus, for instance, in *Ridley*, the court held that the complaint satisfied Rule 9(b)
even though it did not identify the individuals at the company with whom the plaintiff spoke or
exactly when the miscommunications occurred because such information was more likely to be
within the company's control.  453 B.R. at 75 ("At the pleading stage, a greater level of detail is
not required.").

A. **Defendants made numerous actionable material misstatements and omissions.**

"At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by
alleging a statement or omission that a reasonable investor would have considered significant in
making investment decisions."  *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).
A material omission is actionable if the speaker had a duty to disclose the omitted fact.  *Sanofi*-,
774 F.Supp.2d at 560.  A duty to disclose may arise either by operation of law (*i.e.*, through a
statute or regulation) or "as a result of the ongoing duty to avoid rendering existing statements
misleading by failing to disclose material facts."  *Thesling v. Bioenvision, Inc.*, 374 Fed.Appx.
141, 143 (2d Cir. 2010).  Indeed, "[w]hen a corporation chooses to speak, it has a 'duty to be
both accurate and complete.'"  *Sanofi*, 774 F.Supp.2d at 561 (quoting *Caiola v. Citibank, N.A.*,
295 F.3d 312, 331 (2d Cir. 2002)).

Dr. Cottam's claims against the Defendants are based, in significant part, on the material
misstatements and omissions in the Subscription Agreement, created by or on behalf of the
Defendants; they are not based upon Radnor and Kibrik's separate fraudulent conduct.  (Def.
Memo. 13-15).  Indeed, although the Subscription Agreement explicitly represented that "[t]here
are no material misstatements or omissions in this Subscription Agreement or any information
provided in the Offering materials" (Ex. C, § 6(a)), as set forth in the Complaint and expounded

herein, this representation was false.

**1. The Subscription Agreement misrepresented the number of shares Dr. Cottam was to receive and omitted the occurrence of the reverse stock splits and the effect that the reverse stock splits would have on his investment.**

The Subscription Agreement materially misrepresented the number of shares in 6D Global that Dr. Cottam should have received pursuant to his investment in 6D Acquisitions.  The Subscription Agreement clearly states that Dr. Cottam was to receive the same number of shares in 6D Global that he had purchased through his investment in 6D Acquisitions.  (Ex. C, p.11); however, Dr. Cottam received far less than what he was promised in the Subscription Agreement.

The Subscription Agreement similarly omitted that the reverse stock splits in CleanTech that occurred either (1) prior to his investment, or (2) prior to the Share Exchange would affect his investment in any way.  (Compl. ¶¶ 36-37, 42).  These omissions are particularly glaring even though the Subscription Agreement does provide that any shares in 6D Global that Dr. Cottam would receive would be subject to reverse stock splits **subsequent** to the Share Exchange.  (Ex. C, p.11).  The Defendants' reliance on ownership proportionality is misleading. As explained in detail above (*supra* at 6), the Subscription Agreement does not speak to "ownership percentage;" but rather, in clear and unequivocal terms, it describes the nature of the transaction as the automatic conversion of 6D Acquisitions stock to 6D Global stock on a 1:1 basis.

In an attempt to negate the reliance element of Dr. Cottam's securities fraud claim, the Defendants suggest that Dr. Cottam's status as a "sophisticated" and "accredited" investor (as those terms are defined in the Subscription Agreement) somehow relieves the Defendants from

conveying truthful and accurate information.  (Def. Memo. 16).  This is, of course, contrary to the facts and the law.  Dr. Cottam's reliance on the Defendants' misrepresentations and omissions in the Subscription Agreement was entirely reasonable.  The Defendants point to nothing to suggest that he had a duty to investigate the truth of the contents of the documents with which the Defendants presented him.  *See Mazuma Holding Corp. v. Bethke*, 21 F.Supp.3d 221, 232 (S.D.N.Y. 2014).  Moreover, even if Dr. Cottam was a sophisticated investor and there were sufficient red flags to trigger a duty to investigate, such a determination is a question of fact that is not properly decided on a motion to dismiss.  *See id.* at 232.

The case upon which the Defendants rely, *Pivot Point Capital Master LP v. Deutsche Bank AG*, No. 08-CV-2788 (AKH), 2010 WL 9452230 (S.D.N.Y. Dec. 9, 2010), is inapplicable here.  In *Pivot Point*, the plaintiff alleged that the defendants had engaged in market manipulation which requires proof of the plaintiff's reasonable reliance on the integrity of the market.  *Id.* at *5.  There, the Court held that the plaintiff could not credibly rely on the integrity of the market in connection with the purchase of a unique form of securities in a volatile auction environment.

However, unlike the theory of market manipulation presented in *Pivot Point*, Dr. Cottam's claim is based upon the **Defendants'** misrepresentations and omissions **to Dr. Cottam**. In fact, in granting the defendant's motion to dismiss, the *Pivot Point* Court noted that the defendant had "disclosed all the material facts regarding the auction process in the PPM.  In the face of full disclosure regarding how an auction process would actually proceed, a plaintiff cannot reasonably plead reliance on an assumption that it would operate in some other fashion." *Id.* at *5.  Here, the Defendants completely failed to disclose all of the material facts to Dr.

14

Cottam and, in fact, misrepresented numerous material facts.

      **2.   The Subscription Agreement failed to disclose that**
          **Dr. Cottam's shares in 6D Global would be restricted.**

      The Subscription Agreement also failed to disclose that trading restrictions would be

placed on the 6D Global stock that Dr. Cottam acquired and expressly misled Dr. Cottam into

believing that his 6D Global stock would be freely tradable.

      Section 5(g) of the Subscription Agreement provides that

> [t]he Subscriber recognizes, understands and acknowledges that there are
> substantial restrictions on the transferability of **Units**, and the Subscriber may
> have to hold **Units** indefinitely and may not be able to liquidate Subscriber's
> investment in **Units** when Subscriber wishes to do so, if at all, because among
> other things: (i) **Units** cannot be offered or sold unless an exemption from
> registration is available under the Securities Act or the **Units** are registered under
> the Securities Act, and (ii) the Company is under no obligation to register the
> **Units** or assist the Subscriber in complying with any exemption from registration.
> Accordingly, the Subscriber will not transfer any **Units** except in compliance with
> all applicable federal and state securities laws and regulations, and, in such
> connection, the Company may request an opinion of counsel reasonably
> acceptable to the Company as to the availability of any exemption.
> ***Notwithstanding* the foregoing, the shares of Common Stock underlying the
> Units shall be automatically exchanged into shares of 6DT upon the
> effectiveness of the Merger.**

(Ex. C, § 5(g) (emphasis added); *see also* § 5(j) ("Subscriber is aware that the **Units** are

restricted securities within the meaning of Rule 144 of the Securities Act[.]") (emphasis added)).

The Subscription Agreement explicitly defines a "Unit" as 50,000 shares of 6D Acquisitions

common stock and "6DT" as the "post-Share Exchange Nasdaq listed parent entity," which is

Defendant 6D Global.  (Ex. C, § 1(a); p.11).

      The language within the Subscription Agreement upon which the Defendants rely and

which is quoted in full above relates only to the transferability of 6D Acquisitions stock and

expressly excludes 6D Global stock from those restrictions.  Thus, although the Subscription

Agreement disclosed that the transferability in the shares of 6D Acquisitions common stock (*i.e.*, the "Units") would be restricted, it clearly conveyed the message that "notwithstanding" those restrictions, the shares of 6D Acquisitions would be converted into 6D Global, a freely tradable stock.

Dr. Cottam does not deny that the shares he received in 6D Global were subject to Rule 144 (Def. Memo. 17); however, the Defendants were under an obligation to disclose the applicability of that Rule and not mislead Dr. Cottam into believing that his 6D Global shares would be freely tradeable.

In *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 152 (2d Cir. 1993), the Second Circuit rejected the same argument the Defendants make here.  In *Brass*, the plaintiff had filed claims for breach of contract and fraud in connection with his purchase of warrants to obtain the defendant's stock.  In negotiating the terms of the warrants, the defendant's CEO did not disclose that the stock which could be purchased with the warrants would be restricted pursuant to Rule 144.  *Id.* at 152.  In support of its motion to dismiss, the defendant argued that "because knowledge of the SEC Rule 144 restriction on its securities was readily available to plaintiff," it was under no duty to disclose that fact to the plaintiff.  *Id.* at 151.  The Second Circuit rejected the defendant's argument and held that the defendant, standing in position with superior knowledge regarding the restriction, was under a duty to disclose it to the defendant, but failed to do so.  *Id.* at 152.

Moreover, just as is the case with the Subscription Agreement, the language within the stock purchase rights agreement (representing the warrants) at issue in *Brass* inferred that the stock would be freely tradeable.  *Id.* at 149.  The Defendants here cannot rely on the mere

16

existence of Rule 144 to sustain their motion to dismiss when the Subscription Agreement is, on its face, plainly misleading with respect to Rule 144's application to the alienability of Dr. Cottam's 6D Global stock.

### 3. Defendants Misrepresented the Process Regarding How to Remove the Restrictions in Order for Dr. Cottam to Sell the 6D Global Stock.

As set forth in the Complaint, and ignored by the Defendants in their instant motion, for a period of five months, Dr. Cottam actively sought to have the restrictions removed from the shares of 6D Global in order to sell them. (Compl. ¶ 60-62). However, 6D Global precluded Dr. Cottam from timely selling the stock by creating a moving target regarding what hurdles Dr. Cottam had to overcome in order to have the restrictions removed. For instance, 6D Global provided Dr. Cottam with multiple written lists of requirements purporting to represent what Dr. Cottam needed to undertake in order to remove the restrictions. One requirement on one list provided by 6D Global was that he would have to obtain a "sell order" before the restriction could be removed. This requirement, however, was not disclosed to Dr. Cottam in an earlier iteration of the document. (Compl. ¶ 62).

These constantly changing requirements necessary to have the share restrictions removed, as alleged in the Complaint, were, upon information and belief, either unnecessary or purposefully omitted and designed to delay Dr. Cottam from selling his shares in a timely fashion. Indeed, in just those three months, the share price of 6D Global plummeted from over $8/share to the just over $2/share for which Dr. Cottam ultimately sold his shares in August 2015. These material misrepresentations and omissions made in connection with Dr. Cottam's sale of his securities constitute independent bases for his claim of securities fraud.

17

### 4. The Subscription Agreement failed to disclose the contemplated reverse merger and that CleanTech was a shell company.

Neither the Subscription Agreement nor the relevant SEC filings disclosed that the contemplated transaction between CleanTech and Six Dimensions involved a reverse merger or a shell corporation.  (Compl. ¶¶ 46-50).  In a footnote, the Defendants argue that the Complaint fails to plead this allegation with particularity because it does not define "reverse merger" or "shell corporation" or how the facts are different from what was disclosed to him.  (Def. Memo. 14, n.9).  This is false.  First, Dr. Cottam is not required to explicitly define in the Complaint either "reverse merger" or "shell corporation."  The Complaint clearly identifies that the Subscription Agreement represented that the transaction between CleanTech and Six Dimensions would result in Six Dimensions becoming a subsidiary of CleanTech, through which CleanTech would continue to conduct its operations.  (Compl. ¶¶ 46-47, Ex. C p.10).  The clear message conveyed was that CleanTech was not a shell corporation and that the two companies would not merge, but exist independently as a parent and a subsidiary.

The Defendants' argument here is further belied by the relevant misleading and fraudulent SEC filings in which, prior to the Share Exchange, CleanTech represented both that (1) it was not a shell corporation and (2) the transaction would not be a reverse merger.  (Compl. ¶¶ 49-50).  However, subsequent SEC filings disclosed the exact opposite, namely that the transaction was, in fact, a reverse merger.  (Compl. ¶ 53).  Moreover, 6D Global representatives later confirmed to Dr. Cottam that CleanTech was a shell corporation, which is one of the reasons why restrictions were placed on his shares.  (Compl. ¶ 60).

These misrepresentations and omissions were material.  Certainly, a reasonable investor would consider as important the fact that the nature of the transaction affected the alienability of

18

the shares received.  Indeed, Dr. Cottam, in particular, did not want to invest in any transaction

involving a reverse merger or a shell corporation.  (Compl. ¶ 45).  The loss causation is equally

clear.  As a result of the Defendant's misrepresentations and omissions, Dr. Cottam was induced

to invest and obtain restricted shares which were restricted, in part, because a shell corporation

was involved in the transaction.

**B.  <u>The Complaint Sufficiently Alleges Scienter.</u>**

Scienter, for purposes of a claim under 10b-5, is (1) "an intent to deceive, manipulate or

defraud" or (2) "recklessness."  *Employees' Retirement Sys. Of Gov't of the Virgin Islands v.*

*Blanford*, 794 F.3d 297, 305 (2d Cir. 2015).  In this context, scienter is sufficiently pled "by

alleging facts (1) showing that the defendants had both the motive and opportunity to commit the

fraud, or (2) constituting strong circumstantial evidence of conscious misbehavior."  *ATSI*

*Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

The PLSRA requires that complaints alleging securities fraud "state with particularity

facts giving rise to a strong inference that the defendant acted with the required state of mind."

15 U.S.C. § 78u-4(b)(2).  However, the Complaint will survive a motion to dismiss "if a

reasonable person would deem the inference of scienter cogent and at least as compelling as any

opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues &*

*Rights, Ltd.*, 551 U.S. 308, 324 (2007).  "[T]his pleading standard does not involve applying the

more probing test used at the summary judgment or judgment as a matter of law stage of

litigation, as the court is 'unaided by discovery' at the motion to dismiss stage."  *Employees'*

*Retirement*, 794 F.3d at 306 (*quoting Tellabs*, 551 U.S. at 324, n.5).  Moreover, "[i]n determining

whether a plaintiff has adequately pled scienter, a court must determine whether all of the facts

alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *In re Virtus Investment Partners, Inc. Sec. Litig.*, 2016 WL 3647959, at *5 (S.D.N.Y. July 1, 2016). Here, Dr. Cottam sufficiently alleged scienter under either both motive and opportunity and circumstantial evidence of misbehavior.

First, regarding motive and opportunity, the Defendants do not deny that they had the opportunity to commit the alleged fraud, nor can they. Additionally, the motive for the Defendants to commit the fraud here is clear. The Defendants wanted and, in fact, needed investors such as Dr. Cottam to invest in the Offering. A careful examination of the Subscription Agreement reveals that the Defendants were under the gun to complete the Offering. The first page of the Subscription Documents, dated June 17, 2014, directs the investor/subscriber to

> Please deliver the completed documents, and the full amount of your proposed investment, no later than June 30, 2014. The minimum offering is $3,000,000 and the maximum offering is $5,100,000. The offering period may be extended by the Company and the Placement Agent (as hereinafter defined) in their joint discretion, without further notice, to a date not later than September 30, 2014.

(Ex. C, p.2). Accordingly, by the terms of the Subscription Agreement, September 30, 2014 was the absolute latest that an investor could invest in the transaction, assuming that both 6D Acquisitions and Radnor extended the deadline, which they evidently did. Delving deeper into the Subscription Agreement further reveals that without the minimum of $3,000,000 invested in the offering, the transaction between Clean Tech and Six Dimensions would not occur. *See* (Ex. C, p.11) ("[I]t shall be a condition to the closing of the Share Exchange that the Company complete the Offering.").

Thus, this was not a situation where the fraud Dr. Cottam complains of was fraud by

CleanTech upon Six Dimensions or vice versa in order to move the merger forward as was the situation in the case cited by the Defendants.  (Def. Memo. 18 (citing *Kalnit v. Eichler*, 264 F.3d 131, 141 (2d Cir. 2001)).  Rather, the Defendants' motivation to commit the fraud against Dr. Cottam was to ensure that the investors such as Dr. Cottam actually invested in the Offering within the tight deadline set forth in the Subscription Agreement to further ensure that the Share Exchange would occur.

Second, the Complaint also alleges sufficient circumstantial evidence of misbehavior. Here, the Defendants were clearly aware that when Dr. Cottam was presented with and signed the Subscription Agreement in September 2014, the Subscription Agreement was materially false because, *inter alia*, the number of CleanTech shares available therein was misrepresented and it failed to disclose that the reverse stock splits that had already occurred would have any bearing on the number of shares Dr. Cottam was to receive in 6D Global.  *See In re Bioscrip, Inc. Sec. Litig.*, 95 F.Supp.3d 711, 733 (S.D.N.Y. 2015) (scienter properly pled where complaint alleged that defendants had information to suggest that their public statements were false).

**C.  Dr. Cottam's economic injuries were caused by the Defendants' conduct.**

Dr. Cottam's economic loss in this case is clear; and it is a loss directly caused by the Defendants' misconduct.  First, Dr. Cottam is not seeking to be placed in the economic position he was in prior to the fraud (*i.e.*, through out-of-pocket damages), nor is that the exclusive remedy for securities fraud.  In fact, there are numerous theories of recovery for securities fraud. "In order to accommodate 'the wide variety of factual predicates to § 10(b) claims, courts have utilized their discretion to endorse several different compensatory damages theories,' including gross economic loss and benefit of the bargain damages."  *Mazuma*, 21 F.Supp.3d at 235

(*quoting Panos v. Island Gem Enterprises, Ltd., N.V.*, 880 F.Supp. 169, 176 (S.D.N.Y. 1995)). Accordingly, that Dr. Cottam, in fact, received a return of his investment is not dispositive.

Here, as a result of the fraud, Dr. Cottam's loss under a theory of benefit of the bargain is far from hypothetical.  (Def. Memo. 20).  Dr. Cottam received over 2.4 million fewer shares than Defendants led him to believe he would receive, and he should accordingly recover the value of those 2.4 million shares at the time he was supposed to have received them in September 2014.

Additionally, as a result of not receiving freely tradable shares in 6D Global because of the Defendants' fraud, Dr. Cottam was unable to sell the shares upon receiving them at the end of September 2014 following the Share Exchange, during which the shares were trading around between $6-7.  Nor was Dr. Cottam able to sell his shares at the conclusion of the purported 6-month restriction period at the end of March 2015, when shares were trading at between $8-9.  It was not until after the share price started to plummet, that 6D Global finally agreed to remove the restrictions and permit Dr. Cottam to sell his shares at just over $2/share.

Thus, utilizing readily available past historical trading data, the Court can clearly determine, (1) the value as of the end of September 2015 of the 2.4 million shares that Dr. Cottam should have received, but did not; and (2) the difference of the value of the shares that Dr. Cottam did sell in August 2015 with the value of the shares had he been able to sell them in either September 2014 or at the end of March 2015 but for the Defendants' fraudulent conduct in delaying the removal of the share restrictions.  *See Mazuma Holding Corp.,* 21 F.Supp.3d at 234 (loss causation properly pled where fraud alleged was on a particular investor regarding misrepresentations defendants made regarding the alienability of purchased stock).

22

## IV.    LEAVE TO AMEND SHOULD BE GRANTED

Dr. Cottam does not concede that the Complaint fails to sufficiently allege any of his claims.  However, to the extent that the Court dismisses some or all of the claims for failure to state a cause of action or for failure to plead with particularity, Dr. Cottam respectfully requests that the Court grant him leave, pursuant to FRCP 15(a)(2), to file an amended complaint to rectify any pleading deficiencies identified by the Court.  *See Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999) ("When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint.").  All of the purported deficiencies alleged by the Defendants should be readily correctable.  *See, e.g., Fiore v. Rivera*, 2015 WL 5007938, at *7 (E.D.N.Y. Aug. 20, 2015) (granting leave to replead after dismissal of complaint where "it is possible that valid claims might be stated").

## CONCLUSION

Dr. Cottam has been aggrieved by the Defendants' fraudulent and otherwise wrongful conduct, and he must be afforded the opportunity to seek appropriate relief.  For the foregoing reasons, we respectfully submit that the Defendants' motion must be denied in its entirety, together with such other and further relief as the Court deems just and proper.

Dated:        New York, New York
              October 12, 2016

                                        Respectfully submitted,


                                        GOTTLIEB & JANEY LLP

                                        /s/ Derrelle M. Janey
                                        _____

                              By: Derrelle M. Janey

                                        Derrelle M. Janey
                                        111 Broadway, Suite 701
                                        New York, New York 10006
                                        (212) 566-7766
                                        *Attorneys for Plaintiff*
                                        *John Cottam*

TO:     Peter N. Flocos
        K&L Gates LLP
        599 Lexington Avenue
        New York, New York 10022-6030
        *Attorneys for Defendants*
        *6D Global Technologies, Inc.,*
        *6D Acquisitions, Inc., and*
        *Tejune Kang*

24