K&L GATES LLP

Peter N. Flocos
K&L Gates LLP
599 Lexington Avenue
New York, NY 10022-6030
Phone: 212.536.4025
Fax: 212.536.3901
Email: peter.flocos@klgates.com

B. John Casey (admitted *pro hac vice*)
K&L Gates LLP
One SW Columbia St., #1900
Portland, OR 97258
Phone: 503-226-5716
Email: john.casey@klgates.com

*Counsel for Defendants 6D Global Technologies, Inc., 6D Acquisitions, Inc., and Tejune Kang*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN COTTAM,<br><br>            Plaintiff,<br><br>    v.<br><br>GLOBAL EMERGING CAPITAL GROUP, LLC; ALEXANDER KIBRIK; WILLIAM UCHIMOTO; 6D GLOBAL TECHNOLOGIES, INC.; 6D ACQUISITIONS, INC., and TEJUNE KANG,<br><br>            Defendants. | Case No. 1:16-cv-04584 (RJS)<br><br>**REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT BY DEFENDANTS 6D GLOBAL TECHNOLOGIES, INC., 6D ACQUISITIONS, INC., AND TEJUNE KANG** |

## TABLE OF CONTENTS

|   |   | Page |
|---|---|---|
| INTRODUCTION | | 1 |
| I. | Plaintiff received what he bargained for based on the only internally consistent and commercially reasonable interpretation of the Subscription Agreement. | 1 |
| II. | Plaintiff has not plausibly – much less with particularity – alleged securities fraud under Rule 10b-5. | 3 |
| | A. No misrepresentations regarding Plaintiff's number of shares. | 3 |
| | B. No misrepresentations regarding transferability of Plaintiff's shares. | 4 |
| | C. No misrepresentations regarding removing restricted shares legends. | 6 |
| | D. No misrepresentations regarding the underlying transaction between CleanTech and Six Dimensions. | 8 |
| | E. Plaintiff does not adequately allege scienter. | 8 |
| | F. Plaintiff has not suffered an actionable loss (or any loss), and, in any event, no alleged misconduct by the 6D Defendants caused Plaintiff's alleged loss. | 9 |
| CONCLUSION | | 10 |

# INTRODUCTION

Defendants' interpretation of the Subscription Agreement is the only interpretation that both harmonizes the material terms of the Agreement and is commercially reasonable. As set forth in Defendants' initial Memorandum, when the number of shares allegedly promised Plaintiff under the Agreement is read together with the Agreement's capitalization table (or "Cap Table," as defined below), it is clear that Plaintiff was promised a 0.54% interest in 6D Global in return for an $875,000 investment. Plaintiff's Opposition does not appear to dispute as such that that the Agreement read as a whole contemplates Plaintiff receiving a 0.54% ownership percentage in return for his $875,000. Rather, Plaintiff offers an interpretation of the Agreement that ignores the Cap Table and asks the Court to read provisions in isolation and out of context – something prohibited by well-settled interpretive canons. Plaintiff's selective interpretation of the Agreement would (1) result in a *6.9x* windfall that no commercially reasonable parties would have contemplated, and (2) render meaningless not only the Cap Table, but also the representations made by Plaintiff in the Agreement regarding his sophistication and familiarity with the securities laws' share transfer restrictions applicable to the transaction.

**I.   Plaintiff received what he bargained for based on the only internally consistent and commercially reasonable interpretation of the Subscription Agreement.**

After Plaintiff's perfunctory acknowledgment that the Subscription Agreement must be construed "so as to give full meaning and effect to *all of its provisions*,"[1] he then proceeds to ignore a critical feature of that Agreement – the detailed capitalization table ("Cap Table") set forth on the second page of the Agreement. *See generally LaSalle Bank*, 424 F.3d at 206

---

[1] Opp. at 5 (quoting *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2014)) (emphasis supplied); *see also LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (courts must construe contracts "to give full meaning and effect to all of its provisions") (quotations omitted).

(interpretation that "has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible") (quotations omitted).  The Cap Table, when read together with the rest of the Agreement, makes clear that the Agreement's primary and dominant purpose was to provide investors like Plaintiff with a certain percentage ownership of the new company, 6D Global – not to award outrageous windfalls based on reverse share splits.  *See Williams Press, Inc. v. State*, 37 N.Y.2d 434, 440, 335 N.E.2d 299 (1975) ("We seek to give each clause its intended purpose in the promotion of the primary and dominant purpose of the contract."); *Reda v. Eastman Kodak Co.*, 233 A.D.2d 914, 915, 649 N.Y.S.2d 555 (4th Dep't 1996) (noting that the Court must use "reasonable effort . . . to harmonize all of the [contract's] terms" and rejecting plaintiffs' interpretation where "it would distort the primary purpose of the [agreement]").  As explained in detail in Defendants' initial Memorandum, the Cap Table informed investors what percentage of the new company, 6D Global, they would own after ("upon") the Offering and the Share Exchange.  In Plaintiff's case, he allegedly purchased 58 "Units," equal to 2.9 million 6D Global shares *out of the 536,125,218 total issued and outstanding shares as provided by the Cap Table*.  That is, he purchased a 0.54% stake in 6D Global, and it is undisputed that he received that stake.

Plaintiff asks the Court to ignore the Cap Table, and to read out of context Sections 1(a) and 1(b) of the Agreement, which state that Plaintiff's alleged 58 "Units" correspond to 2,900,000 shares of 6D Acquisitions and that those shares would "automatically convert[] on a 1:1 basis" to 6D Global shares "[i]mmediately upon the closing and effectiveness of the Share Exchange."  But the bargain set forth in the Agreement was not for 2,900,000 shares as such; instead, the bargain was for the percentage ownership those shares represented based on the Cap Table.  Accordingly, to the extent reverse splits occurred, the number of shares Plaintiff was to receive – like all other shareholders – would be correspondingly reduced.  In this connection,

PAGE 2 – 6D DEFENDANTS' REPLY

nothing in the Subscription Agreement precludes pre-Share Exchange reverse share splits, or immunizes Plaintiff from such splits. In short, when read in harmony with the Cap Table, Sections 1(a) and 1(b) of the Agreement promised Plaintiff only the stated 0.54% stake in 6D Global.

In this regard, Plaintiff's reliance on the inapposite decision in *Reiss v. Financial Performance Corp.* reflects the fundamental flaws in Plaintiff's interpretive approach. Unlike the Subscription Agreement, there is no indication that the warrant documents in *Reiss* included a capitalization table, or indeed any other information, that informed investors of what percentage of the company they would receive upon exercise of their warrants. Unlike in *Reiss*, therefore, Defendants are not improperly asking the court to "fill in" an omitted contingency (the question of ownership interests in the event of a share split) – the Subscription Agreement, read as a whole, already answers that question.

Plaintiff also insists that he is entitled to an exorbitant, 6.9x split-driven windfall because investment in 6D Global was "risky." Opp. at 8. But this is a *non sequitur*. The risks at issue, as discussed at length in the "risks" section appearing at pages 5 – 10 of the Subscription Agreement, were the risks that 6D Global or CleanTech would not perform well *as businesses*. Plaintiff has not and cannot identify anything in the Agreement supporting the notion that he assumed that business-related risk in return for the prospect that he might hit the lottery based on a share split to which all investors but himself were to be subjected.

## II. Plaintiff has not plausibly – much less with particularity – alleged securities fraud under Rule 10b-5.

### A. No misrepresentations regarding Plaintiff's number of shares.

Plaintiff maintains that the Subscription Agreement "materially misrepresented" how many 6D Global shares he would receive. Opp. at 13. This argument simply rehashes his meritless breach of contract claim, as discussed previously, and highlights the improperly

PAGE 3 – 6D DEFENDANTS' REPLY

duplicative nature of Plaintiff's fraud and contract claims. *Id.*[2]

B.     **No misrepresentations regarding transferability of Plaintiff's shares.**

Plaintiff also claims that the 6D Defendants misled him to believe that his ultimate shares in 6D Global – which he acquired through a *private offering* – would be unrestricted and freely tradable. This claim fails for a host of reasons. The 6D Defendants *did* disclose that Plaintiff's securities were restricted. In fact, the *front page* of the Subscription Agreement states: "The *securities* offered hereby have not been registered . . . . [and] may not be transferred, sold, pledged, hypothecated or assigned except as permitted under [the Securities] Act or such laws pursuant to registration or exemption therefrom." (emphasis added). Also, Plaintiff represented in Paragraph 5(g) of the Subscription Agreement that "there are substantial restrictions on the transferability of Units." In Paragraph 5(j), he further represented:

> Subscriber is aware that the Units are restricted securities within the meaning of Rule 144 of the Securities Act, and may not be sold or otherwise transferred other than pursuant to an effective registration statement or an exemption from registration. The Subscriber understands the meaning of these restrictions.

Plaintiff argues that these representations referred only to the "Units" – *i.e.*, the shares of 6D *Acquisitions* – not the 6D *Global* shares. Opp. at 15-16. This is yet another anti-contextual and commercially unreasonable interpretation. It is evident from the face of the Subscription Agreement that the purpose of the transactions was for Plaintiff to purchase shares in 6D Global; Plaintiff admits this in his own Complaint. Compl. ¶ 15.

Moreover, Plaintiff represented in paragraph 5(g) of the Agreement that the "Units" were so restricted that Plaintiff may have to hold onto his securities "indefinitely." Yet the last

---

[2]     Federal courts have dismissed common law and Rule 10b-5 fraud claims that were redundant with plaintiffs' breach of contract claims. *Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001); *Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd.*, 383 F. Supp. 2d 428, 452–53 (S.D.N.Y. 2003).

PAGE 4 – 6D DEFENDANTS' REPLY

sentence of that same paragraph provides that "[n]otwithstanding the foregoing [restrictions], the shares of Common Stock underlying the Units [the 6D Acquisitions shares] shall be *automatically exchanged* into shares of 6D [Global] upon the effectiveness of the Merger." (emphasis added).  If conversion from the undeniably restricted 6D Acquisitions stock to 6D Global stock was "automatic," Plaintiff could not have reasonably believed that those restrictions would simply evaporate upon conversion.

Indeed, if as Plaintiff represented he was familiar with Rule 144, then he must have known that Rule 144's restrictions for privately purchased securities do not magically evaporate when securities are converted into securities of the issuer or an affiliate.  *See* 17 C.F.R. 230.144(a)(3)(i) ("The term restricted securities means:  (i) Securities acquired *directly or indirectly from the issuer, or from an affiliate of the issuer*, in a transaction *or chain of transactions* not involving any public offering.") (emphasis added).  The Subscription Agreement, through which Plaintiff received shares in 6D Global, was plainly *not* a public offering.  Compl. ¶ 15; *see also* Subscription Agreement 5(u).

Plaintiff's reliance on *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142 (2d Cir. 1993) is entirely misplaced.  As an initial matter, there is no indication that the investors in *Brass*, like Plaintiff here, were *accredited* investors – a status that imposes a heightened duty to investigate prior to investing.[3]  Critically, moreover, the investment agreement in *Brass* did *not say a word* about Rule 144 or other transferability restrictions.  *Brass* is therefore a far cry from this case, where Plaintiff admits that he made extensive representations in the Subscription Agreement regarding Rule 144 and transferability restrictions, and simply resorts to hyper-technical

---

[3]  *See In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 439 (S.D.N.Y. 2001) (sophisticated investors have "an enhanced duty to obtain available information material to investment decisions").

nitpicking over the use of the word "Units" in those provisions. Further, *Brass* did not involve a Rule 10b-5 claim, but rather a fraudulent concealment claim under New York law. There is no affirmative duty of disclosure under Rule 10b-5. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (emphasizing that "§ 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading.") (quotations omitted). This is particularly the case with respect to accredited investors such as Plaintiff.[4]  By contrast, *Brass* was a common law fraud case that relied upon what it viewed as certain New York state cases imposing a duty to speak "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Brass*, 987 F.2d at 150. Moreover, *Brass* is a 23-year-old, pre-Internet case and today, information regarding Rule 144 is freely available with very little effort on the Internet, including particularly the SEC's own Website.[5] Nor does the Complaint plead facts indicating that the defendants knew that the plaintiff was under some misimpression regarding Rule 144 and share transferability restrictions.

C.  **No misrepresentations regarding removing restricted shares legends.**

Plaintiff vaguely alleges that 6D Global "created arbitrary, fraudulent and unlawful hurdles" to remove the transfer restriction legends appearing on his shares, but it is unclear from the face of this allegation what his Rule 10b-5 claim is in this regard. Plaintiff identifies only *one* so-called "hurdle" – that 6D Global required a "sell order" before it could remove

---

[4]  *See* 17 C.F.R. § 230.502 (b)(1) ("The issuer is not required to furnish the specified information to purchasers when it sells securities . . . to any accredited investor."); 17 C.F.R. § 230.502(b)(2)(vii) (requiring such disclosure "to any purchaser that is *not* an accredited investor") (emphasis added).

[5]  *See* "Investor Publications – Rule 144: Selling Restricted and Control Securities," at https://www.sec.gov/investor/pubs/rule144.htm.

restrictions.  Compl. ¶¶ 61-62, Opp. at 17.  He claims, *on information and belief alone*, that this requirement was "unnecessary or purposefully omitted."  Opp. at 17.

A plaintiff cannot plead securities fraud on information and belief alone.  *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 725 (S.D.N.Y. 2015) ("[I]f an allegation regarding the statement or omission is made on information and belief, . . . [plaintiff must] state with particularity all facts on which that belief is formed.").  Also missing from the Complaint are allegations that would satisfy Rule 9(b)'s requirements for an actionable misstatement, aside from a vague allegation that "6D Global" told him about the seller order (Compl. ¶ 62).[6]

Even if nonspecific, information-and-belief allegations were sufficient, Plaintiff has not and cannot plausibly allege why 6D Global's requirement for proof of a sell order before removing the restrictions was "unnecessary."  Indeed, as explained to investors by the SEC on its Website in a section entitled "Investor Publications – Rule 144:  Selling Restricted and Control Securities":

> *Removing the legend can be a complicated process* requiring you to work with an attorney who specializes in securities law. . . .
>
> If a dispute arises about whether a restrictive legend can be removed, the SEC will not intervene.  *Removal of a legend is a matter solely in the discretion of the issuer of the securities.  State law, not federal law, covers disputes about the removal of legends.*  Thus, the SEC will not take action in any decision or dispute about removing a restrictive legend.[7]

Plaintiff has pleaded no facts, under state law, federal law, or otherwise, suggesting that the 6D

---

[6] Under Rule 9(b), Plaintiff must "(1) specify the statements that [he] contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Emps.' Ret. Sys. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015).  Plaintiff does not identify the human speaker, where and when that statement was made, or how, apart from on pure information and belief, the statement was fraudulent.  *Id*.

[7] *See* "Investor Publications – Rule 144: Selling Restricted and Control Securities," at https://www.sec.gov/investor/pubs/rule144.htm (emphasis added).  A true and correct copy of a printout of this website is attached as Exhibit 1 to the Reply Declaration of B. John Casey.

defendants did anything wrong with respect to removal of the share restriction legends.

> D. **No misrepresentations regarding the underlying transaction between CleanTech and Six Dimensions.**

Plaintiff claims that 6D Global should have told him that CleanTech was a "shell corporation" and that its transaction with Six Dimensions was a "reverse merger." Opp. at 18. He thus takes issues with certain labels, but does not (and cannot) plausibly contend that the nature of the transaction was misrepresented to him. Indeed, the Subscription Agreement plainly discloses that prior to the Share Exchange, CleanTech would "complete[] the spin-off of all of the company's China-based operations and assets[,]" and change its name to 6D Global after the Share Exchange. Compl. Ex. C, Second Whereas Clause. Plaintiff does not allege that the Subscription Agreement inaccurately described these transactions.

> E. **Plaintiff does not adequately allege scienter.**

The only motive Plaintiff alleges is that the 6D Defendants "were motivated to . . . induce [Plaintiff] to invest in the Offering to supply 6D Global with funds to operate and . . . to consummate the Share Exchange." Compl. ¶ 75. Plaintiff does not dispute Second Circuit law that the desire to pursue a corporate transaction like the Share Exchange does not establish scienter, *see* Defs' Mem. at 18, but now contends that scienter can be inferred because the 6D Defendants "were under the gun" to complete the Offering. Opp. at 20. But corporate pressure does not convert the general motive to complete a transaction into securities-fraud scienter. *See In re Hardinge, Inc. Sec. Litig.*, 696 F. Supp. 2d 309, 330 (W.D.N.Y. 2010) (plaintiffs' allegations that the defendants "were under a unique and specific pressure to perform" were "meritless given that the pressure to perform is common place in corporations").[8] Plaintiff also

---

[8] *See also In re Bayer AG Sec. Litig.*, No. 03 CIV.1546 WHP, 2004 WL 2190357, at *14 (S.D.N.Y. Sept. 30, 2004) (rejecting motive-and-opportunity scienter claim based on allegations that "[defendant] had the motive to engage in fraud because the Company was under pressure to

fails to address a critical deficiency in his lone scienter allegation – the lack of any "concrete and personal" benefit to each of the 6D Defendants. *ECA v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009); Defs' Mem. at 18.[9]

### F. Plaintiff has not suffered an actionable loss (or any loss), and, in any event, no alleged misconduct by the 6D Defendants caused Plaintiff's alleged loss.

Plaintiff maintains that he suffered a recoverable loss, even though he *profited* eight percent in less than a year, and even though he claims he would not have made the profitable investment absent the alleged misstatements or omissions. Because Plaintiff profited, he cannot plead the standard "out of pocket" measure of Rule 10b-5 damages. Rather, he asks for "benefit-of-the-bargain" damages, but then ignores the case law that the 6D Defendants cited explaining why those damages are unavailable to him. Benefit-of-the-bargain damages are not available if it is "speculative . . . whether the parties would have reached any agreement" absent the alleged omissions and misrepresentations. *Barrows v. Forest Laboratories, Inc.*, 742 F.2d 54, 60 (2d Cir. 1984). Plaintiff cannot plausibly allege that the 6D Defendants would have entered the Subscription Agreement if it meant, as Plaintiff contends, that all investors would have received a 6.9x windfall based on nothing but the immaterial timing of a reverse share split.

Furthermore, benefit-of-the-bargain damages "must be based on the bargain that was actually struck, not on a bargain whose terms must be supplied by hypotheses about what the parties would have done if the circumstances surrounding their transaction had been different." *Id*. The bargain struck was for 6D Global shares that Plaintiff admits were restricted (Opp. at

---

bring a 'blockbuster' drug to market and thus . . . had an incentive to turn a blind eye to safety considerations").

[9]   Plaintiff's additional argument on scienter is that the 6D Defendants knew that the Subscription Agreement was false. This argument merely assumes that there were misstatements, and fails to plead the requisite specific "conscious behavior" as an alternative to pleading motive. *See Kalnit v. Eichler*, 264 F.3d 131, 139, 142 (2d Cir. 2001).

PAGE 9 – 6D DEFENDANTS' REPLY

16).  He merely claims that he *thought* they were unrestricted.  Had he known of the restrictions, Plaintiff could have struck the same bargain – receiving the same restricted shares; or passed on the investment – losing out on the eight percent he made.  Under no scenario, however, would he have received *unrestricted* shares, and therefore he is not entitled to that benefit.

## CONCLUSION

Respectfully, the Court should dismiss Plaintiff's claims against the 6D Defendants with prejudice.


October 26, 2016.

                Respectfully submitted,

                By:  *s/ Peter N. Flocos*
                Peter N. Flocos
                K&L Gates LLP
                599 Lexington Avenue
                New York, NY 10022-6030
                Phone: 212.536.4025
                Fax: 212.536.3901
                Email: peter.flocos@klgates.com

                B. John Casey, admitted *pro hac vice*
                K&L Gates LLP
                One SW Columbia Street, Suite 1900
                Portland, OR 97258
                Tel.: (503)-228-3200
                Email: john.casey@klgates.com

                Attorneys for Defendants 6D Global Technologies, Inc., 6D Acquisitions, Inc., and Tejune Kang,


To: All Counsel of Record via CM/ECF