**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____x

JOHN COTTAM,

                            Plaintiff,                16 CV 04584 (RJS)

v.

GLOBAL EMERGING CAPITAL GROUP, LLC,    **AMENDED ANSWER,**
ALEXANDER KIBRIK, WILLIAM                       **COUNTERCLAIMS**
UCHIMOTO, 6D GLOBAL                           **AND THIRD PARTY**
TECHNOLOGIES, INC., 6D                          **COMPLAINT**
ACQUISITIONS, INC., and TEJUNE
KANG,

                           Defendants.
_____x

6D GLOBAL TECHNOLOGIES, INC.,
6D ACQUISITIONS, INC. and TEJUNE KANG,

                      Counterclaim Plaintiffs,

v.

JOHN COTTAM,

                      Counterclaim Defendant.
_____x

6D GLOBAL TECHNOLOGIES, INC. AND
6D ACQUISITIONS, INC.,

                      Third-Party Plaintiffs,

v.

ANNA LOTAN LTD, UDO BAUMHEIER, ARNOLD
NICKLAUS D'CRUZ, DAVID DORFMANN,
EARLY BIRD TECH LIMITED, DANIEL FINN, MAUREEN
FINN, THOMAS FINN, MARK GHITIS, DAVID E. GIBBS,
JR., GLOBAL INVESTMENT ALLIANCE, INC.,
CHRISTIAN GIORDANO, THOMAS GOHMAN, JOHN J.
HURST, ZEYNEP INANLI, INET GLOBAL AG, EDWARD
KAZIEV, ROGER H. KLEIN, THOMAS J. KNOX, DANIEL
LARSON, JANICE LI, MARTIN ANGUS RANCH,
NICOLAS MATILE, MANSA NICOME, NANCY PALERMO,
HERMAN PALERMO, ALEXANDER PUSTYLNIK, CHARLES
H. SIMPSON, ROGER H. SNAITH, BRIAN SQUIRES,
MING-HSUAN SUNG, ALPHONSO C. VANLOW,
ALBERT VIVIANI,

                      Third-Party Defendants.
_____x

Defendants 6D Global Technologies, Inc., 6D Acquisitions, Inc., and Tejune Kang (collectively, the "6D Defendants") for their Amended Answer to Plaintiffs' Complaint and Counterclaims in this action, hereby respectfully answer and allege as follows. References to paragraphs are to the paragraphs of Plaintiff's Complaint. The below Amended Answer and Affirmative Defenses incorporate by reference all the allegations set forth in the below Counterclaims.

<u>**ANSWER**</u>

1.      The allegations of Paragraph 1 contain legal conclusions and statements about the types of claims the Complaint purports to assert, to which no response is required. The 6D Defendants deny that any valid claims are asserted.

2.      Deny the allegations of Paragraph 2.

3.      The allegations of Paragraph 3 contain legal conclusions to which no response is necessary, and otherwise deny the allegations of Paragraph 3.

4.      The allegations of Paragraph 4 contain legal conclusions, to which no response is required. Defendants deny that any valid claims are asserted.

5.      Deny knowledge or information sufficient to respond to the allegations of Paragraph 5.

6.      Deny knowledge or information sufficient to respond to the allegations of Paragraph 6.

7.      Deny knowledge or information sufficient to respond to the allegations of Paragraph 7.

8.      Deny the allegations of Paragraph 8.

9.     Deny the allegations of Paragraph 9.

10.     Deny the allegations of Paragraph 10.

11.     Deny the allegations of Paragraph 11.

12.     Deny the allegations of Paragraph 12.

13.     Deny knowledge or information sufficient to respond to the allegations of Paragraph 13.

14.     Deny knowledge or information sufficient to respond to the allegations of Paragraph 14.

15.     Deny knowledge or information sufficient to respond to the allegations of Paragraph 15, and respectfully refer the Court to the relevant SEC filings, incorporated by reference, for the full and accurate contents therein.

16.     Deny the allegations of Paragraph 16.

17.     Deny knowledge or information sufficient to respond to the allegations of Paragraph 17.

18.     Deny knowledge or information sufficient to respond to the allegations of Paragraph 18, and respectfully refer the Court to the Subscription Agreement and the relevant SEC filings, incorporated therein by reference, for the full and accurate contents thereof.

19.     Deny the allegations of Paragraph 19, and respectfully refer the Court to the Subscription Agreement for the full and accurate contents thereof.

20.     Deny the allegations of Paragraph 20, and respectfully refer the Court to the Subscription Agreement for the full and accurate contents thereof.

21.     Deny the allegations of Paragraph 21, and respectfully refer the Court to the Subscription Agreement and the relevant SEC filings, incorporated therein by reference, for the full and accurate contents thereof.

22.     Deny any implication of wrongdoing by the 6D Defendants, and, with respect to actions by other persons or entities, deny knowledge or information sufficient to respond to the allegations of Paragraph 22.

23.     Deny the allegations of Paragraph 23, and respectfully refer the Court to the Subscription Agreement and the relevant SEC filings, incorporated therein by reference, for the full and accurate contents thereof.

24.     Deny the allegations of Paragraph 24, and respectfully refer the Court to the Subscription Agreement and the relevant SEC filings, incorporated therein by reference, for the full and accurate contents thereof.

25.     Deny the allegations of Paragraph 25, and respectfully refer the Court to the Subscription Agreement and the relevant SEC filings, incorporated therein by reference, for the full and accurate contents thereof.

26.     Deny the allegations of Paragraph 26, and respectfully refer the Court to the Subscription Agreement and the relevant SEC filings, incorporated therein by reference, for the full and accurate contents thereof.

27.     Deny knowledge or information sufficient to respond to the allegations of Paragraph 27.

28.     Deny the allegations of Paragraph 28, and respectfully refer the Court to the Subscription Agreement and the relevant SEC filings, incorporated therein by reference, for the full and accurate contents thereof.

29.     Deny the allegations of Paragraph 29, and respectfully refer the Court to the Subscription Agreement and the relevant SEC filings, incorporated therein by reference, for the full and accurate contents thereof.

30.     Deny the allegations of Paragraph 30.

31.     Deny the allegations of Paragraph 31.

32.     Deny the allegations of Paragraph 32.

33.     Deny the allegations of Paragraph 33, except denies knowledge or information to respond as to allegations regarding what the Plaintiff allegedly stated to parties other than the 6D Defendants.

34.     Deny knowledge or information sufficient to respond to the allegations of Paragraph 34.

35.     Deny knowledge or information sufficient to respond to the allegations of Paragraph 35.

36.     Deny the allegations of Paragraph 36, and respectfully refer the Court to the Subscription Agreement and the relevant SEC filings, incorporated therein by reference, for the full and accurate contents thereof.

37.     Deny the allegations of Paragraph 37, and respectfully refer the Court to the Subscription Agreement and the relevant SEC filings, incorporated therein by reference, for the full and accurate contents thereof.

38.     Deny the allegations of Paragraph 38, and respectfully refer the Court to the Subscription Agreement and the relevant SEC filings, incorporated therein by reference, for the full and accurate contents thereof.

39.     Deny the allegations of Paragraph 39.

40.     Deny the allegations of Paragraph 40, and respectfully refer the Court to the Subscription Agreement and the relevant SEC filings, incorporated therein by reference, for the full and accurate contents thereof.

41.     Deny the allegations of Paragraph 41, and respectfully refer the Court to the Subscription Agreement and the SEC filings, incorporated therein by reference, for the full and accurate contents thereof.

42.     Deny the allegations of Paragraph 42, and respectfully refer the Court to the Subscription Agreement and the SEC filings, incorporated therein by reference, for the full and accurate contents thereof.

43.     Deny the allegations of Paragraph 43, and respectfully refer the Court to the Subscription Agreement and the SEC filings, incorporated by reference, for the full and accurate contents thereof.

44.     Deny the allegations of Paragraph 44.

45.     Deny any implication of wrongdoing by the 6D Defendants, and, with respect to actions by other persons or entities, deny knowledge or information sufficient to respond to the allegations of Paragraph 45.

46.     Deny the allegations of Paragraph 46, and respectfully refer the Court to the Subscription Agreement and relevant SEC filings, incorporated therein by reference, for the full and accurate contents thereof.

47.     Deny the allegations of Paragraph 47, and respectfully refer the Court to the Subscription Agreement, incorporated by reference, for the full and accurate contents thereof.

48.     Deny the allegations of Paragraph 48, and respectfully refer the Court to the Subscription Agreement and relevant SEC filings, incorporated therein by reference, for the full and accurate contents thereof.

49.     Deny the allegations of Paragraph 49, and respectfully refer the Court to the relevant SEC filings for the full and accurate contents thereof.

50.     Deny the allegations of Paragraph 50, and respectfully refer the Court to the relevant SEC filings for the full and accurate contents thereof.

51.     Deny the allegations of Paragraph 51, and respectfully refer the Court to the Subscription Agreement and the relevant SEC filings, incorporated therein by reference, for the full and accurate contents thereof.

52.     Deny the allegations of Paragraph 52, and respectfully refer the Court to the relevant SEC filings for the full and accurate contents thereof.

53.     Deny the allegations of Paragraph 53, and respectfully refer the Court to the relevant SEC filings for the full and accurate contents thereof.

54.     Deny the allegations of Paragraph 54, and respectfully refer the Court to the Subscription Agreement and relevant SEC filings, incorporated therein by reference, for the full and accurate contents thereof.

55.     Deny the allegations of Paragraph 55, and respectfully refer the Court to the Subscription Agreement and relevant SEC filings, incorporated therein by reference, for the full and accurate contents thereof.

56.     Deny any implication of wrongdoing by the 6D Defendants, and, with respect to actions by other persons or entities, deny knowledge or information sufficient to respond to the allegations of Paragraph 56.

57.     Deny any implication of wrongdoing by the 6D Defendants, and, with respect to actions by other persons or entities, deny knowledge or information sufficient to respond to the allegations of Paragraph 57.

58.     Deny any implication of wrongdoing by the 6D Defendants, and, with respect to actions by other persons or entities, deny knowledge or information sufficient to respond to the allegations of Paragraph 58.

59.     Deny the allegations of Paragraph 59.

60.     Deny the allegations of Paragraph 60, and respectfully refer the Court to the relevant SEC filings for the full and accurate contents thereof.

61.     Deny the allegations of Paragraph 61.

62.     Deny the allegations of Paragraph 62.

63.     Deny the allegations of Paragraph 63.

64.     Deny knowledge or information sufficient to respond to the allegations in Paragraph 64.

65.     Deny any implication of wrongdoing by the 6D Defendants, and, with respect to actions by other persons or entities, deny knowledge or information sufficient to respond to the allegations of Paragraph 65.

66.     Deny any implication of wrongdoing by the 6D Defendants, and, with respect to actions by other persons or entities, deny knowledge or information sufficient to respond to the allegations of Paragraph 66.

67.     Deny any implication of wrongdoing by the 6D Defendants, and, with respect to actions by other persons or entities, deny knowledge or information sufficient to respond to the allegations of Paragraph 67.

68.     Deny any implication of wrongdoing by the 6D Defendants; with respect to actions by other persons or entities, deny knowledge or information sufficient to respond to the allegations of Paragraph 68; deny the allegations regarding SEC filings and respectfully refer the Court to such filings for the full and accurate contents thereof.

69.     Deny the allegations of Paragraph 69, and respectfully refer the Court to the relevant SEC filings for the full and accurate contents thereof.

70.     Deny any implication of wrongdoing by the 6D Defendants, and, with respect to actions by other persons or entities, deny knowledge or information sufficient to respond to the allegations of Paragraph 70.

71.     Defendants repeat and re-allege paragraphs 1 – 70 as if set forth in full herein.

72.     Deny the allegations of Paragraph 72.

73.     Deny the allegations of Paragraph 73.

74.     Deny the allegations of Paragraph 74.

75.     Deny the allegations of Paragraph 75.

76.     Deny the allegations of Paragraph 76.

77.     Deny the allegations of Paragraph 77.

78.     Deny the allegations of Paragraph 78.

79.     Deny the allegations of Paragraph 79.

80.     Deny the allegations of Paragraph 80.

81.     Defendants repeat and re-allege paragraphs 1 – 80 as if set forth in full herein.

82.     Deny the allegations of Paragraph 82.

83.     Deny the allegations of Paragraph 83.

84.     Deny the allegations of Paragraph 84.

85.     Defendants repeat and re-allege paragraphs 1 – 84 as if set forth in full herein.

86.     Deny the allegations of Paragraph 86.

87.     Deny the allegations of Paragraph 87.

88.     Deny the allegations of Paragraph 88.

89.     Deny the allegations of Paragraph 89.

90.     Defendants repeat and re-allege paragraphs 1 – 88 as if set forth in full herein.

91.     Deny the allegations of Paragraph 91.

92.     Deny the allegations of Paragraph 92.

93.     Deny the allegations of Paragraph 93.

Defendants deny that any of the forms of relief listed in the Wherefore clauses of the Complaint are appropriate.

## AFFIRMATIVE DEFENSES

Without conceding that they bear the burden of proof as to any of the below defenses, the 6D Defendants assert the following affirmative defenses.

1.     The Complaint fails to state a claim upon which relief may be granted.

2.     The Complaint fails to allege fraud with particularly as required by Fed. R. Civ. P. 9(b) as to the 6D Defendants.

3.     The issues and claims in this action are subject to arbitration.  This action should be dismissed without prejudice or stayed during the pendency of the arbitration now taking place between the Plaintiff and the 6D Defendants' co-defendants.  This Amended Answer and Counterclaims is asserted by recently substituted counsel who is faced with procedural deadlines only in order to preserve any timeliness issue under the Federal Rules of Civil Procedure and

relevant statutes of limitations.  This Amended Answer and Counterclaim is not intended to be, and shall be deemed to be, an intentional waiver of any right of the 6D Defendants to have this action stayed or dismissed pending the outcome of the pending arbitration.

4.      The Plaintiff's claims are barred by the doctrine of waiver, estoppel, laches and ratification.  The Plaintiff received 420,290 shares in 6D Global in late September/early October 2014, and did not timely raise any objection to the number of shares he received.  In light of Plaintiff's newfound claim that he was entitled to 2.9 million shares in 2014, the difference in number between that figure and the 420,290 shares he received is so large that it defies credibility for Plaintiff to now suggest he did not notice the discrepancy.  Indeed, prior to the time that Plaintiff made his investment at issue, he was fully aware of the reverse splits that had timely been disclosed in the SEC filings that were expressly incorporated by reference in the Subscription Agreement.  Thus, it is no surprise that the Plaintiff for many months did not make any objection whatsoever to the number of shares he received.  In fact, Plaintiff sold all his shares at a profit without ever having timely objected to the number of shares received.  The 6D Defendants detrimentally relied on the course of conduct of the Plaintiff in not only accepting the 420,290 shares in 6D Global that he received in 2014, but also the ongoing conduct of the Plaintiff when it repeatedly attempted to sell those shares in 2014 and 2015.  Relying on the course of conduct of the Plaintiff, the 6D Defendants distributed to all 34 investors under the Subscription Agreement the number of shares that took into account the reverse splits of CleanTech that the Plaintiff and all other investors were fully aware of.

5.      This action must be dismissed on the ground that it fails to join necessary or indispensable parties.

6.      Plaintiff's claims are barred under the doctrine of unclean hands.

7.     Plaintiff's claims are barred by the applicable statute of limitations periods.

8.     Plaintiff cannot establish that he suffered any damages.  What Plaintiff omits to inform the Court, and the fundamental flaw with his claims, is that if his reading of the Subscription Agreement is correct, ***then all of the other similarly-situated 33 investors who invested under the same Subscription Agreement would also have been entitled to 6.9 times the number of shares of 6D Global that they received in 2014***.  If this had occurred, then the each of the shares that Plaintiff, and every other investor, would have received would have been worth proportionately less.  After all, the assets and value of the underlying company were fixed at any given time, and if one multiplied the number of outstanding shares equally among all investors, each share would be worth correspondingly and proportionately less, taking into account the total number of outstanding shares.   Thus, as a matter of logic, the value of the 2.9 million shares that Plaintiff claims he was entitled to in 2014 would have been worth the same as the number of shares he in fact received.

## COUNTERCLAIMS AND THIRD-PARTY CLAIMS

### INTRODUCTION

1.     The Plaintiff in this action is a highly-sophisticated investor, and was one of 34 investors who in 2014 signed the same Subscription Agreement, and made investments and purchased units pursuant to, the same Subscription Agreement, that is the subject of Plaintiff's Complaint.  Plaintiff's claims are based on a reading of the Subscription Agreement under which he claims that he was entitled to receive 6.9 times the number of shares of 6D Global Technologies, Inc. ("6D Global") than he received.  However, what Plaintiff omits to inform the Court, and the fundamental flaw with his claims, is that if his reading of the Subscription Agreement is correct, ***then all of the other similarly-situated 33 investors who invested under***

***the same Subscription Agreement would also have been entitled to 6.9 times the number of shares of 6D Global that they received in 2014***.  If this had occurred, then the each of the shares that Plaintiff, and every other investor, would have received would have been worth proportionately less.  After all, the assets and value of the underlying company were fixed at any given time, and if one multiplied the number of outstanding shares equally among all investors, each share would be worth correspondingly and proportionately less, taking into account the total number of outstanding shares.   Thus, as a matter of logic, the value of the 2.9 million shares that Plaintiff claims he was entitled to in 2014 would have been worth the same as the number of shares he in fact received.

2.       What Plaintiff is improperly attempting to do is have the Court grant ***only to him*** – not the other 33 investors under the Subscription Agreement -- the benefit of the reading of the Subscription Agreement that he promotes.  However, Plaintiff's attempt to elevate himself above all the other 33 similarly situated investors defies logic, law, equity and fairness.  If the reading of the Subscription Agreement that Plaintiff promotes is credited by the Court, then as a matter of logic, every other investor under the Subscription Agreement must also be deemed to have been entitled in 2014 to 6.9 times the number of shares of 6D Global that each of them received. The result would be the recognition that if every investor were deemed to have been entitled to 6.9 times the number of shares in 2014, then each of their respective shares would have been worth correspondingly and proportionately less (because the underlying assets and value of the company was fixed at any given time), and thus the overall value of the shares that each investor received would not change.

3.       Alternatively, if the Court were to ignore the economic reality that each investor ended up getting his fair value and  correct proportionate interest in 6D Global, and if the Court

granted every investor a judgment that adopted Plaintiff's faulty logic, then the all 34 investors under the Subscription Agreement – not just the Plaintiff – would be awarded many millions of dollars in damages.  In that event, 6D would obviously face judgments for so many millions of dollars that it would be put out of business, causing, among other things, all of its dozens of employees to lose their jobs.  The Court should not allow the Plaintiff to accomplish this illogical and unjust result.

### THIRD PARTY DEFENDANTS

4.    In addition to Plaintiff, there are 33 other similarly-situated investors (the "Third-Party Defendants") who during the same period in 2014 signed, and made investments and purchased units pursuant to, the very same Subscription Agreement that is the subject of Plaintiff's Complaint.   Those 33 other co-equal investors are necessary and/or indispensable parties to this action.  First, the Third-Party Defendants are necessary and/or indispensable parties under Federal Rules of Civil Procedure 19 and 20, because without adding such parties, the 6D Defendants would be subject to incurring double, multiple or otherwise inconsistent obligations, and the Third-Party Defendants would be susceptible to having their interests diluted unfairly at the expense of Plaintiff.

5.    It would defy logic, law, equity and fairness for only the Plaintiff, and not the 33 other co-equal investors who signed and invested under the same Subscription Agreement, to alone benefit from the reading of the Subscription Agreement he is promoting in this action.  If Plaintiff's reading of the Subscription Agreement is correct, then all 34 investors under the Subscription Agreement were entitled to 6.9 times the number of shares that they received in 2014, and, as explained above, as a matter of logic the Plaintiff suffered no damages.  This is because, under the Plaintiff's reading of the agreement, he would still have received the same

proportional interest in the overall value of the company.  The only other logical possibility, if the Plaintiff's incorrect theory were to prevail, would be for all of the 34 Third-Party Defendants to be collectively entitled to millions of dollars in damages, rendering 6D insolvent and causing its dozens of employees would lose their jobs.  Under no circumstance could Plaintiff alone benefit from the theory it is promoting: the law must treat all similarly-situated investors equally.  Thus, the Third-Party Defendants are necessary and/or indispensable parties to this action.

6.      Moreover, as the 6D Defendants assert a remedy of reformation as part of their counterclaims, case law within the Southern District of New York, applying New York law, makes clear that the Third-Party Defendants are necessary and/or indispensable parties to this action for this separate reason.  *E.g.*, *Apple Mortgage Corp. v. Barenblatt*, 162 F. Supp. 3d 270, 282 (S.D.N.Y. 2016).

7.      Accordingly, the 6D Defendants hereby bring into this action as third party defendants the 33 other investors who invested money and received shares of 6D Global under the same Subscription Agreement as the Plaintiff.  All of the Third-Party Defendants expressly agreed in Section 8(c) of the Subscription Agreement to the personal and subject matter jurisdiction of any federal or state court in the State of New York, and expressly agreed in Section 8(a) that service of process could be accomplished via nationally recognized overnight courier or registered or certified mail, return receipt requested.  Thus, this Court has personal jurisdiction over all the Third-Party Defendants and has subject matter jurisdiction over the controversy.

8.      Third-Party Defendant Anna Lotan Ltd signed the Subscription Agreement prior to September 29, 2014, and invested $270,000 pursuant to the Subscription Agreement, causing

such funds to be invested/wired prior to September 29, 2014.  Anna Lotan Ltd received 130,435 shares of 6D Global Technologies, Inc. ("6D Global") as a result of this investment.

9.     Third-Party Defendant Udo Baumheier ("Baumheier") is an individual who signed the Subscription Agreement prior to September 29, 2014, and invested $30,000 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014.  Upon information and belief, Baumheier resides in Germany.  Baumheier received 14,493 shares of 6D Global as a result of this investment.

10.     Third-Party Defendant Arnold Nicklaus D'Cruz is an individual who signed the Subscription Agreement prior to September 29, 2014, and invested $60,000 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014. Upon information and belief, D'Cruz resides in Singapore.  D'Cruz received 28,986 shares of 6D Global as a result of this investment.

11.     Third-Party Defendant David Dorfmann is an individual who signed the Subscription Agreement prior to September 29, 2014, and invested $97,500 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014. Upon information and belief, Dorfmann resides in Monaco.  Dorfmann received 47,102 shares of 6D Global as a result of this investment.

12.     Third-Party Defendant Early Bird Tech Limited signed the Subscription Agreement prior to September 29, 2014, and invested $993,600 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014.  Upon information and belief, Early Bird Tech Limited has a business address in New York County, New York.  Early Bird Tech Limited received 480,000 shares of 6D Global as a result of this investment.

13.     Third-Party Defendant Daniel Finn is an individual who signed the Subscription Agreement prior to September 29, 2014, and invested $75,000 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014.   Upon information and belief, Daniel Finn resides in Ireland.  Daniel Finn received 36,232 shares of 6D Global as a result of this investment.

14.     Third-Party Defendants Maureen Finn and Thomas Finn are individuals who signed the Subscription Agreement prior to September 29, 2014, and together invested a total of $15,000 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014.   Upon information and belief, Maureen and Thomas Finn reside in Ireland.  Maureen and Thomas Finn received a total of 7,247 shares of 6D Global as a result of this investment.

15.     Third-Party Defendant Mark Ghitis is an individual who signed the Subscription Agreement prior to September 29, 2014, and invested $45,000 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014.   Upon information and belief, Ghitis resides in Germany.  Ghitis received 21,740 shares of 6D Global as a result of this investment.

16.     Third-Party Defendant David E. Gibbs, Jr. is an individual who signed the Subscription Agreement prior to September 29, 2014, and invested $60,000 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014. Upon information and belief, Gibbs resides in Pittsburgh, Pennsylvania.  Gibbs received 28,986 shares of 6D Global as a result of this investment.

17.     Third-Party Defendant Global Investment Alliance Inc. signed the Subscription Agreement prior to September 29, 2014, and invested $100,000 pursuant to the Subscription

Agreement, causing such funds to be invested/wired prior to September 29, 2014.   Global Investment Alliance Inc. received 48,310 shares of 6D Global as a result of this investment.

18.     Third-Party Defendant Christian Giordano is an individual who signed the Subscription Agreement prior to September 29, 2014, and invested $34,000 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014. Giordano received 16,426 shares of 6D Global as a result of this investment.

19.     Third-Party Defendant Thomas Gohman is an individual who signed the Subscription Agreement prior to September 29, 2014, and invested $15,000 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014. Upon information and belief, Gohman resides in Germany.   Gohman received 7,247 shares of 6D Global as a result of this investment.

20.     Third-Party Defendant John J. Hurst is an individual who signed the Subscription Agreement prior to September 29, 2014, and invested $60,000 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014.   Upon information and belief, Hurst resides in Texas.  Hurst received 28,986 shares of 6D Global as a result of this investment.

21.     Third-Party Defendant Zeynep Inanli is an individual who signed the Subscription Agreement prior to September 29, 2014, and invested $105,000 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014.   Upon information and belief, Inanli resides in New York County, New York.  Inanli received 50,725 shares of 6D Global as a result of this investment.

22.     Third-Party Defendant Inet Global AG signed the Subscription Agreement prior to September 29, 2014, and invested $100,000 pursuant to the Subscription Agreement, causing

such funds to be invested/wired prior to September 29, 2014.  Upon information and belief, Inet Global AG has its principal place of business in Switzerland.  Inet Global AG received 48,310 shares of 6D Global as a result of this investment.

23.    Third-Party Defendant Edward Kaziev is an individual who signed the Subscription Agreement prior to September 29, 2014, and invested $36,000 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014. Upon information and belief, Kaziev resides in Nassau County, New York.  Kaziev received 17,392 shares of 6D Global as a result of this investment.

24.    Third-Party Defendant Roger H. Klein, Sr. is an individual who signed the Subscription Agreement prior to September 29, 2014, and invested $15,000 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014. Upon information and belief, Klein resides in Wisconsin.  Klein received 7,247 shares of 6D Global as a result of this investment.

25.    Third-Party Defendant Thomas J. Knox is an individual who signed the Subscription Agreement prior to September 29, 2014, and invested $105,000 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014. Upon information and belief, Knox resides in Philadelphia, Pennsylvania.  Knox received 50,725 shares of 6D Global as a result of this investment.

26.    Third-Party Defendant Daniel A. Larson is an individual who signed the Subscription Agreement prior to September 29, 2014, and invested $210,000 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014. Upon information and belief, Larson resides in Tampa, Florida.  Larson received 101,450 shares of 6D Global as a result of this investment.

27.     Third-Party Defendant Janice Li is an individual who signed the Subscription Agreement prior to September 29, 2014, and invested $60,000 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014.   Upon information and belief, Li resides in California.  Li received 28,986 shares of 6D Global as a result of this investment.

28.     Third-Party Defendant Martin Angus Ranch is an entity that signed the Subscription Agreement prior to September 29, 2014, and invested $82,500 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014. Upon information and belief, Matin Angus Ranch is located in Colorado.

29.     Third-Party Defendant Nicolas Matile is an individual who signed the Subscription Agreement prior to September 29, 2014, and invested $97,500 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014. Upon information and belief, Matile resides in Monaco.  Matile received 47,102 shares of 6D Global as a result of this investment.

30.     Third-Party Defendant Mansa Nicome is an individual who signed the Subscription Agreement prior to September 29, 2014, and invested $30,000 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014. Upon information and belief, Matile resides in Kings County, New York.  Nicome received 14,493 shares of 6D Global as a result of this investment.

31.     Third-Party Defendants Nancy Palermo and Henry Palermo are individuals who signed the Subscription Agreement prior to September 29, 2014, and together invested a total of $90,000 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014.   Upon information and belief, the Palermos reside in Kings County,

New York.  The Palermos received a total of 43,479 shares of 6D Global as a result of this investment.

32.     Third-Party Defendant Alexander Pustylnik is an individual who signed the Subscription Agreement prior to September 29, 2014, and invested $97,500 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014. Upon information and belief, Pustylnik resides in Kings County, New York.  Pustylnik received 47,102 shares of 6D Global as a result of this investment.

33.     Third-Party Defendant Charles H. Simpson is an individual who signed the Subscription Agreement prior to September 29, 2014, and invested $112,500 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014. Upon information and belief, Simpson resides in California. Simpson received 54,348 shares of 6D Global as a result of this investment.

34.     Third-Party Defendant Roger Snaith is an individual who signed the Subscription Agreement prior to September 29, 2014, and invested $390,000 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014.   Upon information and belief, Snaith resides in Hong Kong.  Pustylnik received 188,406 shares of 6D Global as a result of this investment.

35.     Third-Party Defendant Brian Squires is an individual who signed the Subscription Agreement prior to September 29, 2014, and invested $45,000 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014.   Upon information and belief, Squires resides in Queens County, New York.  Squires received 21,740 shares of 6D Global as a result of this investment.

36.     Third-Party Defendant Ming-Hsuan Sung is an individual who signed the Subscription Agreement prior to September 29, 2014, and invested $45,000 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014. Upon information and belief, resides in California.  Sung received 21,740 shares of 6D Global as a result of this investment.

37.     Third-Party Defendant Alphonso C. Vanlow is an individual who signed the Subscription Agreement prior to September 29, 2014, and invested $15,000 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014. Upon information and belief, Vanlow resides in Kings County, New York. Vanlow received 7,247 shares of 6D Global as a result of this investment.

38.     Third-Party Defendant Albert Viviani is an individual who signed the Subscription Agreement prior to September 29, 2014, and invested $195,000 pursuant to the Subscription Agreement, causing such funds to be invested/wired prior to September 29, 2014. Upon information and belief, Viviani resides in Monaco.  Viviani received 94,203 shares of 6D Global as a result of this investment.

39.     According to the Plaintiff's reading of the Subscription Agreement, each of the above Third-Party Defendants was entitled to 6.9 times the number of shares of 6D Global that they each received in 2014 pursuant to the Subscription Agreement.

## BACKGROUND FACTS

40.     The Subscription Agreement form was printed as of June 17, 2014, and as of that date, accurately set forth the number of shares of CleanTech then in existence.  Specifically, page 2 of the Subscription Agreement states that "there are currently an aggregate of 24,982,822

shares of CleanTech Common Stock issued and outstanding."  This information was accurate on the date that the Subscription Agreement form was printed.

41.     The Subscription Agreement also included a Cap Table on page 2 that set forth the capitalization of CleanTech, whose calculation was based on the then-existing 24,982,822 shares of CleanTech.  The number of shares underlying the Units that were being offered in the form Subscription Agreement (50,000 shares per Unit), and the agreement reached among all the investors and 6D, were clearly calculated according to and based on the then-existing 24,982,822 shares of CleanTech.

42.     As of the date it was printed (June 17, 2014), the Subscription Agreement set forth the fundamental and material economic terms going to the foundation of the agreement that all investors were agreeing to, based on the stated assumptions in the form Subscription Agreement as to the number of then-existing outstanding shares of CleanTech.  The Subscription Agreement's provisions regarding the number of shares per Unit being offered for investment were clearly based on the number of shares of CleanTech in existence as of the date the Subscription Agreement was published.

43.     On page 9 of the Subscription Agreement, bold and italicized text expressly provided that it incorporated by reference existing CleanTech SEC filings, as well as any CleanTech SEC filings that would be made between the date of its publication and the date that investors made their investments.  The Subscription Agreement makes clear, and the Plaintiff understood, that there would be other investors similarly purchasing Units as valued under the terms of the Subscription Agreement

44.     Subsequent to the printing of the form Subscription Agreement form, but before Plaintiff made his investment, CleanTech Common Stock underwent two reverse splits: one

which occurred on or about July 14, 2014, and another which occurred on or about September 16, 2014.  These two reverse splits were fully and accurately disclosed in timely-filed SEC filings, which Plaintiff – a highly sophisticated investor -- had full access to.  As noted, these SEC filings that fully disclosed the two reverse splits were incorporated by reference in to the Subscription Agreement.

45.     The Subscription Agreement not only expressly incorporates by reference the existing and forthcoming SEC filings, but clearly warned investors, including the Plaintiff, in boldface and italicized type, to carefully read all subsequent CleanTech 10-K and 10-Q filings that were to be made between the date that the Subscription Agreement was printed and the time the investors, including the Plaintiff, made their investment.  The fact of these two reverse-splits were known to the Plaintiff – a highly sophisticated investor – before he invested his money and signed the form Subscription Agreement.

46.     The Plaintiff understood that the number of shares underlying the Units as defined in the form Subscription Agreement was based on the number of shares outstanding as of the date the form Subscription Agreement was printed (June 17, 2014).  There was a meeting of the minds between the Plaintiff and 6D Acquisitions, Inc. that the economic terms of the transaction contemplated by the form Subscription Agreement, including the number of shares underlying each Unit, was based on the total number of CleanTech shares outstanding as of the date that the form Subscription Agreement was printed, as well as the capitalization of CleanTech set forth in the Cap Table.  This included the figure of 536,125,218 shares of CleanTech represented in the Cap Table.

47.     When the Plaintiff received his 420,290 shares of 6D Global in late September or early October 2014, he and/or his authorized agents received documentation that clearly set forth

the number of shares of 6D Global that he received.  The Plaintiff and his agents were and are highly sophisticated, and had they truly believed that Plaintiff was entitled to 2.9 million shares of 6D Global, the discrepancy between the 2.9 million shares Plaintiff now claims he was entitled to, and the 420,290 shares he actually received, was so dramatic that any reasonable person, and certainly any reasonable sophisticated investor, would have raised the discrepancy if in fact they believed there was a shortfall.

48.     In reality, Plaintiff was well aware that he had received the correct proportion of shares of 6D Global as did all 34 investors under the Subscription Agreement, taking into account the two reverse splits of CleanTech that had occurred between the printing of the form Subscription Agreement in June 2014 and the September 29, 2014 Share Exchange.

## FIRST CAUSE OF ACTION
### (Mutual Mistake)

49.     The above paragraphs are incorporated and repeated herein.

50.     The 6D Defendants maintain in the first instance that a fair reading of the Subscription Agreement, and the SEC filings of CleanTech Innovations, Inc. ("CleanTech") that were incorporated into the Subscription Agreement, cannot be reconciled with the absurd result that Plaintiff advocates: namely, that only the Plaintiff would have been entitled to receive 6.9 times the shares per Unit of 6D Global as every other investor under the Subscription Agreement.   However, pleading in the alternative, even assuming that there is a technical reading of the Subscription Agreement that would lead to this result, then the Subscription Agreement must be reformed under the doctrine of mutual mistake.

51.     The Subscription Agreement form was printed as of June 17, 2014, and as of that date, accurately set forth the number of shares of CleanTech then in existence.  Specifically, page 2 of the Subscription Agreement states that "there are currently an aggregate of 24,982,822

shares of CleanTech Common Stock issued and outstanding."  This information was accurate on the date that the Subscription Agreement form was printed.

52.     The Subscription Agreement also included a Cap Table on page 2 that set forth the capitalization of CleanTech, whose calculation was based on the then-existing 24,982,822 shares of CleanTech.  The number of shares underlying the Units that were being offered in the form Subscription Agreement (50,000 shares per Unit) were clearly calculated according to and based on the then-existing 24,982,822 shares of CleanTech.

53.     As of the date it was printed (June 17, 2014), the Subscription Agreement set forth the fundamental and material economic terms going to the foundation of the agreement that all investors were agreeing to, based on the stated assumptions in the form Subscription Agreement as to the number of then-existing outstanding shares of CleanTech.  The Subscription Agreement's provisions regarding the number of shares per Unit being offered for investment were clearly based on the number of shares of CleanTech in existence as of the date the Subscription Agreement was published.

54.     On page 9 of the Subscription Agreement, bold and italicized text expressly provided that it incorporated by reference existing CleanTech SEC filings, as well as any CleanTech SEC filings that would be made between the date of its publication and the date that investors made their investments.  The Subscription Agreement makes clear, and the Plaintiff understood, that there would be other investors similarly purchasing Units as valued under the terms of the Subscription Agreement.

55.     Subsequent to the printing of the form Subscription Agreement form, but before Plaintiff made his investment, CleanTech Common Stock underwent two reverse splits: one which occurred on or about July 14, 2014, and another which occurred on or about September

16, 2014.   These two reverse splits were fully and accurately disclosed in timely-filed SEC filings, which Plaintiff – a highly sophisticated investor -- had full access to.   As noted, these SEC filings that fully disclosed the two reverse splits were incorporated by reference in to the Subscription Agreement.

56.     The Subscription Agreement not only expressly incorporates by reference the existing and forthcoming SEC filings, but clearly warned investors, including the Plaintiff, in boldface and italicized type, to carefully read all subsequent CleanTech 10-K and 10-Q filings that were to be made between the date that the Subscription Agreement was printed and the time the investors, including the Plaintiff, made their investment.   The fact of these two reverse-splits were known to the Plaintiff – a highly sophisticated investor – before he invested his money and signed the form Subscription Agreement.

57.     The Plaintiff understood that the number of shares underlying the Units as defined in the form Subscription Agreement was based on the number of shares outstanding as of the date the form Subscription Agreement was printed (June 17, 2014).   There was a meeting of the minds between the Plaintiff and 6D Acquisitions, Inc. that the economic terms of the transaction contemplated by the form Subscription Agreement, including the number of shares underlying each Unit, was based on the total number of CleanTech shares outstanding as of the date that the form Subscription Agreement was printed, as well as the capitalization of CleanTech set forth in the Cap Table.   This included the figure of 536,125,218 shares of CleanTech represented in the Cap Table.

58.     As a result of the two reverse splits that were fully disclosed in the SEC filings that were expressly part of the Subscription Agreement, at the time that the Plaintiff and 6D Acquisitions, Inc., as well as the other 33 investors, formally entered into the agreement, the

statements in the Subscription Agreement that "there are currently 24,982,833 shares of CleanTech Common Stock issued and outstanding" and the corresponding figure of 536,125,218 shares of CleanTech in the Cap Table, were not accurate.

59.     Despite the meeting of minds that previously existed between the Plaintiff and 6D Acquisitions, Inc., and the other 33 investors, as to the economic terms of the agreement, on the date that the Plaintiff signed the form Subscription Agreement and invested his money, and on the date the other 33 investors similarly invested their money, the number of CleanTech shares then in existence varied from the number of shares that were set forth in the form Subscription Agreement that was printed months earlier.  Thus, the Subscription Agreement form set forth a mutual mistake in fact not only as to the number of CleanTech shares actually in existence as of the date of the investment, but also as to the corresponding figures in the Cap Table  – a mutual mistake that did not reflect the previous and true actual meeting of the minds that had been reached as to the material economic terms of the agreement.  This mutual mistake of fact affected the proportion of shares reflected in the Cap Table.

60.     This mutual mistake in fact was of mutual concern and went to the foundation of the meeting of the minds that had been formed between the Plaintiff and 6D Acquisitions, Inc., as well as the other 33 investors under the Subscription Agreement.

61.     To properly implement the parties' clear intentions, and to avoid the absurd result that only Plaintiff (as opposed to all other investors) would receive a windfall and multiples of the number of shares that every other investor received, it is obvious that the number of shares referred to in the Subscription Agreement as "underlying the Units" should be proportionately adjusted to take into account the reverse splits of CleanTech stock that occurred between the

printing of the Subscription Agreement form, and the time of the Share Exchange contemplated under the Subscription Agreement.

62.     If Plaintiff's reading of the Subscription Agreement were to be accepted, the Subscription Agreement would have been impossible to carry out according to its express terms or as a practical matter, because the agreement contemplated an amount of CleanTech shares that was much larger than that which actually existed.  In that sense, as of the date of the Plaintiff's investment, the number of shares of CleanTech set forth in the earlier printed form Subscription Agreement is a scrivener's error, as the form Subscription Agreement no longer reflected the actual number of CleanTech shares in existence by virtue of SEC filings that are expressly made part of the agreement.  The meeting of the minds reached between 6D Acquisitions, Inc. and the investors (including the Plaintiff) was that each investor would receive an interest per Unit that valued each Unit at 50,000 shares based on the number of shares of CleanTech listed in the Cap Table.  That meeting of the minds, and the interests of avoiding an absurd result, requires that the Subscription Agreement be reformed to take into account the true agreement reached between 6D Acquisitions, Inc. and the Plaintiff.

63.     Additionally, accepting Plaintiff's reading of the contract would entitle all other investors under the Subscription Agreement to claim that they too should be entitled to receive shares in an amount unadjusted for the two reverse splits of CleanTech stock, as it would be absurd to allow only one investor under the Subscription Agreement to enjoy such a windfall. Had Plaintiff's reading of the Subscription Agreement been applied at the time the transaction was consummated, Plaintiff would ultimately own the same relative percentage of 6D Global Technologies as he did upon receipt of the shares in the amount adjusted for the two reverse stock splits.

64.     Under the doctrine of mutual mistake, the Court should reform the contract to reflect the essence of the agreement, and the obvious intention of the parties, to adjust the number of shares per Unit to correspond to the number of CleanTech shares outstanding as result of the two reverse splits.

## SECOND CAUSE OF ACTION
### (Unilateral Mistake)

65.     The above paragraphs are repeated and incorporated by reference as if fully set forth herein.

66.     Pleading in the alternative, even if the Subscription Agreement is viewed as containing a mistake that was unilateral on the part of 6D Acquisitions, Inc., the circumstances here warrant reformation of the Subscription Agreement under the doctrine of unilateral mistake. New York law allows for reformation to be predicated upon a unilateral mistake on one side and deceptive conduct on the other side which tended to obscure the true agreement.  Here, the Plaintiff engaged in deceptive conduct in order to attempt to obtain a windfall that no other investor under the Subscription Agreement would enjoy.

67.     In 2014, the Plaintiff received documents plainly showing the he received 420,290 shares in 6D Global, and yet he did not timely object to the number of shares received. Indeed, prior to the time that Plaintiff made his investment at issue, he was fully aware of the reverse splits that had timely been disclosed in the SEC filings that were expressly incorporated by reference in the Subscription Agreement.  Thus, it is no surprise that the Plaintiff for many months did not make any objection whatsoever to the number of shares he received.  In fact, Plaintiff sold all his shares at a profit without ever having timely objected to the number of shares received.

68.     Only after the Plaintiff sold his stock at a profit many months after receiving it, and fully aware of the number of shares he received for many months, the Plaintiff now belatedly seeks to be the sole investor who is entitled to 6.9 times the economic value of the shares than every other investor. Had Plaintiff timely objected to the number of shares he received in 2014, the 6D Defendants and other investors would have had the ability to bring everyone into Court to declare the rights of all interested parties, given that all investors must be treated equally. Instead, acting with deception and opportunistically, the Plaintiff sat back for many months knowing exactly how many shares he received, sold his shares at a profit, and now has brought a belated claim for breach of contract that seeks to confer upon him a windfall that no other investor under the Subscription Agreement enjoyed.  The law and equity should not allow this. This case is precisely why the doctrine of reformation exists, and it should respectfully be applied in these circumstances.

WHEREFORE, Defendants pray judgment against the Plaintiff, and each of them, as follows:

(a) Dismissing the claims set forth in the Complaint;

(b) In the alternative, reforming the contract and providing other declaratory and equitable relief to adjust the number of shares per Unit to correspond to the reverse splits in stock that had occurred between the date of the form Subscription Agreement and the consummation of the Share Exchange;

(c) Such other and further relief as the Court deems appropriate.


Dated: New York, New York
        August 21, 2017


By:      /s/ Tom M. Fini
         Tom M. Fini, Esq.
Jacques Catafago, Esq.
Tom M. Fini, Esq.
CATAFAGO FINI LLP
The Empire State Building
350 Fifth Avenue, Suite 7412
New York, NY 10118
212-239-9669
tom@catafagofini.com

Attorneys for 6D Global Technologies, Inc.,
6D Acquisitions, and Tejune Kang