**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____x

JOHN COTTAM,

                                   Plaintiff,                16 CV 04584 (RJS)

v.

GLOBAL EMERGING CAPITAL GROUP, LLC,
ALEXANDER KIBRIK, WILLIAM
UCHIMOTO, 6D GLOBAL
TECHNOLOGIES, INC., 6D
ACQUISITIONS, INC., and TEJUNE
KANG,

                                   Defendants.
_____x


## 6D DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
## TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT


                                        CATAFAGO FINI LLP
                                        The Empire State Building
                                        350 Fifth Ave., Suite 7710
                                        New York, NY 10118
                                        Tel.: (212) 239-9669

## Table of Contents

PRELIMINARY STATEMENT.......................................................................... 1

ARGUMENT ............................................................................................... 3

    I.    Plaintiff is Not Able to Establish Damages, And, At The Very
        Least, There Are Issues of Fact Regarding Damages............................ 3

        A.  Plaintiff Cannot Establish That He is Entitled to Any
             Expectation Damages............................................................... 3

        B.  Because Plaintiff Cannot Establish Expectation Damages,
             Plaintiff is Only Entitled to Reliance Damages ................................. 10

    II.    Plaintiff's Selective Plain Text Argument Does Not Establish a Breach...... 11

    III.    The 6D Defendants Have Alleged Viable Claims for Reformation
         Based On Mutual Mistake and Unilateral Mistake, Which Preclude
         Summary Judgment ...................................................................... 17

    IV.    The Defenses Asserted by the 6D Defendants Raise Fact Issues that Require
         Discovery ...................................................................................... 21

    V.    Plaintiff is Not Entitled to Summary Judgment Against Tejune Kang,
        Who Signed the Subscription Agreement in His Official Capacity, And Has
        Not Explained Why 6D Is Liable ................................................. 22

# Tables of Authorities

*Aiello v Burns Intl. Sec. Servs. Corp.*, 110 A.D.3d 234 (1st Dep't 2013)...........................21

*Baby Togs, Inc. v. Harold Trimming Co.,* 413 N.Y.S. 2d 283 (1st Dep't 2014)...................................................................................................................18

*Banks v. Corr. Servs. Corp.*, 475 F. Supp. 2d 189 (E.D.N.Y. 2007)...............................3, 23

*Bar-Tur v. Arience Capital Mgmt., L.P.*, 490 Fed. Appx. 392
  (2d Cir. N.Y. Aug. 3, 2012)....................................................…....................................16

*Blum v. Spaha Capital Management LLC*, 44 Supp.3d 482 (S.D.N.Y. 2014).....................19

*BrandAid Mktg. Corp. v. Biss*, 2008 WL 190494 (S.D.N.Y. Jan. 22, 2008).......................6, 8

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314
  (S.D.N.Y. 2009).................................................................................................4

*Coventry Enterprises LLC v. Sanomedics International Holdings, Inc.*, 191 F. Supp. 3d 312
  (S.D.N.Y. 2016)..............…................................................................................6

*Document Sec., Sys. v. Coupons, Inc.*, 55 F. Supp. 3d 485 (W.D.N.Y. 2014)................…......4, 7

*First Indemnity of America Ins. Co. v. Shinas*, 2009 WL 315428 (S.D.N.Y. Sept. 30, 2009).....13

*GM Acceptance Corp. v Clifton-Fine Cent. Sch. Dist.*, 85 NY2d 232  (N.Y. 1995)................21

*Greenwich Capital Fin. Prods., Inc. v Negrin*, 74 AD3d 413
  (1st Dept 2010)...................................................................................................11, 17

*In re Indep. Energy Holdings PLC Sec. Litig.*, Fed. Sec. L. Rep. (CCH) P92,524,
2003 WL 22244676 (S.D.N.Y. 2003) ....................................................................8

*Kovens v. Paul, 2009 SL 562280 (S.D.N.Y. Mar. 2, 2009)*.......................................6, 9, 10

*Maalouf v. Salomon Smith Barney*, Not Reported in F.Supp.2d, 2004 WL 2008848
  (S.D.N.Y. Sept. 7, 2004), aff'd by *Maalouf v. Citigroup Global Mkts., Inc.*,
  156 Fed. Appx. 367 (2d Cir. N.Y. Nov. 28, 2005.......................................................11

*Macy's Inc. v Martha Stewart Living Omnimedia, Inc.*, 127 A.D.3d 48, 6 N.Y.S.3d 7,
  (1st Dep't 2015)....................................................................................................12

*Maranga v. McDonald & T. Corp.*, 8 A.D.3d 351, 777 N.Y.S.2d 732, 733
(2d Dep't 2004)...........................................................................................23

*Metro. Switch Bd. Co. v. Amici Assocs., Inc.,* 20 A.D.3d 455, 455, 799 N.Y.S.2d
531, 531 (2d Dep't 2005).............................................................................22

*Mineola Garden City Co., Ltd. V. Bank of America*, 49 F. Supp. 3d 28 (E.D.N.Y. 2014).........12

*Mitsubishi Electric Corp. v. Westcode, Inc.*, 2016 WL 3748023 (N.D.N.Y. Jul. 11, 2016).......13

*Nash v. Kornblum*, 12 N.Y.2d 42 (N.Y. 1962)...........................................................18, 20

*New York v. UPS*, 2016 WL 4735368 (S.D.N.Y. Sept. 10, 2016).....................................4, 5

*Peabody v. Davis*, 636 F. 3d 368 (7th. Cir. 2011)..........................................................6

*Platinum Equity Advisors, LLC v SDI, Inc.*, 51 Misc. 3d 1230(A)
(N.Y. Sup. Ct. June 7, 2016).........................................................................13

*Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005)...............................12, 16

*Potter v. Padilla*, 143 A.D. 3d 1246 (4th Dep't 2016).....................................................12

*Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 143 (2d Cir. 2016)............4, 5, 10

*Reiss v. Financial Performance Corp.*, 97 N.Y.2d 195 (2001).........................................15

*In re Residential Capital, LLC*, 533 B.R. 379 (Bankr. S.D.N.Y. 2015)..........................4, 10

*Ribacoff v. Chubb Group of Insurance Companies*, 2 A.D.3d 153, 154,
770 N.Y.S.2d 1, 2 (1st Dep't 2003).................................................................17

*Rodeo Family Enters., LLC v Matte,* 2011 NY Slip Op 31113(U)
(N.Y. Sup. Ct. Apr. 25, 2011)........................................................................20

*In re Roob's Estate*, 59 Misc. 2d 619 (N.Y. Sur. Ct. 1969)..............................................6

*In re Schick*, 232 B.R. 589, 598-99 (S.D.N.Y. 1999)....................................................19

*Sicom S.P.A. v. TRS Inc.*, 168 F. Supp. 3d 698 (S.D.N.Y. 2016).....................................4

*Simon v. Electrospace Corp.*, 28 N.Y.2d 136 (N.Y. 1971)...............................................8

*True v. True*, 63 A.D.3d 1145 (2d Dep't 2009)..........................................................20

*Value Time, Inc. v. Windsor Toys, Inc.*, 709 F. Supp. 436 (S.D.N.Y. 1989).........................23

*Washington Temple Church of God in Christ, Inc. v. Global Props. & Assoc., Inc.*,
  43 Misc. 3d 1216(A), 990 N.Y.S.2d 440, 2014 N.Y. Misc. LEXIS 1876,
  2014 NY Slip Op 50666(U), 2014 WL 1646124 (N.Y. Sup. Ct. Mar. 31, 2014)..................21

*Waxman v. Envipco Pickup & Processing Servs.*, 2006 WL 1788964
  (S.D.N.Y. June 28, 2006)................................................................................... 8, 9

*Wilson v. Great Am. Indus.*, 979 F.2d 924, 933 (2d Cir. 1992)..........................................8

*Wilton Reassurance Life Company of New York v. Smith*, 2015 WL 631973,
  at *16 (E.D.N.Y. Feb. 13, 2015)...............................................................................17

Defendants 6D Global Technologies, Inc. ("6D"), 6D Acquisitions, Inc. ("6D Acquisitions"), and Tejune Kang (together, the "6D Defendants"), hereby submit this memorandum of law in opposition to Plaintiff's motion for summary judgment.

## PRELIMINARY STATEMENT

Plaintiff's motion for summary judgment should be denied, as it ignores controlling legal authority as to both damages and liability.  At the very least, there are issues of fact that cannot be resolved without expert and other discovery taking place.

First, even assuming, *arguendo,* that there was a breach of the Subscription Agreement, Plaintiff cannot demonstrate that he suffered any expectation damages, and certainly has not established the absence of any issue of fact regarding such damages.  Plaintiff simplistically relies on the market price of 6D stock to measure damages, but ignores that under his reading of the contract, there would have been many millions of more shares of 6D issued in the market. Expectation damages are based on the "but for" world that would have existed in the absence of the alleged breach.  In that "but for" world, all 34 similarly-situated investors (and all other 6D shareholders) would have been entitled to 6.9 times the number of shares that they held.  The existence of those many millions of additional shares would obviously have lowered the price per share of 6D stock.  Given this reality, and the fact that 6D was thinly traded, Plaintiff cannot establish that he suffered any damages.  In the very least, whether Plaintiff actually suffered any damages, and the quantity of damages, involve fact-intensive issues that would need to be the subject of expert damages analysis, informed by fact discovery.

Second, given that 6D stock was thinly traded, plus the fact that Plaintiff's reading of the contract would necessarily entail calculating damages in the but for world where there would be many millions of more shares of 6D flooding the market, whatever damages analysis he may now belatedly try to offer will unavoidably involve a high degree of speculation as to whether and what amount of damages he actually suffered.  Where, as here, expectation damages are

1

speculative and uncertain, the proper measure of damages for a breach is reliance damages, which gives back to the Plaintiff what he invested. Here, the shares that Plaintiff received were sold by him for a profit – he actually received more from the sale of his 6D shares than he invested. As such, reliance damages are zero, and it is actually the 6D Defendants who are entitled to summary judgment dismissing the breach of contract claim.

Third, although the Court has indicated its initial view that one provision of the Subscription Agreement (the "Agreement") might be read in a manner suggesting that there was a breach, the Court was not previously made aware of certain facts, provisions and arguments -- discussed for the first time in this brief -- which demonstrate that Plaintiff is advancing a selective plain text argument that is ultimately untenable. As explained below, Plaintiff's selective plain text approach is improper, because it ignores the literal effect of other plain text in the Agreement, impermissibly rendering those provisions completely meaningless in ways not previously explained to the Court.

Fourth, summary judgment is also improper because the 6D Defendants have asserted viable counterclaims for mutual mistake and unilateral mistake. Although the economic terms of the agreement that had been reached (the "meeting of the minds") between the 34 investors and 6D is clear, by the time the Agreement was signed, it mistakenly states and assumes that, as of the date of the share exchange, there were 536,125,218 shares outstanding. Given the certainty with which the Court can understand the true economic agreement reached, this is the classic case where, whether under the doctrine of mutual mistake or unilateral mistake, the Court should reform the contract to make explicit what is plainly implicit when the contract is read as a whole: that the shares that each of the 34 investors was to receive needed to be adjusted to take into account the reverse splits that had occurred.

Fifth, the 6D Defendants have raised valid defenses which also defeat summary judgment. Given how sophisticated the Plaintiff is, and the fact that he represented and warranted in the Agreement that he read the SEC filings that disclosed the very reverse splits at issue, there are valid defenses of waiver, estoppel and ratification. In the very least, these

defenses raise fact issues that make summary judgment inappropriate, especially since there has been no discovery whatsoever in this action.  Finally, the Plaintiff cannot demonstrate that Tejune Kang should have any personal liability, and has not explained why 6D (not a signatory to the Agreement) should be liable for the alleged breach or damages claimed.

In sum, whether it is because Plaintiff has offered no coherent damage analysis, or because he is attempting improperly to read one provision of the Agreement in isolation while ignoring other express conditions in the Agreement, it becomes clear that Plaintiff is trying to take advantage of an improper selective plain text reading in an attempt to realize an absurd windfall.  We respectfully submit that the law and common sense should lead the Court to deny summary judgment, or in the least that there are fact issues that warrant discovery.

## FACTUAL BACKGROUND

Plaintiff did not submit a Rule 56.1 statement of facts, alone a basis to deny his motion. The Plaintiff is relying only on the contract, and market data regarding the price of 6D stock, but this ignores the issues of fact that exist as explained below.  The Plaintiff's motion for summary judgment should be denied as a matter of law for the reasons set forth herein.  However, in the alternative, as set forth below and as supported by the accompanying Declarations of Tejune Kang (the "Kang Declaration"), Winthrop Gardner Minot (the "Minot Declaration") and Paul L. Hinton (the "Hinton Declaration"), under FRCP 56(d), in the least expert and fact discovery is needed before the Court could rule on summary judgment.

## ARGUMENT

I. **Plaintiff Is Not Able to Establish Damages, And, At The Very Least, There Are Issues of Fact Regarding Damages**

A. **Plaintiff Cannot Establish That He Is Entitled to Any Expectation Damages**

A plaintiff seeking summary judgment on a breach of contract claim "bears the burden of proof of establishing that any claimed damages were caused by defendant's breach to a

3

reasonable degree of certainty." *In re Residential Capital, LLC*, 533 B.R. 379, 407 (Bankr. S.D.N.Y. 2015). Where the existence or amount of damages is uncertain, or there are issues of fact as to these issues, summary judgment must be denied. *Sicom S.P.A. v. TRS Inc.*, 168 F. Supp. 3d 698, 708 (S.D.N.Y. 2016) (denying summary judgment on breach of contract claim because "[a]s the party moving for summary judgment, plaintiff bears the burden of presenting sufficient undisputed material facts for the Court to rule in its favor," and "plaintiff has not provided a sufficient undisputed basis for the Court to make a determination as to the quantum of damages.").

Here, Plaintiff seeks expectation damages. Pl. Moving Brief at 14-16. Expectation damages "constitute the amount necessary to put plaintiff in as good a position as if defendant had fulfilled the contract." *In re Residential Capital, LLC*, 533 B.R. at 407; *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 143 (2d Cir. 2016). "[T]he non-breaching party may not be placed in a better position because of the breach than he would have been in had the contract been performed." *Document Sec. Sys. v. Coupons.com, Inc.*, 55 F. Supp. 3d 485, 496 (W.D.N.Y. 2014).

New York courts have made clear that expectation damages must be calculated by taking into account the circumstances of the hypothetical, "but-for" world that would have existed had the alleged breach not taken place and the agreement had been fulfilled. *See New York v. UPS*, 2016 WL 4735368, at *10 (S.D.N.Y. Sept. 10, 2016) ("It is certainly clear that the use of but-for worlds is commonplace in assessing damages in many different scenarios. For example, use of a but-for world is appropriate when the appropriate measure of damages is the difference between the loss a plaintiff would have suffered (if any) in the absence of offending conduct versus what he/she in fact suffered."); *see also Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 319 (S.D.N.Y. 2009) (damages evaluated based on but-for world); *see Kovens v. Paul*, 2009 WL 562280 (S.D.N.Y. Mar. 2, 2009) (calculation of damages impermissibly speculative because it would have to take into account the different trajectory a company would have taken had plaintiff received the shares he was entitled to under the

agreement).  "The rationale for basing damages on a but-for world analysis is that in most cases—with the exception of cases involving punitive and treble damages—plaintiffs are not entitled to recoup windfalls, i.e., damages beyond the harm suffered."  *See New York v. UPS*, 2016 WL 4735368, at *10 (S.D.N.Y. Sept. 10, 2016).

Further, under well established New York law, the calculation of Plaintiff's damages must deduct any benefits Plaintiff received from any performance tendered by 6D under the agreement. *See Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 143 (2d Cir. 2016) ("if any benefit or opportunity for benefit appears to have accrued to the plaintiff because of the breach, a balance must be struck between benefit and loss, and the defendant is only chargeable with the net loss.").

Applying these well-established principles, even assuming, arguendo, that 6D breached the Agreement, Plaintiff cannot demonstrate that he suffered damages, and has certainly not established damages for purposes of summary judgment.  In his motion for summary judgment, Plaintiff simplistically measures his expectation damages using the publicly listed trading value of 6D stock on the first date the he claims he should have been permitted to sell his shares.  Pl. Br. at 15.  Plaintiff's approach to damages is fundamentally flawed because it ignores that in the "but for" world where there was no breach, no share exchange would have taken place (and he would have been entitled to return of his investment), and even if a transaction had been possible, under Plaintiff's reading there would have been many millions of more shares of 6D in existence, which would have lowered the price per share such that there are no damages or any alleged damages are purely speculative.

As set forth in the accompanying declaration of Defendants' proposed damages expert, Paul Hinton, under any scenario where the alleged breach by 6D had not taken place, Plaintiff is not able to demonstrate that he would have suffered damages.  First, if the two reverse splits of CleanTech stock at issue had not taken place, then CleanTech would have been delisted, and the Share Exchange would not have taken place.  *See* Hinton Declaration; Minot Declaration; Kang Declaration.   Thus, had 6D not committed the alleged breach by adjusting the shares distributed

to investors to take into account the two reverse splits that were required to keep CleanTech and its successor publicly traded, the Share Exchange would not have occurred, and, under the terms of the Subscription Agreement, Plaintiff would have been entitled to a return of his investment. *See* Subscription Agreement, Section 3; *see also id.* at 3 ("in the event the Share Exchange is not consummated, all subscriptions shall be returned to the subscribers herein without interest"). Since Plaintiff sold the shares he received for an amount above his investment, in that scenario, he suffered no damages.

Moreover, even assuming (contrary to reality) that the Share Exchange could have been carried out without the reverse splits of CleanTech stock having taken place, or (again, contrary to reality) that the Share Exchange was possible if the adjustments to take into the account the reverse splits had not occurred, Plaintiff still cannot demonstrate damages.  This is because under the reading of the Subscription Agreement that Plaintiff is advancing – in the "but for" world where 6D did not commit the alleged breach -- all of the 34 investors under the Subscription Agreement (and indeed, all other shareholders of 6D) would have been entitled to 6.9 times the number of shares that they ended up holding.   As set forth in the Hinton Declaration, the existence of these many millions of additional shares of 6D would have lowered the price per share of 6D.[1]  This is common sense, because since the assets of 6D were fixed, multiplying the

---

[1] *See Coventry Enterprises LLC v. Sanomedics International Holdings, Inc.*, 191 F. Supp. 3d 312, 322 (S.D.N.Y. 2016) ("[A] proper [damages] analysis would require consideration of the impact of the sale of a substantial number of shares on the market price of SIMH stock."); *BrandAid Mktg. Corp. v. Biss*, 2008 WL 190494, at *5 (S.D.N.Y. Jan. 22, 2008) ("the issuance of 23.5 million shares more than quadrupled the number of outstanding shares, presumably diluting the market value of each share."); *Peabody v. Davis*, 636 F. 3d 368, n. 12 (7th Cir. 2011) (where stock was valued at $2,000, the court presumed that a ten-to-one stock split would result in the shares being valued at $200); *In re Roob's Estate*, 59 Misc. 2d 619, 621 (N.Y. Sur. Ct. 1969) ("a stock split reduces the value of the individual shares as well as the interest in the corporation that each represents…").

number of outstanding shares by approximately seven times would be expected to drastically lower the market price per share.[2]

Indeed, even if one were to assume an improbable "but for" world, where only Plaintiff was entitled to the additional shares he claims he was entitled to (which completely ignores that there are 34 similarly-situated investors, as well as other shareholders, who all would have been entitled under Plaintiff's reading of the contract to 6.9 times the number of shares), Defendants' expert explains that Plaintiff still would not be able to substantiate the damages he seeks. *See* Hinton Declaration. Again, this is because the existence of millions of additional shares of 6D, combined with the fact that the stock was thinly traded, would have drastically reduced the price per share of 6D.

In light of the above, even assuming, arguendo, that 6D breached the Subscription Agreement, Plaintiff cannot establish that he has suffered any damages as a result of such breach. *See Document Sec. Sys. v. Coupons.com, Inc.*, 55 F. Supp. 3d 485 (defendant granted summary judgment where, even assuming that defendant breached the agreement, plaintiff did not suffer any expectation damages thereby, and any payment that it received would have placed it in a better position than if the contract had been performed).

In the alternative, in the very least there is an issue of fact as to whether Plaintiff has suffered any damages recoverable as expectation damages, which involve the need for expert testimony. Plaintiff ignores applicable case law which holds that, where, as here, restricted stock

---

[2] As set forth in the Hinton Declaration at page 6, n. 12: "Even though there were 77 million shares outstanding on September 29, 2014 6D could not have given any more of these to Investors in the Offering unless they were purchased from other shareholders. Even if 6D held treasury shares that it could have issued to satisfy Plaintiff's claim without paying for them, unless 6D received equivalent consideration in return, issuing treasury shares would still be dilutive. Thus the effects of dilution associated with Plaintiff's claim cannot be avoided."

is at issue, expert analysis is required to quantify damages as of the date of the breach, discounted to take the restrictions into account.[3]

It is noteworthy that Plaintiff has not provided any expert analysis of damages, and has not provided any damages analysis whatsoever that calculates damages based on the value of the shares as of September 29, 2014, the date of the alleged breach. As set forth in the Declaration of Paul Hinton, any damages calculation as of that date would be zero or purely speculative. For the same reasons as set forth above, the value of the 2.9 million shares that Plaintiff asserts he was entitled to would, as of September 29, 2014, need to be discounted to account for the fact that all subscribers and other shareholders would also own 6.9 times the number of shares of 6D. Furthermore, since Plaintiff acknowledges that his stock had restrictions on trading, there would need to be a further discount to take into account the restriction. This analysis, in the very least, involves fact-intensive issues for which expert testimony is appropriate.[4]   Whatever

---

[3] *See Waxman v. Envipco Pickup & Processing Servs.*, 2006 WL 1788964, at *4 (S.D.N.Y. June 28, 2006) ("the conclusion that the receipts should be valued at the time of the breach does not mean that the market price of unrestricted...receipts at the time of breach is the appropriate measure of damages. The general rule is that the market price of a security should be discounted to reflect the decrease in value, if any, due to a restriction on its transferability...the value of the receipts is the market price for unrestricted receipts minus a discount to take into account the decrease in value due to the receipts' restricted status," and "that the amount of the discount is a factual matter for the jury at trial."); *BrandAid Mktg. Corp. v. Biss*, 2008 WL 190494, at *5 (S.D.N.Y. Jan. 22, 2008) ("Where the shares of stock are restricted, the general rule is that the market price of a security should be discounted to reflect the decrease in value, if any, due to a restriction on its transferability.  While a discount of thirty to thirty-five percent from their publicly traded value has been treated as a starting point in several cases that valued restricted shares, the precise discount . . . depends on the facts of [the] case, including expert testimony."); *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 147 (N.Y. 1971) (if stock at issue was restricted, "then the market price would have to be discounted in some way.").

[4] *Wilson v. Great Am. Indus.*, 979 F.2d 924, 933 (2d Cir. 1992) ("Appraisal and valuation methods for differently situated corporations require resort to technical economic concepts that quite often fall outside the realm of judicial expertise and require reliance on expert testimony."); *In re Indep. Energy Holdings PLC Sec. Litig.*, 2003 WL 22244676, at *3 (S.D.N.Y. 2003) ("proof  of damages in securities cases is always difficult and invariably requires expert testimony which may, or may not be, accepted by a jury"); *Waxman v. Envipco Pickup & Processing Servs.*, 2006 WL 1788964, at *4 (S.D.N.Y. 2006) ("Of course, the precise discount that applies in any particular case, including this one, depends on the facts of that case, including

analysis Plaintiff may belatedly attempt, calculating damages as of September 29, 2014 will involve a substantial degree of speculation, given the thinness of trading of the stock and the existence of many millions of more shares on the market in the world that would have existed "but for" the alleged breach.

There are also issues of fact in dispute regarding Plaintiff's unsubstantiated assertion that the proper date to measure damages is March 30, 2015 – six months after he asserts he should have received his stock. Contrary to Plaintiff's conclusory assertions that "he was stalled, misled and prevented" from selling his stock between March 30, 2015 and the date that he sold his stock (August 2015), there were completely innocent and legitimate reasons, having nothing to do with any wrongdoing by any defendant, as to why Plaintiff could not sell his shares earlier. As set forth in the Kang Declaration, the delay was due to legal and regulatory requirements of the S.E.C. under Rule 144 of the Securities Act of 1933, not any wrongful conduct. For this reason as well, in the very least, there are fact issues regarding Plaintiff's alleged damages – here, the proper date on which to measure damages. These fact issues should not be resolved as a matter of law, and certainly not before the conducting of any discovery whatsoever herein.

To be clear, although there are *in the least* multiple issues of fact that preclude summary judgment, it is also clear that whatever argument or evidence the Plaintiff will offer regarding damages will involve an impermissible degree of speculation and uncertainty. Further, Plaintiff cannot sidestep his failure to establish damages by suggesting that Defendants, as the alleged wrongdoers, bear the burden of establishing damages or the amount of damages. As the court in *Kovens v. Paul* explains, the wrongdoer rule does not obviate a Plaintiff's obligation to

---

expert testimony on the question of the proper discount amount considering the characteristics of the company at issue and the precise nature of the restrictions involved. For that reason, the Court cannot now say what the proper discount amount should be for the Envipco receipts at issue in this case that question is for the jury at trial after a review of all the relevant evidence."). Plaintiff had the obligation to present this expert analysis, and thus failed to meet its burden on summary judgment. Even if this failure is ignored, then, in any event, the 6D Defendants are in the least entitled to discovery from Plaintiff regarding damages, and hereby seek that discovery pursuant to Fed. R. Civ. P. 56(d). *See* Kang Declaration.

demonstrate the amount of damages with reasonable certainty. *See Kovens v. Paul*, 2009 WL 562280, at *7 (S.D.N.Y. Mar. 2, 2009) (the wrongdoer principle "may be invoked only once a plaintiff has demonstrated the amount of damages with reasonable certainty."). Thus, as set forth in the next section, even if Plaintiff is entitled to damages, reliance damages are the only damages available to Plaintiff as a matter of law.

### B. Because Plaintiff Cannot Establish Expectation Damages, Plaintiff is Only Entitled To Reliance Damages

Because 6D stock was thinly traded, and Plaintiff's reading of the contract would necessarily entail calculating damages in a "but for" scenario where there would be many millions of more shares of 6D flooding the market, whatever damages Plaintiff claims he suffered, and whatever analysis he may now belatedly try to offer, will unavoidably involve a high degree of speculation and uncertainty as to whether and what amount of damages he actually suffered.

Where, as here, expectation damages are speculative and uncertain, the proper measure of damages for a breach is reliance damages, which gives back to the plaintiff what he invested. Under New York law, "[w]hen expectation damages defy precise calculation, reliance damages are the appropriate remedy." *In re Residential Capital, LLC*, 533 B.R. 379, 407 (Bankr. S.D.N.Y. July 14, 2015). "Reliance damages seek to restore the injured party to the position he or she was in before the contract was formed and allow for recovery of expenditures the injured party made in reliance on defendant's representations and that he or she otherwise would not have made." *Id.*

Reliance damages would consist of returning to the Plaintiff he made, less any benefit he received from any performance of the contract. *See Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125 (2d Cir. 2016). As Plaintiff admits in the complaint, Plaintiff sold the shares he received at a profit relative to his expenditures under the Subscription Agreement. (Compl. at ¶26 and ¶64). Specifically, the Plaintiff invested $870,000.00 under the Subscription Agreement, and sold his shares for $940,000.00. *Id.* Thus, the benefit that accrued to Plaintiff

due to Defendants' alleged breach actually exceeded the expenditures he made in reliance on Defendants' representations, and, as a matter of law, the reliance damages suffered by Plaintiff are zero. Accordingly, Defendants are entitled to summary judgment dismissing the Plaintiff's contract claim. *Maalouf v. Salomon Smith Barney*, 2004 WL 2008848, at *5 (S.D.N.Y. Sept. 7, 2004) ("Where a defendant's liability is limited to a certain amount, courts may grant summary judgment limiting damages to that amount.").[5]

## II.    Plaintiff's Selective Plain Text Argument Does Not Establish a Breach

During conferences in this action, the Court has indicated its initial view that the plain text of one provision of the Subscription Agreement indicates that 6D Acquisitions may have breached the Subscription Agreement by not delivering shares to Plaintiff on a 1-to-1 basis. However, the Court made these initial observations on a motion to dismiss, where 6D's prior counsel did not point out facts and provisions of the Agreement that demonstrate that Plaintiff is advocating a selective plain text argument which is untenable. The Court can only address arguments made, and it is only now that the 6D Defendants will lay out for the first time exactly why Plaintiff's selective plain text argument is untenable.

Although it is true that courts will generally hold sophisticated parties to the plain text of their agreements, it is also true that New York law still recognizes an important exception to that rule. It is still well-settled law that a "contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." *Greenwich Capital Fin. Prods., Inc. v Negrin*, 74 A.D.3d 413, 415 (1st Dep't 2010). Importantly, if a literal reading of a provision would lead to absurd results and render other provisions of the agreement meaningless, the courts can reject such construction in favor of one

---

[5] One line of decisions under New York law holds that, where there is a breach of contract, but no damages, the Court should grant nominal damages of $1. *See Maalouf v. Salomon Smith Barney*, 2004 WL 2008848 (S.D.N.Y. Sept. 7, 2004), *aff'd*, *Maalouf v. Citigroup Global Mkts., Inc.*, 156 Fed. Appx. 367 (2d Cir. N.Y. Nov. 28, 2005). The Defendants are neutral as to whether the Court follows the line of authority that grants summary judgment dismissing the contract claim where there are no damages, or the line of cases granting summary judgment that the damages on Plaintiff's breach of contract claim are $1.

which would better accord with the reasonable expectations of the parties. *See Id.* (rejecting a reading of the contract that relies on "formalistic literalism" where it "leads to absurd results," and rendered another clause "without meaning."); *Mineola Garden City Co., Ltd. V. Bank of America*, 49 F. Supp. 3d 283, 288 (E.D.N.Y. 2014) (same).

Furthermore, "in examining a contract to find the parties' intent as to a particular section, a court should read 'the entirety of the agreement in the context of the parties' relationship' rather than isolating distinct provisions out of an entire agreement." *Macy's Inc. v Martha Stewart Living Omnimedia, Inc.*, 127 A.D.3d 48, 54 (1st Dep't 2015); *see also Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005) ("Contracts must be read as a whole, and if possible, courts must interpret them to effect the general purpose of the contract. It is also important to read the document as a whole to ensure that excessive emphasis is not placed upon particular words or phrases.") (internal citations omitted).

In light of these principles, there are specific facts and provisions of the Subscription Agreement that were not previously highlighted for the Court and which show that if the Plaintiff's literal reading of the Agreement is adopted, then the Agreement would be internally inconsistent, it would render certain provisions meaningless, and it would lead to truly absurd results. First, page 2 of the Agreement sets forth conditions of the transactions, defines the "Share Exchange" transaction that is contemplated (in the first Whereas clause), and includes a Cap Table that sets forth the exact number of shares and economic interest that the subscribers were being offered under the Agreement (in the third Whereas clause). Although these conditions appear in the Whereas clauses on page 2 and the Court was previously made aware of this, what the Court was not specifically made aware of was the following: the actual body of the Agreement – at Section 3 – adopts these conditions and adopts the definition of "Share Exchange."[6] Moreover, Section 3 of the Subscription Agreement not only utilizes the defined

---

[6] Although normally a whereas clause cannot create substantive rights under an agreement, where, as here, the whereas clause defines a term which is later used in the body of the agreement, that definition is deemed to be part of the agreement. *E.g., Potter v. Padilla*, 143 A.D. 3d 1246, 1247 (4th Dep't 2016) ("the court did not err in referencing the definition in

terms "Share Exchange" from the Whereas clause on page 2, but also makes clear that the Share Exchange is an actual *condition of the closing of the Offering*. This is critically important, because, under the literal and plain text of Section 3, the Offering could not close unless the "Share Exchange," as defined, had occurred.

It is undisputed that the Share Exchange, as defined in the first Whereas clause, *literally did not occur*. While the Share Exchange as defined required that CleanTech would issue 266,787,609 shares to the shareholders of 6D, in actuality, CleanTech issued only 38,664,871 shares to 6D. See SEC filing appearing at Fini Dec. Ex. H. This is because of the two reverse-splits of CleanTech that had occurred between the printing of the form Agreement and the closing of the transactions. Thus, as a matter of plain text and literal reading of the contract, the Share Exchange – which is an express condition of the closing of the Offering -- did not occur. The Agreement also spells out the remedy if the Share Exchange, which is an express condition, does not occur: the subscribers are to receive their investment back. *See* Agreement, Section 3; *see also id.* at 3 ("in the event the Share Exchange is not consummated, all subscriptions shall be returned to the subscribers herein without interest").

Thus, under a literal and plain reading of the text of the Agreement, the Share Exchange did not take place, and Plaintiff's remedy should be to receive the return of his investment.[7] As set forth above, since he received stock of value and sold this stock for a profit, Plaintiff has no

---

construing the agreement even though the definition was found only in the agreement's 'whereas' clause, because such recital paragraphs may be used to 'assist in determining the proper construction of a contract."); *Platinum Equity Advisors, LLC v. SDI, Inc.*, 51 Misc. 3d 1230(A) (N.Y. Sup. Ct. 2016) (using whereas clause to determine the parties' intent); *First Indemnity of America Ins. Co. v. Shinas*, 2009 WL 315428 (S.D.N.Y. Sept. 30, 2009) (using whereas clause to define the terms of the agreement) *see also Bild v. Konig*, 2011 WL 666259 (E.D.N.Y. Feb. 14, 2011) (using a whereas clause to help define the scope of the agreement); *Mitsubishi Electric Corp. v. Westcode, Inc.*, 2016 WL 3748023 (N.D.N.Y. Jul. 11, 2016) (using whereas clause to define scope of agreement).

[7] Plaintiff cannot assert that waiver or estoppel principles applies only to 6D to prevent it from now suggesting that a plain text reading of Agreement would mean that the Share Exchange did not take place. The Agreement's no waiver provision at Section 8(b) applies equally to 6D and Plaintiff.

damages. Indeed, had the shares of 6D stock been worthless the moment he received them, Plaintiff would surely argue exactly that: that a plain text reading of the Agreement required a return of his investment. Plain text is a two-way street. If Plaintiff wants to read the Agreement literally and not as a whole to effectuate the contract's purpose, he should not be able to selectively read one provision literally, while ignoring the effect of a literal reading of other provisions of the same Agreement.

Another critical provision of the Subscription Agreement is the representation and warranty by the Plaintiff that he had carefully read all the SEC filings by CleanTech, including the filings which plainly disclosed the two reverse splits at issue. Agreement, Section 4 ("The Subscriber represents and warrants that he or she has carefully considered and reviewed all the information contained in the reports CleanTech's [sic] files with the Commission."). This is important, because in reading the contract as a whole, one cannot ignore that the sophisticated investors involved here all are deemed to have been aware of the two reverse splits.

Another key provision of the Agreement that was not previously highlighted for the Court was that it was a condition for the closing of the Share Exchange and the Offering that CleanTech's stock be listed on the NASDAQ. Specifically, Section 3 makes clear that closing of the Offering is "conditioned upon the closing of the Share Exchange and the transactions and conditions contemplated thereby," which includes the condition, set forth in the second Whereas clause on page 2 of the Agreement, that CleanTech be listed on the NASDAQ. Thus, if the two reverse splits of CleanTech had not taken place, then, once again, a condition to closing would not have taken place, and the subscribers would be entitled to a return of their investment.

Finally, as the Court is aware, the Cap Table on page 2 of the Agreement makes clear that the parties had contemplated that there would be 536,125,218 shares of outstanding CleanTech common stock at closing, of which 17,000,000 shares (or 3.15% of the company) would be apportioned to the subscribers.

When provisions outlined above are read together, it is possible to read the Agreement as a whole to make all the provisions consistent and to carry out the intention of the parties: that the

sophisticated parties involved all represented and warranted that they read the SEC filings, the reverse splits were fully disclosed, the reverse splits were necessary to meet a condition of the closing (keeping CleanTech listed), the investors received the same economic interest they had bargained for as reflected in the Cap Table, and the Share Exchange and stock distributed all naturally involved a number of shares adjusted to take into account the reverse splits.

Plaintiff's reading of the contract is impermissible because it involves a selective use of plain text that renders other provisions of the Agreement meaningless. For example, Plaintiff's reading requires one to ignore the contract's express condition that CleanTech needed to be listed on the NASDAQ, which would not have been possible without the reverse splits. Plaintiff's reading also renders meaningless the number of shares of CleanTech that were assumed to be outstanding in the Cap Table, and the number of shares that were assumed to be involved with the Share Exchange, which were incorporated as conditions in Section 3 of the Agreement. That is, the Plaintiff's reading requires that these conditions and assumptions now be seen as completely irrelevant and meaningless, because he claims he is entitled to his 2.9 million shares in the abstract, without any concern for the fact that these express conditions and assumptions were literally not met.

The decision in *Reiss v. Financial Performance Corp.*, 97 N.Y.2d 195 (2001) is clearly distinguishable because *Reiss* did not involve a situation, such as here, where the reverse splits at issue meant that express conditions to the transaction at issue had not occurred. That case involved the simple situation where a company entered into a warrant agreement with a director, under which he could purchase 500,000 shares of stock at 10 cents a share. The court applied that agreement by its terms, despite a later reverse split, which the company argued conferred a windfall. The case with 6D is much different. Here, the Agreement has numerous explicit conditions making very clear how many shares of stock are assumed to exist in the world as conditions to closing the transactions, and the plain text of the Agreement provides that these are conditions for the Offering of shares to the Subscribers. And unlike in *Reiss*, this case also does not involve only one stockholder: this is an Agreement which involves a class of 34 investors

15

who all bargained for a certain number of shares, but under the express condition that there would be a certain number of shares outstanding. That condition ended up not existing.

A consistent, plain text result here would be to conclude that the express, plain text conditions of the Agreement were not literally met, and the investments should be returned. Alternatively, the Court could read the contract as a whole to conform the result to what the parties clearly intended. A third reasonable result would be to find an ambiguity in the Agreement, and either resolve that ambiguity by reading the contract as a whole to accomplish the parties' clear intent, or else have a trial as to the intent.[8]

But the one result that is clearly wrong here would be to accept the "selective plain text" argument being advocated here by Plaintiff. It makes no sense to suspend and render utterly meaningless the plain text provisions of the Agreement which painstakingly state, *as conditions to closing*, how many shares of CleanTech are assumed to exist, and how many of those shares the subscribers will receive, but then turn around and enforce in isolation the single plain text provision that would give Plaintiff 2.9 million shares – while ignoring that Plaintiff was only to receive the 2.9 million shares if the other conditions in the Agreement occurred, which they literally did not because the number of shares assumed to exist in fact did not exist.

In light of the above, this case does indeed present a situation where a literal reading of one provision in isolation as Plaintiff proposes would truly lead to absurd results and which

---

[8] A contract is ambiguous if "it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Bar-Tur v. Arience Capital Mgmt., L.P.*, 490 Fed. Appx. 392, 394 (2d Cir. 2012). At the very least, there is an issue of fact as to the intent of the parties, and thus, Plaintiff should not be granted summary judgment. *See Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005) ("summary judgment when interpreting a contract may be granted only when the intent of the parties can be ascertained from the face of their agreement. However, when the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment.").

would render other key provisions of the Agreement meaningless.[9]   Accordingly, Plaintiff's attempt to obtain summary judgment utilizing such a selective plain text argument should be rejected.

### III.    The 6D Defendants Have Alleged Viable Claims for Reformation Based On Mutual Mistake and Unilateral Mistake, Which Preclude Summary Judgment

Plaintiff's motion for summary judgment should be denied for the additional, independent reason that the 6D Defendants have alleged viable counterclaims for reformation based on mutual mistake and unilateral mistake.

Plaintiff asserted in his pre-motion letter that a claim for mutual mistake has not been pled because it cannot be alleged that he made a mistake.  Plaintiff misconstrues the law.  The 6D Defendants do allege that the Plaintiff shared a mistaken assumption of fact with 6D, which is set forth in the Subscription Agreement, and which varies from the true meeting of the minds that had been reached between parties.  This states a claim for mutual mistake, as such a claim is adequately alleged if the following elements are set forth: (1) that the parties had a real and existing agreement on particular terms; (2) yet, at the time the agreement was entered into, "the parties find themselves signatories to a writing which does not accurately reflect that agreement." *Ribacoff v. Chubb Group of Insurance Companies*, 2 A.D.3d 153, 154 (1st Dep't 2003).  *See also Wilton Reassurance Life Company of New York v. Smith*, 2015 WL 631973, at *16 (E.D.N.Y. Feb. 13, 2015).

Here, the Amended Counterclaim for mutual mistake clearly alleges these elements. First, the Counterclaim alleges that there was an agreement reached between 6D Acquisitions, Inc. and the Plaintiff (as well as the other 33 investors): "There was a meeting of the minds between the Plaintiff and 6D Acquisitions, Inc. that the economic terms of the transaction contemplated by the form Subscription Agreement, including the number of shares underlying

---

[9] *Greenwich Capital Fin. Prods., Inc. v. Negrin*, 74 AD3d 413, 415 (1st Dep't 2010) (rejecting a reading of the contract that relies on "formalistic literalism" where it "leads to absurd results," and rendered another clause "without meaning.").

each Unit, was based on the total number of CleanTech shares outstanding as of the date that the form Subscription Agreement was printed as well as the capitalization of CleanTech set forth in the Cap Table." (Doc. 68; Counterclaim at ¶46; *See also* Counterclaim at ¶¶52-53 and ¶57). Second, the Counterclaim alleges that, contrary to the agreement that had been reached, the signed contract contained a mistake in fact regarding the number of outstanding shares of CleanTech that actually existed when the agreement was signed by Plaintiff and he invested: namely, that "as a result of the two reverse splits that were fully disclosed in the SEC filings that were expressly part of the Subscription Agreement, at the time that the Plaintiff and 6D Acquisitions, Inc., as well as the other 33 investors, formally entered into the agreement, the statements in the Subscription Agreement that 'there are currently 24,982,833 shares of CleanTech Common Stock issued and outstanding' and the corresponding figure of 536,125,218 shares of CleanTech in the Cap Table, were not accurate." (Counterclaim at ¶58). Thus, the Counterclaim alleges that the mistake was indeed mutual: it reflected a mistaken assumption held by both parties which vitally affected the material basis upon which the parties contracted. (Counterclaim at ¶58, 59).[10]  Furthermore, the nature of the Agreement itself is clear evidence that Plaintiff was also operating under a mistaken assumption of fact. Specifically, given the fact that the Share Exchange was conditioned upon there being 1.2 billion shares of CleanTech stock, and the performance of the Financing Exchange was conditioned upon the closing of Share Exchange, the parties were under the mistaken assumption as stated in the Agreement that the figures in the Cap Table were accurate.

The decision in *True v. True*, 63 A.D.3d 1145 (2d Dep't 2009), is instructive and illustrates that mutual mistake has been adequately alleged. There, the agreement was that the

---

[10] The fact that a party drafted the agreement or could have avoided the error does not bar such party from seeking reformation. *See Baby Togs, Inc. v. Harold Trimming Co.*, 413 N.Y.S. 2d 393, 394, (1st Dep't 1979) ("Where there is no mistake about the agreement and the only mistake alleged is in the reduction of the agreement to writing, such mistake of the scrivener, or of either party, no matter how it occurred, may be corrected."); *Nash v. Kornblum*, 12 N.Y.2d 42 (N.Y. 1962) (Plaintiff granted reformation when the agreement was drafted by the plaintiff's agent).

"plaintiff's stock awards from his employer, Goldman Sachs, would be 'divided 50-50 in kind.'"
However, contrary to the agreement regarding 50-50 division, the same agreement also contained
a mistake, in that it assumed that more shares of the husband's stock awards from Goldman
Sachs were available for distribution than actually were. *Id.* at 1146-47.  This mistake in the
agreement was caused by the husband (the party seeking reformation) having provided a
summary stating that the wife would receive 1,894 shares, based on the gross number of 3,655
shares he had. *Id.* at 1148.  This ignored that the parties actually intended to divide the *net* shares
– net of taxes and fees. *Id.*  Because this mistake "undermined their intent to divide the net shares
available for division, 50-50 in kind," the court reformed the contract to refer to the net shares
available. *Id.*  Just as the actual meeting of the minds in *True* was that the parties would divide
the property 50-50, here the Cap Table on page 2 of the Subscription Agreement reflects the
agreement between the parties and the economic terms thereof.  And, as in *True,* here the parties
ended up with a signed agreement that, when executed, mistakenly set forth the number of
outstanding CleanTech shares that actually existed as of the singing of the contract and
investment.

Citing a single case dealing with *rescission*, as opposed to reformation, the Plaintiff in its
pre-motion letter argued that the 6D Defendants cannot assert mutual mistake because "the
mutual mistake doctrine may not be invoked by a party to avoid the consequences of its own
negligence." (8/25/17 Letter at 2, citing *Blum v. Spaha Capital Management LLC*, 44 Supp.3d
482 (S.D.N.Y. 2014)).  However, the weight of New York law favors the view that where a party
seeks *reformation*, as opposed to rescission (which completely avoids any contractual
obligation), negligence by the party seeking reformation (including his own drafting error) does
not, in itself, bar a mutual mistake claim.[11]  Moreover, even if a party's negligence could in itself

---

[11] *E.g., In re Schick*, 232 B.R. 589, 598-99 (S.D.N.Y. 1999).  This is because in every situation
involving mistake, a party could in theory have avoided the mistake with the exercise of due
care.  *See id.*, citing Restatement (Second) of Contracts § 157 ("A mistaken party's fault in
failing to know or discover the facts before making the contract does not bar him from
... reformation ...."); *id.* cmt. a ("[T]he availability of relief would be severely circumscribed"

preclude a mutual mistake claim, whether the party was negligent is a fact-intensive issue that is not amenable to resolution on a motion to dismiss.[12]

In the alternative, the 6D Defendants allege an adequate unilateral mistake claim. Where, as here, a party knowingly attempts to take advantage of a unilateral mistake, it is not necessary for fraud to be alleged or proven in order for the doctrine of unilateral mistake to apply.[13] The Defendants adequately allege that Plaintiff is a sophisticated investor, was aware at the time he signed the agreement that the reverse splits of CleanTech common stock had already occurred, and is now attempting to realize a windfall that none of the other 33 investors would receive. (Counterclaim at ¶¶67-68). Defendants' assertion that Plaintiff was aware of the reverse splits when he signed the agreement and invested his money is not only plausible, but Plaintiff expressly represented and warranted in the agreement that he read the SEC filings that disclosed the reverse splits.

---

if negligence barred reformation "because a party can often avoid a mistake by the exercise of [due] care.").

[12] *Washington Temple Church of God in Christ, Inc. v. Global Props. & Assoc., Inc.*, 2014 WL 1646124, at *5 (N.Y. Sup. Ct. Mar. 31, 2014) ("whether the parties' failure to conduct an independent examination . . . constitutes a failure to exercise 'ordinary care' is an issue to be resolved by the trier of fact…with respect to negligence, 'even when the facts are conceded there is often a question as to whether the defendant or the plaintiff acted reasonably under the circumstances. This can rarely be decided as a matter of law.'") (internal citations omitted).

[13] *Nash v. Kornblum*, 12 N.Y.2d 42, 47-48 (N.Y. 1962) ("It clearly and convincingly appears from the record here that this is a case of a mistake on the part of the plaintiff's agent in typing the erroneous linear ground measurement, which plaintiff did not discover before submission to the defendant, and the latter, with knowledge of the mistake, trying to take advantage of the error…In our view of the case it was unnecessary for the plaintiff to establish fraud on the part of the defendant."); *see also Rodeo Family Enters., LLC v Matte*, 2011 NY Slip Op 31113(U) (N.Y. Sup. Ct. Apr. 25, 2011) ("Reformation is an equitable remedy that generally applies to cases of mutual mistake, but it can also be 'predicated upon a unilateral mistake on one side and deceptive conduct on the other side which tended to obscure the true agreement…'").

IV.    **The Defenses Asserted by the 6D Defendants Raise Fact Issues that Require Discovery**

The 6D Defendants have asserted affirmative defenses that raise fact issues which require discovery. Plaintiff's conduct gives rise to defenses of waiver and estoppel, among others. At the time he entered into the Agreement, Plaintiff expressly represented and warranted that he had read all of the materials provided with the Offering, as well as all of CleanTech's SEC filings. See Subscription Agreement at 10. These SEC filings fully disclosed the two reverse splits. On September 29, 2014, Plaintiff received 420,290 shares of 6D stock, almost 2.5 million less than the 2.9 million he now claims he is entitled to. The disparity between what plaintiff received and what he now claims he was entitled to is so drastic that he must have known that it existed upon receiving the shares. Given his representations and warranties that he had read the SEC filings disclosing the reverse splits at the time he entered into the Agreement, his acceptance of the shares in September 2014, and his later sale of those shares at a profit in 2015, he thereby intentionally and voluntarily abandoned his right to assert that Defendants breached the agreement. Indeed, under New York law, "waiver may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage." *GM Acceptance Corp. v Clifton-Fine Cent. Sch. Dist.*, 85 NY2d 232, 236 (N.Y. 1995) ("Plaintiff apparently never objected to Clifton-Fine's unauthorized payment of the first contract directly to Maier-Schule nor did plaintiff object when the second contract was executed. If it can be established at trial that plaintiff had notice of this indirect payment to Maier-Schule, plaintiff may have impliedly waived the direct payment requirement under the assignment by permitting the account debtor to remit payment to the assignor over a substantial period of time."). Furthermore, although the Agreement contains a non-waiver provision, "the law is abundantly clear in New York that, even where a contract specifically contains a nonwaiver clause and a provision stating that it cannot be modified except by a writing, it can, nevertheless, be effectively modified by actual performance and the parties' course of conduct." *Aiello v Burns Intl. Sec. Servs. Corp.*, 110 A.D.3d 234, 245 (1st Dep't 2013).

Further, Plaintiff gave no indication to Defendants that he was discontent with the amount of shares he received, or that he planned to assert a breach of contract claim in order to obtain them. Defendants therefore had no knowledge and no way of knowing that the Plaintiff would assert a claim. Defendants reasonably and justifiably relied on Plaintiff's conduct and representations in forming the belief that their performance under the Agreement had been satisfactory, and that the adjustment for the reverse stock splits had been accepted. Defendants then proceeded to distribute shares to other investors, and continued to conduct its business, operating under the assumption that the agreement would not be challenged. Plaintiff surely expected that Defendants would act upon his silence, along with his intentional acceptance and sale of the shares, in forming their belief that he was satisfied with the amount of shares he received, because they would have no other way of knowing. He further must have expected that this belief would materially affect 6D's course of business, because, having reviewed the Offering materials, he was apprised of 6D's financial situation, and the impact that asserting this claim would have.

In order to adequately and prove the elements of these defenses, Defendants need discovery to explore Plaintiff's knowledge and why engaged in such conduct, and thus summary judgment should be denied.

## V.     Plaintiff is Not Entitled To Summary Judgment Against Tejune Kang, Who Signed the Subscription Agreement in His Official Capacity, And Has Not Explained Why 6D Is Liable

Without explanation, Plaintiff demands summary judgment against Tejune Kang, individually, for breach of contract. Mr. Kang signed the subscription agreement in his capacity as chief executive officer of 6D Acquisitions and not individually. "An individual who signs a corporate contract and indicates the name of the corporation and the nature of his representative capacity on the contract is generally not subject to personal liability." *Metro. Switch Bd. Co. v. Amici Assocs., Inc.,* 20 A.D.3d 455, 455 (2d Dep't 2005) (internal citation and quotation marks

22

omitted) ("the respondents established their prima facie entitlement to judgment as a matter of law by showing that they executed the subject agreement solely in their capacities as corporate officers, and without any intent to become personally liable to perform thereunder"). This is because, "[i]n New York, corporate officers and shareholders are not liable for corporate debts or breaches of contract unless the corporate veil is pierced." *Banks v. Corr. Servs. Corp.*, 475 F. Supp. 2d 189, 197 (E.D.N.Y. 2007); *see, e.g., Maranga v. McDonald & T. Corp.*, 8 A.D.3d 351, 352 (2d Dep't 2004) ("Where a principal of a corporation expressly signs a contract in his or her capacity as an officer of the corporation, unless he or she purports to personally bind him or herself, he or she will not be held personally liable under the contract."); *Value Time, Inc. v. Windsor Toys, Inc.*, 709 F. Supp. 436, 438 (S.D.N.Y. 1989) ("Because he was acting in his capacity as an officer, Rigberg cannot be held individually liable for the corporation's alleged breach of contract"; dismissing case where no allegation sufficient to support veil-piercing). Here, there are no facts pled or asserted in Plaintiff's summary judgment motion that indicate that Mr. Kang should be liable through a veil-piercing theory. As a result, not only is Plaintiff not entitled to summary judgment against Kang, but Kang is entitled to summary judgment dismissing the claim.

Plaintiff similarly has not explained any basis for holding 6D Global Technologies, Inc. liable for the alleged breach. The signatory to the Agreement was 6D Acquisitions. Under Section 1(b) of the Agreement, it was agreed that this entity would be dissolved. Further, as explained above, a literal reading of the Agreement supports the view that the Share Exchange contemplated didn't occur, and the Agreement contemplated that in that event, the investors would receive a return of their investment. See supra at __. Plaintiff did not cite any law or point to any governing documents that demonstrate why 6D Global Technologies, Inc. is necessarily liable for a breach of an agreement signed by another corporate entity, particularly where the return of investment was the contemplated damages if the transactions precisely as contemplated did not occur.

## CONCLUSION

For the above reasons, the Plaintiff's motion for summary judgment should be denied.


Dated: New York, New York
       September 8, 2017


                                        By:      /s/ Tom M. Fini
                                                 Tom M. Fini, Esq.
                                        Jacques Catafago, Esq.
                                        Tom M. Fini, Esq.
                                        CATAFAGO FINI LLP
                                        The Empire State Building
                                        350 Fifth Avenue, Suite 7412
                                        New York, NY 10118
                                        212-239-9669
                                        tom@catafagofini.com

                                        Attorneys for 6D Global Technologies, Inc.,
                                        6D Acquisitions, and Tejune Kang

24