**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

JOHN COTTAM,

Plaintiff,

16 CV 04584 (RJS)

v.

GLOBAL EMERGING CAPITAL GROUP, LLC,
ALEXANDER KIBRIK, WILLIAM UCHIMOTO,
6D GLOBAL TECHNOLOGIES, INC.,
6D ACQUISITIONS, INC., and TEJUNEKANG,

Defendants.

---------------------------------------------------------------x

**THE 6D DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS**

CATAFAGO FINI LLP
The Empire State Building
350 Fifth Ave., Suite 7710
New York, NY 10118
Tel.: (212) 239-9669

# Table of Contents

ARGUMENT .......... 1

I. The Counterclaims for reformation are made in the alternative to other legal positions that may moot the reformation claims .......... 1

II. Plaintiff's First Point – which acknowledges that there are at least 11 non-conclusory factual paragraphs in the counterclaims – mischarterizes the counterclaims and in any event ignores the elements of mutual and unilateral mistake .......... 5

III. The 6D Defendants Have Adequately Pled Mutual Mistake .......... 5

A. The 6D Defendants Clearly Allege the Elements of Mutual Mistake .......... 5

B. Plaintiff Misunderstands the 6D Defendants' Theory of Mutual Mistake .......... 7

1. Plaintiff's Claim that No Prior Agreement Existed is Irrelevant Because Case Law Does Not Require, and the 6D Defendants Do Not Allege, the Existence of a "Prior" Agreement .......... 7

2. The 6D Defendants Adequately Allege A Mutual Mistake – The Parties Both Signed an Agreement That Mistakenly Assumes The Number of Shares that Are A Condition to the Deal .......... 9

C. Plaintiff's Arguments that the 6D Defendants' Theory of Mutual Mistake is Facially Implausible are Unavailing .......... 10

IV. The 6D Defendants Have Adequately Pled Unilateral Mistake .......... 13

CONCLUSION .......... 15

# Table of Authorities

## Cases

*257 Park Ave. Assoc. v. Music Sales Corp.,* 24 A.D.3d 371 (1st Dep't 2005)....19
*Baby Togs, Inc. v. Harold Trimming Co*., 67 A.D.2d 868 (1st Dep't 1979)....16
*Banker v. Banker*, 56 A.D.3d 1105 (3rd Dep't 2008)....10
*Bild v. Konig*, 2011 WL 666259 (E.D.N.Y. Feb. 14, 2011)....13
*Blum v. Spaha Capital Management LLC*, 44 F.Supp.3d 482 (S.D.N.Y. 2014)....15
*Blum v. Spaha Capital Mgmt., Inc., LLC*, 44 F.Supp.3d 482 (S.D.N.Y. 2014)....15
*Brender v. Brender*, 199 A.D.2d 665 (3rd Dep't 1993)....10
*Cox v. Lehman Bros*., 15 A.D.3d 239, 239 (1st Dep't 2005)....18
*First Indemnity of America Ins. Co. v. Shinas*, 2009 WL 315428 (S.D.N.Y. Sept. 30, 2009)....12
*Gunther v. Vilceus*, 142 A.D.3d 639 (2nd Dep't 2016)....9
*Lehman Bros. Holdings Inc.*, 761 F.3d 303 (2d Cir.2014)....14
*Mitsubishi Electric Corp. v. Westcode, Inc.*, 2016 WL 3748023 (N.D.N.Y. Jul. 11, 2016)....13
*Nash v. Kornblum*, 12 N.Y.2d 42 (N.Y. 1962)....16
*Nash v. Kornblum*, 12 N.Y.2d 42, 47-48....18
*Platinum Equity Advisors, LLC v. SDI, Inc.*, 51 Misc. 3d 1230(A) (N.Y. Sup. Ct. 2016)....12
*Potter v. Padilla*, 143 A.D. 3d 1246, 1247 (4th Dep't 2016)....12
*Reiss v. Financial Performance Corp.*, 97 N.Y.2d 195 (2001)....3
*Resort Sports Network Inc. v. PH Ventures III, LLC,* 67 A.D.3d 132, 136 (1st Dep't 2009)....19
*Ribacoff v. Chubb Group of Insurance Companies*, 2 A.D.3d 153, 154, 770 N.Y.S.2d 1, 2 (1st Dep't 2003)....6
*Rodeo Family Enters., LLC v Matte,* 2011 NY Slip Op 31113(U) (N.Y. Sup. Ct. Apr. 25, 2011)....17
*Romag Fasteners, Inc., v. Fossil, Inc.*, 979 F. Supp. 2d 264, 287 (D. Conn. 2013)....5
*Schick*, 232 B.R. 589, 598 (S.D.N.Y. 1999)....16
*Shively v. Mitchell*, 2013 WL 5761498 (S.D.N.Y. Oct. 24, 2013)....14
*Shively v. Mitchell*, 2013 WL 5761498, at *2-3 (SDNY Oct. 24, 2013)....8
*True v. True*, 63 A.D.3d 1145, 882 N.Y.S.2d 261 (2d Dep't 2009)....9
*Washington Temple Church of God in Christ, Inc. v. Global Props. & Assoc., Inc.*, 43 Misc. 3d 1216(A) (N.Y. Sup. Ct. 2014)....16
*Wilton Reassurance Life Company of New York v. Smith*, 2015 WL 631973, at *16 (E.D.N.Y. Feb. 13, 2015)....7

Defendants 6D Global Technologies, Inc. ("6D"), 6D Acquisitions, Inc. ("6D Acquisitions"), and Tejune Kang (together, the "6D Defendants"), hereby submit this memorandum of law in opposition to Plaintiff's motion to dismiss.

## ARGUMENT

### I. THE COUNTERCLAIMS FOR REFORMATION ARE MADE IN THE ALTERNATIVE TO OTHER LEGAL POSITIONS THAT MAY MOOT THE REFORMATION CLAIMS

At the outset, it is important to note that the Counterclaims by the 6D Defendants are made in the alternative to other threshold legal positions by the 6D Defendants that have been fully briefed with respect to Plaintiff's motion for summary judgment. These threshold issues on summary judgment may moot the need for this motion to dismiss the reformation claims to be decided. Thus, while this brief demonstrates that the 6D Defendants have adequately alleged claims for mutual mistake and unilateral mistake for purposes of a motion to dismiss, it is important to stress that this should not detract from the primary arguments the 6D Defendants have made which may make the reformation claims unnecessary to resolve.

In their opposition to Plaintiff's summary judgment motion (Doc. 79), the 6D Defendants provided detailed arguments illustrating the inadequate and speculative nature of Plaintiff's damages analysis. In the Plaintiff's reply brief on summary judgment, the Plaintiff never meaningfully responded to those arguments.

As explained in Defendants' opposition to summary judgment, Plaintiff's damages analysis in no way accounted for the tens of millions of additional shares of 6D stock that would have existed in the but-for world that the Plaintiff's theory of the case entails, in which

all 34 investors under the Subscription Agreement were entitled to 6.9 times the number of shares they received. As explained in the 6D Defendants' brief in opposition to summary judgment, and the accompanying declaration of defendants' damages expert Paul Hinton, the issuance of these many millions of additional shares would have substantially diluted the value of 6D shares (the price per share), to the point where Plaintiff's expectation damages are purely speculative. Doc. 79 at 6-8. Plaintiff also failed to provide an analysis of damages calculated based on the value of 6D stock as of the date of the breach, which, under New York law, is the date as of which such damages must be calculated. Doc. 79 at 7-8 & n.3.

Furthermore, Plaintiff's damages analysis failed to discount the value of 6D shares to account for the undisputed fact that these shares would have been restricted, and that 6D stock was thinly traded. It is well-settled under New York law that a discount factor should be applied when calculating damages arising under such circumstances. Doc. 79 at 7-8. Defendants further demonstrated that, given the circumstances of the case, any damages analysis offered by Plaintiff would be inherently speculative, and thus, under New York law, the appropriate remedy would be reliance damages. Id. at 10. Tellingly, Plaintiff never responded to these points on reply, nor offered any expert declaration to calculate damages. Instead, the Plaintiff simply insisted – contrary to law -- that the market price of 6D stock, as of a date *different* from the date of the alleged breach, was the proper measure of damages. This completely ignores all the valid problems with Plaintiff's damages theory that the Defendants had demonstrated.

Importantly, Plaintiff's inability to establish non-speculative expectation damages clearly distinguishes this case from the decision in *Reiss,* upon which Plaintiffs place principal reliance. In *Reiss v. Financial Performance Corp.*, 97 N.Y.2d 195 (2001), there were only two

plaintiffs, each of whom held warrants under two independent contracts that allowed them to exercise those warrants at specific prices. Therefore, *Reiss* did not involve the situation presented here, where there are 34 investors who participated in the Subscription Agreement, and whose contracts were interdependent, rather than independent. Furthermore, the alleged damages here arise not from the exercise of warrants with a specified exercise price as in *Reiss*, but from shares of 6D, whose price per share would have obviously been massively driven down had many millions of additional shares flooded the market, as necessarily would have occurred under Plaintiff's theory of the case (because every one of the 34 investors under the Subscription Agreement would have been entitled to 6.9 times the number of shares they received).

Plaintiff also failed to rebut other valid points made in opposition to summary judgment, including that his argument that there was a breach of the agreement was a selective plain text argument that ignored other plain text of the agreement. This includes the fact that the Share Exchange, as defined in the agreement, and the specific number of shares of CleanTech assumed to exist, were conditions precedent to the transactions. Doc. 79 at 12-16. These conditions never occurred, and the contract expressly provided that if the conditions did not occur, the investors would receive a return of their investment, not expectation damages. Doc. 79 at 13.

The Plaintiff had a full opportunity on summary judgment to lay out its damages theory and address these arguments. Yet, tellingly, in the face of the 6D Defendants' demonstration as to why Plaintiff's damages are inherently speculative, and the defendants' other points, Plaintiff provided no meaningful response in its reply brief. It provided no logical or legal explanation as to how the price of 6D stock would magically have remained the same, if, as

the Plaintiff's theory entails, there would have been many millions of additional shares of stock in existence. Again, this is because there are 33 other similarly-situated investors under the Subscription Agreement, and Plaintiff's theory is that all 34 investors should have received 6.9 times the number of 6D stock that they actually received. In addition to completely ignoring this obvious point, the Plaintiff provided no expert analysis as to how or why the price of 6D could have remained the same even if many millions of additional shares had been in existence. This is presumably because no reputable expert could offer such an illogical opinion. Plaintiff also cited no case law whatsoever for its position as to the date when damages are appropriately measured, because the controlling case law makes clear that the date that damages are to be measured is the date of the alleged breach.

Because the Plaintiff had a full opportunity to brief these issues on summary judgment but chose not to do so, it would be entirely appropriate for the Court, under Fed. R. Civ. P. 56(f)(1), to grant summary judgment in favor of the 6D Defendants. *See Romag Fasteners, Inc., v. Fossil, Inc.*, 979 F. Supp. 2d 264, 287 (D. Conn. 2013) (granting summary judgment to non-movant *sua sponte* where moving party's experts provided insufficient evidence to support movant's claim).

In light of the above, the 6D Defendants submit that the reformation claims, which were alleged only in the alternative to the threshold legal positions of the 6D Defendants, may be moot in light of the fundamental deficiencies in Plaintiff's theory of its case, which Plaintiff elected to ignore in its reply brief on summary judgment. Alternatively, if the Court instead finds that issues of fact exist as to Plaintiff's theory of its case, then this brief explains why the 6D Defendants have adequately alleged claims of mutual mistake and unilateral mistake for purposes of the pleading stage, pending resolution of such issues of fact.

## II. PLAINTIFF'S FIRST POINT – WHICH ACKNOWLEDGES THAT THERE ARE AT LEAST 11 NON-CONCLUSORY FACTUAL PARAGRAPHS IN THE COUNTERCLAIMS – MISCHARTERIZES THE COUNTERCLAIMS AND IN ANY EVENT IGNORES THE ELEMENTS OF MUTUAL AND UNILATERAL MISTAKE

In its brief, Plaintiff's first point (Point I, at pages 3 to 6) consists only of a typing out of the 11 paragraphs from the 6D Defendants' Counterclaims that it acknowledges consist of non-conclusory allegations. This 4-page point does not demonstrate anything to the Court, because Plaintiff does not list in this section the elements of mutual or unilateral mistake and show how or why these admittedly non-conclusory allegations do not satisfy the elements of mutual and unilateral mistake. Literally, all the Plaintiff has done is typed out the 11 paragraphs. Then, without citing any case law in that section regarding the elements of mutual and unilateral mistake, or showing specifically how the allegations are lacking, the Plaintiff simply asserts in conclusory fashion that accepting these allegations as true, these admittedly non-conclusory allegations are "insufficient to state a claim for relief under either the doctrine of mutual mistake or unilateral mistake." Pl. Br. at 6.

As set forth below, the 11 paragraphs of the 6D Defendants' Counterclaims that the Plaintiff acknowledges are non-conclusory, in addition to the other specific allegations that the Plaintiff ignores, do allege, for purposes of a motion to dismiss, the elements of claims for mutual mistake and unilateral mistake.

## III. THE 6D DEFENDANTS HAVE ADEQUATELY PLED MUTUAL MISTAKE

### A. The 6D Defendants Clearly Plead the Elements of Mutual Mistake

Contrary to Plaintiff's argument, the 6D Defendants have adequately pled mutual mistake. Mutual mistake is sufficiently alleged if the following elements are set forth: (1) that the parties have a real and existing agreement on particular terms; (2) yet, at the time the

agreement was entered into, "the parties find themselves signatories to a writing which does not accurately reflect that agreement." *Ribacoff v. Chubb Group of Insurance Companies*, 2 A.D.3d 153, 154, 770 N.Y.S.2d 1, 2 (1st Dep't 2003). Here, the Counterclaim for mutual mistake clearly alleges these elements.

First, the Counterclaim alleges that there was an agreement reached between 6D Acquisitions, Inc. and the Plaintiff (as well as the other 33 investors): "There was a meeting of the minds between the Plaintiff and 6D Acquisitions, Inc. that the economic terms of the transaction contemplated by the form Subscription Agreement, including the number of shares underlying each Unit, was based on the total number of CleanTech shares outstanding as of the date that the form Subscription Agreement was printed as well as the capitalization of CleanTech set forth in the Cap Table." (Counterclaim at ¶46; *See also* Counterclaim at ¶¶52-53 and ¶57).

Second, the Counterclaim alleges that, contrary to the agreement reached, the signed contract also contained a mistake in fact regarding the number of outstanding CleanTech Innovations, Inc. ("CleanTech") shares that actually existed: namely, that "as a result of the two reverse splits that were fully disclosed in the SEC filings that were expressly part of the Subscription Agreement, at the time that the Plaintiff and 6D Acquisitions, Inc., as well as the other 33 investors, formally entered into the agreement, the statements in the Subscription Agreement that 'there are currently 24,982,833 shares of CleanTech Common Stock issued and outstanding' and the corresponding figure of 536,125,218 shares of CleanTech in the Cap Table, were not accurate." (Counterclaim at ¶¶ 46, 58). Thus, the Counterclaim alleges that the mistake was indeed mutual: it reflected a mutually signed agreement, that set forth a mistaken assumption held by both parties – the true number of outstanding shares of CleanTech -- which vitally affected the material basis upon which the parties contracted. (Counterclaim at ¶¶ 46,

58). As such, the Counterclaim alleges that at the time the agreement was executed, both parties signed a document that contained a mistaken assumption of fact that materially affected the basis upon which they contracted. (Counterclaim at ¶59).

In light of the above, the 6D Defendants do adequately allege a claim for mutual mistake. That is, the Counterclaim alleges very clearly that the parties had reached an agreement that was based on the assumption that a certain number of shares of CleanTech existed, so there is no doubt as to what the actual agreement was. The Counterclaim also clearly alleges that although the parties both signed the agreement with that assumption of fact, that assumption of fact was fundamentally mistaken.

The Plaintiff never confronts or addresses in its brief (either here or in its reply brief on summary judgment) that the Subscription Agreement very clearly provides in the first three Whereas clauses that the number of shares assumed to exist is an assumption being agreed to by the parties, and are even *conditions* to the transactions. The Plaintiff does not address this point, because there is no good answer to it. Because the number of shares of CleanTech that were assumed to exist did not exist, and because these numbers of shares were actually conditions of the Agreement, it becomes clear that either: (1) a condition of the agreement was not met, and the parties agreed that the remedy for conditions not being met was that the subscribers would get their money back;[1] or (2) given that the number of shares per Unit (50,000) were based on the assumption that a certain number of shares existed, the Court could reform the agreement to conform to what all the parties by their conduct agreed to: adjust the number of shares per Unit

[1] As set forth in the 6D Defendants' brief in opposition to Plaintiff's motion for summary judgment, the parties expressly contemplated and agreed that if the conditions in the Subscription Agreement were not met, the subscribers would receive a return of their investment. Doc. 79 at 13.

to correspond to the number of CleanTech shares that existed, so that the economic reality of what was agreed to is preserved.

### B. Plaintiff Misunderstands the 6D Defendants' Theory of Mutual Mistake

#### 1. Plaintiff's Assertion that No Prior Agreement Existed is Irrelevant Because Case Law Does Not Require, and the 6D Defendants Do Not Allege, the Existence of a "Prior" Agreement

Plaintiff incorrectly assert that the 6D Defendants alleged that there was a "prior agreement" between the 6D Defendants and Dr. Cottam, "but that, at some point, the number of shares contemplated by the 'prior agreement' changed[.]" (Doc. 82-3, Pl. Br. at 7). This is not accurate. Rather, the 6D Defendants clearly allege that the Subscription Agreement contained both the actual agreement of the parties, as well as the mistake which both parties signed onto. That is, the 6D Defendants allege that both the agreement and the mistake occur in the same document – specifically, the Subscription Agreement. It is well established that a claim for mutual mistake can be alleged where the same writing reflects both the true agreement between the parties, as well as the error. *See Shively v. Mitchell*, 2013 WL 5761498, at *2-3 (S.D.N.Y. Oct. 24, 2013) ("In December 2011, Shively, Mitchell, and Ruscica signed the final Shareholders' Agreement... 'representing owners of all issued stock of Home Remodeling, Inc.,'...Unbeknownst to [the parties], at the time of the negotiations and agreement, Home Remodeling, Inc. did not exist as a corporation."); *True v. True*, 63 A.D.3d 1145, 882 N.Y.S.2d 261 (2d Dep't 2009) (same agreement contained the actual agreement and the error); *see also Banker v. Banker*, 56 A.D.3d 1105 (3rd Dep't 2008) (A stipulation of settlement called for the subdivision of a property, but the property could not be subdivided due to a restrictive covenant that the parties were unaware of); *Brender v. Brender*, 199 A.D.2d 665 (3rd Dep't 1993) ("Here, it appears that all involved mistakenly believed at the time the stipulation was entered into that

plaintiff would be able to continue to obtain medical insurance through defendant's group health plan. As it developed, such coverage simply was not available . . . .").

The Counterclaim first alleges that "[t]here was a meeting of the minds between the Plaintiff and 6D Acquisitions, Inc. that the economic terms of the transaction contemplated by the form Subscription Agreement," including the number of shares underlying each Unit, was based on the total number of CleanTech shares outstanding as set forth in the Cap Table. (Counterclaim at ¶46; *See also* Counterclaim at ¶¶52-53 and ¶57). The Counterclaim also alleges that page 2 of the Subscription Agreement contains the erroneous assumption that there were 536,125,218 outstanding shares. (Counterclaim ¶¶ 46, 58). Because the case law makes clear that a claim for mutual mistake can be alleged where the true agreement, as well as the mistake, are contained in the same document, Plaintiff's argument that there was no "prior agreement" does not defeat the mutual mistake claim for purposes of a motion to dismiss.

### 2. The 6D Defendants Adequately Allege A Mutual Mistake – The Parties Both Signed an Agreement That Mistakenly Assumes The Number of Shares that Are A Condition to the Deal

Plaintiff argues that the 6D Defendants have not alleged facts that demonstrate that Dr. Cottam shared the "same erroneous belief" as the 6D Defendants. (Pl. Br. at 7). Plaintiff focuses on whether or not the 6D Defendants allege that Dr. Cottam "ever had, or expressed, any understanding of, or intent to agree to, a lower number of shares than that explicitly provided for in the plain text of the Subscription Agreement." (Pl. Br. at 7). However, the Plaintiff simply ignores that the Subscription Agreement contains a clear, mutually signed agreement that contains a clear agreement, condition and assumption that there were "**536,125,218 shares**" of CleanTech stock "Issued and Outstanding." (Counterclaim ¶¶ 46, 58, referring to Subscription Agreement at 2). It is indisputable that there were, in fact, *not* **536,125,218 shares** of CleanTech

stock issued and outstanding when the parties signed the Subscription Agreement, due to the reverse splits that had taken place. Thus, the parties mutually signed onto an agreement containing a mutually agreed to but mistaken assumption that went to heart of their agreement.

Case law demonstrates that a mistake is mutual, in the sense that both parties sign a document that contains the mistake – even if the agreement was drafted by only one party. *E.g., In re Schick*, 232 B.R. 589, 598 (S.D.N.Y. 1999) (holding that reformation based on mutual mistake is available even where the fault in drafting lies with only one of the parties).

Here, the Counterclaim clearly alleges that page 2 of the Subscription Agreement contains the mutally agreed to, but erroneous, assumption that there were 536,125,218 outstanding shares. (Counterclaim ¶¶ 46, 58). Thus, the Counterclaim alleges that the mistake was indeed mutual: it reflected a mistaken assumption held by both parties that vitally affected the material basis upon which the parties contracted.

Moreover, this mistaken fact clearly goes to the heart of the agreement. To begin with, the Counterclaim alleges that the parties agreed "that the economic terms of the transaction contemplated by the form Subscription Agreement, including the number of shares underlying each Unit," *was based on* the total number of CleanTech shares outstanding as of the date the agreement was signed and entered into. (Counterclaim at ¶ 46; *See also id.* at ¶¶52-53 and ¶57) (emphasis added). Accordingly, an error in the total number of CleanTech shares outstanding will directly affect the key economic terms of the transaction. Furthermore, the existence of the 536,125,218 issued and outstanding CleanTech shares was, in fact, a condition to the agreement.[2]

[2] Although normally a whereas clause cannot create substantive rights under an agreement, where, as here, the whereas clause defines terms such as "Share Exchange" which are later used in the body of the agreement (see Subscription Agreement, Section 3), that definition is deemed to be part of the agreement. *E.g., Potter v. Padilla*, 143 A.D. 3d 1246, 1247 (4th Dep't 2016) ("the court did not err in referencing the definition in construing the agreement even though the

**C. Plaintiff's Arguments that the 6D Defendants' Theory of Mutual Mistake is Facially Implausible are Unavailing**

Plaintiff argues that Dr. Cottam could not have had an "erroneous belief" because he relied on the Subscription Agreement "with the understanding that the writing was reliable and constituted the terms of the agreement at that time, including the explicit capitalization requirements stated on page 2." (Pl. Br. at 8).[3] This is at odds with the representation and warranty by Plaintiff that he has "carefully considered and reviewed all the information contained in the reports CleanTech's [sic] files with the Commission." Subscription Agreement, Section 4. Included in those filings were the disclosures of the reverse splits. Incredibly, Plaintiff entirely ignores the fact that he expressly warranted he had read the SEC filings that disclosed the reverse splits. The Counterclaim clearly alleges the Plaintiff agreed in writing that he had read the SEC filings and was aware of these facts. Counterclaim ¶¶ 55-56.

Under New York law, "a party's failure to read or understand a contract that it signs does not relieve it of its obligation to be bound by the contract." *Kamdem-Ouaffo v. Pepsico, Inc.*, 160 F. Supp. 3d 553, 565 (S.D.N.Y. 2016). Thus, Plaintiff cannot claim, especially for the purposes of a motion to dismiss, that he was not aware of these disclosures.

---

definition was found only in the agreement's 'whereas' clause, because such recital paragraphs may be used to 'assist in determining the proper construction of a contract."); *Platinum Equity Advisors, LLC v. SDI, Inc.*, 51 Misc. 3d 1230(A) (N.Y. Sup. Ct. 2016) (using whereas clause to determine the parties' intent); *First Indemnity of America Ins. Co. v. Shinas*, 2009 WL 315428 (S.D.N.Y. Sept. 30, 2009) (using whereas clause to define the terms of the agreement) *see also Bild v. Konig*, 2011 WL 666259 (E.D.N.Y. Feb. 14, 2011) (using a whereas clause to help define the scope of the agreement); *Mitsubishi Electric Corp. v. Westcode, Inc.*, 2016 WL 3748023 (N.D.N.Y. Jul. 11, 2016) (using whereas clause to define scope of agreement).

[3] As discussed above, Plaintiff again misidentifies the "erroneous belief" at issue. The erroneous belief is not how many shares Dr. Cottam expected to receive. Instead, the mistake was what the parties mutually agreed to as a condition of the agreement: the number of shares of CleanTech that were outstanding. (Counterclaim ¶¶ 46, 58).

Second, Plaintiff argues that the 6D Defendants have not satisfied Rule 9(b)'s pleading requirements, asserting that the defendants must allege "the precise nature of the parties' misunderstanding" and "when and where the alleged mistake occurred." (Pl. Br. at 9). However, the 6D Defendants have very clearly and specifically alleged the nature of the misunderstanding: that the number of shares assumed to exist, and that were a condition of the agreement, did not exist. The specifics of the alleged mutual mistake are clearly alleged and it hard to imagine what other details the Plaintiff is suggesting is needed or required to state a claim. See e.g., *Shively v. Mitchell*, 2013 WL 5761498 (S.D.N.Y. Oct. 24, 2013) (holding that mutual mistake was adequately alleged where The Amended Complaint alleged that the parties were mutually mistaken about whether HRI, in which Shively invested $1 million, existed.). As discussed in detail above, the 6D Defendants allege both the nature of the mistake – that the Subscription Agreement erroneously stated that there were "536,125,218 shares" of CleanTech stock "Issued and Outstanding" (Counterclaim at ¶¶ 46, 58) – and its location on page 2 of the Subscription Agreement (*id.*). Thus, the 6D Defendants have satisfied Rule 9(b), as the particulars of the agreement and the mistake are clearly laid out in the Counterclaims.

Second, Plaintiff argues that the 6D Defendants cannot assert mutual mistake because "the mutual mistake doctrine may not be invoked by a party to avoid the consequences of its own negligence." (Pl. Br. at 10-11, *citing Blum v. Spaha Capital Management LLC*, 44 F.Supp.3d 482 (S.D.N.Y. 2014)). The decision in *Blum* did not involve a situation such as here, where the number of shares assumed to exist were a condition of the transactions. Also, *Blum* is a case dealing with *rescission*, as opposed to reformation. The weight of New York law favors the view that where a party seeks *reformation*, as opposed to rescission (which completely avoids any contractual obligation), negligence by the party seeking reformation (including his own

drafting error) does not, in itself, bar a mutual mistake claim.[4] Moreover, even if a party's negligence could in itself preclude a mutual mistake claim, whether the party was negligent is a fact-intensive issue that is not amenable to resolution on a motion to dismiss.[5]

## IV. THE 6D DEFENDANTS HAVE ADEQUATELY PLED UNILATERAL MISTAKE

In the alternative, 6D Defendants allege an adequate unilateral mistake claim. Contrary to the Plaintiff's assertion, where, as here, a party knowingly attempts to take advantage of a unilateral mistake, it is not necessary for fraud to be alleged or proven in order for the doctrine of unilateral mistake to apply. *Nash v. Kornblum*, 12 N.Y.2d 42, 47-48 (N.Y. 1962) ("It clearly and convincingly appears from the record here that this is a case of a mistake on the part of the plaintiff's agent in typing the erroneous linear ground measurement, which plaintiff did not discover before submission to the defendant, and the latter, with knowledge of the mistake, trying to take advantage of the error…In our view of the case it was unnecessary for the plaintiff to establish fraud on the part of the defendant."); *see also Rodeo Family Enters., LLC v Matte,* 2011 NY Slip Op 31113(U) (N.Y. Sup. Ct. Apr. 25, 2011) ("Reformation is an equitable remedy that generally applies to cases of mutual mistake, but it can also be 'predicated upon a unilateral

---

[4] *E.g., In re Schick*, 232 B.R. 589, 598-99 (S.D.N.Y. 1999). This is because in every situation involving mistake, a party could in theory have avoided the mistake with the exercise of due care. *See id.*, citing Restatement (Second) of Contracts § 157 ("A mistaken party's fault in failing to know or discover the facts before making the contract does not bar him from ... reformation ...."); *id.* cmt. a ("[T]he availability of relief would be severely circumscribed" if negligence barred reformation "because a party can often avoid a mistake by the exercise of [due] care.").

[5] *Washington Temple Church of God in Christ, Inc. v. Global Props. & Assoc., Inc.*, 2014 WL 1646124, at *5 (N.Y. Sup. Ct. Mar. 31, 2014) ("whether the parties' failure to conduct an independent examination . . . constitutes a failure to exercise 'ordinary care' is an issue to be resolved by the trier of fact…with respect to negligence, 'even when the facts are conceded there is often a question as to whether the defendant or the plaintiff acted reasonably under the circumstances. This can rarely be decided as a matter of law.'") (internal citations omitted).

mistake on one side and deceptive conduct on the other side which tended to obscure the true agreement...'").

In an effort to avoid the holding in *Nash* and its progeny, the Plaintiff makes the baseless argument that because *Nash* is a state law case, "it is not controlling." Pl. Br. at 13 n.10. But it is axiomatic that as to matters of New York State law, this Court indeed treats as binding rulings such as *Nash*, which was issued by the Court of Appeals of New York. *See Ace American Ins. Co. v. American Guarantee & Liability Ins. Co.*, 2017 WL 2840286 at *5 (S.D.N.Y. July 2, 2017).

The Defendants adequately allege that Plaintiff is a sophisticated investor, was aware at the time he signed the agreement that the reverse splits of CleanTech common stock had already occurred, and is now attempting to realize a windfall that none of the other 33 investors would receive. (Counterclaim at ¶¶67-68). Defendants' assertion that Plaintiff was aware of the reverse splits when he signed the agreement and invested his money is not only plausible, but Plaintiff expressly represented and warranted in the agreement that he read the SEC filings that disclosed the reverse splits.

Under applicable case law, such conduct is sufficient to make out the type of conduct necessary to establish a claim for reformation based on unilateral mistake and inequitable and/or deceptive conduct. *See also Nash v. Kornblum*, 12 N.Y.2d 42, 47-48 ("It clearly and convincingly appears from the record here that this is a case of a mistake on the part of the plaintiff's agent in typing the erroneous linear ground measurement, which plaintiff did not discover before submission to the defendant, and the latter, with knowledge of the mistake, trying to take advantage of the error…In our view of the case it was unnecessary for the plaintiff to establish fraud on the part of the defendant. Perhaps reformation could have been predicated

upon a unilateral mistake on one side and deceptive conduct on the other side which tended to obscure the true agreement.”)*; 257 Park Ave. Assoc. v. Music Sales Corp.,* 24 A.D.3d 371 (1st Dep't 2005) (Reformation granted in matter involving “a mistake on the part of plaintiff in reducing to writing the parties’ renewal lease agreement, ‘which the plaintiff did not discover before submission to the defendant, and the latter with knowledge of the mistake, trying to take advantage of the error.” (internal citations omitted); *see also Resort Sports Network Inc. v. PH Ventures III, LLC,* 67 A.D.3d 132, 136 (1st Dep't 2009) (“a unilateral mistake may give rise to reformation where the other party takes advantage of an error only it has noticed under circumstances constituting fraud.”).

Accordingly, the 6D Defendants have also made out an adequate claim for reformation due to unilateral mistake, especially since this is the motion to dismiss stage of the litigation, where no discovery has taken place.

## CONCLUSION

For the reasons stated above, the Plaintiff’s motion to dismiss should be denied.

Dated: New York, New York
October 17, 2017

By: /s/ Tom M. Fini
Tom M. Fini, Esq.

Jacques Catafago, Esq.
Tom M. Fini, Esq.
CATAFAGO FINI LLP
The Empire State Building
350 Fifth Avenue, Suite 7412
New York, NY 10118
212-239-9669
tom@catafagofini.com

Attorneys for 6D Global Technologies, Inc., 6D Acquisitions, and Tejune Kang