CATAFAGO FINI LLP
Attorneys at Law

The Empire State Building
350 Fifth Avenue, Suite 7710
New York, NY 10118

tel: 212-239-9669   fax: 212-239-9688
www.catafagofini.com

November 9, 2017

**Via ECF**

Hon. Richard J. Sullivan
United States District Court
Southern District of New York
40 Foley Square, Room 2104
New York, N.Y. 10007

Re:   *Cottam v. Global Emerging Capital Group*, 16-cv-04584 (RJS)
      Motion For Clarification Regarding Proposed Scheduling Order

Dear Judge Sullivan:

We represent the 6D Defendants in the above litigation. As the Court is aware, the parties cooperated and submitted a proposed Case Management Plan and Scheduling Order at Doc. 91. Counsel have a legitimate area of disagreement regarding the discovery schedule, for which we respectfully seek Court clarification. Counsel agreed to separately write Your Honor to explain our respective positions.

The disagreement concerns whether a window for expert discovery should be included in the schedule. For the reasons set forth below, the 6D Defendants hereby respectfully move by this letter motion for a Court directive that Plaintiff be required to confer with Defendants to include a window for expert discovery in the Case Management Plan and Scheduling Order.

The 6D Defendants contend that expert testimony is relevant to the counterclaims for mutual mistake and unilateral mistake and thus should be included in the Case Management Plan and Scheduling Order. Moreover, expert discovery is relevant to claims and defenses that will remain regardless of the ultimate success of those counterclaims. Thus, to foster efficiency, rather than invite piecemeal and inefficient discovery, the 6D Defendants respectfully submit the portion of the standard case management form that the Court requires which includes expert discovery should be completed.

Expert testimony is relevant to the Counterclaims for mutual mistake and unilateral mistake. The 6D Defendants contend that the Agreement the parties signed was mistaken regarding the number of CleanTech shares in existence as of the date the Agreement was signed and entered into – an assumption that was a material condition to closing the contemplated transactions. The reason there were less shares than the Agreement stated was because two reverse splits were necessary in order satisfy a condition of the closing, which was that CleanTech be publicly listed on the NASDAQ. Whether the transactions contemplated were possible in the absence of the reverse splits at issue is a question that involves expert testimony regarding (a) NASDAQ listing rules, (b) the trading price of Clean Tech stock, and (c) the price impact on Clean Tech and 6D stock if, as Plaintiff's theory of the case entails, all 34 investors had received 6.9 times the number of shares they received. Whether the parties could have accomplished the contemplated transactions without there being reverse splits thus implicates expert testimony.

These issues in turn are relevant to the Counterclaims, because whether the transactions were possible without reverse splits goes to the heart of what the parties understood and expected from the Agreement, and whether they signed onto an agreement which, given the mistake, would have made performance impractical unless, as 6D contends, it was understood by the sophisticated investors that reverse splits needed to occur in order to bring the parties' agreement on economic terms to fruition.

Expert testimony is also relevant to claims of mutual mistake and unilateral mistake regarding customs and practices in the industry, including what information sophisticated parties have access to and are typically provided by their broker (we understand that Plaintiff had a broker who interacted with him regarding the stock). This evidence will be highly relevant to the credibility of the Plaintiff and his broker, who will need to explain to the Court and potentially a jury a number of material issues, such as how they were not immediately aware of the incredibly drastic difference between the number of shares the Plaintiff received (420,290), as compared to the 2.9 million shares the Plaintiff now claims – years after he profited by the shares he received – that he believed he was entitled to.

Of course, these are only examples of expert topics, and document discovery may raise other potential topics for which experts may be needed. Because of this, not surprisingly, case law reflects that courts allow expert testimony with respect to claims of mutual mistake. *E.g., In re Henry F. Raab*, 82 B.R. 250, 252 (S.D.N.Y. Bankr. 1988) (Where rescission was asserted under a theory of mutual mistake, the court noted that "[a]n accountant employed by the Borek, Stockel accounting firm appeared at the trial and gave testimony in the capacity of an expert witness, in support of Domestic's position that the stock purchase agreement should be rescinded.").

In addition, expert discovery will be relevant to other defenses of the Defendants, irrespective of the outcome of the Counterclaims for mutual mistake and unilateral mistake. Issues regarding custom and practice, including of brokers and sophisticated investors, will be relevant to whether Plaintiff's claims are barred by his conduct, in light of information that was available to him and that, under customs and practices of brokers and other relevant actors, he would have received in the ordinary course.

Moreover, as set forth in the 6D Defendants' summary judgment papers, expert discovery would be highly relevant to damages, regardless of the outcome of the Counterclaims. Any claim for damages would have to consider the effect on the trading price of 6D stock of issuing a larger number of shares than were actually issued, and the ability of the plaintiff to sell a larger volume of shares at these prices. As the 6D Defendants explained in their summary judgment papers, under Plaintiff's theory of the case, there should have been 6.9 times the number of shares in existence than actually existed, because all 34 investors should have received 6.9 times the number of shares they received. Given the tens of millions of additional shares that would have necessarily existed under the Plaintiff's own theory, expert testimony will demonstrate (as set forth by the 6D Defendants' expert Paul Hinton in the summary judgment papers) that the price of 6D stock would have unavoidably gone down so radically that Plaintiff could never demonstrate any non-speculative damages.

The Court's case management plan, which the parties were directed to complete, of course includes a requirement that dates be established for expert discovery. The 6D Defendants respectfully submit that this normal course should be followed. Indeed, it would create inefficiencies and potential

duplication of effort if the parties do not undertake expert discovery at this time, when discovery is required in any event. Future motions for summary judgment and/or under Fed. R. Civ. P. 50 would be confusing if the parties end up submitting expert declarations without the benefit of expert discovery, reports and cross-examination.

For the above reasons, the 6D Defendants respectfully submit that the normal course should be followed, and the case management plan should include a window of time for expert discovery. We wish to stress that counsel on both sides were cooperative and respectful with each other as usual, and that Plaintiff's counsel actually agreed that clarification from the Court would be a good idea.

Respectfully submitted,

**CATAFAGO FINI LLP**

\_\_\_\_/s/\_\_\_\_\_Tom M. Fini_____
Tom M. Fini, Esq.
The Empire State Building
350 Fifth Avenue, Suite 7710
New York, NY 10118
212-239-9669
tom@catafagofini.com
Counsel for the 6 D Defendants