NITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                                    :

JOHN COTTAM,
                               Plaintiff,    :

                                                    :           16 Civ. 4584 (LGS)
                   v.                     :

                                                    :        OPINION AND ORDER
GLOBAL EMERGING CAPITAL GROUP,    :
LLC, et al.,
                                         :
                                  Defendants. :
                                                 :
------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

Plaintiff John Cottam commenced this action against 6D Global Technologies, Inc., 6D Acquisitions, Inc. ("6D Acquisitions") and Tejune Kang (collectively, "Defendants"),[1] alleging breach of contract and violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5. The parties filed cross-motions for summary judgment, and Defendants move for default judgment on their Counterclaims for mutual mistake and unilateral mistake. For the reasons stated below, Plaintiff's motion for summary judgment on the breach of contract claim is granted as to liability against Defendants 6D Global Techologies, Inc. and 6D Acquisitions, denied as to damages and denied as to Defendants' affirmative defense of waiver. Defendants' motion for summary judgment is granted as to Plaintiff's claim under Section 10(b) of the Exchange Act and Rule 10b-5, granted as to Plaintiffs' claims against Tejune Kang, and denied as to Plaintiff's breach of contract claim against the remaining Defendants. Defendants' motion for default is also denied, and Defendants' Counterclaims are dismissed.

---

[1] Additional Defendants have since been dismissed.

## I.    BACKGROUND

### A.    The Contract

The following facts are taken from the parties' submissions and are undisputed.[2]  In brief, on June 13, 2014, CleanTech Innovations, Inc. ("CleanTech") entered into an Agreement and Plan of Share Exchange with Initial Koncepts, Inc. d/b/a Six Dimensions ("Six Dimensions") and its shareholder, Chairman of the Board and Chief Executive Officer, Defendant Tejune Kang, which would effect, in substance, the acquisition of Six Dimensions by CleanTech (the "Merger Agreement").  Pursuant to the Merger Agreement, among other things, CleanTech would (1) change its name to 6D Global Technologies, Inc.; (2) acquire all of the shares of Six Dimensions in exchange for 50% of CleanTech's shares (the "Share Exchange"), with the result that Six Dimensions would become a wholly-owned subsidiary of CleanTech; and (3) engage in a private placement equity offering (the "Offering") of 6D Acquisitions shares to finance in part the acquisition of Six Dimensions.

On September 18, 2014, Plaintiff signed and entered into a Subscription Agreement (the "Subscription Agreement") to participate in the Offering.  Pursuant to the Subscription Agreement, Plaintiff purchased shares of 6D Acquisitions' common stock, where 6D Acquisitions was "a special purpose vehicle formed for the purpose of investing in the reorganized entity following [the Share Exchange]".[3]  The Subscription Agreement itself was a contract between Plaintiff and 6D Acquisitions, and was signed on behalf of 6D Acquisitions by

---

[2] Plaintiff denies many facts in Defendant's Rule 56.1 statement as "not material."  Where Plaintiff denies the materiality of a fact rather than the fact itself, and where the at-issue fact is supported by additional evidence in the record, the facts are accepted as undisputed.
[3] The Subscription Agreement defines the Exchange both as the "Share Exchange" and as the "Exchange."

Defendant Tejune Kang, Chief Executive Officer.

Through the Share Exchange, per the Subscription Agreement, "CleanTech will issue 266,787,609 shares of its common stock, equal to approximately fifty percent (50%) of its outstanding shares of common stock, to the shareholders of [Six Dimensions] in exchange for all of the outstanding shares of [Six Dimensions] . . . , thereby rendering [Six Dimensions] a wholly-owned subsidiary of CleanTech . . . ." Dkt. No. 249-4 at 2. This provision is also included in the related Merger Agreement which was publicly filed as an exhibit to a Form 8-K by CleanTech on June 16, 2014. *See* Expert Report of Winthrop Gardner Minot (the "Minot Report"), Exhibit C, Ex. 10.1 at 2 ("WHEREAS, the Parties desire that [CleanTech] acquire all of the [Six Dimensions] Shares from the [Six Dimensions] Holder in exchange for 266,787,609 newly issued shares of [CleanTech's] Common Stock equal to approximately fifty percent (50%) of [Six Dimensions'] issued and outstanding common stock following the Reorganization . . .")

The Subscription Agreement further provides that:

WHEREAS, prior to or simultaneous with the closing of the [Share Exchange], and as a condition thereto, CleanTech shall have (i) obtained shareholder approval to amend its Articles of Incorporation to: (A) increase its authorized common stock to 1,200,000,000 shares, par value $0.0000001 per share, (B) change the name of the company to "6D Global Technologies, Inc." and (C) authorize the conversion of the company into a corporation organized under the laws of the State of Delaware; (ii) obtained approval by NASDAQ of the listing of the company's common stock on the NASDAQ Capital Market . . .

Dkt. No. 249-4 at 2. The Subscription Agreement also provides that "[u]pon raising the Maximum Offering of $5.1 million, CleanTech will be capitalized" as laid out in the following capital table (the "Cap Table"):

| | |
|---|---|
| 266,787,609 shares | Exchange Shares issued to 6D |
| 242,534,190 shares | Exchange Shares issued to NYGG Asia post-conversion |
| 7,253,419 shares | Public Shares post-cancellation of 17,729,403 shares |
| 17,000,000 shares | Investors in Offering (assuming $5,100,000 maximum) |
| 2,550,000 shares | Placement Agent's 15% equity fee (5-year Warrants, assuming $5,100,000 maximum offering is completed) |

536,125,218 shares     Total Issued and Outstanding (including Warrants)

Dkt. No. 249-4 at 2.

In the section of the Subscription Agreement defining the Offering, the Subscription

Agreement states that the Offering is:

> [F]or the purchase of subscription units (the "Units"), each Unit to consist of fifty thousand (50,000) shares of [6D Acquisitions] common stock, par value $0.001 per share (the "Common Stock"). The purchase price for each Unit shall be fifteen thousand dollars ($15,000) . . . Immediately upon the closing and effectiveness of the [Share Exchange], each share of Common Stock underlying the Units purchased herein shall be automatically converted on a 1:1 basis into shares of [6D Global Technologies, Inc.'s] NASDAQ listed common stock (the "Financing Security Exchange"), such shares shall be distributed to the Subscribers herein and [6D Acquisitions] shall subsequently be dissolved.

Dkt. No. 249-4 at 3. This conversion ratio is repeated in a whereas clause: "upon completion of

the Offering and immediately upon the closing of the [Share Exchange], all of [6D

Acquisitions'] common stock underlying the Units . . . offered hereby will be automatically

exchanged into shares of [6D Global Technologies, Inc.] on a 1:1 basis." Dkt. No. 249-4 at 3.

The Subscription Agreement further provides that "it shall be a condition of the closing

of the [Share Exchange] that [6D Acquisitions] complete the Offering" and "in the event the

[Share Exchange] is not consummated, all subscriptions shall be returned to the subscribers

herein without interest, deduction or offset[,]" Dkt. No. 249-4 at 3, and also that "[t]he closing of

the Offering and the transactions contemplated hereby are conditioned upon the closing of the

[Share Exchange] and the transactions and conditions contemplated thereby" and "[i]n the event

the Minimum Offering amount is not received . . . all subscriptions shall be returned to the

Subscribers without interest, deduction or offset." Dkt. No. 249-4 at § 3. The Subscription

Agreement also states that, "upon completion of the Offering, the [Share Exchange] and the

Financing Exchange, [6D Global Technologies, Inc.] may undergo a reverse-split of its then-

outstanding common stock at [6D Acquisitions'] sole discretion." Dkt. No. 249-4 at 3.

Finally, the Subscription Agreement contains a section titled "Risks Related to Investing in the Units," which provides that "CleanTech's most recent annual report on Form 10-K, as updated or supplemented by subsequent quarterly reports on Form 10-Q and current reports on Form 8-K to the extent filed" are "incorporated here by reference" and that "[t]he Subscriber represents and warrants that he or she has carefully considered and reviewed all the information contained within the reports CleanTech's files [sic] with the [Securities and Exchange] Commission" (the "SEC"). Dkt. No. 249-4 at 9-10. The transactions contemplated by the Subscription Agreement were executed on September 29, 2014.

Although the Subscription Agreement was signed by Plaintiff on September 18, 2014, and was executed on September 29, 2014, the "Confidential Subscription Documents" packet including the Subscription Agreement is dated June 17, 2014. The cover page states, "Please deliver the completed documents . . . no later than June 30, 2014. . . . The offering period may be extended by [6D Acquisitions] . . . to a date not later than September 30, 2014."

## B.     The Reverse Stock Splits

On July 14, 2014, CleanTech effected a one-for-three reverse stock split (first made public on July 3, 2014 in an 8-K filing with the SEC. This reverse stock split occurred after CleanTech received[4] a written notification from NASDAQ that "it had failed to comply with NASDAQ Listing Rule 5550(a)(2) . . . because the closing bid price per share of its common stock was below the $1.00 minimum bid price for continued listing of its common stock." After CleanTech's share price temporarily achieved a $1.00 closing bid price, the share price again dropped and NASDAQ issued a delisting determination. CleanTech appealed the delisting, and

---

[4] CleanTech received the notification on July 24, 2013. The reverse stock split occurred after CleanTech received two extensions to its deadline to regain compliance.

NASDAQ determined to maintain the listing subject to CleanTech's executing the Merger Agreement with Six Dimensions, and 6D Global Technologies, Inc.'s meeting the listing standards. CleanTech then underwent a one-for-2.3 reverse-stock split on September 25, 2014 (made public in anticipation on September 16, 2014, in an 8-K filing). These reverse stock splits reduced the number of total shares outstanding in CleanTech by a factor of 6.9, as a result of which the Cap Table and the number of shares to be issued in the Share Exchange in the Subscription Agreement were inaccurate at the time the Subscription Agreement was signed and the contemplated transactions were executed.

### C.    The Investment

Plaintiff invested $870,000. As the Subscription Agreement provides that an investor could purchase one Unit of stock, equal to fifty thousand shares, for $15,000, an investment of $870,000 under that language purchased fifty-eight Units, or 2,900,000 shares of stock in 6D Global Technologies, Inc. (following the conversion of the shares at a 1:1 ratio). Thirty-three other investors also participated in the Offering under the same Subscription Agreement, investing a total -- along with Plaintiff -- of approximately $4.6 million. A month after he made his investment, Plaintiff was sent an account statement representing that he had received 420,290 shares[5] of 6D Global Technologies, Inc. Plaintiff became aware that he had received only 420,290 shares of restricted 6D Global Technologies, Inc. no later than April 2015. Plaintiff sold his shares in August 2015 for $940,000, making a $70,000 profit on his initial investment.

---

[5] 420,290 is equal to 2,900,000 divided by 6.9, *i.e.*, Defendants reduced the number of shares provided to Plaintiff proportionately to the reduction in total shares caused by the reverse stock splits.

### D. Procedural History

Plaintiff commenced this action on June 16, 2016, alleging that Defendants breached the Subscription Agreement by failing to provide him with 2,900,000 shares of 6D Global Technologies, Inc. common stock, and that Defendants committed securities fraud by misrepresenting the number of shares of 6D Global Technologies, Inc. he was entitled to receive, failing to disclose the reverse stock splits of CleanTech and misrepresenting that the 6D Global Technologies, Inc. shares would be freely tradeable. Defendants' motion to dismiss was denied in an Order issued by Judge Richard Sullivan, then assigned to the case. The Order further stated that "the Court finds the contract at issue in this case to be unambiguous and that Plaintiff is likely to succeed on his breach of contract claim."

Defendants subsequently filed an Answer and Counterclaims of mutual and unilateral mistake on July 29, 2017, amended on August 24, 2017. The parties now cross-move for summary judgment on both remaining claims -- breach of contract and federal securities fraud. Defendants move for default judgment on their Counterclaims.

## II. LEGAL STANDARD

When parties cross-move for summary judgment, the Court analyzes the motions separately, "in each case construing the evidence in the light most favorable to the non-moving party." *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018). Summary judgment is appropriate where the record establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When the

movant has properly supported its motion with evidentiary materials, the opposing party must

establish a genuine issue of fact by "citing to particular parts of materials in the record." FED. R.

CIV. P. 56(c)(1)(A). "[A] party may not rely on mere speculation or conjecture as to the true

nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d

159, 166 (2d Cir. 2010) (internal quotation marks omitted and alteration in original).

## III. DISCUSSION

### A. Breach of Contract

#### 1. Standard

"Under New York law, a breach of contract claim requires proof of (1) an agreement, (2)

adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages."[6] *Fischer*

*& Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011); *accord Mergers &*

*Acquisition Servs., Inc. v. Eli Glob., LLC*, No. 15 Civ 3723, 2017 WL 1157132, at *6 (S.D.N.Y.

Mar. 27, 2017). Under ordinary principles of contract construction, "a written agreement that is

complete, clear and unambiguous on its face must be enforced according to the plain meaning of

its terms." *Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A. v. Navarro*, 36 N.E.3d 80, 85

(N.Y. 2015); *accord Marin v. Constitution Realty, LLC*, 71 N.E.3d 530, 533-34 (N.Y. 2017)

("[A]greements are construed in accord with the parties' intent. . . . The best evidence of that

intent is the parties' writing." (internal citation omitted)).

---

[6] New York law applies in this case because the Subscription Agreement provides that it is
governed by New York law and because the parties assume that New York law applies. "A
federal court sitting in diversity or adjudicating state law claims that are pendent to a federal
claim must apply the choice of law rules of the forum state." *Rogers v. Grimaldi*, 875 F.2d 994,
1002 (2d Cir. 1989); *accord Berlin v. Jetblue Airways Corp.*, No. 18 Civ. 1545, 2020 WL
502629, at *8 (E.D.N.Y. Jan. 30, 2020). "New York choice-of-law rules also 'require[ ] the
court to honor the parties' choice [of law provision] insofar as matters of substance are
concerned, so long as fundamental policies of New York law are not thereby violated.'" *Bank of
New York v. Yugoimport*, 745 F.3d 599, 609 (2d Cir. 2014) (alteration in original).

"The threshold question in a dispute over the meaning of a contract is whether the contract terms are ambiguous," *Revson v. Cinque & Cinque, P.C.,* 221 F.3d 59, 66 (2d Cir. 2000) (construing New York law); *accord In re Motors Liquidation Co.*, 578 F. App'x 43, 44 (2d Cir. 2014) (summary order) (construing New York law), which "is an issue of law for the courts to decide." *Marin*, 71 N.E.3d at 534 (quotation marks omitted). "A contract is unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Williams v. Town of Carmel*, 106 N.Y.S.3d 333, 335 (2d Dep't 2019) (quoting *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002)). "[C]lear contractual language does not become ambiguous simply because the parties to the litigation argue different interpretations." *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 869 N.Y.S.2d 511, 517 (1st Dep't 2008), *aff'd*, 920 N.E.2d 359 (N.Y. 2009); *accord JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009).

Here, the parties do not dispute the existence of the Subscription Agreement or that Plaintiff adequately performed. The two elements at issue are breach and damages.

### 2. Breach by the Defendant

The Court grants summary judgment to Plaintiff on the issue of breach because the Subscription Agreement is unambiguous, Defendants' Counterclaims seeking reformation of the contract fail on the merits, and Defendants raise no other applicable defenses or disputed issues of material fact.

### a) The Contract is Unambiguous

Judge Sullivan held in denying Defendants' motion to dismiss, that "the Court finds the contract at issue in this case to be unambiguous." The law of the case doctrine "commands that

when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise." *Johnson v. United States*, 623 F.3d 41, 43 n.4 (2d Cir. 2010). "'Cogent and compelling' reasons generally fall into three categories: (1) an intervening change of controlling law, (2) the availability of new evidence, or (3) the need to correct a clear error or prevent manifest injustice." *Ezra v. Bristol-Myers Squibb Co.*, 784 F. App'x 48, 50 (2d Cir. 2019) (summary order) (citing *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002)). "Ultimately, however, the 'doctrine is admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment.'" *Id.* (quoting *Virgin Atl. Airways v. Nat'l Mediation Bd.,* 956 F.2d 1245, 1255 (2d Cir. 1992)).

Judge Sullivan's decision was not made in clear error, nor is there any other reason to revisit his decision. The Subscription Agreement provides for Plaintiff's purchase of subscription Units, each of which consists of fifty thousand shares of 6D Acquisitions common stock and which, following the Share Exchange, would be "automatically converted on a 1:1 basis into shares of [6D Global Technologies, Inc.'s] NASDAQ listed common stock . . . [and] distributed to the Subscribers herein . . . ." The ratio of exchange is stated earlier in the Subscription Agreement as well: "upon completion of the Offering and immediately upon the closing of the [Share Exchange], all of [6D Acquisitions'] common stock underlying the Units . . . offered hereby will be automatically exchanged into shares of [6D Global Technologies, Inc.] on a 1:1 basis." This language "has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Williams*, 106 N.Y.S.3d at 335.

Defendants argue that to interpret the Subscription Agreement as an agreement that Plaintiff's shares would be exchanged on a 1:1 basis would lead to absurd results and render other provisions of the Subscription Agreement meaningless. Defendants' argument is as follows: the number of shares in existence at the time the Subscription Agreement was drafted was 6.9 times more than the number of shares in existence after the contemplated transactions were executed on September 29, 2014 due to the two reverse splits. The Subscription Agreement therefore contained errors, including the number of shares to be issued in the Share Exchange -- *see* Dkt. No. 249-4 at 2 ("CleanTech will issue 266,787,609 shares of its common stock, equal to approximately fifty percent (50%) of its outstanding shares of common stock, to the shareholders of 6D in exchange for all of the outstanding shares of 6D,") -- and the numbers included in the Cap Table, detailing how CleanTech "will be capitalized" "[u][pon raising the Maximum Offering of $5.1 million," *see* Dkt. No. 249-4 at 2. Because there were significantly fewer shares in existence at the time of execution than contemplated in the Subscription Agreement, it would be unreasonable to give Plaintiff -- and each of the thirty-three other similarly-situated investors under the Subscription Agreement -- one share in 6D Global Technologies, Inc. for every one share purchased in the Offering; to do so would have flooded the market with many millions of shares, causing the market value of 6D Global Technologies, Inc. to drop. The parties' intent should therefore be gleaned from the Cap Table, which contemplates that 17,000,000 shares (or 3.15% of the then-existing shares) would be apportioned to subscribers like Plaintiff, and the Court should interpret the Subscription Agreement to allocate to Plaintiff shares in accordance with the percentage contemplated in the Cap Table rather than according to the 1:1 ratio. According to Defendants, since the number of CleanTech

shares was reduced by 6.9, Plaintiff therefore should receive 6.9 times fewer shares in 6D Global Technologies, Inc. than he purchased in the Offering to maintain this proportion.

Defendants' argument is unpersuasive. Extrinsic evidence regarding intervening events that may have changed the eventual impact of the Subscription Agreement is not appropriately considered in interpreting an unambiguous contract. *See Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199–200, 764 N.E.2d 958 (2001) ("An omission or mistake in a contract does not constitute an ambiguity [and] . . . the question of whether an ambiguity exists must be ascertained from the face of an agreement without regard to extrinsic evidence." (alteration in original)). Courts are not free to disregard unambiguous language in a contract in favor of their own familiar notions of economic efficiency. *See Global Reinsurance Corporation of America v. Century Indemnity Company*, 30 N.Y.3d 508, 519, 91 N.E.3d 1186 (2017) ("The foregoing principles [of contract interpretation] do not permit a court to disregard the precise terminology that the parties used and simply assume [a different meaning], based on its own familiar notions of economic efficiency . . . .").

Defendants fail to identify any ambiguous language in the Subscription Agreement. That the Subscription Agreement contemplates, in error, without further discussion and in a whereas provision, a capitalization whereby a certain number of the existing shares would go to Subscribers like Plaintiff is not sufficient to create ambiguity where the operative clause providing the conversion ratio is unambiguous. *See Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 103 (2d Cir. 1985) ("Although a statement in a 'whereas' clause may be useful in interpreting an ambiguous operative clause in a contract, 'it cannot create any right beyond those arising from the operative terms of the document.") (construing New York law); *accord New York Univ. v. Galderma Labs., Inc.*, 689 F. App'x 15, 16 (2d Cir. 2017) (summary order) ("Any argument with

respect to the 'whereas' statement . . . is unavailing where, as here, the operative definition . . . is not ambiguous.") (construing New York law).

Although the logic of Defendants' argument is clear, ultimately, no language in the Subscription Agreement indicates the parties' mutual intent for Plaintiff to receive a proportion of 6D Global Technologies, Inc.'s shares based on the number of shares in existence at the time of the Share Exchange, and the Court cannot imply such intent whole-cloth and disregard the clear language dictating a 1:1 conversion ratio.[7] The very nature of a ratio creates a clear conversion methodology independent of the number of shares converted. "Under New York law . . . a fundamental objective of contract interpretation is to give effect to the *expressed* intention of the parties." *Matter of MPM Silicones, L.L.C.*, 874 F.3d 787, 795 (2d Cir. 2017) (emphasis added). "[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Reiss*, 97 N.Y.2d at 199 (quotation marks omitted); *accord Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.*, 6 N.Y.S.3d 7, 12 (1st Dep't 2015) ("A court should 'not write into a contract conditions the parties did not include by adding or excising terms under the guise of construction . . . .'"). "[T]he Court of Appeals has set a high bar for declaring a contract absurd." *Warberg Opportunistic Trading Fund, L.P. v. GeoResources, Inc.*, 973 N.Y.S.2d 187, 192 (1st Dep't 2013). While it may have been unwise for Defendants to effect the reverse splits before the execution of the Offering, or for Defendants not to address that possibility in the Subscription

---

[7] The Subscription Agreement does include a clause contemplating that 6D Global Technologies, Inc. may undergo a reverse-split *after* the execution of the contemplated transactions, *see* Dkt. No. 249-4 at 3 ("WHEREAS, upon completion of the Offering, the Share Exchange and the Financing Exchange, 6DT may undergo a reverse-split of its then-outstanding common stock at the Company's sole discretion."), and a clause contemplating that 6D Acquisitions "may issue additional equity shares to fund 6D's operational requirements which would dilute [Plaintiff's] share ownership," *see* Dkt. No. 249-4 at 9. Neither of these supports Defendants' argument.

Agreement, "that, by itself, does not render the result here absurd." *Jade Realty LLC v. Citigroup Commercial Mortg. Tr. 2005-EMG,* 980 N.E.2d 945, 947 (N.Y. 2012) ("To be sure, Jade's interpretation of the note results in a potentially lower prepayment premium in the first six years, instead of the potentially lower prepayment premiums in the seventh through tenth years. While these terms might be 'novel or unconventional,' that, by itself, does not render the result here absurd.").

Defendants do not identify new evidence or an intervening change in the controlling law, and their cited cases are inapposite. *See Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 68-9 (2d Cir. 2005) (declining to interpret a publishing contract and related software agreement to require royalties for the transfer of a right to a program that serves as a potential medium for distribution of the at-issue work because "[i]f this nexus between the agreements were interpreted to mandate a royalty in the production context, the authors would have a claim to royalties at two stages of the distribution chain—one at production and a second at the sale of copies of the Work"); *Mineola Garden City Co. v. Bank of Am.*, 49 F. Supp. 3d 283, 288 (E.D.N.Y. 2014) (declining to interpret an arbitration provision literally where such interpretation would permit either party to easily avoid arbitration); *Greenwich Capital Fin. Prod., Inc. v. Negrin*, 74 A.D.3d 413, 416, 903 N.Y.S.2d 346 (1st Dep't 2010) (interpreting the word "and" as separating two distinct categories rather than as creating a conjunctive clause because the latter could lead to the absurd result where the first clause was meaningless). The Subscription Agreement, "on its face is [not] reasonably susceptible of more than one interpretation." *Chimart Assocs. v. Paul*, 489 N.E.2d 231, 233 (N.Y. 1986). Accordingly, the Subscription Agreement is not ambiguous. This Court adheres to Judge Sullivan's holding.

**b) Defendants' Motion for Default Judgment on the Counterclaims**

Defendants bring two Counterclaims, purportedly for mutual mistake and for unilateral mistake. Although these doctrines are typically expressed as affirmative defenses, because Defendants pleaded them as counterclaims, they are considered to be claims in this opinion. Regardless of nomenclature and as discussed below, the purported Counterclaims do not entitle Defendants to a default judgment, and they are dismissed on the merits.

On the issue of default, Plaintiff failed to file an Answer responding to the Counterclaims after his motion to dismiss was denied. On that basis, Defendants move for default. The motion is denied. First, the motion fails to comply with Rule 55, as Defendants have not obtained a certificate of default against Plaintiff. *See* FED. R. CIV. P. 5(A); Southern District of New York, Local Rule 55.1. This alone has been held to warrant a denial of a motion for default judgment. *See, e.g., MWH Int'l, Inc. v. Inversora Murten, S.A.*, No. 1:11 Civ. 2444, 2015 WL 728097, at *2 (S.D.N.Y. Feb. 11, 2015).

Plaintiff also has been actively litigating this case since 2016, and Defendants are not prejudiced by Plaintiff's failure to answer the Counterclaims. As it is "well established that default judgments are disfavored [and a] clear preference exists for cases to be adjudicated on the merits," *Pecarsky v. Galaxiworld.com Ltd.*, 249 F.3d 167, 174 (2d Cir. 2001); *accord Nolan v. Primagency, Inc.*, 344 F. App'x 693, 695 (2d Cir. 2009) (summary order), the Court declines to decide this case against an active litigant on a procedural technicality that would foreclose litigating the merits of Plaintiff's breach of contract claim. *See Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993) ("The dispositions of motions for entries of defaults and default judgments and relief from the same under Rule 55(c) are left to the sound discretion of a district court because it is in the best position to assess the individual circumstances of a given case and to evaluate the credibility and good faith of the parties."); *Inversora Murten, S.A.*, 2015 WL

728097, at *2 (declining to grant default judgment where actively litigating defendants did not answer an interpleader complaint).

### c) Defendants' Motion for Summary Judgment on the Counterclaims

Even where a contract is unambiguous, "[i]n the proper circumstances, mutual mistake or fraud may furnish the basis for reforming a written agreement." *Chimart Assocs.*, 489 N.E.2d at 233. Because the Counterclaims fail as a matter of law, Defendant's motion for summary judgment as to the Counterclaims is denied.

#### (1) Unilateral Mistake

"[I]n the case of unilateral mistake, it must be alleged that one party to the agreement fraudulently misled the other, and that the subsequent writing does not express the intended agreement." *Greater New York Mut. Ins. Co. v. United States Underwriters Ins. Co.*, 827 N.Y.S.2d 147, 149 (1st Dep't 2007); *accord Ivory Dev., LLC v. Roe*, 25 N.Y.S.3d 686, 691 (3d Dep't 2016) ("A unilateral mistake provides grounds for reformation of a contract only when coupled with fraud . . . ."); *Barclay Arms, Inc. v. Barclay Arms Assocs.*, 540 N.E.2d 707, 708-09 (N.Y. 1989) ("A bare claim of unilateral mistake by plaintiff, unsupported by legally sufficient allegations of fraud on the part of defendants, does not state a cause of action for reformation. . . The complaint did not allege the essential elements of a fraud claim, misrepresentation of a material fact, falsity, scienter and deception.").[8]

---

[8] Defendants argue that that Defendants need not establish fraud on the part of Plaintiff, citing *Nash v. Kornblum*, 186 N.E.2d 551 (N.Y. 1962), in which the Court of Appeals found it was "unnecessary for the plaintiff to establish fraud on the part of the defendant. Perhaps reformation could have been predicated upon a unilateral mistake on one side and deceptive conduct on the other side which tended to obscure the true agreement." *Id.* at 554. This argument is unpersuasive. The court in *Nash* was applying that rule to different circumstances; there, plaintiff's employee made a small scrivener's mistake in the placement of a decimal in a contract, resulting in an overpayment by plaintiff to defendant, which defendant refused to reimburse. *Id.* Significantly, the court held, that "'[w]here there is no mistake about the

"Under New York law, to state a claim for fraud a [party] must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the [opposing party] knew to be false; (3) which the [opposing party] made with the intention of inducing reliance; (4) upon which the [party] reasonably relied; and (5) which caused injury to the [party]." *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001); *accord Travelers Indem. Co. of Illinois v. CDL Hotels USA, Inc.*, 322 F. Supp. 2d 482, 498 (S.D.N.Y. 2004) (applying this standard to a claim of unilateral mistake); *Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, No. 18 Civ. 8152, 2019 WL 5595042, at *15 (S.D.N.Y. Oct. 30, 2019) (same). "A party seeking reformation of a contract by reason of mistake must establish, with clear and convincing evidence, that the contract was executed under mutual mistake or a unilateral mistake induced by the other party's fraudulent misrepresentation . . . ." *Yakobowicz v. Yakobowicz*, 37 N.Y.S.3d 560, 561 (2d Dep't 2016); *accord Tompkins Fin. Corp. v. John M. Floyd & Assocs., Inc.*, 41 N.Y.S.3d 577, 582 (3d Dep't 2016) (same).

The Counterclaim alleges that Plaintiff was aware of the reverse stock splits at the time he made his investment and that he acted "with deception and opportunistically" by failing to make any objection to the number of shares he received following the executed transactions until after he had sold his shares at a profit. These facts, even if proven, are insufficient to establish fraud on the part of Plaintiff. Even accepting *arguendo* that Plaintiff was aware of the reverse stock splits at the time that he signed the Subscription Agreement and therefore that the clauses setting forth the conversion ratio were unreasonable, his failure to raise the issue until after he

agreement, and the only mistake alleged is in the reduction of that agreement to writing, such mistake of the scrivener, or of either party, no matter how it occurred, may be corrected." *Id*. at 553. The court further noted that "[t]his is not a case where the plaintiff unilaterally and mistakenly [drafted the contract] and defendant, without a duty to speak and absent fraud, agreed to the proposal." *Id*.

sold his shares does not constitute fraudulent inducement. *See Mooney v. Manhattan Occupational, Physical & Speech Therapies, PLLC*, 89 N.Y.S.3d 707, 710-11 (2d Dep't 2018) ("The plaintiff provided no evidence in support of her claim of fraudulent inducement based on opposing counsel's failure to inform the plaintiff's counsel that the stipulation was not limited and/or did not reserve her rights. Even if opposing counsel was aware of the mistake, he owed no duty to disclose it to his adversary."); *Barclay Arms, Inc.*, 540 N.E.2d at 709 (affirming dismissal of claim of unilateral mistake as not stating a cause of action for reformation where "plaintiff merely alleged that defendant committed fraud in concealing knowledge of a 'loophole' in the contract" but "did not allege the essential elements of a fraud claim."). Defendants point to no evidence that Plaintiff fraudulently induced them into entering into the contract. Defendants' motion for summary judgment on the Counterclaim of unilateral mistake is denied, and the Counterclaim is dismissed.

### (2)  Mutual Mistake

Defendants' motion for summary judgment on the Counterclaim of mutual mistake is denied. A mutual mistake occurs when "both parties to [a contract] shared the same erroneous belief as to a material fact, and their acts did not in fact accomplish their mutual intent." *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 46 (2d Cir. 1991) (construing New York law); *accord MV Realty PBC, LLC v. Innovatus Capital Partners, LLC*, No. 18-3671, 2019 WL 7293868, at *2 (2d Cir. Dec. 30, 2019) (summary order). "[A] petitioning party has to show in no uncertain terms, not only that mistake . . . exists, but exactly what was really agreed upon between the parties." *George Backer Mgmt. Corp. v. Acme Quilting Co.*, 385 N.E.2d 1062, 1066 (N.Y. 1978); *accord Warberg Opportunistic Trading Fund, L.P.*, 973 N.Y.S.2d at 194. "[P]roof of mutual mistake must be of the highest order, and must show clearly and beyond doubt that there

has been a [mutual] mistake." *Asset Mgmt. & Capital Co. v. Nugent*, 925 N.Y.S.2d 653, 654 (2d

Dep't 2011) (internal quotation marks and citations omitted); *accord Weir v. Guardian Life Ins.*

*Co. of Am.*, 351 F. App'x 492, 493 (2d Cir. 2009) (summary order) (under New York law, "proof

of the variance between the meeting of the minds and its expression in the writing must be

clear.")

Defendants argue the following: it is undisputed that the Subscription Agreement

contained mistakes of fact as to the number of shares then in existence due to the reverse splits.

These reverse stock splits were announced in public SEC filings, which were incorporated into

the Subscription Agreement, and therefore Plaintiff was aware of the mistake of fact when he

signed the Subscription Agreement. Moreover, these reverse stock splits were necessary for

CleanTech to maintain its NASDAQ listing, which was a condition of the Share Exchange, *see*

Dkt. No. 249-4 at 2, and the Offering, *see* Dkt. No. 249-4 at Part 3. Therefore, Plaintiff and 6D

Global Technologies, Inc. mutually believed that the economic terms of the transaction

contemplated by the Subscription Agreement, including the number of shares underlying each

Unit, was based on the total number of shares outstanding.

This argument is unpersuasive. Defendants assert that their intention was to modify the

conversion ratio in the Subscription Agreement in accordance with the reverse stock splits to

maintain the proportions identified in the Cap Table. Even accepting that was Defendants'

intent, they present no evidence that Plaintiff shared their intent. The only evidence of Plaintiff's

intent is his testimony that, when he "invested the money in September 2014 . . . [he] knew

exactly how many shares [he] was getting": 2,900,000, and Plaintiff's statement to FINRA in

May 2015 that he "was clearly expecting to get the initial [6D Global Technologies, Inc.] shares

at 1:1 ratio at a price of $0.30/share." The argument made in Defendants' expert report that

Plaintiff, as a sophisticated investor, should have understood that this ratio would be adjusted to account for the reverse stock splits is not sufficient to meet the high evidentiary standard required for reformation where the contract includes no language linking the conversion rate to the number of shares. *George Backer Mgmt. Corp.*, 385 N.E.2d at 1066 ("[A] petitioning party has to show in no uncertain terms, not only that mistake . . . exists, but exactly what was really agreed upon between the parties."). Without evidence of Plaintiff's intent to agree exactly to the terms put forward by Defendants, "the mistake of a single party as to a term of the contract does not justify reformation under New York law." *AMEX Assurance Co. v. Caripides*, 316 F.3d 154, 162 (2d Cir. 2003); *see also Ortho-Clinical Diagnostics Bermuda Co. v. FCM, LLC*, 739 F. App'x 664, 668 (2d Cir. 2018) (summary order) ("[The party's] allegations regarding its own intentions are insufficient to establish that [the opposing party] too intended to assume and knowingly undertook an unstated obligation . . ."). And while the Subscription Agreement conversion ratio may not make good economic sense for Defendants in light of the reverse stock splits, this alone is not sufficient for reformation. *See George Backer Mgmt. Corp.*, 385 N.E.2d at 1066 ("Reformation is not granted for the purpose of alleviating a hard or oppressive bargain, but rather to restate the intended terms of an agreement when the writing that memorializes that agreement is at variance with the intent of both parties."); *accord 159 MP Corp. v. Redbridge Bedford, LLC*, 71 N.Y.S.3d 87, 98 (2d Dep't 2018) ("The fact that with the benefit of hindsight, a party believes that it had agreed to an unfavorable contractual term, does not provide courts with authority to rewrite the terms of a contract or to extricate parties from poor bargains."), *aff'd*, 128 N.E.3d 128 (2019).

Defendants cite cases that are inapposite and relate to minor drafting errors where the parties' mutual intent was clear. *See, e.g., True v. True*, 882 N.Y.S.2d 261 (2009) (finding

reformation of a contract appropriate where the language of the contract provided that the parties would split plaintiff's stock awards "divided 50-50 in kind," but where the parties had used an inaccurate number of shares in their calculations); *Baby Togs, Inc. v. Harold Trimming Co.*, 413 N.Y.S.2d 393, 394 (1st Dep't 1979) (finding a triable issue of fact as to whether there was mutual mistake where plaintiff made a scrivening error in drafting the contract after the parties agreed to a certain price). The error in the Subscription Agreement is much more than a minor drafting error; Defendants allege not only an error in the number of shares, but also ask the Court to re-write the two separate clauses stating the conversion ratio. In these circumstances, reform is improper. *See Loewenson v. London Mkt. Companies*, 351 F.3d 58, 62–63 (2d Cir. 2003) ("Even though we might be willing to reform an agreement inadvertently based on an arithmetic error, we do not believe that reformation is available for use of a methodology explicitly agreed to by the parties, even though that methodology is flawed. In such circumstances, it cannot be said that a flawless methodology was shown to have been intended by the parties."); *Rispler v. Sol Spitz Co.*, 418 F. Supp. 2d 82, 90-91 (E.D.N.Y. 2005) (where the settlement agreement required payment by defendants' Plan to plaintiffs of an amount greater than the Plan's assets due to an unforeseen decline in the stock market, the court held that "[g]iven that the methodology for calculating the settlement amount was clear, unambiguous and explicitly stated on the record by *defense counsel,* who entered this agreement unconditionally and with full knowledge of the stock markets potential impact, reformation is not available on the basis of mutual mistake" (emphasis in original)), *report and recommendation adopted in part*, No. 04 Civ. 1323, 2005 WL 1285781 (E.D.N.Y. May 31, 2005). Defendants' motion for summary judgment as to the Counterclaim of mutual mistake is denied, and the Counterclaim is dismissed.

### 3.　　　Damages

The parties' cross-motions for summary judgment as to damages are denied.  "Proof of damages is an essential element of a claim for breach of contract under New York law." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016).  "Under New York law, damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003); *accord LG Capital Funding, LLC v. CardioGenics Holdings, Inc.*, 787 F. App'x 2, 3 (2d Cir. 2019) (summary order).  Where "the breach involved 'the deprivation of an item with a determinable market value, the market value at the time of the breach is the measure of damages.'"  *Cole v. Macklowe*, 882 N.Y.S.2d 417, 419 (1st Dep't 2009); *accord LG Capital Funding, LLC*, 787 F. App'x at 3.  "New York's damages rule is precisely the same when the breach of contract is nondelivery of shares of stock." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 262 (2d Cir. 2002) (alteration omitted).

"A non-breaching party is entitled, as a matter of law, to recover market value damages to the extent that they can be proven with reasonable certainty." *Cynergy Holdings, LLC*, 839 F.3d at 141 (quotation marks omitted); *accord LG Capital Funding, LLC v. M Line Holdings, Inc.*, No. 16 Civ. 06012, 2018 WL 3599731, at *10 (E.D.N.Y. July 27, 2018).

> "Certainty," as it pertains to general damages, refers to the *fact* of damage, not the amount.  For when it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach.  A person violating his contract should not be permitted entirely to escape liability because the amount of the damage which he has caused is uncertain.

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) (quotation marks omitted).  "Where . . . the non-breaching party has proven the *fact* of damages by a preponderance of the evidence, the burden of uncertainty as to the amount of damage is

upon the wrongdoer." *Cynergy Holdings, LLC*, 839 F.3d at 141 (quotation marks omitted). "Doubts are generally resolved against the party in breach." *Id*. "Therefore, a plaintiff need only show a stable foundation for a reasonable estimate of the damages incurred as a result of the breach. At that point, the burden of any uncertainty as to the amount of damages is on the breaching party. *Id.* (citation and quotation marks omitted).

### a)      Defendants' Motion -- Fact of Damages

Defendants argue that the breach of contract claim should be dismissed because Plaintiff has not met his burden of showing reasonable certainty as to the fact of damages, based on Defendants' two expert reports. Defendants cite the report of their expert Paul Hinton ("Hinton report"), which analyzes four but-for scenarios in which Plaintiff receives the additional shares he was due in the Offering:

- In the first scenario, CleanTech does not undergo the reverse stock splits. In this but-for world, Defendants would therefore not have been listed on the NASDAQ Market as was required as a condition of the Offering, and the Offering would not have occurred. Since the Subscription Agreement provides that Plaintiff would be refunded his investment in the event of the failure of the contemplated transactions, and since Plaintiff in fact made a $70,000 profit, Plaintiff has suffered no damages.

- In the second scenario, all shareholders in 6D Global Technologies, Inc. are issued 6.9 times the number of shares they were actually issued, essentially reversing the reverse stock splits. Per Hinton's analysis, such an issuance would have diluted the value of the shares by 6.9, and accordingly the 2,900,000 shares Plaintiff would have received would have had same value as the 420,290 shares he actually received. Additionally, such a reversal of the reverse share splits would have triggered a failure of the contemplated

transactions for the same reason provided in the first scenario. In this scenario, Plaintiff therefore would have suffered no damages.

- In the third and fourth scenarios, either Plaintiff alone or Plaintiff and the other investors who participated in the Offering are issued 6.9 times the number of shares they were actually issued. In either event, the issuance of additional shares would have triggered the failure of the Offering because the resulting dilution (3% dilution if only Plaintiff were issued the additional shares, 17% dilution if all participants in the Offering were issued additional shares) would have reduced the proportion of 6D Global Technologies, Inc. stock held by Six Dimensions shareholders below the "approximately fifty percent" holding mandated as a condition of the Share Exchange. Even if the contemplated transactions proceeded regardless, such dilution -- in combination with the stock trading restrictions and limited liquidity of the stock – would have substantially decreased the stock value.

Defendants' arguments are unpersuasive. Defendants are essentially asserting an impossibility defense by arguing that full performance under the Subscription Agreement was precluded because it would have resulted in a breach of the Merger Agreement -- either by increasing the total number of shares of 6D Global Technologies Inc. stock in existence such that its shares would have been delisted by NASDAQ for breaching NASDAQ's minimum value rule (Scenarios 1 & 2), or by decreasing the percentage of the total number of 6D Technologies Inc. shares paid to Six Dimensions shareholders following execution of the transactions below the "approximately fifty percent" of total stock owed to them under the Merger Agreement (Scenarios 3 & 4) -- precluding execution of any of the transactions, leading to a return of Plaintiff's investment. "[U]nder New York law, impossibility (which is treated synonymously

with impracticability) is a defense to a breach of contract action 'only when . . . performance [is rendered] objectively impossible . . . by an unanticipated event that could not have been foreseen or guarded against in the contract.'" *Axginc Corp. v. Plaza Automall, Ltd.*, 759 F. App'x 26, 29 (2d Cir. 2018) (summary order) (alteration in original) (quoting *Kel Kim Corp. v. Cent. Mkts., Inc.*, 519 N.E.2d 295, 296 (N.Y. 1987)). But even if Defendants are correct and performance under the Subscription Agreement was rendered impossible by the terms of the Merger Agreement,[9] this defense is unavailable to Defendants because the terms of the Merger Agreement were not unanticipated. *See Ebert v. Holiday Inn*, 628 F. App'x 21, 24 (2d Cir. 2015) (summary order) (rejecting impossibility defense where, "even assuming performance was rendered impossible, the [at-issue event] was a foreseeable risk"). "[I]f [the risk] was foreseeable there should have been provision for it in the contract, and the absence of such a provision gives rise to the inference that the risk was assumed." *United States v. Winstar Corp.*, 518 U.S. 839, 905 (1996).

Here, the Subscription Agreement is dated, and was executed, after the signed Merger Agreement was published in an SEC filing, and therefore Defendants assumed the risk of contracts that are fundamentally incompatible with each other and with Defendants' decision to engage in reverse stock splits. Defendants are in no position to argue that the breach caused no

---

[9] It is unclear from the record whether performance under the Subscription Agreement would have breached the Merger Agreement; Defendants cite no evidence in support of their argument that the dilution of share value caused by paying to Plaintiff the shares due to him under the Subscription Agreement would have triggered a failure of the Offering and related transactions beyond the assertion that the Merger Agreement was conditioned on Six Dimensions stockholders receiving "approximately fifty percent (50%)" of CleanTech's common stock in the Share Exchange, *see* the Minot Report, Exhibit C, Ex. 10.1 at 2. But the word "approximately" in this context is ambiguous and Defendants present no evidence as to what the signatories to the Merger Agreement intended it to mean. Therefore it is unclear whether such a dilution would indeed have triggered such a failure.

damages, having chosen to breach the Subscription Agreement (by paying to Plaintiff a number of shares less than the number owed to him under the Subscription Agreement) rather than breach the Merger Agreement (by paying to Six Dimensions shareholders a percentage of the total shares in 6D Global Technologies Inc. less than the "approximately fifty percentage" owed to them under the Merger Agreement), and now having presumably profited from that choice. *See Kolodin v. Valenti*, 979 N.Y.S.2d 587, 591 (1st Dep't 2014) (accepting assertion of impossibility defense where performance under at-issue contract would have breached subsequent stipulation because stipulation was unforeseeable and "not something that the parties could have contracted around").

Defendants' further argument that the value of the stock owed Plaintiff would be diluted by the issuance of additional shares, the restricted nature of the stocks and the limited liquidity of the stock is not sufficient alone to render the fact of damages uncertain. *See, e.g.*, *Fezzani v. Dweck*, 779 F. App'x 815, 817–18 (2d Cir. 2019) (summary order) ("To be sure, Plaintiffs' evidence (or lack thereof) demonstrates potential holes in their theory of damages, but [to meet their burden for summary judgment] *Celotex* requires Defendants to demonstrate 'a complete failure of proof concerning an essential element of Plaintiffs' case' sufficient to 'necessarily render all other facts immaterial.' This they have not done. *Celotex* does not require Plaintiffs to *prove* damages to survive summary judgment." (citation and alterations omitted)) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)); *see also Tractabel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) (noting that "[a] person violating his contract should not be permitted entirely to escape liability because the amount of the damage which he has caused is uncertain"). "Where . . . the non-breaching party has proven the *fact* of damages by a preponderance of the evidence, the burden of uncertainty as to the amount of damage is upon the

wrongdoer." *Cynergy Holdings, LLC*, 839 F.3d at 141 (quotation marks omitted). Defendants'
motion for summary judgment as to damages is denied.

### b) Defendants' Motion -- Waiver of Damages[10]

Defendants assert the affirmative defense of waiver, specifically that Plaintiff is not
entitled to anything more than the 420,290 shares of 6D Global Technologies, Inc. that he
received. A genuine issue of material fact precludes summary judgment for Defendants on this
defense.

"Waiver requires the voluntary and intentional abandonment of a known right which, but
for the waiver, would have been enforceable. Waiver may be established by affirmative conduct
or by failure to act so as to evince an intent not to claim a purported advantage." *Tom Rice
Buick-Pontiac v. Gen. Motors Corp.*, 551 F.3d 149, 157 (2d Cir. 2008) (quoting *Gen. Motors
Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.*, 85 N.Y.2d 232, 236, 647 N.E.2d 1329
(1995)); *accord Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd.*, 257 F. Supp. 3d
348, 359 (S.D.N.Y. 2017) (construing New York law).

Defendants argue that Plaintiff waived his argument that he is entitled to more shares by
accepting the 420,290 shares of 6D Global Technologies, LLC stock, requesting that 6D Global
Technologies, Inc. lift the restrictions on the shares (which required Plaintiff to sign a hold
harmless agreement), and then selling his shares at a profit. But, based on the evidence in the
record, a reasonable jury could find that Plaintiff did not voluntarily and intentionally abandon a
known right to additional damages. Defendants' Rule 56.1 Statement and Plaintiff's response
include the following:

---

[10] Plaintiff does not move for summary judgment on Defendants' remaining affirmative
defenses, and the defenses are not mentioned in the parties' briefing. Accordingly, this opinion
does not address the remaining affirmative defenses.

Statement:  It is undisputed that, despite admittedly becoming aware in March or April of 2015 of his number of 6D shares, Plaintiff did not promptly commence any legal action at that time to recover on his alleged "shortfall" of millions of shares, or correct the number of shares that all 6D investors received.  Instead, Plaintiff continued to perform under the contract and initiated the process to lift the restrictions on the sale of his shares, ultimately selling them at a profit a few months later in August and September of 2015.

Response:  Denied.  Immediately, Dr. Cottam started conversations with his Broker and Defendant's company.  Dr. Cottam immediately sought legal representation (a long pursuit and interviews with several lawyers) after he found out months later that he was lied to about his broker's firm filing their own federal case against Defendants, and his brokerage obtaining legal representation for him.

Plaintiffs' assertions are supported by his deposition testimony, in which he further described a series of communications following his discovery of the breach with his broker, his broker's legal counsel and various attorneys.  In addition, Plaintiff filed a complaint with FINRA in May 2015, as evidenced by exhibits to Defendants' motion.  Based on this evidence, a reasonable jury could conclude that Plaintiff did not waive his claim to damages.  *See Nick's Garage, Inc.*, 875 at 113 ("A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'").

### c)      Plaintiff's Motion -- Damages

Plaintiff asserts, without reliance on expert reports,[11] that he should be granted summary judgment on the breach of contract claim with an award of $22,382,236.50, based on the value of the stock on March 30, 2015, diluted by 17%,[12] plus interest, less his profits.  Plaintiff's methodology is incorrect as a matter of law as the correct measure of damages is calculated from the date of breach, with an adjustment of value to correct for any restrictions on the stock, any

---

[11] Defendants argue that Plaintiff's failure to submit an expert report addressing damages is sufficient by itself to preclude damages, but the cases they cite in support of this assertion are inapposite as they exclusively address damages in securities fraud cases.

[12] Plaintiff essentially adopts some, but not all, of the Hinton Report's fourth scenario analysis, and argues that there would be a 17% dilution in share value after Defendants issued the roughly 15.1 million shares necessary for Defendants to perform under all the Subscription Agreements signed for the Offering.

dilution in value and the stock's liquidity.

First, "the market value at the time of the *breach* is the measure of damages." *Cole*, 882 N.Y.S.2d at 419 (emphasis added). The share price on September 29, 2019 at close of business was $8.30. The share price on March 30, 2015 is irrelevant to the analysis. *See Lucente v. IBM Corp.,* 310 F.3d 243, 262 (2d Cir. 2002) (noting that "New York courts are clear that breach of contract damages are to be measured from the date of the breach," and commenting that "[a]lthough [prior cases applying this rule] dealt with stock that was not restricted, we have found no New York cases suggesting that a different rule would apply to restricted stock"); *accord Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir. 1990); *Adler v. Solar Power, Inc.*, No. 16 Civ. 1635, 2018 WL 1626162, at *8 (S.D.N.Y. Mar. 30, 2018); *Jamil v. Solar Power Inc.*, 230 F. Supp. 3d 271, 275 (S.D.N.Y.), *aff'd sub nom. Jamil v. SPI Energy Co.*, 713 F. App'x 42 (2d Cir. 2017), *as amended* (Nov. 29, 2017).

Second, the evidence in the record is insufficient to calculate accurately the value of the stock on the date of the breach, and some of that evidence is disputed. The parties seem to agree that the stock was restricted at the time of breach, which would require some adjustment to its value. *See Simon v. Electrospace Corp.*, 269 N.E.2d 21, 27 (N.Y. 1971) ("If restricted, then the market value would have to be discounted in some way."); *accord Jamil*, 230 F. Supp. 3d at 275 ("The general rule is that the market price of a security should be discounted to reflect the decrease in value, if any, due to a restriction on its transferability."). The parties also dispute the stock's liquidity and its impact on the share value.[13] The lack of evidence as to these two factors

---

[13] Plaintiff asserts in his memorandum of law, without support, that "[t]he liquidity of the market was such that [Plaintiff] could have easily sold his shares. As it was, over 5.76 million shares sold after his shares should have become unrestricted. . . . Indeed, over 2.35 million shares sold in ONE DAY during the four month period after this." The Hinton Report states that the shares were thinly traded and, in a liquidity analysis in Appendix C to the Hinton Report that assumes

precludes granting Plaintiff summary judgment as to his specific request for damages. *See Adler*, 2018 WL 1626162, at *8 (denying summary judgment as to damages where "the nature of the restrictions on alienability of the stock represents a fact sufficient to allow a rational jury to infer . . . that the value of the stock at the time it was to be granted in accordance with the Employment Agreement, was diminished); *Coventry Enterprises LLC v. Sanomedics Int'l Holdings, Inc.*, 191 F. Supp. 3d 312, 321–22 (S.D.N.Y. 2016) (denying in part plaintiff's motion for summary judgment and ordering additional discovery where "the measure of damages must correctly value the withheld convertible notes as of the date of breach [and the] valuation must account for the attendant restrictions on conversion and liquidation"); *Waxman v. Envipco Pickup & Processing Servs., Inc.*, No. 02 Civ. 10132 , 2006 WL 1788964, at *3 (S.D.N.Y. June 28, 2006) ("[T]he precise discount that applies in any particular case, including this one, depends on the facts of that case, including expert testimony on the question of the proper discount amount . . . . For that reason, the Court cannot now say what the proper discount amount should be . . . [T]hat question is for the jury at trial after a review of all the relevant evidence."). Plaintiff's motion for summary judgment as to damages on the breach of contract claim is denied.[14]

---

only Plaintiff received the additional shares owed pursuant to the 1:1 conversion ratio and that he tried to sell his shares as quickly as possible, argues that the average sale price of his shares would have been $1.05. Defendants do not provide analysis for how the liquidity of the market would have affected the share value had all thirty-four investors in the Offering received shares at a 1:1 conversion ratio.

[14] Plaintiff requests that the Court "assess punitive damages as well at a factor of X 90" on the final page of his Reply. Punitive damages are unavailable on a New York breach of contract claim. *Soviero v. Carroll Grp. Int'l, Inc.*, 813 N.Y.S.2d 49, 50 (1st Dep't 2006) ("[P]unitive damages . . . are not recoverable for ordinary breach of contract.").

## B. Claims Against Tejune Kang

Defendants' motion for summary judgment as to the claims against Tejune Kang is granted. First, Plaintiff fails to address in his opposition Defendants' argument that Mr. Kang is entitled to summary judgment. In this Circuit, "in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition [to summary judgment] that relevant claims or defenses that are not defended have been abandoned."[15] *Jackson v. Fed. Express.*, 766 F.3d 189, 198 (2d Cir. 2014); *accord Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) (claims deemed abandoned where plaintiff "fail[ed] to argue that they should survive [defendant's] motion for summary judgment" while arguing against the motion as to his other claims); *City of New York v. Blue Rage, Inc.*, No. 17 Civ. 3480, 2020 WL 423432, at *13 (E.D.N.Y. Jan. 27, 2020) (deeming abandoned defenses and counterclaim where defendants failed to respond to plaintiff's arguments) (citing cases). That Plaintiff opposed Defendants' argument in his reply brief is irrelevant as arguments raised for the first time in a reply brief are waived. *See Fisher v. Kanas*, 487 F. Supp. 2d 270, 278 (E.D.N.Y. 2007), *aff'd*, 288 F. App'x 721 (2d Cir. 2008) (citing *ABN AMRO VERZEKERINGEN BV v. Geologistics Ams., Inc.,* 485 F.3d 85, 97 n.12 (2d Cir.2007)); *accord Mateo v. Bristow*, No. 12 Civ. 5052, 2013 WL 3863865, at *8 (S.D.N.Y. July 16, 2013) (citing cases).

In any event, Defendants' motion for summary judgment as to claims against Mr. Kang is also granted on the merits. The parties appear to agree that Mr. Kang signed the Subscription Agreement on behalf of 6D Acquisitions, Inc. as its Chief Executive Officer. "[A]n individual who signs a corporate contract and indicates the name of the corporation and the nature of his

---

[15] Plaintiff's counsel withdrew before Plaintiff filed his reply in support of his own motion for summary judgment, but Plaintiff was counseled at the time of filing his opposition to Defendants' motion.

representative capacity on the contract is generally not subject to personal liability." *Metro. Switch Bd. Co. v. Amici Assocs., Inc.*, 799 N.Y.S.2d 531, 531 (2d Dep't 2005) (granting summary judgment to individual defendants because "they executed subject agreement solely in their capacities as corporate officers, without any intent to become personally liable to perform thereunder, and agreement clearly stated that it was entered into between plaintiff and corporation"); *accord Maranga v. McDonald & T. Corp.*, 8 A.D.3d 351, 352, 777 N.Y.S.2d 732 (2d Dep't 2004) ("Where a principal of a corporation expressly signs a contract in his or her capacity as an officer of the corporation, unless he or she purports to personally bind him or herself, he or she will not be held personally liable under the contract."). Plaintiff cites no evidence that Mr. Kang intended to subject himself to personal liability when he signed the Subscription Agreement as CEO of 6D Acquisitions.

Plaintiff argues in his Reply that the corporate veil should be pierced as to Mr. Kang based on his "constructive fraud." But under New York law,

> [g]enerally . . . piercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury

*Cortlandt St. Recovery Corp. v. Bonderman*, 96 N.E.3d 191, 203 (N.Y. 2018); *accord Levine as trustee of Marvin H. Schein Descendants' Tr. v. Brown*, No. 15 Civ. 1738, 2020 WL 550653, at *2 (S.D.N.Y. Feb. 4, 2020) (construing New York law). Plaintiff cites no evidence -- disputed or otherwise -- that Mr. Kang exercised complete domination of 6D Acquisitions with respect to the Subscription Agreement, and therefore Defendants' motion for summary judgment as to the claims against Mr. Kang is granted.

## C.      Securities Fraud

Defendants' motion for summary judgment as to Plaintiff's claimed violation of Section

10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 is granted.

> A Rule 10(b)–5 action requires the following elements: (1) a material
> misrepresentation or omission; (2) scienter, that is, a wrongful state of mind; (3) a
> connection with the purchase or sale of a security; (4) reliance, often referred to in
> cases involving public securities markets as transaction causation; (5) economic
> loss; and (6) 'loss causation,' i.e., a causal connection between the material
> misrepresentation and the loss."

*Dalberth v. Xerox Corp.*, 766 F.3d 172, 182 (2d Cir. 2014) (citing *Dura Pharm., Inc. v. Broudo*,

544 U.S. 336, 341-42 (2005)).  Plaintiff cites no evidence of a fraudulent misrepresentation or

omission, or of scienter.

Despite various conclusory allegations of deceptive conduct, Plaintiff's actual damages

arise from Defendants' breach of the Subscription Agreement, and Plaintiff makes no arguments

otherwise.  Defendant's breach of contract, however, is not appropriately resolved under federal

securities law.  *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 776 (2d Cir. 1991) (observing

that a plaintiff "may not transform [a] state law breach of contract or fiduciary duty action into a

fraud claim under the federal securities laws"); *Alfandary v. Nikko Asset Mgt., Co., Ltd.*, 17 Civ.

5137, 2019 WL 4747994, at *6 (S.D.N.Y. Sept. 30, 2019) (dismissing securities fraud claim

because  "[w]hether or not Defendants violated their contractual obligations, however, is not a

question suited for resolution under federal securities law"); *Drexel Burnham Lambert Inc. v.*

*Saxony Heights Realty Assocs.*, 777 F. Supp. 228, 235 (S.D.N.Y. 1991) (dismissing

securities fraud claim where it was merely a "contract dispute dressed up in the language of

fraud").  Plaintiff's securities fraud claim is accordingly dismissed.[16]

---

[16] The Court retains jurisdiction over the breach of contract claim under 28 U.S. § 1332 due to
the diversity of the parties and the amount in controversy.

## IV.    CONCLUSION

For the reasons herein, the parties' cross motions for summary judgment are each GRANTED in part and DENIED in part.  With respect to all claims against Tejune Kang, summary judgment is granted, and he is dismissed as a party to the action.  With respect to the securities fraud claim, summary judgment is granted to Defendants.  With respect to the breach of contract claim, summary judgment is granted to Plaintiff on the issue of liability against the remaining Defendants, but denied to all parties on the issue of damages and Defendants' affirmative defense of waiver.  Defendants' Counterclaims are dismissed.  Defendants' motion for default judgment is denied, and Defendants' request for oral argument is denied as moot.

The Clerk of Court is respectfully directed to close the motions at Docket Nos. 248, 257 and 268.

Dated:  March 30, 2020
      New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE