L38VCOTT

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   JOHN COTTAM,

 4                   Plaintiff,

 5              v.                        16 CV 4584 (LGS)

 6   6D GLOBAL TECHNOLOGIES, INC.,
     6D ACQUISITIONS, INC.,
 7
                    Defendants.          REMOTE BENCH TRIAL
 8                                        (Via Zoom)
     ------------------------------x
 9                                        New York, N.Y.
                                          March 8, 2021
10                                        10:30 a.m.

11   Before:

12                   HON. LORNA G. SCHOFIELD,

13                                          District Judge

14                            APPEARANCES

15   JOHN COTTAM, pro se

16   CATAFAGO FINI
          Attorneys for Defendants
17   BY:  TOM M. FINI
          ADAM B. SHERMAN
18

19

20

21

22

23

24

25
```

L38VCOTT

1          (Remote proceeding via Zoom)

2          THE COURT:  Good morning.

3          MR. FINI:  Good morning.

4          MR. COTTAM:  Good morning, your Honor.

5          (Case called)

6          THE DEPUTY CLERK:  Before we begin, I'd like to remind

7     the parties and anyone else listening that recording or

8     rebroadcasting of this proceeding is prohibited.  Violation of

9     this prohibition may result in sanctions.

10         We're here before the Honorable Lorna G. Schofield.

11         THE COURT:  So here we are again at long last, our

12    trial.  Welcome, everyone.

13         Let me just start by preadmitting exhibits; we

14    discussed them at our final pretrial conference.

15         So I'm admitting Joint Exhibits 1 through 5, and 8

16    through 16.  I'm admitting Plaintiff's Exhibits 1 through 10,

17    13 to 22, 24 to 27, and Defendants' Exhibits 1 through 11.

18         (Joint Exhibits 1-5 and 8-16 received in evidence)

19         (Plaintiff's Exhibits 1-10, 13-22, 24-27 received in

20    evidence)

21         (Defendant's Exhibits 1-11 received in evidence)

22         THE COURT:  I also want to remind the parties of the

23    time limits that I set at the final pretrial conference, and

24    that is half an hour for any cross, half an hour for redirect,

25    except as to the plaintiff, Dr. Cottam; we agreed that we would

L38VCOTT                    Cottam - cross

1   not have redirect, but that he would be free to explain his

2   answers on cross; and that if he did so at any length, then I

3   would give the defendants some additional time on cross.

4          We also discussed ten minutes per side for summations,

5   plus any additional time that I need to ask questions.

6          So I think we all know each other, except I have not

7   met Mr. Hinton, who I understand is the expert for defendants.

8   Since he's an expert and not a fact witness, I'll permit him to

9   sit in on the testimony of plaintiff.  And we'll begin now with

10  plaintiff's case.

11         So also just to remind everybody, I, of course, have

12  your direct testimony in writing, which is what I requested.

13         So beginning with plaintiff's case means we'll begin

14  with the cross of plaintiff.

15  JOHN COTTAM,

16      called as a witness on his own behalf,

17      having been duly sworn, testified as follows:

18  CROSS-EXAMINATION

19  BY MR. FINI:

20  Q.  Good morning, Dr. Cottam.

21         You understand that you are under oath; correct?

22  A.  Right.

23  Q.  Could you please explain for the Court your educational

24  background.

25  A.  I have an education in engineering science technology,

L38VCOTT                    Cottam - cross

1    which was heavily math-oriented, which was a two-year diploma.

2    And then I finished an electrical engineering degree with a

3    computer minor, which was also heavily math-oriented.  And then

4    I did a master's degree in health systems, which was sort of

5    like an MBA geared towards productivity in the health care

6    industry.  Then I did an M.D., four-year degree at USF; and

7    then I did a four-year dermatology residency in Tampa.

8    Q.  Okay.  So Dr. Cottam, you're a dermatologist; correct?

9    A.  Right.

10   Q.  You're a medical doctor; correct?

11   A.  Right.

12   Q.  Did you ever obtain a degree of any sort in economics?

13   A.  No.

14   Q.  Did you ever obtain a degree of any sort in finance?

15   A.  No.

16   Q.  Have you ever performed stock valuations in your career?

17   A.  No.

18   Q.  Would you concede that you're not an expert at stock

19   valuations?

20   A.  Correct.

21        MR. FINI:  Your Honor, since the facts regarding

22   waiver are undisputed and in our proposed findings of fact and

23   conclusions of law, I have no further questions and I move

24   under the Federal Rules of Evidence to strike any layperson's

25   opinion that attempts to offer an expert opinion on the

L38VCOTT                         Hinton - cross

1    valuation of stock.

2              THE COURT:  Okay.  I'll take that under advisement.  I

3    think I've expressed my views before, and I'm unlikely to grant

4    that motion.  But I'll take it under advisement and not rule

5    now.

6              MR. FINI:  Thank you.

7              THE COURT:  So you're saying you have no further

8    questions; is that right?

9              MR. FINI:  That's right.

10             THE COURT:  All right.  So then let us move to the

11   defense case.  We have Mr. Hinton's testimony by declaration.

12             And so Dr. Cottam, you're free to cross him.

13             Oh, wait, Mr. Street.  I'm sorry, Mr. Street has to

14   swear him in first.

15   PAUL HINTON,

16        called as a witness by the Defendants,

17        having been duly sworn, testified as follows:

18   CROSS-EXAMINATION

19   BY MR. COTTAM:

20   Q.  Okay.  Good morning, sir.

21             Let's pull up your direct testimony declaration, page

22   4, last paragraph.  I'd like to read it here.

23             It says:  Any attempt --

24             THE COURT:  Wait, wait.  Can we wait just a minute?

25             I want to find out from Mr. Sherman how we're doing

L38VCOTT                        Hinton - cross

1   this.  Okay.  Go ahead.

2   Q.  Any attempt to determine the effect on the value of 60

3   shares of the hypothetical unexpected increase in the number of

4   shares would be a challenging expert assignment.  My opening

5   expert report included calculations showing how difficult this

6   would be --

7            THE COURT:  Okay.  I'm going to stop you just a

8   second.  Our poor court reporter is taking it down verbatim; so

9   even though we can read it, she still has to take it down

10  verbatim.  So if you wouldn't mind telling us where on the page

11  this is, and then speak slowly.

12           MR. COTTAM:  It's on page 4, last paragraph.

13           THE COURT:  All right.  Okay.

14           And let me just ask the court reporter, did you get

15  all that or do we need to start somewhere?

16           THE COURT REPORTER:  I got it, your Honor.

17           THE COURT:  Okay.  Great.

18           Go ahead, Dr. Cottam.  Sorry to interrupt.

19  BY MR. COTTAM:

20  Q.  He went on to say:  The effects of which I found might not

21  even be possible to reliably estimate, due to the particular

22  and unique facts of this case.

23           So my question is you said here that possibly no

24  expert would be able to reliably estimate the effects of the

25  increase in shares; is that correct?

L38VCOTT                        Hinton - cross

1   A.  Yeah.  I said it's a very challenging assignment.

2   Q.  I just would like a yes-or-no answer please.

3   A.  Okay.

4   Q.  Okay.  You are aware that in expert --

5          THE COURT:  Wait, wait, wait.  We need the yes-or-no

6   answer.  So what was the answer?

7          MR. COTTAM:  He said yes.

8          THE COURT:  Well, I'm going to ask him.

9          Did you say yes?

10          MR. COTTAM:  Oh, sorry.

11   A.  Can you restate the question?  You say it may be -- it may

12   be -- it may not be possible to estimate a reliable answer to

13   the question.  That's -- that's what I think I wrote, and so I

14   stand by that.

15   Q.  Okay.

16          MR. FINI:  And your Honor, the expert in a case like

17   this should be able to explain his answer.

18          THE COURT:  Well, you get redirect for that.

19          MR. FINI:  Okay.

20   BY MR. COTTAM:

21   Q.  Okay.  You are aware that in expert testimony, reliability

22   is one of the basic elements that must be met; correct?

23   A.  I understand that, yes.

24   Q.  You are aware that in this --

25   A.  It does vary though based on the --

L38VCOTT                          Hinton - cross

 1              (Indiscernible crosstalk)

 2     Q.   -- must be tested, right?

 3              THE COURT:  Wait, wait.

 4              So you have to let him finish his answer.

 5              MR. COTTAM:  Oh.  I was asking a yes or no.

 6              THE COURT:  Well, okay.  So if you want yes or no, you

 7     have to preface your question.

 8              MR. COTTAM:  Okay.

 9     Q.   So I would like a yes or no if you're aware that in expert

10     testimony, reliability is one of the basic elements that must

11     be met; correct?

12     A.   Yes.  But how you -- how you meet it depends on --

13              MR. COTTAM:  Your Honor, this is --

14              (Indiscernible crosstalk)

15              THE COURT:  Okay.  So here's what we'll do:  If you

16     can answer yes or no, you can answer it.  If you can't, you can

17     say, I can't answer yes or no.  But if all you need to do is

18     explain your answer, then your lawyer can take care of that on

19     redirect.  Okay?

20              THE WITNESS:  Okay.

21     BY MR. COTTAM:

22     Q.   This is yes or no:  You're aware that in scientific method,

23     theories must be tested; correct?

24     A.   Yes.

25     Q.   Yes or no:  And if someone blocks any such analysis, since

L38VCOTT                           Hinton - cross

1    this is a unique situation, as you say, to actually test any

2    such theory, we would need to go back in time; correct?

3                MR. FINI:  Objection.

4                THE COURT:  Sustained.

5                Wait, wait, wait, wait.  So just wait.

6                If there's an objection, you wait for me to rule.

7                And what's your objection?

8                MR. FINI:  Your Honor, *Daubert*, as applied to stock

9    cases, you don't need -- not all experts have the same level of

10   scientific peer review.  As we know, there are certain fields

11   of study where these *Daubert* --

12               THE COURT:  Okay.

13               MR. FINI:  -- objections --

14               THE COURT:  Wait.  I understand your objection.

15               I'll allow the question, not -- for whatever it's

16   worth.  Go ahead.

17   BY MR. COTTAM:

18   Q.  And if someone brought any such analysis, since this is a

19   unique situation, to actually test such a theory, we would need

20   to go back in time; correct?

21               MR. FINI:  Objection.

22   A.  No.

23               THE COURT:  Overruled.

24               Mr. Hinton, when your lawyer objects, wait for me to

25   rule on the objection.  If I sustain the objection, don't

L38VCOTT                    Hinton - cross

1    answer the question.  If I overrule it, then you should answer.

2              Okay?

3              THE WITNESS:  Yes.  Thank you, your Honor.

4              THE COURT:  Sure.

5    BY MR. COTTAM:

6    Q.  Okay.  This is a yes or no:  And so we cannot test any

7    expert theory in this case, including your own, if we can't go

8    back in time; correct?

9              MR. FINI:  Objection.

10             THE COURT:  Sustained.

11             You don't have to answer that.

12             Go ahead.

13             MR. COTTAM:  Okay.

14   Q.  In the scientific method -- this is a yes or no -- if we

15   can't test a theory, there is no way to come up with an

16   estimate of the error rate of that theory; is that correct?

17             MR. FINI:  Objection.

18             THE COURT:  Overruled.

19             MR. FINI:  That means you answer, Paul, when you're

20   ready.

21   A.  Yes.

22   Q.  Yes or no:  And when we can't get any analysis on error

23   rate, we cannot even quantify any reliability; is that correct?

24             THE COURT:  Go ahead.

25   A.  Yes.

1        MR. COTTAM:  Your Honor, this is taking a long time,

2    and I've got a lot of questions to go through.  Could we

3    somehow either delay the time or get these answers quicker

4    please?  These are yes or nos.

5        THE COURT:  Okay.  Why don't we just say this:  I take

6    it you want a yes or no answer for all your questions; is that

7    right?

8        MR. COTTAM:  Unless otherwise stated, yes.

9        THE COURT:  Okay.  So let's assume that.  You don't

10   have to say that every time.  But, you know, cross-examination

11   is not you're just reading a bunch of questions as fast as you

12   can.  So he's entitled to listen to your question and then

13   answer yes or no.  If he can't, he can say I can't answer yes

14   or no.

15       So go ahead.  You may need to revamp your questions

16   and skip a few, I don't know.

17       MR. COTTAM:  Okay.

18   BY MR. COTTAM:

19   Q.  Sir, did you perform an analysis with all of the

20   calculations you needed to?

21       MR. FINI:  Objection.

22       THE COURT:  Sustained.

23       I'm not sure there is an analysis in his declaration.

24       MR. COTTAM:  Okay.  Well, his declaration includes his

25   attachment of his actual damages report.

L38VCOTT                    Hinton - cross

1          THE COURT:  Okay.  All right.

2          I'm not sure it's really relevant, but you can

3    certainly ask.

4          MR. COTTAM:  Okay.

5    BY MR. COTTAM:

6    Q.  Did you perform an analysis with all of the calculations

7    you needed to?

8          THE COURT:  You may answer.

9    A.  Sorry, I don't understand the question.  I obviously

10   submitted an analysis.

11         MR. COTTAM:  Your Honor, this is a yes-or-no --

12   A.  -- limited in scope --

13         THE COURT:  Wait.  Just wait.

14         He said he didn't understand the question.  Now he's

15   trying to tell you why he didn't understand the question.

16         MR. COTTAM:  Well, I could repeat --

17         THE COURT:  Well, he didn't understand it; it's not

18   that he didn't hear it.

19   A.  I think my expert report stands for itself, right.  There's

20   an analysis in there; it has a limited scope.  And I think I

21   delineated the scope.  I had the information I needed to

22   conduct the analysis that I did in that report within the scope

23   that's defined.

24   Q.  Okay.  Yes or no, did you present a complete report to this

25   federal court?

1    A.   What do you mean by "complete"?

2    Q.   Well, what you define as complete.

3              MR. FINI:  Objection.

4              THE COURT:  Well, okay.  So did you say what you

5    thought you needed to say in your report?  I'm going to

6    rephrase the question just so it's understandable to me.

7              Mr. Hinton?

8              THE WITNESS:  Well, Judge, one of the issues is there

9    was a subsequent -- I never got a chance to respond to

10   plaintiff's March declaration.  And there was a change in the

11   approach that plaintiff is taking in terms of the valuation and

12   damages issues.  And so I wasn't able to complete my

13   articulation of my opinions with regard to that change in

14   methodology.

15             THE COURT:  Okay.

16   BY MR. COTTAM:

17   Q.   Sir, were you hired to simply say there were no damages?

18             MR. FINI:  Objection.

19   A.   No.

20             THE COURT:  Overruled.

21   Q.   So if I tried to sell my shares in a few weeks, it would

22   definitely depress the price; correct?

23             THE COURT:  Wait.  I need some clarification.

24             If you tried to sell your shares of what?

25             MR. COTTAM:  Of my 6D stock.

L38VCOTT                          Hinton - cross

1              THE COURT:  Okay.

2     A.  It depends.

3     Q.  Okay.  Do you have any proof whatsoever that I would

4     attempt to sell my shares in a few days or weeks?

5     A.  No.

6     Q.  So you're speculating then; correct?

7     A.  No.

8     Q.  And you have no absolute proof that it would drop the price

9     precipitously, do you, if I did sell my shares?

10    A.  It depends.

11    Q.  So you're speculating on that as well; correct?

12    A.  No.

13    Q.  Are you aware that 6D bragged about their potential growth

14    and their listing on the supposedly prestigious Russell

15    indexes?

16              MR. FINI:  Objection.

17              THE COURT:  Overruled.

18    A.  I'm aware of their press releases.

19    Q.  Okay.  Do you know investors weren't -- do you know if

20    investors weren't planning on holding their stock for years?

21    A.  Which investors?

22    Q.  Any of them.

23    A.  I haven't studied that question.

24    Q.  So you could have made assumptions that are wrong; is that

25    correct?

L38VCOTT                     Hinton - cross

1    A.  I didn't make an assumption about that.

2    Q.  Let's take a look at page 6 under number 13.

3              THE COURT:  Wait, wait, wait.  Page 6 of what?

4              MR. COTTAM:  On the same document we're on.

5              THE COURT:  Okay.  Thank you.  Paragraph 13.

6              Thank you.

7              MR. COTTAM:  Yes, number 13.

8    Q.  It says:  Cleantech, the name of 6D, was notified by NASDAQ

9    that it would be delisted.  Thus, any analysis of stock value

10   would also need to account for the risk of potential delisting.

11             My question is, yes or no, are you aware of any

12   specific delisting warnings of 6D that 6D got, not CTEK, from

13   the NASDAQ after the merger?

14   A.  No.

15   Q.  Question, yes or no:  Are you aware that 6D and CTEK were

16   completely different companies?

17   A.  Yes.

18   Q.  Are you aware their value and operations were completely

19   different?

20   A.  Yes.

21   Q.  Were you under the impression that CTEK was merging with 6D

22   in a normal merger?

23   A.  What do you mean by "normal"?

24   Q.  Like not a reverse merger.

25   A.  What's a reverse merger?

L38VCOTT                     Hinton - cross

1    Q.  Well, you're an expert; you should know.

2             Do you know that 6D has no relation whatsoever to

3    CTEK's operations?

4    A.  Yes.

5    Q.  So let's go to page 6 under 12.  It says here:

6             My expert report included some of this analysis to

7    illustrate the tremendous challenges in trying to value 6D

8    stock under these unique set of facts.  But I did not provide a

9    complete analysis of damages, as I understood that was

10   plaintiff's burden.

11            So my question here is, these tremendous challenges

12   would, quote, require significant hypothetical analysis partly

13   because of this situation being so unique; is that correct?

14   A.  I don't know what you mean by "hypothetical analysis."

15   Q.  Well, you're doing an analysis that would be bringing a

16   hypothesis for the actual result, so it's hypothetical.

17            THE COURT:  What was the question again?  Sorry.

18   Q.  The question is these tremendous challenges would require

19   significant analysis requiring hypothetical issues partly

20   because this situation was so unique; correct?

21   A.  I don't agree with that.  Your concept of hypothetical is

22   not well-defined.

23   Q.  Okay.  Would your analysis, which isn't even complete in

24   your own words, would be a onetime theory calculated just for

25   these unique circumstances; correct?

L38VCOTT                    Hinton - cross

1   A.  No.

2   Q.  There would be no way to test that analysis, would there?

3   A.  No.

4   Q.  If the only way to test it is to go back in time and put

5   those stocks in people's hands, then the analysis would be

6   hypothetical and, hence, purely speculative; correct?

7   A.  No.

8          THE COURT:  Objection sustained.

9          This is argumentative.  We don't need argument; just

10  ask questions.

11         MR. COTTAM:  All right.

12  Q.  Let's see here.  Let's pull up your original declaration,

13  Joint Exhibit 5.  On page 13, under 29 of this original

14  declaration, it says:  This adjustment preserved the 3.2

15  percent ownership share of 6DT due to the investors.

16         My question here is, are you aware of --

17         THE COURT:  Wait, wait, wait.  This is paragraph 29?

18         MR. COTTAM:  No, on page 13 under 29.

19         THE COURT:  Page 13.

20         MR. COTTAM:  Original declaration, not this one.

21         Joint Exhibit 5.

22         THE COURT:  So Joint Exhibit 5, I'm looking on the

23  left, this is Joint Exhibit 5.  Is his original declaration

24  attached to his testimony declaration?

25         MR. COTTAM:  Yes.

L38VCOTT                    Hinton - cross

1           THE COURT:  You might find it there then.

2           But in the meantime, let's not waste time.  You can

3    read it slowly so I can understand it.

4           MR. COTTAM:  Okay.

5    BY MR. COTTAM:

6    Q.  It says:  This adjustment preserved the 3.2 percent

7    ownership share of 6DT due to investors.

8           My question is, are you aware that this Court has

9    deemed the one-to-one transfer promised as unambiguous, and

10   that investors never obtained a percentage ownership?

11   A.  I'm aware of the judge's ruling.

12   Q.  Okay.  Did you ever read the agreement?

13   A.  Yes.

14   Q.  Were you told what the language meant or did you make up

15   your own mind as to the meaning when you read it?

16   A.  It wasn't my job to interpret the agreement.

17          THE COURT:  And moreover, the interpretation of the

18   agreement is not at issue here.  I've already found that the

19   agreement was breached in that the subscription -- in that the

20   people who subscribed didn't get all the shares they were

21   promised.  Go ahead.

22          MR. COTTAM:  All right.

23   Q.  So let's go to page 9 and 10 under number 24.  It says

24   here:  As a combined result of the offering share exchange,

25   etc., it says that investors in the offering would first become

L38VCOTT                        Hinton - cross

1    shareholders of Cleantech, and then as a result of the

2    financing exchange shareholders in the publicly listed entity

3    6DT.

4            So my question is, who told you that investors would

5    first become shareholders in CTEK?

6    A.  I read the agreement.

7    Q.  You don't know then that that's incorrect?

8    A.  No.

9    Q.  So if you read the agreement, sir, are you aware there's

10   nothing in there that has the investors investing in CTEK?

11           MR. FINI:  Objection, your Honor.

12           This line of questioning is just not relevant to the

13   issue.

14           THE COURT:  That's true.  But I'll let him go ahead.

15   Q.  You said you read the agreement; correct?

16   A.  Yes.

17   Q.  Are you aware that investors invested in a company called

18   6D Acquisitions?

19   A.  Yes.

20   Q.  Are you aware that those shares were supposed to be

21   transferred into the post merger entity on a one-to-one basis?

22   A.  I forget all the details of the transactions as we sit

23   here, but I did describe it in detail in my report.

24   Q.  Okay.  So per your testimony, we are dealing with a unique

25   situation, like you've never seen such a situation before;

L38VCOTT                          Hinton - cross

1    correct?

2            MR. FINI:  Objection.

3            THE COURT:  Overruled.

4    A.  I mean, there are always unique characteristics --

5    Q.  Well, you said this is a unique --

6            THE COURT:  Wait.  Just wait.  Wait.

7            When he's talking, just let him finish.

8            Finish your sentence, Mr. Hinton.

9    A.  Yes.  But this is a uniquely challenging case.  But the

10   issues that have to be analyzed and that I analyzed are well

11   understood.  And it's well understood the impact that they can

12   have on prices.

13   Q.  Okay.  Have you ever seen any valid research on such a

14   unique situation before?

15           MR. FINI:  Objection.

16           THE COURT:  Overruled.

17   A.  There are lots of studies that deal with --

18           THE COURT:  Go ahead.

19           There are lots of studies that deal with?

20   A.  There are lots of studies that deal with different aspects

21   of lack of marketability.  They don't always deal with all of

22   the combination of issues that we have to deal with here in the

23   same study, but that's why it requires expert analysis.

24   Q.  Okay.  This is a yes-or-no question:  Since it is a unique

25   situation, the challenges involved in reliably predicting the

1    stock price may be almost impossible in your own words; is that

2    correct?

3    A.  It may be, yes.  I wrote that.  It may be.

4    Q.  Question, yes or no:  And any analysis would not be able to

5    be tested, since we cannot go back in time or create a parallel

6    universe; is that correct?

7              MR. FINI:  Objection.

8    A.  I disagree --

9              THE COURT:  Overruled.

10   A.  I disagree with that premise.

11   Q.  Okay.  Question:  Have you presented any statistical

12   analysis on the error rate on what analysis you did bring?

13   A.  I haven't --

14   Q.  No.  No or yes.

15             MR. FINI:  The witness gets to explain his answer,

16   your Honor.

17   Q.  There's no explanation --

18             THE COURT:  Just -- so, Mr. Hinton, you can say no or

19   yes or I can't answer that.  And your lawyer can follow up if

20   you have explaining that you want to do.

21   A.  What is the test statistic, Mr. Cottam, that you're asking

22   me to report an error rate about?

23   Q.  In the scientific method when you're coming up with

24   theories and you are an expert witness, you need to produce a

25   statistical error rate on your analysis or your theory so that

L38VCOTT                        Hinton - cross

1    we can understand what are the chances of your theory being

2    correct or not.  That's part of the whole situation and

3    scientific method and Rule 702.

4           So my question again is, you presented no statistical

5    analysis on the error rates of what analysis you did bring; is

6    that correct?

7    A.  You're wrong.  Your interpretation is wrong.

8    Q.  Okay.

9    A.  When you report a test -- when you report a test statistic,

10   when you report an estimate, you are right, you are correct,

11   you have to have a known rate of error.  But there are many

12   situations -- and this is one of them -- where the methodology

13   that you bring does not involve developing a test statistic.

14          So in this case, there are many facts that you have to

15   evaluate and weigh in order to assess --

16   Q.  So what I'm asking, sir --

17   A.  -- the impact.

18   Q.  So a yes-or-no question.

19   A.  There isn't --

20   Q.  This is a yes-or-no question.

21          (Indiscernible crosstalk)

22          MR. FINI:  Your Honor --

23          THE COURT:  Wait.  Just wait.  Everybody just please

24   wait.  Everybody is talking on top of everyone else, and the

25   court reporter can't get it down, so we can't do that.

1          So Mr. Hinton, you've made your explanation.  And what

2     you've basically said is that the answer you're getting to this

3     question is nonsense because it assumes something that isn't

4     valid.  But you still have to answer the question.

5          And the question was, was there any statistical

6     analysis on the error rate for the analysis you did?  And

7     there's a yes-or-no answer to that question.

8          So, Mr. Hinton, if you could just answer it.

9     A.   Right.  I didn't develop a test statistic, and so there is

10    no error rate analysis.

11    Q.   All right.  Thank you.

12          MR. FINI:  But, your Honor, I just want to place an

13    objection.  If someone asks someone, Did you clean the

14    helicopter blades on your car, there's a sense in which the

15    answer is no.  But you really should not force the witness to

16    say no to that, since it really -- there are no helicopter

17    wings on the car.  So to say --

18          THE COURT:  That's a good point.  I take your point.

19          But in this case --

20          MR. FINI:  And the fact of the matter is that

21    evaluating stocks uses factors that people in the --

22          THE COURT:  Wait, wait, wait, wait.

23          We don't need argument; we don't need lawyers'

24    argument right now.

25          So Dr. Cottam, would you just please continue with

L38VCOTT                    Hinton - cross

1    your questions.

2              MR. COTTAM:  Okay.

3              THE COURT:  And I'll try and keep the helicopter

4    analogy in mind.

5    BY MR. COTTAM:

6    Q.  Let's pull up Joint Exhibit 4.  And let's go to Appendix C

7    on page 43.  Under number one, quantifying the potential impact

8    of trades on liquidation prices in an illiquid market.  It

9    reads under 7, 1.7:  The impact of prices of selling the large

10   additional volume of 60 shares is difficult to estimate because

11   it depends on the demand for 6D shares and may be unknown if

12   volumes exceed market depth.

13             It also says at number 8:  The extent of demand for

14   shares is difficult to estimate, not least because it is

15   continually changing.  This is another reason why it may not be

16   possible to develop an estimate of the impact on prices on the

17   immediate liquidation of large numbers of shares that is not

18   speculative.

19             Number 9:  We do not know the depth of the market for

20   CTEK shares prior to the offering or 6D shares during the

21   subsequent period.  We do know the volume of shares traded.

22   Making the assumption that the market depth was equal to the

23   volume of shares traded on each day, the prevailing market

24   price would provide for estimating the price at which

25   additional shares could have been sold into the market on each

L38VCOTT                    Hinton - cross

day.  In reality, doubling the trading volume would be expected

to depress prices as the sellers' offers were matched with less

willing buyers in the market.

        So my question here is, yes or no, in general, you

stated here that if significantly more shares are sold from one

day to the next, day-to-day, especially on a thinly traded

stock, then the price of the stock will likely drop

significantly; is that correct?

A.  It depends on the direction of the trades.

Q.  You're stating here that in reality, doubling the trading

volume would be expected to depress prices as the seller offers

were matched with less willing buyers.  So you're generally

stating here, again, that especially on a thinly traded stock,

then the price of the stock will likely drop significantly if

there were significantly more shares sold from one day to the

next; is that correct?

A.  Right.  I'm talking about --

Q.  Yes or no?

A.  -- very specific --

        THE COURT:  Wait.  Just go ahead and give us the

answer.  Mr. Hinton, go ahead and answer.

        THE WITNESS:  I'm sorry, Judge.

        THE COURT:  No, it's fine.

A.  It's not a general statement.

        THE COURT:  Dr. Cottam, what is this document?  You

L38VCOTT                      Hinton - cross

1    just said Appendix C on page 43, and I see we're at paragraph

2    9.  What is the document?

3              MR. COTTAM:  This is Joint Exhibit 4 in his original

4    damages analysis.

5              THE COURT:  So is this his expert report or --

6              MR. COTTAM:  Yes.

7              THE COURT:  Okay.  I just need you to identify it not

8    only so you can find it, but so I understand what it is we're

9    looking at.

10             MR. COTTAM:  Okay.  All right.

11             THE COURT:  Okay.  And I believe you have three

12   minutes left.

13             MR. COTTAM:  Oh, you're kidding me.  Your Honor, this

14   has taken a lot more.  We've got to get through the most

15   important part here.

16             THE COURT:  Well, why don't you get to it right now.

17             MR. COTTAM:  Okay.  Well, we got to get going here.

18             Let's pull up Plaintiff's Exhibit 26, 6D trading

19   history.

20   Q.  So let's take a look at the stock price on 6D on 6/25 to

21   6/26.  Do you see a significant increase in shares sold on 6/26

22   to 6/25?

23   A.  It's higher than the 6/29.

24   Q.  There was an increase from over 229,000 to over two million

25   shares sold; correct?

L38VCOTT                    Hinton - cross

1    A.  On that day, yes.

2    Q.  And the price held fairly constant, didn't it?

3    A.  Well, it went from 6.5 to 6.8.

4    Q.  Right.  So can you take a look at the stock price on 8/24

5    to 8/25.  Do you see the price -- or the volume went up by a

6    factor of 18 times to over three million shares, and the stock

7    price actually almost tripled; do you see that?

8    A.  I'm sorry, which date?

9    Q.  This is --

10            THE COURT:  August 24.

11   Q.  -- 8/24, 8/25.

12   A.  Yes, the volume goes up and the price goes up.

13   Q.  Yes.  Let's take a look at 7/23 to 24.  The volume

14   increased by over three times, and the price went up, not down,

15   a little bit; is that correct?

16   A.  Yes, on that day.

17   Q.  Okay.  So let's take a look at 7/28 to 7/29.  The volume

18   went up 3.3 times; and the stock price went up, not down,

19   again, by a little bit; correct?

20   A.  I'm sorry, you're moving a bit fast.  Which day --

21   Q.  7/28 to 7/29.

22   A.  Yes, I mean, these are --

23   Q.  Okay.  Let's take a look at 6/24 to 6/25.

24            THE COURT:  Okay.  So, Dr. Cottam, if your point is --

25   you don't have to find every single one.  If your point is --

1            MR. COTTAM:  -- the point, your Honor --

2            (Indiscernible crosstalk)

3            THE COURT:  And the document is in evidence.  So you

4    don't have to get the witness to say every one of them.

5            MR. COTTAM:  Yes, I understand.

6            But this is -- this is a point that there's 11

7    instances in an extremely short time that is exactly the

8    opposite of Mr. Hinton's theory.

9            THE COURT:  All right.  So why don't we do this:  Why

10   don't you just tell us the dates.  Because the document is in

11   evidence; you don't have to ask the question.

12           So we've already got one, two, three, four of them.

13   Give us the rest.

14           MR. COTTAM:  Okay.  We've got 6/24 to 6/25.

15           THE COURT:  Okay.  Hang on.

16           MR. COTTAM:  That's 5.9 times the stock price drop by

17   less than two percent.  We have 5/1 to 5/4.

18           THE COURT:  Okay.

19           MR. COTTAM:  With a five times increase and a drop of

20   less than a half a percent.  We have 5/5 to 5/6, with an

21   increased volume of 4.7 times, and the stock price drop by

22   two percent.

23           We have 7/1 to 7/2, the volume increase by over two

24   times and the price went up by four percent.  We have 7/2 to

25   7/6, the volume went up by 25 percent and the stock price went

L38VCOTT                    Hinton - cross

1  up, not down, by 28 percent.

2          We have 8/4 to 8/5, an almost 14 times increase in

3  volume; and the stock price went up, not down, by 6.6 percent.

4          And then the last one is 9/4 to 9/8.  The stock price

5  went up by 27 percent when the volume increased by over 4.6

6  times.

7          So that's 11 instances in an extremely short time that

8  is exactly the opposite of Mr. Hinton's general theory.

9          THE COURT:  All right.  So you don't need to argue

10 that.  And now you've made sure that those facts are clear to

11 the Court.  I understand.

12         MR. COTTAM:  Okay.  Thank you.

13         THE COURT:  Do you want to ask one final question?

14 Because your time is up.

15         MR. COTTAM:  So, okay.

16         THE COURT:  Or if not that's fine too.

17 BY MR. COTTAM:

18 Q.  My last question, I guess, would -- if we have a

19 hypothetical, unproven, untestable theory that is inconsistent

20 with real-world situations, then no reliable principles and

21 methods could have even been applied; is that correct?

22 A.  I can't answer that.

23 Q.  Okay.

24         THE COURT:  Okay.

25         We could have redirect now.

L38VCOTT                    Hinton - redirect

1    REDIRECT EXAMINATION

2    BY MR. FINI:

3    Q.  Good morning, Mr. Hinton.  I have some follow-up questions.

4    A.  Good morning.

5    Q.  Mr. Hinton, are there established criteria and methods that

6    experts use in the field of valuing stock?

7    A.  Absolutely.  And in this particular circumstance, they are

8    particularly important because we're dealing with a situation

9    where it's well-established that you can't rely on the market

10   price as the right measure of value.  And this is an issue that

11   many economists -- but also practitioners, because the SEC and

12   the IRS and in the case law have struggled with.  And if you

13   can't use the market price, what are you supposed to do?

14        And there's a well-established set of factors that

15   you're supposed to consider to weigh in the particular

16   circumstances how you -- how you should consider deviations

17   from the market price.

18   Q.  So, Mr. Hinton, although stock valuation may not be an

19   exact science or a scientific field per se, are there

20   nevertheless established standards in literature as to what an

21   expert should consider in arriving at a stock price?

22   A.  Yeah.  Well, in this case, the SEC itself has recognized

23   that there isn't an automatic procedure or methodological

24   formula for coming up with a determination.  Instead, they

25   recognize that this is more akin to an appraisal situation

1    where different factors have to be weighed in considering

2    deviations for market price.  And so those qualitative

3    judgments require intensive analysis and should be based in

4    available evidence.  But they are not necessarily amenable to

5    developing a test statistic for which there's a known rate of

6    error.

7    Q.  Okay.  And in offering your opinions in this case, have you

8    considered the factors that experts in the field do consider in

9    determining the value of stock?

10   A.  I have.  The important factors here are also -- they're

11   listed in economic literature, but they are also listed in the

12   case law.  It's well-known that the circumstances -- the types

13   of factors you need to take account of are how the liquidity in

14   the market, which means how thinly traded or how much trading

15   volume there is relative to the amount at issue, the size of

16   the blocks -- block trades, the size of the amount, the

17   quantity of shares attempted to be sold, the financial

18   condition of the company.  Is it an already established

19   company, is it mature, and does it have -- what's the extent of

20   the risks to its operations, they have a known track record.

21        The particular situation here where you have

22   restrictions on the stock that are -- in these case the prevent

23   transfer under certain circumstances as a special case, and

24   there may be other factors like certain shares may -- and

25   transactions may result in some sort of control premium.  So

1    these are all factors that you have to take into account.  Most

2    studies will look at one aspect of this or another.

3            In our case we also have the issue of dilution.  So

4    it's rare that you'll be able to find one study that combines

5    all of these issues together.  So in general, your going to

6    have to -- you're going to have to conduct analysis of each and

7    weigh those factors when you come to a determination.

8    Q.  Mr. Hinton, when you wrote your original expert report on

9    March 14, 2018 --

10           MR. FINI:  Adam, could you please bring up doc number

11   63, which is plaintiff's summary judgment -- original summary

12   judgment motion from August 11, 2017.  Could you please bring

13   that up.

14           Your Honor --

15           THE COURT:  Wait.  So just so I know, this is not in

16   evidence?

17           MR. FINI:  This is not an exhibit because I didn't

18   know that -- I didn't know what Mr. Cottam's examination would

19   be, but this is in response to one of his points.

20           THE COURT:  Do you want to just -- I will admit it

21   because it's already on the docket; but just so we can have it

22   identified as an exhibit, what would be your next exhibit

23   number?  I could actually probably tell.  So it would be

24   Defendants' Exhibit 12.

25           MR. FINI:  Yes.

L38VCOTT                    Hinton - redirect

1          THE COURT:  Do you want to offer it as Defendants'

2     Exhibit 12?

3          MR. FINI:  Yes.

4          THE COURT:  Okay.  All right.  And I can take judicial

5     notice of it under the rules of evidence, so I will admit it.

6          (Defendants' Exhibit 12 received in evidence)

7     BY MR. FINI:

8     Q.  So Mr. Hinton, we've marked as Defendants' Exhibit 12 the

9     plaintiff's summary judgment motion dated August 11, 2017.

10    When you wrote your expert report, did you consider the damage

11    theory that the plaintiff had offered in the case?

12    A.  Yeah, I mean that was my charge at that time.

13    Q.  And --

14    A.  -- which is --

15         MR. FINI:  Adam --

16    A.  -- respond to it.

17         MR. FINI:  Adam, could you bring us to the

18    second-to-last page of this exhibit please, which is page 15.

19    Q.  Mr. Hinton, if you look at the last paragraph on page 15,

20    one line from the bottom, it says:  When the restriction

21    expired on March 30th, 2015, 6D Global was trading at 8.64 a

22    share.  Is it correct that the plaintiff was measuring damages

23    by looking at what the price of the stock would have been six

24    months after the breach in March of 2015?

25    A.  Yes.  It appeared that the plaintiff's theory was that you

L38VCOTT                    Hinton - redirect

1   should look at the time period after the restrictions were --

2   might have been able to be lifted -- they didn't actually get

3   lifted in March -- but to look at the prices in the market

4   after that time and use that to estimate what they could have

5   been sold for.  And so that was the framing of my original

6   report, was to consider whether that -- how those numbers would

7   work out.  Unfortunately, there's nothing here -- we didn't see

8   a plaintiff's expert report, and so they are wrong obviously --

9              THE COURT:  I'm just --

10             (Indiscernible crosstalk)

11             THE COURT:  I'm going to interrupt for just a minute.

12  I'm sorry.  But just in the interest of the brevity of time,

13  I've already determined that the price that has to be -- the

14  value of the shares that we're talking about has to be

15  determined as of the closing date.  And could someone just

16  confirm to me that that's September 29th, 2014?

17             MR. COTTAM:  Yes, it is.

18             THE COURT:  Okay.  So we don't need to talk about

19  March.  The plaintiff's theory is not about March now.  And I

20  understand that your original report was aimed at a theory that

21  is no longer relevant, so we can move on.

22             MR. FINI:  Okay.  Adam, could you please bring up

23  document 348, which is plaintiff's proposed findings of fact

24  and conclusions of law.

25             THE COURT:  So this is docket number 348.

1       MR. FINI:  We'll make that -- what's the next exhibit,

2   Adam?

3       MR. SHERMAN:  13.

4       THE COURT:  It's 13.

5       MR. FINI:  Okay.

6   BY MR. FINI:

7   Q.  So Mr. Hinton, earlier in the case, before the plaintiff

8   shifted his damage theory, he was arguing that the valuation is

9   the date that the restriction should have been lifted.

10      MR. FINI:  Adam, could you turn to page --

11      MR. COTTAM:  Your Honor, I'd like to object at least

12  just to that characterization.  I didn't really change my --

13      MR. FINI:  Your Honor --

14      THE COURT:  Okay.  Wait, wait, wait.

15      Okay.  You're right.  Just -- let's just wait.  That

16  is argument.  All he wants to do is tell me something that's in

17  this document.  So why don't you just point that out.

18  BY MR. FINI:

19  Q.  Mr. Hinton, paragraph --

20      MR. FINI:  Adam, could you turn to page 41 of 50, if

21  you go by the court docket number at the top.

22      THE COURT:  Paragraph?

23      MR. FINI:  And it's paragraph 232.

24  BY MR. FINI:

25  Q.  Mr. Hinton, was plaintiff's paragraph 232 the first time

L38VCOTT                         Hinton - redirect

1   you had seen plaintiff attempt to value the stock as of the

2   audit of the breach?

3   A.   It was.

4   Q.   And this document was submitted to the Court after your

5   opening declaration; correct?

6   A.   It was.

7   Q.   Have you analyzed what the effect of the restriction and

8   dilution would be as of the date of the breach in response to

9   plaintiff's new argument?

10   A.   Yes.  I mean, I've been anticipating seeing something from

11   plaintiffs for a long time.  This was the first time I had

12   an -- I saw something to respond to.  And I disagree with it

13   because it doesn't take account of all the factors that

14   establish that you need to account that are unique in the

15   situation.  So just focusing --

16            THE COURT:  Actually, if you could stop just a minute.

17            Your lawyer had asked you whether you had analyzed the

18   effect of, and then I missed the rest of it.  But I would

19   really like the answer to that question before you explain

20   anything.  So could I get the question again please?

21   BY MR. FINI:

22   Q.   After you received the plaintiff's theory of damages as of

23   the date of the breach, did you analyze the effect of the

24   restriction and dilution as of the date of the breach?

25            THE COURT:  Wait.

1          Just have you analyzed the effect of the what?

2              MR. FINI:  The effect of the restriction.

3              THE COURT:  Yes.  And?

4              MR. FINI:  And the dilutive effect of additional

5      shares as of the date of the breach.

6              THE COURT:  Okay.  Thank you.

7      A.  Yes.  And in addition, the most important issue being the

8      lack of the thinly traded -- the lack of liquidity and other

9      factors.

10             The two factors you list are not the only two that you

11     have to consider, according to the established procedures here.

12     You have to take into account those other factors I listed

13     earlier.  And those had been a part of factors that I had been

14     developing empirical evidence on and was anticipating an

15     opportunity earlier in the case actually to respond to some

16     sort of theory from plaintiff.  So yes, I did do that analysis

17     and I have my own views about that.

18     Q.  What did you conclude?

19             THE COURT:  So I'll say it for you -- just wait.  I'm

20     going to say it for you, Dr. Cottam.

21             This is all new, as far as I know, unless it's

22     something that is in the most recent declaration.  And --

23             MR. COTTAM:  And it's not.

24             THE COURT:  So -- pardon?  It's not?  No, no, no, just

25     wait.

1          And so I -- if it's new and it hasn't been disclosed

2     before, I'm not prepared to accept it now.  But I am curious,

3     I'm not sure -- it depends what relationship it has to what

4     he's already said.  So you can answer it, but it is subject to

5     an objection that I assume Dr. Cottam is making.

6          MR. COTTAM:  Yes, definitely.

7          THE COURT:  Okay.  So you may answer it, but just

8     understand, I'm not sure what weight, if any, I would give it.

9     But I'm curious what your answer is.

10    BY MR. FINI:

11    Q.  So, Mr. Hinton, I asked you what you concluded.

12    A.  I concluded -- well, firstly, that the 17 percent number

13    that is stated here is not the right -- is wrong, a wrong way

14    to think about the -- in fact, it's only one of the many

15    factors.  When you take into account the other factors,

16    particularly the fragility of the company, the restrictions,

17    the thinly traded nature of the shares, and the size of the

18    block that we're talking about, that, to a reasonable degree of

19    certainty, I would conclude that the intrinsic value of these

20    restricted shares, if 2.9 million shares were to have been

21    issued on that date, would have been in the penny stock range,

22    by which I mean the only way you could find someone to acquire

23    those shares at that time was -- would be for a few cents in --

24    essentially treating it as a speculative bet, right, as you

25    would with any penny stock investment.  It's essentially a

L38VCOTT                    Hinton - redirect

1   lottery ticket investment, highly volatile and uncertain.

2   Q.  And even in your original expert report and declarations,

3   did you explain why the plaintiff had not even reasonably

4   approximated his damages?

5   A.  I did.  And you know, here you see it again, right.  I

6   mean, you can't just pick out one factor, which is the

7   dilution, and ignore all the other effects.  The trading volume

8   on this date was 309 shares.

9        What plaintiff is arguing is that 2.9 million shares

10  could be valued at that price on that day.  That's 10,000 times

11  more shares.  So even the examples that Mr. Cottam pointed to

12  in the trading history after this date, you don't see, one day

13  to the next, 10,000 times more trading volume.

14       I've always, from the beginning, identified this

15  thinly traded issue of this stock as being a key issue.  But

16  there are the other issues as well, right.  There's as soon as

17  you put a restriction on a stock and you can't actually sell

18  it, it means that you're exposed to the operational and market

19  risk associated with the business operations of that company,

20  because you're only going to be able to realize some return on

21  your investment in the future.

22       And this is a highly speculative company with no track

23  record.  If you look at the financials of the company, the

24  10-Ks, its recent experience admittedly for Cleantech is that

25  it made losses.  So it doesn't have a track record.  It's a

1   microtech stock.  These are all additional factors.

2           THE COURT:  So could I ask a couple of questions?

3           One is we've been assuming that $8.30 was the market

4   price on the relevant date, the closing date.  And I just

5   wanted to clarify, was that the mean between the highest and

6   the lowest, or was that the closing price, or what was the

7   8.30, just out of curiosity?

8           THE WITNESS:  I believe that's the closing price; it's

9   the conventions report daily prices at the close.  But this

10   is -- this is a situation akin to what happened in -- I've

11   looked at some of the case law, the *Dabinowitz* case, where, you

12   know, a similar penny valuation was determined to be -- was

13   found.

14           THE COURT:  So could I ask you a question there?  And

15   again with the caveat that I'm not sure that I can really

16   accept in an evidentiary sense a new opinion that hadn't been

17   disclosed before.

18           But when you talk about it being -- having a value in

19   the penny stock range and taking into factors all the ones that

20   you've listed that I won't repeat, I take it you didn't say,

21   Well, we're going to discount it by 30 percent for the

22   restrictions, we're going to discount it by 25 percent because

23   it's thinly traded, and so forth and so on.  I gather this was

24   more of an impressionistic valuation based on the impact these

25   various factors together would have on the willingness of a

L38VCOTT                        Hinton - redirect

1   buyer to engage in the transaction as opposed to some precise

2   price; is that right?

3           THE WITNESS:  Well, it's right to some degree, but it

4   starts from the literature on restricted stock discount.  So I

5   wanted to start -- to give you an idea of how I got to that

6   opinion.  As I pointed out, the restrictions, the effective

7   restrictions, it's just one factor that is in play here, right.

8   Even if you had an Apple stock that's traded with high degrees

9   of volume and is a very secure company and you issued

10  restricted stock, you're still going to have to issue that

11  stock at a discount.  And there are economists who have studied

12  that.  And one of the exhibits -- if you want to pull up the

13  Silber study, Adam, is an example of where economists tried to

14  look at those examples of restricted stock.

15          THE COURT:  And where is this?  Where is this in

16  evidence?

17          THE WITNESS:  It's one of the exhibits.

18          MR. FINI:  Adam, what is it, Defendant's 3?  Which one

19  is it, Adam?  Adam, are you there?

20          THE COURT:  He's there, but he's on mute.

21          MR. FINI:  Oh, Adam --

22          MR. SHERMAN:  Here's Defendants' Exhibit 3.

23          MR. FINI:  Is that the Silber article?

24          (Indiscernible crosstalk)

25          MR. FINI:  It's Defendants' Exhibit 3.

L38VCOTT                          Hinton - redirect

1           THE COURT:  Got it.  Thank you.

2           THE WITNESS:  So as a starting point, when I was

3   thinking about, okay, so how are we going to value essentially

4   the intrinsic value at the date of the breach, right, which is,

5   I think, to understand what we're talking about, we know we

6   can't sell the shares, right, so this is not -- you know, this

7   is not using a hypothetical sale, you know, modeling, you know,

8   what you could sell it for later on.  It's basically saying,

9   Well, what's the intrinsic value on that date.  And it's

10  essentially an option value, the option that you have once the

11  restriction is lifted in the future to sell.

12          And because, you know, this is -- essentially,

13  you're -- you have to think about all the factors that would

14  affect the value of this option.

15          Now, one of the ways that economists have done this is

16  they've said, Oh, okay.  Well, when there are these big

17  companies, and some of them issue restrictive stock at a

18  discount, we can look at all these companies.  And then we can

19  start to look at how big these restricted stock discounts are.

20          And in this study, this is an example with this one

21  firm, actually the data on this is from the '80s, but you'll

22  see that --

23          THE COURT:  Could I just interrupt you again?

24          I recall your saying in your report or declaration,

25  something you'd submitted in the past, that even though one

1    could find these studies of well-established stocks and to do

2    something about the effect of restriction there, that that's

3    not necessarily transferable to a case like this, where the

4    stock is very thinly traded and there are various other

5    variables that will affect the valuation of the stock.

6              And so -- I mean, I understand that, so you don't --

7    and also I think one of the --

8              THE WITNESS:  No, no.  I think what I wanted you to

9    get from this is that the range of values here go from, you

10   know -- the largest discount here, it's still not large enough

11   to account for those other factors.  So if you look in this

12   study, they look --

13             MR. FINI:  Mr. Hinton, is there a page you're pointing

14   to?

15             THE WITNESS:  Yeah.  If you look at the next page

16   you'll see there's a table at the top here.  And you'll see on

17   the top line, number one, percent discount, the average is

18   33.75, and the maximum is 84.

19             And so what I'm saying is this is just one issue, and

20   it's really being measured for companies that are not the sort

21   of fragile, thinly traded microtech companies.  Generally

22   speaking, the 69 companies in this study are more

23   well-established publicly traded companies.

24             So the 84 percent, it's just a starting point.

25             Now you've got to say, Okay.  If you're just dealing

1    with the issue of there being a restriction, you get to 84

2    percent.  Now we've got to think about these other things.

3    Now, being thinly traded, this is not just thinly traded, this

4    is extraordinarily thinly traded on that day.  If you look at

5    the fact there was only 309 shares traded on that day, we're

6    talking about a block of shares 10,000 times larger, like maybe

7    three million.

8            So in my first report --

9            THE COURT:  Wait, wait, wait.

10           Could I ask a question again?  I mean, you've likened

11   this to an option.

12           THE WITNESS:  Yes.

13           THE COURT:  And so isn't the question then the trading

14   volume on some hypothetical future day judged as of September

15   29th and not the trading volume on that day?

16           THE WITNESS:  Right.  I think you're right to some

17   extent.  We're using -- this goes to another issue, which is

18   the -- you're right that if you want to think about it from the

19   point of view of the ultimate -- ultimate ability to sell in

20   the future, you would have to make some assumption about how

21   much liquidity there's going to be in the future.  But your

22   best estimate of how much liquidity there is in the future is

23   going to be what you know about liquidity today, right.

24           So what you really should be doing is saying, I

25   shouldn't use -- it's hindsight to use any information in the

L38VCOTT                    Hinton - redirect

1    future; but yes, it's an expectational -- it's an expectational

2    concept, yes.  But so we're really looking at the liquidity on

3    that day, not because we're saying we would have actually sold

4    it on that day, but as a measure of what it would have, you

5    know, been in the future.

6             THE COURT:  Or you could look at it as the liquidity

7    for the prior week or the prior month or -- and you could also

8    look at how much fluctuation.  I mean --

9             THE WITNESS:  Right.  That's right.

10            THE COURT:  I think there are about five minutes left,

11   so I don't want to hijack any more of your time.

12            THE WITNESS:  So how much liquidity there is is

13   measured relative to how big a trade you want to make, right.

14   And what I'm pointing out here is it's 10,000 times bigger,

15   right.  So what that means is, you know, if you try to

16   transact, you're either not going to be able to transact or

17   you're going to be able -- or it's going to have a huge effect

18   on the price.  That's just one way of looking at that problem.

19            When you look at the other factors as well that you're

20   supposed to look at, so besides the trade, the thinness of the

21   liquidity, the fact that there is no track record of the

22   company, as soon as you have a restriction, you're essentially

23   locked into the operational risk of this company.  And one of

24   the risks is, you know, it could be delisted.  And if it

25   becomes an OTC stock, that reduces and depresses liquidity even

L38VCOTT                        Hinton - redirect

further.

So when I said it's a unique circumstance, what I meant was although each of these factors has been studied and is known to have an important impact, there aren't really any studies you can look at where they sort of said, What if you have all these combination of things all at the same time?

So I think that in my assessment, having looked at those different factors -- and I did study the liquidity in quite some detail in my first report -- you also do have to include the dilution effect.  You put all those factors together, starting at 84, you're going to end up with a discount that's approaching 100 percent.  It can't be exactly 100, because we know that an option always has some intrinsic value; there's always some chance that your lottery ticket is going to pay off.  And so it can't be nothing.

But we have to remember in this case, plaintiff actually made money on the sale of their shares.

MR. COTTAM:  Objection, your Honor.

THE WITNESS:  And so even if we can say --

MR. COTTAM:  Your Honor, I object.  I don't think making money has anything to do --

THE COURT:  Wait, wait, wait, wait, wait, wait, wait, wait, wait.  You can't interrupt with that.

Go ahead.  All we're trying to figure out is what the value of the shares was on September 29th.

1          THE WITNESS:  Right.

2          And what I'm saying is if you start with the 84

3    percent, and then you take into account these other factors,

4    you're going to be pushing the discount -- effective discount

5    down approaching, you know, 100 percent.  It can't be 100

6    percent; it has to be something.  But -- because it's --

7    essentially you think of it as an option.

8          The problem here is that doesn't mean there's any

9    damages necessarily, because there's an offset.  The plaintiff

10   actually made money when they sold the shares they actually

11   received.  And so whether or not that intrinsic value -- this,

12   sort of, option value -- is larger in value than the amount

13   that they actually made on an investment is speculative.  It's

14   not -- we don't know whether there was actually any damage at

15   all.  And that actually distinguishes this case from some of

16   the other case law, you know, as I've seen it.

17   BY MR. FINI:

18   Q.  Mr. Hinton, could you just explain why the later sale of

19   the stock with a profit of 70,000 is relevant?  Could you just

20   explain that a little bit more.

21          MR. COTTAM:  Objection, your Honor.

22          I don't believe it's relevant to --

23          THE COURT:  Overruled.

24          I want to hear what he has to say.

25   A.  Well, two ways to think about it.

L38VCOTT                        Hinton - redirect

1          Either you think about what actually happened and you

2     pare it to a but-for world where Mr. Cottam got 2.9 million

3     shares.  And you have to compare what actually happened, which

4     is, he sold his shares and he got the money, versus what would

5     have happened.  You can't separate those things out.  That's

6     one way to think about it.

7          The other way to think about it is if you want to

8     think about the conjecture that Mr. Cottam is making, which is

9     what should have happened is he should have got 2.9 million.

10     If that had happened, then the true price -- the price would

11     have been pushed down, and essentially the amount at which he

12     acquired his original shares was inflated.

13          So either way, you can't just ignore what he actually

14     received from this investment.  You have to look at -- you

15     know, I think the most coherent and simplest way of thinking

16     about it is what happened in the actual world.  You need a

17     complete counterfactual that is realistic and looks at all the

18     implications of that.

19          In the counterfactual, there's 2.9 million,

20     potentially even more if the other investors were to have

21     gotten the same treatment.  And you look at what you would have

22     gotten in that case, and you have to compare the two.  And

23     that's how you get damages.

24          If you made money in the actual world, he'd have to be

25     claiming that he would have made more money, and that's not --

L38VCOTT                          Hinton - redirect

1          THE COURT:  Could I just ask a question?

2          You spend a lot of your time in one of the directions

3  talking about each of your four scenarios and the assumptions

4  to be made.  And it seemed to me -- well, it seemed to me that

5  you didn't like any of the assumptions.  And I understand your

6  time is up, but if you'd just answer my last question.

7          But if you were picking one of the assumptions as the

8  most logically coherent one, as I recall, one is that only Dr.

9  Cottam got the increased number of shares, one was that all of

10  the subscribers got the increased number of shares, one was

11  that all of the shareholders got the increased number of

12  shares, and the other was that the stock splits just didn't

13  happen, which I don't get at all, but, anyway.

14          But in terms of which one seems most coherent to you

15  or most probable or appropriate to use in your analysis, which

16  do you think is most appropriate and why?

17          THE WITNESS:  Well, first of all, just before I answer

18  your question directly, I would just say everything I've said

19  before in terms of the impact on the damage claim on the 2.9

20  doesn't depend on me making some determination about --

21          THE COURT:  I understand.

22          THE WITNESS:  -- between the different scenarios.

23          THE COURT:  I completely get that.

24          THE WITNESS:  But obviously if it is my opinion -- and

25  I think I stated this in my first report, is that whatever

L38VCOTT                          Hinton - redirect

1    counterfactual you come up with, it should be realistic.  You

2    can't, sort of, change -- you know, change one, sort of,

3    isolated fact and not look at the implications of that or the

4    other relevant facts in the case under that counterfactual.  It

5    has to be a complete realistic counterfactual.

6              THE COURT:  I get that.

7              None of them seem very realistic to me, because they

8    didn't really happen.  So which one do you think is the most

9    realistic?

10             THE WITNESS:  Well, I think the least realistic one is

11   the one where only Dr. Cottam gets 2.9 million, because he was

12   one investor amongst 34 who all --

13             THE COURT:  And I read your affidavit.  I understand

14   the why.  So just tell me which one you would pick, if you can.

15   Or say that I can't pick one.

16             THE WITNESS:  Well, the thing is, Judge, it depends.

17   It's combined issue of law and fact at this point.  Because I

18   think you already ruled, you know, that there's not a

19   connection -- you don't see a connection between the merger

20   agreement and the subscription agreement.

21             But if there is a connection between those two, and

22   then suddenly you were to unexpectedly issue more shares to

23   one, sort of -- one, sort of, subset of the shareholders, the

24   other shareholders would object, right.  And so you would have

25   to take that into account.

1         Now, if you have a counterfactual where you're saying,

2    Well, that's not -- you don't see that -- there isn't a

3    connection, you don't see that connection, then at least --

4    then you would have to recognize that a realistic scenario

5    would be to treat all the investors who are similarly situated

6    and these are -- the same subscription agreement would be

7    treated similarly.

8         Because otherwise, other subscribers, investors, would

9    come forward and say -- and bring their own case and ask for

10   additional shares.  And basically, every time someone else came

11   forward and sued for their, you know, appropriate treatment

12   under that same contract, you'd get more shares being issued.

13   And that would have pushed down the prices further from

14   dilution and these other effects.  And so, you know, it starts

15   to make no sense.

16        THE COURT:  Okay.  I understand.  And I also

17   understand the problem with making those assumptions, as you

18   point out in your --

19        MR. FINI:  Your Honor, if I may.  And I was very

20   happy -- of course I wanted the witness to answer your

21   questions.  I just had one question, and could I just ask one

22   final?

23        THE COURT:  You can ask one final question, yes.

24   BY MR. FINI:

25   Q.  Mr. Hinton, Dr. Cottam pointed to some days, many months

L38VCOTT                    Hinton - redirect

1    after the date of the breach, where there was some higher

2    trading volume.  And he pointed to the prices on those days as

3    somehow undermining your position.

4           Do you agree with the suggestion that he was making?

5    A.  No, he -- his premise was all back -- was faulty, because I

6    wasn't making a general statement, which is whenever there's

7    more volume, the price goes down.

8           And if you read my -- the Appendix C to my original

9    report, I cite -- you know, this is a really well-studied, you

10   know, area of market microstructure.

11          The whole idea is I was talking about a directional

12   trade.  So when you're trying to dispose of -- you know, sell a

13   large volume of shares into the market, more shares than the

14   market has -- you know, can absorb easily, it starts to push

15   down the prices.  And that's well understood.  You have to look

16   at the direction of the trade.

17          And the question is then -- but if you look

18   historically at any day, obviously in any day in the market,

19   you can't look at the daily trading volume and say which

20   direction those trades were being made in.  It's nonsensical.

21   It doesn't tell you anything.  And there also may be other

22   reasons why the prices went up and down on any particular day.

23          So that exercise really -- didn't really speak to the

24   issue of what happens in a market -- and this is something that

25   economists, including Maureen O'Hara, who I cite in my first

L38VCOTT

1    report, is an expert on market microstructure --

2            THE COURT:  I'm just going to -- go ahead and finish

3    your sentence.

4            (Indiscernible crosstalk)

5            THE WITNESS:  Right.  So how is it that prices are

6    affected if you try to sell way, way more shares than have

7    historically been sold in a market?

8            THE COURT:  Okay.  I'm going to stop you right there.

9            So before I close the evidence, I had one question for

10   Dr. Cottam.  So if you'll put your witness hat back on.  And

11   you're still under oath.

12           And I think I am correcting a typographical error, but

13   you tell me.  And it goes to the issue of waiver.

14           You said that you learned that you received 420,290

15   shares on March 14, 2014.  But I think you mean March 14, 2015,

16   given the chronology of events.  But I just wanted you to

17   confirm that.

18           MR. COTTAM:  Yeah, it might be a typo.  But, no, I

19   learned somewhere around the time -- I can't remember, because

20   it's a long time ago.  But it's right around the time when the

21   stocks were supposed to be cleared at around March -- or the

22   end of March or April of 2015.

23           THE COURT:  Okay.  Thank you.

24           All right.  So if everybody is okay to continue, what

25   I'd like to do now is hear the ten-minute arguments from each

1    side.  And I will hear from Dr. Cottam first, if you'd like to

2    go first.

3              MR. COTTAM:  Okay.

4              THE COURT:  Or if you'd like to go last, I'll let you

5    go last.

6              MR. COTTAM:  No, I'll go first.

7              THE COURT:  Okay.

8              MR. COTTAM:  First, I think it's important in this

9    case to summarize the background.

10             CTEK was a shell company with zero operations before

11   the agreement was even dated.  And CTEK lied about this on

12   their SEC documents, as did 6D, when they inherited this

13   status.  Mr. Kang, who was also selling the stock to the

14   investors -- and UC Tech was a shell company and actually

15   required this, yet misrepresented CTEK in the agreements as a

16   going concern.  CTEK and 6D were controlled --

17             THE COURT:  So I'm going to -- can you just talk a

18   little bit more slowly, one, so I can understand you; and two,

19   so the court reporter could get it.

20             MR. COTTAM:  Okay.

21             This merger was a reverse merger and was planned as

22   such and was hidden from investors.  This was specifically lied

23   about in SEC documents to induce investment.  6D eventually

24   admitted the merger was a reverse merger, but still reported it

25   was not a shell company on SEC documents, when it was.

1          6D told Radnor and hence the investors that the

2     six-month restriction would end automatically March 29th, 2015.

3     They then reneged on this, after reneging on the one-to-one

4     transfer promise, changing the requirements for unrestriction

5     three times.  These requirements were called onerous and

6     impossible and far beyond normal by Kibrik, Mr. Alexander

7     Kibrik of Radnor.

8          6D forced investors against their will to hire lawyers

9     and get language, put in letters to 6D in order to clear their

10    stock after they were never informed of this and after 6D and

11    6D Acquisitions got their money.

12         Benjamin Wey was indicted in 2015, along with William

13    Uchimoto, who was also Radnor's counsel.  One of the companies

14    in the indictment was CTEK.  6D was delisted per NASDAQ due to

15    what the NASDAQ said were bald-faced assertions by Tejune Kang

16    and his board related to Benjamin Wey's hidden involvement,

17    transfer of unreported stock to Benjamin Wey associates at the

18    time when my shares should have been clear, and other

19    misrepresentations in the delisting hearings and other filing

20    errors.

21         I believe defendants have an unsubstantiated claim

22    that the relatively small addition of 17 percent in the number

23    of shares would have completely destroyed the stock price

24    beyond the relatively simple calculation that will reduce this

25    price by 17 percent.  They could only, in many of their

1    situations, come up with these claims of impossibility of

2    performance.

3         The effects of dilution are quite simple really.  You

4    just take the company, if it's worth $1,000, if one share is

5    outstanding, one share is worth 1,000.  If ten shares are

6    outstanding, each is worth $100 if the company's value remains

7    constant.

8         With respect to liquidity, there's actually zero

9    evidence that the extra shares would decimate the stock price

10   and there would be attempts at immediate sales.  There would

11   not be necessarily at all.  Claiming any investor would try to

12   sell their stock immediately is not true.  The only reason

13   investors would do this is because of the discovery of the

14   entire scheme of material misrepresentations that I have

15   documented in detail.

16        There was no other reason to believe that there would

17   have needed to be an immediate liquidation of any shares, let

18   alone millions of them.  Stock prices cannot be predicted

19   reliably by any mathematical analysis.  An October 2009 study

20   by New Zealand's Massey University tested more than 5,000

21   technical analysis strategies in 49 countries, showing that not

22   one strategy generated returns that aren't predicted by chance.

23        Defendants' expert claims used improper data ranges

24   for some analyses that are outside of when my stocks should

25   have been cleared and after delisting, they are based on false

1    assumptions of share dumping and fly in the face of these

2    actual historical prices in 6D during and after unusually high

3    volumes of trading in periods in which my stock should have

4    been able to be sold.

5          On one, just one, unusually high volume day of trading

6    that we talked about, June 26th, 2,360,000 shares sold in just

7    one day, and the price held quite constant, in fact, trading at

8    about 33 percent higher within one week.  On many other

9    relatively large volume trading days and weeks, the price

10   remained stable or even increased and, on August 25th, when

11   over three million shares were sold in just one day, the stock

12   price actually jumped over 177 percent, almost triple the

13   price.

14         Defendants' expert methods are not able to be tested

15   in the real world.  I believe I have presented reproducible,

16   stable, logical, and common sense estimates given these two

17   scenarios that I have written up that are fitting with the law

18   and real-world events, which is reasonable.

19         Any theory of the effect of liquidity is impossible to

20   calculate and actually test.  In fact, as Mr. Hinton explained,

21   it may not be possible to develop an estimate of the impact on

22   prices of the immediate liquidation of a large number of shares

23   that is not speculative.  Therefore, such theories cannot be

24   assessed for reliability or validity or any statistical

25   analysis, which is why he never brought a statistical analysis

1    of the error rates of any of his analyses, which is required

2    per Rule 702.  In fact, in what is probably the most stunning

3    admission in this case --

4            THE COURT:  Could I ask you a question about that?

5            MR. COTTAM:  Yes.  Sorry.

6            THE COURT:  Are you saying that because it's

7    difficult -- if not impossible -- to test the effect of

8    liquidity, that it should be ignored then in the valuation

9    process?

10           MR. COTTAM:  Well, I believe that that is something

11   that simply cannot be tested.  You have to be able to test

12   scientific theories.  When you're bringing theories to a court,

13   you have to say, This is my theory.  And this shows how it's

14   been tested before.  And unfortunately, in these situations

15   when people breach contracts, we're left with imperfect

16   situations.  You always will be.  But those imperfect

17   situations should be resolved in favor of the one who is not in

18   breach of the contract.  And that's in the law too.

19           THE COURT:  So my question is, are you saying that the

20   way to do that is to ignore the effect of liquidity on the

21   valuation of your shares?

22           MR. COTTAM:  Well, what I'm saying, your Honor, see,

23   because I think that we should take a look at what the true

24   trading history was.  Because you have real-world events that

25   you can see with 6D.  And when you see the real-world events,

1    then you can say really what would have this situation, in

2    terms of liquidity, been.

3            So let's take a look -- rather than all this

4    hypothetical, I can come up with something hypothetical, he can

5    come up with something hypothetical.  Who wins?  So let's take

6    a look at a real-world situation on multiple times, multiple

7    days, where incredibly increased numbers of shares were dumped

8    on the market and the prices went up incredibly completely

9    opposite of Mr. Hinton's stated theory that if these things

10   from day-to-day increase by two times, there would be a

11   decrease in the stock.  So I think you look at the real-world

12   analysis when it comes to this liquidity, because all you are

13   left with is an argument by the way then.

14           THE COURT:  So what are you saying in terms of the

15   bottom-line number that you are suggesting?  Are you taking

16   that into account in deciding what the per share price is that

17   I should use for the estimate of damages?

18           MR. COTTAM:  Right.  Because I think you're right,

19   your Honor, I don't think it's something that you can -- you

20   can come up with that isn't pure speculation and hypothetical.

21   And so that becomes then something that's purely, you know, up

22   to the Court to decide.

23           THE COURT:  Okay.  Sorry for interrupting.  Go ahead.

24           MR. COTTAM:  That's okay.

25           So I was going on.

1          Any theory of the effective liquidity is impossible to

2     calculate and actually test.  And then he explained this.

3     Therefore, such theories cannot be assessed for reliability and

4     validity.  Then, in fact, what is the most stunning admission,

5     Mr. Hinton claims the analysis required would be so monumental

6     that he literally only provided an incomplete analysis.

7          So his analysis, by his own testimony, is

8     hypothetical, unproven, can't be tested, there's no research

9     for this unique situation, there's no statistical analysis on

10    error rates of anything he's produced.  It is purely

11    speculative, therefore, and no reliable principles and methods

12    that could even be applied can be brought here.

13         He's used incorrect assumptions.  He reads clear

14    language incorrectly in the agreement.  His numbers are

15    inconsistent with these real-world events, and he has an

16    incomplete analysis.

17         So to me, it doesn't just fail *Daubert*, it fails *Frye*

18    and it fails the entirety of Rule 702.  They simply cannot

19    overcome their burden.

20         This expert's main claim now is that I lose because I

21    don't have an expert.  And I cannot imagine a more disturbing

22    perturbation of the expert witness function.

23         Given the above, what defendants are asking this Court

24    to do is:

25         One, set new legal precedent that is, two, based on

1    unproven math; that, three, cannot even be tested; and four,

2    therefore, cannot produce any calculable error rate; five, is

3    inconsistent with real-world trading events; six, makes

4    assumptions that are easily argued against; seven, uses

5    parameters that are impossible to foresee or control for; and

6    eight, is based on assumptions that are not based on the true

7    period in which plaintiff's stock should have become

8    unrestricted; and nine, aim to allow defendants with egregious

9    actions to escape the consequences of those actions.

10          So in contrast to defendants' position, my positions

11   are stable, the numbers are easily calculable and repeatable

12   and hypothetical -- and now not using unstable or untestable

13   hypothetical analysis.

14          I believe I suffered damages.  There was no waiver at

15   all.  And defendant shortchanged me of about two and-a-half

16   million shares.  They then did everything in their power to

17   stop me from clearing what stock they did give me, while they

18   got theirs sold.  This trading pattern that you see in 6D is

19   clear of what happened here.  Thank you.

20          THE COURT:  Okay.  Thank you.

21          I'll hear from the defense.

22          MR. FINI:  Thank you, your Honor.

23          And thank you for conducting this trial via Zoom

24   during the pandemic.  I really appreciate your public service.

25          Your Honor, this case involves an utter lack of proof

1   by the plaintiff as to even a reasonable approximation of his

2   damage.

3           Up until his belated direct testimony affidavit, the

4   plaintiff in multiple filings in this Court had a very clear

5   theory of damage.  The plaintiff, of course, has the initial

6   burden to at least reasonably approximate his damage.  And the

7   plaintiff's theory was set forth, for example, in his original

8   summary judgment motion before Judge Sullivan on August 11,

9   2017, doc 63.  At page 15 of that brief, as we saw, he

10  contended that the way you measure the effect of the

11  restriction is to look at what the price was six months after

12  the breach and what the stock was actually trading for.  He

13  again repeated that in the summary judgment briefs before your

14  Honor on October 2nd, 2019.

15          Our expert did two things along the way:  First, he

16  explained in response to that why that number would be

17  incorrect, even if you looked at the world after the breach.

18  But our expert did more.  He said that if you looked at the

19  date of the breach and the trading volumes, that it would be

20  very difficult, if not impossible -- and when he used the word

21  "speculative," he was talking about that the plaintiff, it

22  would be very difficult for the plaintiff to establish the fact

23  of damages, even the fact of any damage in this case, because

24  by definition, when he sold his stock and made $70,000, he sold

25  it in a world where, by definition, there would have been 34

1    other investors who would have received 6.9 times the number of

2    shares.  That means that when he sold his stocks for $940,000,

3    even if you took plaintiff's simplistic view of the world that

4    the only thing you do is discount that by 17 percent, because

5    there would have been 17 percent more shares, that would be

6    $159,000.  17 percent of 940,000 is $159,000.

7          There is not one piece of evidence that the plaintiff

8    ever presented, no expert testimony whatsoever, contrary to the

9    teaching in the *Waxman* decision, which held -- at Southern

10   District, held that you need an expert to explain what the

11   effect of the restriction is.  These are fact-intensive.  The

12   ranges can dramatically vary, could very well establish

13   companies like Apple.  Some experts had used a range from 25 to

14   45.  And we saw Mr. Hinton today point to a study where

15   discounts went up to, in that particular one, 84 percent.

16         The point is the plaintiff came into this Court and

17   flagrantly did not present an expert.  The plaintiff is truly

18   testing the limit of what does it mean to have to at least

19   reasonably approximate damages.

20         Now, the courts that have addressed that with

21   restrictions were *Waxman* and in the Third Circuit -- *Waxman*

22   cited a Third Circuit decision.  And it was the *Rochez* Bros. *v.*

23   *Rhoades* decision.  And what those decisions clearly indicated

24   was that if the plaintiff doesn't have any expert testimony at

25   all, there's going to be a gap, a lack here, to allow the Court

L38VCOTT                     Summation - Mr. Fini

1    to at least feel that there's a stable foundation of damages.

2          So we turn to New York law, as applied by the Second

3    Circuit.  The Second Circuit has made clear that the wrongdoer

4    rule is not a free pass; it's not a free pass to have no

5    evidence.  In *Process America v. Cynergy Holdings*, 839 F.3d 125

6    (2d Cir. Oct. 5, 2016) at page 141, the Second Circuit repeats

7    well-established law that a plaintiff needs at least a stable

8    foundation.  The quote is:  A plaintiff need only show a stable

9    foundation for a reasonable estimate of the damages.

10          Now, that decision from 2016 clarifies when the Second

11    Circuit in *Bois*, the *Bois* decision, it cites it.  And in that

12    decision, the district judge made a comment of negativity about

13    the wrongdoer rule.  And the Second Circuit did not approve of

14    the negative comment that the lower court made.

15          But the decision in *Process America* and long-standing

16    New York law in Second Circuit decisions, including *W.L.*

17    *Hailey*, 388 F.2d 746, December 1967, the court at page 753

18    held:  Plaintiff need only show the amount of his damages with

19    reasonable certainty.

20          Now, those Second Circuit decisions in our proposed

21    findings of fact and conclusions of law, we have cited numerous

22    Southern District cases which apply those principles, as the

23    Second Circuit has made clear, have instructed as to the limits

24    of the wrongdoer rule.  And those decisions have made clear

25    that the Court has to feel that there is at least a reasonable

1    approximation of damages here.

2              And in this case, we have a situation where the

3    plaintiff flagrantly, intentionally -- while he was represented

4    by counsel -- elected to put forth a theory of damages which

5    was completely incorrect, did not in any way reasonably

6    approximate damages, and was based solely on the idea that you

7    look at the price of the stock when the restriction could first

8    be lifted six months after the breach.

9              And for the first time, after having no expert, not

10   asking for any expert discovery, not taking my expert's

11   deposition, for the first time, after my expert put in his

12   opening testimony declaration, only after that, for the first

13   time, this case presents a very unique situation where the

14   plaintiff came into court and then says for the first time

15   that, Well, the way you measure it at the date of the breach is

16   to just use a 17 percent discount.

17             But even that new theory doesn't even purport to

18   address the issue of the restriction.  That theory only

19   purports to address if the other 34 investors are considered in

20   the but-for world.  And as our expert explained, if they

21   aren't, then we would have an absurd situation where if the

22   other -- each of the individual plaintiffs brings individual

23   actions, there will be more damages against the company than if

24   the class sued in a class action of 34 investors.

25             Courts should imagine real-world, fair, but-for worlds

L38VCOTT                    Summation - Mr. Fini

1    that avoid absurd results and windfalls.  These were not sales

2    of bicycles or a good.  It was the sale of a stock in common

3    under one subscription agreement, where the plaintiff knew that

4    his bargain was he was buying in with other investors under

5    that subscription agreement.  And it would make no sense to

6    ignore those other investors.

7          And now, for the first time that our expert had the

8    opportunity to hear Dr. Cottam's theory of the value of the

9    date of the breach, in this case we now have on the record our

10   expert not only has explained why the plaintiff has not even

11   reasonably approximated his damage, but our expert went

12   further.  He's explained that in this case, there's a perfect

13   storm of factors that would dramatically depress the stock to

14   the point where, in his words, Mr. Hinton testified that with a

15   reasonable degree of certainty this would be a penny stock.

16   And he explained his rationale for that.

17         And any issue that your Honor -- I would like to have

18   the opportunity for post-trial briefing, because your Honor did

19   express some reservation as to whether you could hear that

20   explanation.  And the answer is, of course, yes.  Because

21   otherwise, plaintiffs would be able to play this game.  You go

22   into court, you do no reasonable approximation at all with no

23   expert report.  Then, after the deadline that the court

24   establishes, the direct testimony, you submit an affidavit that

25   blew that deadline.  And then throw in your theory of how to

1    estimate damages.  And then the expert for the defendant gets

2    no chance to respond to that.  The law cannot be that way.  It

3    cannot be a game where that the court is going to pluck a

4    number out of thin air.

5         Dr. Cottam spent a lot of time on *Daubert*.  And he

6    ignores all the learning from the Second Circuit.  *U.S. v.*

7    *Litvak*, 808 F.3d 160 (2d. Cir. 2015), at page 180, the Second

8    Circuit goes through the fact that there are all kinds of

9    experts, not just scientific experts.  And when you don't have

10   scientific experts -- and, Judge, you're no longer visible.  I

11   just wanted to make sure you can still hear me and you're still

12   there.

13        THE COURT:  I can hear you.

14        MR. FINI:  Okay.

15        In the area of valuation, the Second Circuit has made

16   clear that all sorts of experts get to opine on matters, as

17   long as it's not just the expert's say-so; as long as there are

18   at least learnings and methods, or at least benchmarks or

19   factors that are developed in the industry.

20        And the Rhode Island federal court, in *Probate Court*

21   *v. Bank of America*, 2010 Westlaw 1508922, the District of Rhode

22   Island explained that company valuation is fraught with

23   variability because it depends on so many hypothetical factors.

24   This indeterminacy does not mean that the practice is

25   inherently unreliable; rather, it merely reflects the fact that

1    accepted valuation techniques obligate an expert to make a

2    variety of simplifications, assumptions, and estimates, based

3    on reasoned judgment and professional training.

4          And your Honor is aware, given your long service on

5    the court, oftentimes when you have valuation experts, they

6    disagree.  Reasonable experts can disagree.  But in this case,

7    we have a total vacuum on the plaintiff's side.

8          Now, the most interesting decision for your Honor to

9    think about, of course -- and, of course, your scholarly

10   tradition, you've already identified it in your summary

11   judgment motion.  It was the *Jamil* decision, J-A-M-I-L.  And

12   your Honor will think about that decision.

13         And what I would say to that, your Honor, is *Jamil* was

14   an outlier case where the defendant flagrantly himself offered

15   no expert testimony at all as to why -- as to what the effect

16   would be.  And the plaintiff absolutely had some damage,

17   because he had a right to shares in that case, and there was

18   some damage.  And the lower court -- this went up to the Second

19   Circuit.  The Second Circuit pointed out that the lower court

20   warned the defendants in that case.  The Second Circuit

21   decision is at 713 F. App'x --

22         THE COURT:  I'm just going to -- I actually recently

23   read the Second Circuit decision in *Jamil*.  And it's a

24   nonreported, nonprecedential decision.  And as you know, *Jamil*

25   is not binding on me either.

L38VCOTT

1          MR. FINI:  Right.

2          THE COURT:  It's interesting.  I obviously respect

3   Judge Rakoff.  But there are many differences between that case

4   and this case.

5          MR. FINI:  But then, your Honor, I did want to point

6   out one thing.

7          THE COURT:  Okay.  But you're out of time.

8          MR. FINI:  But I did want to point one thing out.

9          The Second Circuit in that case pointed out that Judge

10  Rakoff even warned the parties when they both stipulated and

11  threw up their hands and said no expert, he warned the

12  defendants, I'm going to try to use the prices after the

13  restriction to estimate what the effect would be.  And they

14  didn't make any objection.  They didn't make any objection at

15  all.  They were warned.

16         In our case, we have the exact opposite.  We warned

17  all along to the plaintiff, You have no expert.  You have no

18  estimation of the damage and the effect of all of these factors

19  at the date of the breach.

20         THE COURT:  Thank you.

21         So let me address first the issue of post-trial

22  briefing.  I am not going to accept any post-trial briefing at

23  this point.  If I decide in the course of my writing my opinion

24  that I need it, I will let you know.  But I have the benefit of

25  the transcript.  I know what your position is on that.

1          I hope I'll have the benefit of the transcript.

2          MR. COTTAM:  Your Honor?

3          THE COURT:  Yes.

4          MR. COTTAM:  You said you would give me two minutes to

5   finish, to respond.

6          THE COURT:  Absolutely.  You can have two minutes.

7          I inadvertently gave you the full ten minutes, but you

8   can have two minutes.  Go ahead.

9          MR. COTTAM:  Okay.  I never blatantly avoided an

10  expert at all.  Again, I already explained to you why Judge

11  Sullivan said the defendants' expert testimony will be limited

12  to, etc., etc.  This was a case where the judge was ready to

13  rule *sua sponte* because of the blatant breach of contract.

14         Now, the only people who have been playing games here

15  are Mr. Tejune Kang, Mr. Benjamin Wey, and Radnor, who were

16  together in selling this scam.  Per the *Trachtibal* case, one

17  who breaches his contract should not be permitted entirely to

18  escape liability because the amount of damages is uncertain.

19  For the *Cynergy* case, where the nonbreaching party has proven

20  the fact of damages, which I have, the burden of uncertainty of

21  the amount of damages is upon the wrongdoer.  Doubts are

22  generally resolved against the party in breach.  Certainly

23  there are going to be doubts.

24         Per the *Wakeman* case, to plead a stable foundation, a

25  plaintiff must show there are some facts upon which a jury

L38VCOTT                    Rebuttal - Mr. Cottam

1    could base a judgment.  Not certain, nor strictly accurate, but

2    sufficiently so for the administration of justice.  This is one

3    of those cases.

4            The number one issue in *Daubert* is is the theory

5    testable.  Actually, testing a theory any expert could come up

6    with here would require getting in a time machine, which is why

7    I said I'm not going to bring an expert here to bring perjury.

8    And in addition, we'd have to get them stock in their hands,

9    and then in a but-for world that didn't involve all of the

10   misrepresentations of the defendants.

11           Defendants' own expert witness has said an analysis

12   here requires hypothetical speculation by logic.  This approach

13   is simply untestable and fails -- the first *Daubert* item cannot

14   pass any of them.

15           Tejune Kang and Benjamin Wey brought this hidden

16   reverse merger and shell company not to make any money on a

17   legitimate company, but to use the NASDAQ as a vessel for their

18   stock price manipulation.  To induce investment, they had to

19   hide the reverse merger and shell company status, among other

20   things.

21           Over $80 million of stock was sold before 6D delisted.

22   And the public only had about $6 million worth.  And my just

23   under a million dollars' worth that I sold gives us about $7

24   million.  So someone else sold over $74 million worth of stock

25   in that time.  And the only other shareholders were Tejune Kang

L38VCOTT

1    and Benjamin Wey.  They got away with their stock price

2    manipulation scheme and, in the process, left possibly

3    thousands of people with a complete loss.

4           I'm here fighting for them.  I'm just hoping this case

5    might at least help others in the future.  Thank you.

6           THE COURT:  Okay.  Thank you.

7           So since you were both responsive to my questions

8    during the course of the testimony and even during argument,

9    I'm not sure that I have anything else to ask.

10          Let me just take a look at my notes here and be sure.

11          (Pause)

12          THE COURT:  I don't have anything else.

13          If there's anything else that I need to know, I'll

14   reach out to you.  But I think with your submissions, as well

15   as with the benefit of the testimony and argument, I feel like

16   I know what I need to know.

17          So thank you very much.

18          Is there anything else we need to deal with here?

19          MR. FINI:  Your Honor, I just wanted to say on behalf

20   of myself and my firm -- and I know Dr. Cottam feels the same

21   way -- thank you very much for conducting this.  I look forward

22   to seeing you in person, when we all get the vaccine and we're

23   back in person.  And I wish you and your family good health.

24          THE COURT:  Thank you very much.

25          I wish all of you good health.  Thank you for your

L38VCOTT

1   patience in conducting the trial this way.  It's not the way we

2   normally do things obviously.  But I'm able -- I'm glad we were

3   able to do it.  I think it actually turned out to be very

4   efficient.  I'm glad that we didn't have to have Dr. Cottam

5   travel up to New York.  And I don't know where you are,

6   Mr. Hinton, but I'm glad all of us were able to be where we

7   are.

8           So I wish you all good health.

9           Thank you for your hard work and for your submissions.

10          MR. COTTAM:  Thank you for your time, your Honor.

11          THE COURT:  You're quite welcome.

12          MR. COTTAM:  As Mr. Fini said, thank you.

13          THE COURT:  Okay.  You're welcome.

14          We're adjourned.

15                              *    *    *

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2     Examination of:                             Page

3     JOHN COTTAM

4     Cross By Mr. Fini  . . . . . . . . . . . . . . . 3

5     PAUL HINTON

6     Cross By Mr. Cottam  . . . . . . . . . . . . . 5

7     Redirect By Mr. Fini . . . . . . . . . . . . .30

8

9

10

11                        PLAINTIFF EXHIBITS

12    Exhibit No.                             Received

13      1-10, 13-22, 24-27  . . . . . . . . . . . . . 2

14

15

16                        DEFENDANT EXHIBITS

17    Exhibit No.                             Received

18      1-11  . . . . . . . . . . . . . . . . . . . 2

19      12    . . . . . . . . . . . . . . . . . . . .33

20

21

22                          JOINT EXHIBITS

23    Exhibit No.                             Received

24      1-5 and 8-16                            2

25