```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
JOHN COTTAM,                                                :
                                                            :
                              Plaintiff,                    :    16 Civ. 4584 (LGS)
                                                            :
             -against-                                      :    OPINION AND ORDER
                                                            :
GLOBAL EMERGING CAPITAL GROUP,                              :
LLC, et al.                                                 :
                                                            :
                              Defendants.                   :
------------------------------------------------------------X
```

LORNA G. SCHOFIELD, District Judge:

These are the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, following a one-day bench trial conducted by videoconference on March 8, 2021. Defendants 6D Global Technologies, Inc. ("6D Global Technologies") and 6D Acquisitions, Inc. ("6D Acquisitions") (collectively "Defendants") breached a subscription agreement through which Plaintiff John Cottam sought to purchase shares in 6D Acquisitions, which would be converted on a 1:1 basis to shares in 6D Global Technologies (the "Subscription Agreement"). The bench trial was limited to the issues of (1) damages on Plaintiff's breach of contract claim and (2) Defendants' affirmative defense of waiver. For the reasons stated below, Plaintiff has not met his burden of establishing a stable foundation for a reasonable estimate of damages. As a result, Plaintiff is awarded nominal damages of $1.

**I.  Background**

Plaintiff commenced this action on June 16, 2016, alleging that 6D Global Technologies, 6D Acquisitions and Tejune Kang breached the Subscription Agreement and violated Section 10(b) of the Exchange Act, 16 U.S.C. § 78j(b), and Rule 10b-5. On September 21, 2016,

Defendants filed a motion to dismiss.  The prior judge who presided over this case denied the motion, held that the Subscription Agreement is unambiguous and stated that Plaintiff was likely to succeed on his breach of contract claim.

On August 24, 2017, Defendants filed their answer and counterclaims, as well as a third party complaint.  The third party complaint named as third party defendants the thirty-three other investors who, along with Plaintiff, signed the Subscription Agreement (collectively, the "Third Party Defendants").  Defendants and the Third Party Defendants eventually reached a settlement and stipulated to the dismissal of all claims and counterclaims against each other.

In August and September 2017, Plaintiff and Defendants filed cross-motions for summary judgment.  Summary judgment was granted in favor of defendant Tejune Kang with respect to all claims and granted in favor of all Defendants with respect to Plaintiff's securities fraud claim.  *Cottam v. Glob. Emerging Cap. Grp., LLC et al.*, No. 16 Civ. 4584, 2020 WL 1528526, at *1 (S.D.N.Y. Mar. 30, 2020).  After summary judgment, the only remaining claim was Plaintiff's breach of contract claim -- specifically, that Defendants breached the Subscription Agreement by failing to provide all of the 2,900,000 shares of 6D Global Technologies stock that Plaintiff purchased.  With respect to this claim, Plaintiff's motion for summary judgment was granted as to liability[1] but denied as to damages.  *Id*. at 5-6, 13-14.  Summary judgment was granted as to liability because, even though Plaintiff received the same proportion of shares that the whereas clauses of the Subscription Agreement contemplate, the operative provisions of the Subscription Agreement are unambiguous and provide that Plaintiff is entitled to 2,900,000

---

[1] "Defendants are in no position to argue that the breach caused no damages, having chosen to breach the Subscription Agreement (by paying to Plaintiff a number of shares less than the number owed to him under the Subscription Agreement) . . ." *Cottam*, 2020 WL 1528526 at *12.

2

shares. The summary judgment decision also held that, based on the nuances of contract law, the defenses of mutual mistake, unilateral mistake and impossibility do not apply.

As to damages, Plaintiff's motion for summary judgment was denied because, although Plaintiff established the fact of damages -- *i.e.*, that he received fewer shares than he was entitled to -- there remained a question of fact about the value of the omitted shares due to the impact of restrictions on, and the lack of liquidity of, the stock. *Id*. at 14. In addition, Defendants' motion for summary judgment on the affirmative defense of waiver was denied. Defendants argued that Plaintiff waived his right to additional shares by accepting 420,290 shares of 6D Global Technologies stock, requesting that 6D Global Technologies lift the restrictions on the shares and then selling his shares at a profit. However, a genuine issue of material fact as to whether Plaintiff voluntarily and intentionally abandoned a known right to additional damages precluded summary judgment on this issue.

On March 8, 2021, a virtual bench trial was held to determine the issues of (1) damages and (2) waiver. The two witnesses were Plaintiff, who testified on behalf of himself, and Paul Hinton, a principal of The Brattle Group and member of its Securities and Finance Practice, who testified as an expert witness on behalf of Defendants. Plaintiff was given the opportunity, but not required, to retain his own expert witness and he elected not to do so. Plaintiff proceeded *pro se* for trial but was represented throughout the earlier stages of the case.[2] The parties, prior to trial, submitted written direct testimony, and during trial, conducted cross-examination, redirect (except Plaintiff who did not question himself) and closing arguments. The Court admitted 50

---

[2] Because Plaintiff was *pro se* at the time he filed his pre-trial submissions, as well as during trial, his submissions and testimony are construed liberally "to raise the strongest arguments they suggest." *McCleod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017); *accord Bell v. SL Green Realty Corp.*, 19 Civ. 8153, 2021 WL 516575, at *2 (S.D.N.Y. Feb. 11, 2021).

exhibits, documenting the transactions in which the parties engaged and related issues such as Plaintiff's efforts to sell the 6D Global Technologies shares he received.

## II.     FINDINGS OF FACT

On September 18, 2014, Plaintiff signed and entered into the Subscription Agreement, to participate in a private placement equity offering of 6D Acquisitions shares (the "Offering"). Pursuant to the Subscription Agreement, 6D Acquisitions was "a special purpose vehicle formed for the purpose of investing [in a] reorganized entity" -- 6D Global Technologies.  The Subscription Agreement provides that this investment in 6D Global Technologies was to occur through a share exchange of 266,787,609 shares of CleanTech Innovations, Inc.'s ("CleanTech") common stock, "equal to approximately fifty percent (50%) of its outstanding shares of common stock," for all of the outstanding shares of 6D Acquisitions' common stock (the "Share Exchange").  Through the Share Exchange, 6D Acquisitions would become a wholly owned subsidiary of CleanTech, which would change its name to "6D Global Technologies, Inc." Whereas clauses of the Subscription Agreement provide that the Offering was a condition of the Share Exchange, and include the following capital table ("Cap Table") showing how CleanTech would be capitalized upon raising the maximum offering:

| | |
|---|---|
| 266,787,609 shares | Exchange Shares issued to 6D Acquisitions |
| 242,534,190 shares | Exchange Shares issued to NYGG Asia post-conversion |
| 7,253,419 shares | Public Shares post-cancellation of 17,729,403 shares |
| 17,000,000 shares | Investors in Offering (assuming $5,100,000 maximum) |
| | Placement Agent's 15% equity fee (5-year Warrants, assuming |
| <u>2,550,000 shares</u> | <u>$5,100,000 maximum offering is completed)</u> |
| 536,125,218 shares | Total Issued and Outstanding (including Warrants) |

Operative clauses of the Subscription Agreement provide that through the Share Exchange, shares of common stock in 6D Acquisitions acquired through the Offering would be

"converted on a 1:1 basis into shares of [6D Global Technologies'] Nasdaq listed common stock . . ."

Plaintiff was one of thirty-four investors who participated in the Offering. He invested $870,000. Because the operative clauses of the Subscription Agreement provide that an investor could purchase one unit of stock, equal to fifty thousand shares of 6D Acquisitions stock, for $15,000, Plaintiff's investment of $870,000 purchased fifty-eight units, or 2,900,000 shares of 6D Global Technologies common stock (following the conversion of the shares at a 1:1 ratio). After the form Subscription Agreement was printed and before Plaintiff received his shares, 6D Global Technologies' predecessor company, CleanTech, underwent two reverse stock splits to keep its shares from dropping below a stock price of $1 and remain listed on the NASDAQ National Market System ("NASDAQ"). These reverse stock splits decreased the number of available CleanTech shares by 6.9 times. As a result, when the Offering closed on September 29, 2014, Plaintiff received 420,290 shares of 6D Global Technologies stock -- 6.9 times fewer shares than he purchased.[3] All other 6D Global Technologies shareholders also received 6.9 times fewer shares than the amounts stated in the Cap Table.[4]

On September 29, 2014, the date the Offering closed and Defendants breached the Subscription Agreement, the trading price of 6D Global Technologies stock was $8.30. The value on the date of the breach of the 2,479,710 shares that Plaintiff would have received but for

---

[3] 420,290 is equal to 2,900,000 divided by 6.9, *i.e.*, Defendants reduced the number of shares provided to Plaintiff proportionately to the reduction in total shares caused by the reverse stock splits.
[4] Defendants' Exhibit 8, a 6D Global Technologies Form-8K dated September 29, 2014, in combination with the Cap Table show that 6.9 times fewer shares were issued to 6D Acquisitions shareholders (266,787,609 ÷ 38,664,871 = 6.9); 6.9 times fewer shares were issued to NYGG Asia post-conversion (242,534,190 ÷ 35,149,883 = 6.9); and 6.9 times fewer public shares were cancelled (17,729,403 ÷ 2,569,483 = 6.9).

Defendants' breach is affected by several factors. During trial, Mr. Hinton credibly testified that these factors include dilution caused by the issuance of additional shares; liquidity of the company's stock in the market; restrictions on the sale of Plaintiff's shares; and the financial condition of the issuer, including whether the company is mature.

Through both his written direct testimony and testimony during trial, Plaintiff provided a theory as to the impact of dilution on the market price of the shares to which he was entitled. He explained that (1) but for Defendants' breach of the Subscription Agreement, the thirty-four investors in the Offering would have collectively received an additional 12,985,988 shares, and (2) these additional shares would have diluted the stock price by 17% (to $7.094), as they would represent a 17% increase in the number of shares. Plaintiff asserted that, as a result, he is entitled to $19,621,000 -- which is $20,561,000 (the number of shares times the adjusted market price on the date of the breach) minus $940,000 (the proceeds of the sale of the 420,290 shares Plaintiff had received).[5] While Plaintiff sold his shares at a $70,000 profit, other Offering and public 6D Acquisitions investors lost their investments when 6D Global Technologies was delisted.

Plaintiff did not attempt to quantify the impact of illiquidity, stock restrictions or the financial condition of 6D Global Technologies on the market price of the shares that he did not receive. The shares he purchased through the Subscription Agreement were restricted and subject to a six-month waiting period.[6] In addition, on the date of Defendants' breach, 6D Global Technologies stock was thinly traded, with only 309 shares traded. With respect to the impact of these factors on market price, Plaintiff asserted that "[s]tock prices or trading patterns

---

[5] 2,900,000 x 7.094 = $20,561,000; $20,561,000 - $940,000 = $19,621,000.

[6] The shares were in fact restricted for a period longer than six months. However, on September 29, 2014, the date the Offering closed and the Subscription Agreement was breached, the expectation was that the shares would be restricted for six months.

cannot be 'predicted' reliably by any mathematical analysis." As to the impact of the restriction on share price, Plaintiff testified that, "[t]he effect of 'restriction' is one that can be seen only in hind sight," and that, "[t]here is no way to *a priori* calculate the effect of 'restriction,' which is an agreement based on a gamble; the stock price could decrease during the standard 6 month lock up, or increase (there is no way to tell)." As to the impact of liquidity on share price, Plaintiff testified that increased trading volumes do not necessarily lead to price declines, and further that, "the effect of 'liquidity' is impossible to calculate, [is] therefore speculative in the extreme, and therefore should be denied."

## III.   MOTION TO EXCLUDE PLAINTIFF'S TESTIMONY

Defendants' motion to strike Plaintiff's testimony is denied. During trial, Plaintiff, a dermatologist with a master's degree in health systems and undergraduate degrees in engineering, testified that he does not have degrees in economics or finance and has not performed any stock valuations. Defendants subsequently moved to strike Plaintiff's testimony, on the ground that Plaintiff was offering unqualified expert testimony in the guise of lay opinion testimony. The Court took Defendant's motion under advisement and reserved ruling on the motion.

As a threshold matter, this is a bench trial in which juror confusion is not a concern. In the context of a bench trial, a court has broad discretion to admit testimony giving it whatever weight seems fit. *See, e.g, Alford v. United States*, No. 17 Civ. 5217, 2020 WL 376749, at *15 (S.D.N.Y. Jan. 23, 2020); *Coon v. Bell*, No. 16 Civ. 291, 2019 WL 3975547, at *3 (N.D.N.Y. Aug. 22, 2019). Pursuant to Federal Rule of Evidence 701, "[i]f a witness is not testifying as an expert," his testimony is limited to opinion that is "rationally based on the witness's perception"; "helpful to clearly understanding the witness's testimony or to determining a fact in issue"; and

7

"not based on scientific, technical, or other specialized knowledge."  Here, Plaintiff provided helpful testimony regarding examples of 6D Global Technologies share prices and trading volumes on certain days, as well as the possible impact of dilution on the share price.  With respect to the impact of dilution, Plaintiff's testimony was limited to a simple mathematical explanation that did not require any scientific, technical or other specialized knowledge.  *See New York v. United Parcel Serv., Inc.*, 942 F.3d 554, 596 (2d Cir. 2019), *cert. denied*, 141 S. Ct. 242 (2020) (finding that expert testimony was not needed for "simple arithmetic calculations").  As a result, Plaintiff's testimony is admitted and given due weight.

## IV.   CONCLUSIONS OF LAW AS TO DAMAGES

Plaintiff seeks to recover damages for the 2,479,710 shares to which he was entitled under the Subscription Agreement but did not receive.  For the reasons outlined below, Plaintiff has failed to meet his burden of showing a stable foundation for a reasonable estimate of the damages incurred.  As a result, Plaintiff's request for $19,621,000 in damages is denied and nominal damages in the amount of $1 are awarded.

"Proof of damages is an essential element of a claim for breach of contract under New York law."[7]  *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016). Under New York law, "an award of damages should place a plaintiff in the same position as that party would have been if the contract had not been breached."  *Rich-Haven Motor Sales, Inc. v. Nat'l Bank of New York City*, 558 N.Y.S.2d 91, 91 (2d Dep't 1990); *accord Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003); *Arach Specialty Ins. Co. v. APCO Indus., Inc.*, 2020 WL 6581000, at *6 (E.D.N.Y. Oct. 5, 2020).  Where "the breach involved 'the

---

[7] New York law applies because the Subscription Agreement provides that it is governed by New York law and because the parties assume that New York law applies.

deprivation of an item with a determinable market value, the market value at the time of the breach is the measure of damages.'" *Cole v. Macklowe*, 882 N.Y.S.2d 417, 419 (1st Dep't 2009); *accord LG Cap. Funding, LLC v. CardioGenics Holdings, Inc*, 787 F. App'x 2, 3 (2d Cir. 2019) (summary order).  Contrary to Plaintiff's contentions, these expectation damages -- not lost profits -- are the proper measure of damages.  *See Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 111 (2d Cir. 2007) (estimating general damages for a breach of contract and stating that, "[i]t has long been established in New York that a breaching party is liable for all direct and proximate damages which result from the breach"); *accord LG Capital Funding, LLC*, 787 F. App'x at 3 (applying New York law and finding that the district court erred by awarding what amounted to lost profits, rather than damages that would put the plaintiff in the "economic position [it] would have occupied") (internal quotation marks omitted).

"New York's damages rule is precisely the same when the breach of contract is nondelivery of shares of stock." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 262 (2d Cir. 2002) (alteration omitted); *accord Kaminsky v. Herrick, Feinstein LLP*, 870 N.Y.S. 2d 1, 9 (1st Dep't 2008).  The value of restricted stock should be discounted to reflect the restrictions on its sale.  *See Simon v. Electrospace Corp.*, 269 N.E.2d 21, 27 (N.Y. 1971) ("If restricted, then the market value would have to be discounted in some way."); *accord Jamil v. Solar Power, Inc.*, 230 F. Supp. 3d 271, 275 (S.D.N.Y.), *aff'd sub nom. Jamil v. SPI Energy Co.*, 713 F. App'x 42 (2d Cir. 2017), *as amended* (Nov. 29, 2017).  In addition, the value of stock should take into account its liquidity in the market; where stock is thinly traded, its value should be discounted. *See Davidowitz v. Partridge*, No. 8 Civ. 6962, 2010 WL 5186803, at *12 (S.D.N.Y. Dec. 7, 2010) (explaining that the trading value of the stock at issue was thin and, as a result, it was unlikely that "any significant number of shares" could be sold "without depressing the stock's

price"); *Kovens v. Paul*, No. 04 Civ. 2238, 2009 WL 562280, at *2, 5-7 (S.D.N.Y. Mar. 4, 2009) (analyzing the value of thinly traded stock in a breach of contract action). Additional factors, like the financial condition of the company, can impact the calculation of damages and help ensure the damages calculation is "grounded in reality." *See BrandAid Mktg. Corp. v. Biss*, No. 3 Civ. 5088, 2008 WL 190494, at *5-6 (S.D.N.Y. Jan. 22, 2008), *aff'd*, No. 08-0941-CV, 2009 WL 742077 (2d Cir. Mar. 23, 2009) (awarding $1 in nominal damages where the company had "liabilities far exceeding its assets" and eventually met an "abrupt demise"); *see also Pac. Life Ins. Co. v. The Bank of New York Mellon*, No. 17 Civ. 1388, 2021 WL 673479, at *8-9 (S.D.N.Y. Feb. 22, 2021) (striving to assess damages in the context of a hypothetical "but-for" the breach scenario, that is "grounded in reality" and avoids unfair windfalls).

A non-breaching party that has established the fact of damages by a preponderance of the evidence is entitled to market value damages to "the extent that they can be proven with reasonable certainty." *Process Am., Inc.*, 839 F.3d at 141 (internal citation and quotation marks omitted). While the "burden of uncertainty as to the amount of damages is upon the wrongdoer," the non-breaching party must first "show a 'stable foundation for a reasonable estimate' of the damages incurred as a result of the breach." *Id.* (applying New York law and citing *Freund v. Washington Square Press*, 314 N.E.2d 419, 421 (N.Y. 1974)); *accord Hollander Loader Company LLC v. FLSmidth A/S*, 769 F. App'x 40, 42 (2d Cir. 2019) (summary order) ("To prove general damages under New York law, the plaintiff must show (1) the fact or existence of damages to a 'reasonable certainty' and, if the fact or existence of damages is proven, (2) 'a stable foundation for a reasonable estimate' [of damages] incurred as a result of the breach."). Establishing a "stable foundation for a reasonable estimate" requires putting forth a plausible theory that amounts to something more than a speculative measure of damages. *Freund*, 314

N.E.2d at 421 (finding that Plaintiff failed to provide a "stable foundation for a reasonable estimate" of damages where Plaintiff's estimate of royalties was "speculative"); *Hollander Loader Company LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 481 (S.D.N.Y. 2018), *aff'd*, 769 F. App'x 40 (2d Cir. 2019) (applying New York law and rejecting Plaintiff's evidence of damages as "nothing more than speculative" where damages were based on "basic math" and "internal forecasts" rather than public financial statements).[8]

Here the *fact* -- but not the *amount* -- of damages has been established. The proper measure of the amount of damages is the market value of the 2,479,710 shares that Plaintiff did not receive, on the date of breach -- September 29, 2014. To meet his burden of providing a stable foundation for a reasonable estimate of damages, Plaintiff -- without the aid of an expert and acting *pro se* -- offers a simple explanation; he reasons that (1) but for Defendants' breach of the Subscription Agreement, the investors in the Offering would have collectively received an additional 12,985,988 shares, and (2) these additional shares would dilute the stock price by 17% (to $7.094), as they would represent a 17% increase in the number of shares.

---

[8] *See also Trainum v. Rockwell Collins, Inc.*, No. 16 Civ. 7005, 2018 WL 11220003, at *18 (S.D.N.Y. Feb. 26, 2018), *aff'd*, 765 F. App'x 514 (2d Cir. 2019) (applying New York law and declining to grant damages in part where plaintiff's spreadsheet calculations were unreliable and therefore did not provide a "stable foundation"); *Meda AB v. 3M Co.*, 969 F. Supp. 2d 360, 387 (S.D.N.Y. 2013) (with respect to a breach of contract claim under New York law, finding plaintiff's expert unpersuasive and holding that plaintiff "has not otherwise provided a stable or reasonable basis for assessing any damages"); *Davidowitz*, 2010 WL 5186803 at *11, 13 (S.D.N.Y. Dec. 7, 2010) (explaining that under New York law, where there were restrictions on sale and trading volume was thin, the market price would need to be discounted and finding that where plaintiff's proffered expert testimony as to damages was "obviously wrong," plaintiff had failed to meet his burden); *Esquire Trade & Finance, Inc., et al. v. CBQ, Inc.*, No. 3 Civ. 9650, 2009 WL 3756470, at *4 (S.D.N.Y. Nov. 5, 2009) (finding that it was "[p]laintiffs' burden to provide the Court with a reasonable means of and basis for calculating damages") (citing *Mehta v. New York City Dep't of Consumer Affairs*, 556 N.Y.S.2d 601, 602 (1st Dep't 1990); *BrandAid Mktg. Corp.*, 2008 WL 190494 at *5 (applying New York law and finding that plaintiff was entitled to nominal damages of $1 where it had "not offered any viable method for quantifying" the value of newly issued restricted shares).

Plaintiff's reasoning -- even liberally construed to raise the strongest argument it suggests -- does not provide a sufficiently stable foundation for estimating damages.  Plaintiff's valuation of the stock speaks only to *dilution*; it does not address other factors including the six-month restriction on the shares or the stock's thin trading and related illiquidity, the factors that precluded a summary judgment finding on damages.  Plaintiff asserts that estimating the impact of these other factors is impossible and, as a result, the Court should ignore them.  For example, on the issue of restriction, Plaintiff testified that "[t]here is no way to *a priori* calculate the effect of 'restriction,' which is an agreement based on a gamble; the stock price could decrease during the standard 6 month lock up, or increase (there is no way to tell)."  Plaintiff is correct that purchasing restricted stock is ultimately a gamble.  However, estimating the impact of this gamble on the market price of 6D Global Technologies stock is not about precisely forecasting what the market price of the stock will be on the date the restriction is lifted or looking at what the "actual economic conditions and performance were in light of hindsight."  *Oscar Gruss*, 337 F.3d at 196 (internal quotation marks omitted); *see also Kaminsky*, 870 N.Y.S. 2d at 9 (finding that "evidence of the subsequent market value of the shares was simply not germane").  Instead, the inquiry hinges on the extent to which the market risk associated with this uncertainty decreased the market price of 6D Global Technologies stock on September 29, 2014.  *See Simon*, 269 N.E.2d at 27 (explaining that the value of restricted stock "would have to be discounted in some way").  Plaintiff offers no reasonable basis for making this determination.  Defendant's expert Mr. Hinton credibly testified that no simple rule of thumb could be applied in this case involving a fragile company that is not well established.

Similarly, Plaintiff offers no reasonable basis for estimating the impact of liquidity.  During the trial, Plaintiff provided testimony on 6D Global Technologies share prices and

12

trading volumes on certain dates, to illustrate that increases in trading volume did not necessarily correlate with decreases in share prices and *vice versa*. Putting aside that Plaintiff's testimony muddied rather than clarified any basis for calculating the impact of liquidity, his illustration was flawed. Plaintiff's illustration failed to account for the direction of the trading that occurred on the dates to which he pointed and specifically, whether significant portions of 6D Global Technologies shares were *sold* on those dates.[9] It is well understood that efforts to sell large quantities of shares that the market is unable to absorb will push prices down. *See, e.g., Davidowitz*, 2010 WL 5186803 at *12. Plaintiff has provided no reasonable basis for calculating how much prices would decrease under the circumstances of this case; instead, he characterizes this calculation as "impossible" and "speculative in the extreme," and asserts that the Court, therefore, should ignore the impact of liquidity.

Plaintiff also offers no insight as to how the financial condition of 6D Global Technologies, which was on the brink of delisting, should impact the assessment of damages. Other courts have assessed the impact of factors like restrictions, liquidity, and the financial condition of the subject company, even in complicated cases. *See, e.g.*, *Davidowitz*, 2010 WL 5186803 at *11; *BrandAid Mktg. Corp.*, 2008 WL 190494 at *5. Plaintiff makes the untenable argument that such calculations are impossible and the Court therefore should ignore them. To do so would unquestionably result in an unwarranted windfall to Plaintiff.

This is not an instance in which the market price of 6D Global Technologies shares can serve as a stable foundation for a reasonable estimate of damages. In *Jamil v. Solar Power Inc.*,

---

[9] During trial, Mr. Hinton credibly testified that the analysis of the impact of high trading volume on prices depends on the direction of trades. "[W]hen you're trying to dispose of -- you know, sell a large volume of shares into the market, more shares than the market has – you know, can absorb easily, it starts to push down the prices. And that's well understood. You have to look at the direction of the trade."

the court, based on the record and without the benefit of trial, calculated the market value of 475,000 shares of restricted common stock that the defendant was contractually obligated, but failed to, transfer to the plaintiff. *Jamil*, 230 F. Supp.3d at 273. To estimate the impact of restrictions on the value of the shares, the court looked at the trading price on two separate dates of breach, calculated the extent to which the value of the shares dropped between those dates, assumed a steady rate of decrease to calculate the extent to which value dropped per day, and multiplied the per-day rate of decrease by the relevant holding periods. Putting aside whether it is appropriate to use the actual performance of stock (*i.e.*, hindsight) to calculate damages, *see Oscar Gruss & Son, Inc.*, 337 F.3d at 196, the calculation methods applied in *Jamil* do not work for this case. Here, a confluence of factors -- not just restrictions on the shares -- impacts the value of the stock; dilution that would occur because of the issuance of additional shares, the 6-month restriction on the shares, the liquidity of the shares and the stability of 6D Global Technologies are all factors that, based on the facts before this Court, would depress the value of the 2,479,710 shares that Plaintiff did not receive. The market price on the date of breach, even accepting *arguendo* Plaintiff's proposed method for calculating dilution, is not a sufficiently stable foundation for a reasonable estimate of damages.

While expert testimony is not *per se* required for a case of this nature, where the combined impact of factors including dilution, restriction, liquidity and stability of the subject company leads to a particularly complicated analysis, the practical reality may be that expert testimony is the only way to meet the burden of providing a sufficiently stable foundation for estimating damages. Here, Plaintiff did not retain an expert even when he was represented by counsel and otherwise made *no* effort to quantify, or provide a reasonable basis for quantifying, the impact of these factors (other than dilution), alone or together. Because Plaintiff has not

provided a sufficiently stable foundation for estimating damages, his request for $19,621,000 in damages is denied, and he is awarded $1 in nominal damages.  *See Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 976 F.3d 239, 248, n.10 (2d Cir. 2020) (citing *Hirsch Electric Co. v. Comm Servs, Inc.*, 536 N.Y.S.2d 141, 143 (2d Dep't 1988) ("[A]lthough the plaintiff has failed to demonstrate damages which would be recoverable at trial with respect to the lost profits claim, it is a well-settled tenet of contract law that even if the breach of contract caused no loss or if the amount of loss cannot be proven with sufficient certainty, the injured party is entitled to recover . . . nominal damages.").

Because the Court declines to grant Plaintiff's request for damages, it does not address Defendants' affirmative defense of waiver.

## V.   CONCLUSION

For the reasons stated above, Plaintiff's request for $19,621,000 in damages is denied. The Clerk of the Court is respectfully directed to enter judgment for Plaintiff in the amount of $1 in nominal damages and to close the case.

Dated:  March 31, 2021
        New York, New York

_____
LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE